No. 12-50589

IN THE

UNITED STATES COURT OF APPEALS

FOR THE NINTH CIRCUIT

UNITED STATES OF AMERICA,

    Plaintiff-Appellee,

       v.

GARY WHITE,

    Defendant-Appellant.

_____

GOVERNMENT'S ANSWERING BRIEF

APPEAL FROM
THE UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF CALIFORNIA

_____

ANDRÉ BIROTTE JR.
United States Attorney

ROBERT E. DUGDALE
Assistant United States Attorney
Chief, Criminal Division

CHRISTOPHER K. PELHAM (SBN 241068)
MACK E. JENKINS (SBN 242101)
Assistant United States Attorneys

   1400 U.S. Courthouse
   312 North Spring Street
   Los Angeles, California 90012
   Telephone: (213) 894-0610/2091
   Facsimile: (213) 894-4021
   Email: christopher.pelham@usdoj.gov
   Email: mack.jenkins@usdoj.gov

Attorneys for Plaintiff-Appellee
UNITED STATES OF AMERICA

**TABLE OF CONTENTS**

DESCRIPTION                                                          PAGE

TABLE OF AUTHORITIES.......................................... iii

I. ISSUES PRESENTED............................................. 1

II. STATEMENT OF THE CASE...................................... 2

    A.    NATURE OF THE CASE, COURSE OF THE PROCEEDINGS, AND
           DISPOSITION IN THE COURT BELOW....................... 2

    B.    JURISDICTION, TIMELINESS, AND BAIL STATUS........... 3

    C.    STATEMENT OF FACTS................................... 3

          1.    The Offense and the Indictment.................. 3

          2.    The Trial....................................... 4

          3.    Post-Trial Motions........................... 20

          4.    Sentencing................................... 21

III. SUMMARY OF ARGUMENT..................................... 32

IV. ARGUMENT.................................................. 34

    A.    THE GOVERNMENT PROVIDED SUFFICIENT EVIDENCE TO
           SUPPORT DEFENDANT'S CONVICTION FOR RACKETEERING
           CONSPIRACY.......................................... 34

          1.    Standard of Review........................... 34

          2.    The Government Provided Overwhelming Evidence
              That The Pueblo Bishops Was A Racketeering
              Enterprise Under Section 1961(4) And That
              Defendant Conspired And Agreed That The PBB
              Would Be A Racketeering Enterprise............. 36

          3.    The Government Provided Overwhelming Evidence
              that Defendant Conspired to Conduct, or
              Participate in the Conduct, of the Affairs of
              a Racketeering Enterprise Through a Pattern of
              Racketeering Activity........................ 42

    B.    SUFFICIENT EVIDENCE SUPPORTS DEFENDANT'S CONVICTION
           FOR DRUG TRAFFICKING CONSPIRACY..................... 46

    C.    THE DISTRICT COURT'S GUIDELINES FINDINGS WERE
           OVERWHELMING SUPPORTED BY THE EVIDENCE AT TRIAL..... 50

i

## TABLE OF CONTENTS

DESCRIPTION                                                              PAGE

    1.   Standard of Review............................ 51

    2.   Recorded Video Evidence and Trial Testimony
        Clearly Demonstrated Defendant's Leadership in
        the Pueblo Bishops........................... 52

    3.   Defendant Made Several Credible Threats and
        Foreseeable Violence Occurred After the Gang
        Meeting...................................... 54

    4.   Defendant's Violent Criminal History Warrants
        Criminal History Category VI................. 56

  D.   THE DISTRICT COURT DID NOT COMMIT PROCEDURAL ERROR.. 58

    1.   Standard of Review............................ 58

    2.   Defendant Has Not Alleged, Much Less Proven,
        Any Procedural Error......................... 58

  E.   DEFENDANT'S SENTENCE WAS SUBSTANTIVELY REASONABLE... 60

    1.   Standard of Review............................ 60

    2.   The District Court Did Not Abuse its
        Discretion in Imposing a 14-Year Sentence on a
        Veteran Gang Leader Who Advocated for Violence
        and Drug Trafficking and Had a Deadly Criminal
        Past......................................... 61

V. CONCLUSION.............................................. 63

STATEMENT OF RELATED CASES................................. 65

## TABLE OF AUTHORITIES

<u>**FEDERAL CASES**</u>                                                            <u>**PAGE**</u>

Alleyne v. United States,
    133 S.Ct. 2151 (2013)....................................... 59

Apprendi v. New Jersey,
    530 U. S. 466 (2000)........................................ 59

Boyle v. United States,
    556 U.S. 938 (2009)............................... 37, 38, 39

Harris v. United States,
    536 U.S. 545 (2002)........................................ 59

Howard v. America Online Inc.,
    208 F.3d 741 (9th Cir. 2000)............................... 43

Jackson v. Virginia,
    443 U.S. 307 (1979)........................................ 35

Kotteakos v. United States,
    328 U.S. 750 (1946)........................................ 49

McMillan v. Pennsylvania,
    477 U.S. 79 (1986).................................... 54, 59

Odom v. Microsoft Corp.,
    486 F.3d 541(9th Cir. 2007) ............................... 38

Salinas v. United States,
    522 U.S. 52 (1997).................................... 35, 43

United States v. Armstead,
    552 F.3d 769 (9th Cir. 2008)............................... 51

United States v. Bingham,
    653 F.3d 983 (9th Cir. 2011)............................... 43

United States v. Booker,
    543 U. S. 220 (2005)....................................... 59

United States v. Brown,
    161 F.3d 256 (5th Cir. 1998)............................... 48

United States v. Carty,
    520 F.3d 984 (9th Cir. 2008)..................... 57, 60, 61

iii

## TABLE OF AUTHORITIES (Cont.)

**FEDERAL CASES (Cont.)**                                    **PAGE**

United States v. Daychild,
  357 F.3d 1082 (9th Cir. 2004)............................. 47

United States v. Delgado,
  357 F.3d 1061 (9th Cir. 2004)............................. 50

United States v. Donelson,
  695 F.2d 583 (1982)...................................... 54

United States v. Dota,
  33 F.3d 1179 (9th Cir. 1994)............................. 41

United States v. Duenas,
  691 F.3d 1070 (9th Cir. 2012)......................... 47, 49

United States v. Evans-Martinez,
  530 F.3d 1164 (9th Cir. 2008)......................... 58, 60

United States v. Fernandez,
  388 F.3d 1199 (9th Cir. 2004).................... 35, 42, 48

United States v. Gall,,
  552 U.S. 38 (2007)....................................... 60

United States v. Graf,
  610 F.3d 1148 (9th Cir. 2010)......................... 58, 61

United States v. Guzman,
  849 F.2d 447 (9th Cir. 1988)............................. 41

United States v. Harris,
  695 F.3d 1125 (10th Cir. 2012)........................... 38

United States v. Hinkson,
  585 F.3d 1247 (9th Cir. 2009)................. 51, 54, 55, 57

United States v. Lambert,
  498 F.3d 963 (9th Cir. 2007)............................. 51

United States v. Laverdure,
  385 Fed. Appx. 737 (9th Cir. 2010)...................... 62

United States v. Luong,
  393 F.3d 913 (9th Cir. 2004)............................. 34

United States v. Morgan,
  595 F.2d 1134 (9th Cir. 1979)............................. 54

**TABLE OF AUTHORITIES (Cont.)**

**FEDERAL CASES (Cont.)**                                      <u>PAGE</u>

United States v. Pimentel,
    346 F.3d 285 (2nd Cir. 2003)............................... 47

United States v. Reed,
    575 F.3d 900 (9th Cir. 2009).............................. 46

United States v. Ressam,
    679 F.3d 1069(9th Cir. 2012).............................. 60

United States v. Stargell,
    ___ F.3d ___, 2013 WL 5645171 (9th Cir. 2013)............. 35

United States v. Starnes,
    644 F.2d 673 (7th Cir. 1981).............................. 40

United States v. Stewart,
    420 F.3d 1007 (9th Cir. 2005)............................. 34

United States v. Suarez,
    682 F.3d 1214 (9th Cir. 2012)..................... 41, 46, 53

United States v. Suggs,
    374 F.3d 508 (7th Cir. 2004).............................. 48

United States v. Swiderski,
    593 F.2d 1246 (D.C. Cir. 1978)............................ 38

United States v. Tille,
    729 F.2d 615 (9th Cir. 1984).............................. 40

United States v. Turkette,
    452 U.S. 576 (1981)............................... 36, 37, 38

United States v. Wilson,
    116 F.3d 1066 (5th Cir. 1997)............................. 48

United States v. Yarbrough,
    852 F.2d 1522 (9th Cir. 1988)........................ 43, 44

**FEDERAL STATUTES**

18 U.S.C. § 924(c)........................................... 53

18 U.S.C. § 924(c)(1)(A)...................................... 4

18 U.S.C. § 1961(4)................................... 4, 36, 37

18 U.S.C. § 1961(5).......................................... 42

## TABLE OF AUTHORITIES (Cont.)

**FEDERAL STATUTES (Cont.)**                                    **PAGE**

18 U.S.C. § 1962(c)......................................... 35

18 U.S.C. § 1962(d).......................................... 3

18 U.S.C. § 3231............................................. 3

18 U.S.C. § 3742(a).......................................... 3

21 U.S.C. § 846........................................ 3, 4, 46

21 U.S.C. § 860.............................................. 3

28 U.S.C. § 1291............................................. 3

**FEDERAL RULES**

Fed. R. App. P. 4(b)......................................... 3

Fed. R. App. P. 28(a)(9)(A)................................. 59

**SENTENCING GUIDELINES**

USSG § 3B1.1................................................ 52

USSG § 3B1.1(a)............................................. 52

USSG § 4A1.1................................................ 57

No. 12-50589

IN THE

UNITED STATES COURT OF APPEALS

FOR THE NINTH CIRCUIT

UNITED STATES OF AMERICA,

     Plaintiff-Appellee,

        v.

GARY WHITE,

     Defendant-Appellant.

---

## GOVERNMENT'S ANSWERING BRIEF

### I.

### ISSUES PRESENTED

A.    Whether there was sufficient evidence to support defendant's racketeering conspiracy conviction?

B.    Whether there was sufficient evidence to support defendant's drug trafficking conspiracy conviction?

C.    Whether the district court abused its discretion by imposing specific offense characteristics and a criminal history variance based on overwhelming trial evidence and defendant's violent and understated criminal past?

D.    Whether the district court committed procedural error by considering factors it had found sufficiently proven and relevant to determining defendant's guidelines range?

E.    Whether it was substantively reasonable to sentence an active gang leader who advocated for violence at a gang meeting, and whose prior convictions included manslaughter and attempted murder, to a term of 168 months' imprisonment?

## II.

### STATEMENT OF THE CASE

A.    NATURE OF THE CASE, COURSE OF THE PROCEEDINGS, AND DISPOSITION IN THE COURT BELOW

Defendant-appellant Gary White, also known as "Big J-Killa" ("defendant"), appeals his conviction and 168-month sentence imposed by the district court (the Honorable S. James Otero, United States District Judge) following a 21-day jury trial.

On August 18, 2010, a federal grand jury charged defendant with participating in a racketeering conspiracy and drug trafficking.  (CR 4.)[1]  The government filed a Second Superseding Indictment (the "Indictment") on May 2, 2012.  (CR 1176, ER

---

[1] "ER" refers to the Excerpt of Record file by defendant, "AOB" refers to Appellant's Opening Brief, "GER" refers to the Government's Excerpt of Record, and "RT" refers to Reporter's Transcripts.  All such references are followed by the applicable page number.  "CR" refers to the Clerk's Record in the district court and is followed by the docket number.  "PSR" refers to the Presentence Investigation Report, which was filed under seal.

2

125.)  On July 16, 2012, a jury convicted defendant of racketeering conspiracy, in violation of 18 U.S.C. § 1962(d) (count one); drug trafficking conspiracy, in violation of 21 U.S.C. § 846 (count five); and distribution of a controlled substance within 1,000 feet of a public housing authority, in violation of 21 U.S.C. § 860 (count sixteen).  (CR 1477; GER 1417-21.)  On November 19, 2012, the district court sentenced defendant to 168 months' imprisonment, an eight-year period of supervised release, and a mandatory special assessment of $300. (RT 11/19/12: 47-53; CR 1878.)

B.    JURISDICTION, TIMELINESS, AND BAIL STATUS

The district court had jurisdiction under 18 U.S.C. § 3231. This Court has jurisdiction under 18 U.S.C. § 3742(a) and 28 U.S.C. § 1291.  The district court entered the judgment and commitment order on December 4, 2012.  (CR 1878; ER 119.)  On December 17, 2012, defendant timely filed a notice of appeal. (CR 1899; ER 124.)  See Fed. R. App. P. 4(b).  Defendant is in custody serving the sentence imposed in this case.

C.    STATEMENT OF FACTS

1.    The Offense and the Indictment

Defendant was charged in count one of the Indictment with being a leading member of the Pueblo Bishops Bloods street gang (hereinafter the "PBB" or the "Pueblo Bishops").  (CR 1176; ER 125.)  The indictment alleged that the PBB constituted "an

3

'enterprise' as defined by Title 18, United States Code, Section 1961(4)." (ER 126.) The Indictment further alleged that defendant, and others, "conspired . . . to conduct and participate, directly and indirectly, in the conduct and affairs of that enterprise through a pattern of racketeering activity" that included drug trafficking. (ER 133.) Defendant was charged in count five with "conspir[ing] and agree[ing] with [others] to knowingly and intentionally (i) possess with intent to distribute and (ii) distribute" controlled substances, including heroin, in violation of Title 21, United States Code, Sections 846 and 841(a)(1). (ER 153.) Defendant was charged in count nine with possessing a firearm in furtherance of, and using/carrying a firearm during and in relation to, a crime of violence and a drug trafficking crime, in violation of Title 18, United States Code, Section 924(c)(1)(A). (ER 158.) Defendant was charged in count sixteen with distributing heroin within 1,000 feet of a public housing facility. (ER 161-62.)

> 2. The Trial

Trial commenced on June 5, 2012 against defendant and co-defendants Jermaine Hardiman and Anthony Gabourel. (ER 1376.)

> > a. Background and Description of the Pueblo Bishops Enterprise

The government's witnesses described the Pueblo Bishops gang as an interrelated and organized group of young men with a

4

shared identity, distinct culture, and criminal purpose. Los Angeles Police Department ("LAPD") officer Joel Ruiz testified as the government's expert gang witness. (RT 6/11/12: 176-178; GER 442-444.) Officer Ruiz was a 12-year LAPD veteran who had been assigned to LAPD's Newton Division (the LAPD station that patrols the area controlled by the Pueblo Bishops) for over ten years. (Id.) Officer Ruiz described the Pueblo Bishops as a Bloods gang that has dominated the Pueblo Del Rio Housing Projects ("PDRHP" or "projects") in South Los Angeles. (RT 6/12/12: 7-10; GER 476-79.) He explained that the gang claims, as its territory, the entirety of the PDRHP and portions of the surrounding neighborhood. (Id.) He described the gang as consisting of several "subsets" that fall within the gang's broader identity. (RT 6/12/12: 13-14; GER 482-83.) He also described the gang as having a long-standing and pervasive culture manifested by common graffiti patterns (RT 6/12/12: 35-37; GER 504-506), clothing (RT 6/12/12: 43; GER 512), hand signals (RT 6/12/12: 48; GER 517), and tattoos (RT 6/12/12: 44; GER 513).

Officer Ruiz described the gang as having a seniority-based hierarchy, with the term "OG's," or "original gangsters," applying to older members and the term "YG's," or "young gangsters," to younger members. (RT 6/12/12: 70-71; GER 539-40.) He explained that YG's can "rise in the gang [and]

5

increase their rank . . . by putting in work and showing their loyalty to the gang, whether it be marking the Pueblos or the outlying areas with graffiti, narcotics sales, robberies, shootings, putting in work for the gang." (RT 6/12/12: 71; GER 540.)  Cooperating witness Anthony Hill similarly testified that OG's commanded great respect within the gang, even to the degree that younger members could be "disciplined" for disobeying an OG's instructions.  (RT 6/11/12: 25-26; GER 291-92.)

Based on his ten years of experience, Officer Ruiz summarized the common purpose of the Pueblo Bishops:

> [The] common purposes of the [Pueblo Bishops] gang was to recruit new members, whether it be family members, friends.  The number – **the more number of gang members there are, the more power there is to control territory, to control drug sales, not only within the Pueblo projects, but also its surrounding areas**.

(RT 6/12/12: 32; GER 501) (emphasis added.)  Officer Ruiz explained that Pueblo Bishop members were particularly focused on preserving and enhancing the gang's reputation, both within the PDRHP and outside of it among Los Angeles' broader gang community, stating that:

> reputation for the Pueblos was held in high regards.  They are a respected gang.  They are looked at as a gang who's going to put in work, commit robberies, go out, eliminate rival gang members, to let other rival gang members know they are a force to be reckoned with.

(RT 6/12/12: 33; GER 502.)  Officer Ruiz explained that the gang has a particularly aggressive and historical animus against

neighboring Hispanic gangs, including the 38th Street gang.  (RT
6/12/12: 88; GER 557.)  According to Officer Ruiz, within the
PDRHP, the Pueblo Bishops use their violent reputation to
"create an atmosphere of fear within the projects . . . when
they control the projects, that's when residents are going to be
fearful to call the police.  [They] mostly target[] Hispanics
within the projects [and] target[] Hispanic businesses during
robberies that lie on the borders of the projects."  (RT
6/12/12: 32-33; GER 501-502.)

    The government presented several cooperating witnesses who
were once leaders and members of the Pueblo Bishops.  These
witnesses confirmed Officer Garcia's testimony about the
structure and identity of the gang.  Hill testified that he
helped found the Pueblo Bishops around 1976.  (RT 6/8/12: 191-
92; GER 211-12.)  Hill testified that when he and several other
young men first started the gang, they did so with the intention
of "protect[ing] the [Pueblo Del Rio Housing Projects community
from] other people that came through doing what they wanted to
do."  (RT 6/8/12: 194; GER 214.)  He then explained, however,
that the rise of crack cocaine trafficking led to an increase in
violent activity by Pueblo Bishops, including violent actions
against rival gang members.  (RT 6/8/12: 217; GER 237.)  Hill
testified that as the gang grew in numbers, new members had to
"put in work," that is, carry out violence against other gangs,

7

before being initiated.  (RT 6/8/12: 236-37; GER 256-57.)  New
members also had to be "jumped on" for initiation, that is,
endure a physical attack by existing members.  (RT 6/8/12: 238;
GER 258.)  Hill emphasized that membership in the Pueblo Bishop
gang was distinct from residency within, and familiarity with,
the PDRHP; Hill made clear that not every individual with ties
to the projects was also involved in the criminal enterprise of
the Pueblo Bishops gang.  (RT 6/8/12: 203; GER 223.)

Cooperating witness John Terrell testified similarly.  He
explained that he became a member of the gang in the mid-1980's,
during which time he would observe Pueblo Bishop gang members
wearing matching clothes and flashing similar hand signals.  (RT
6/14/12: 13-14; GER 731-32.)  He testified that he acquired
tattoos in order to mark his initiation into the gang.  (RT
6/14/12: 14; GER 732.)  Terrell stated that as a young member of
the gang, he and other members would "patrol the neighborhood
with weapons [and] be a look-out for rival gang members, stuff
of that nature basically."  (RT 6/14/12: 17; GER 735.)  He also
described how he would "jump [new initiates] into the gang"
through a process of physical confrontation.  (RT 6/14/12: 18;
GER 736.)  Cooperating witness Jose Leon repeated many of these
allegations when he testified.  Leon testified that he became a
Pueblo Bishop member in 2006, and was at that time a resident of
the PDRHP.  (RT 6/19/12: 106-08; GER 826-28.)  He recalled that

8

he was violently initiated into the gang as a recruit.  (RT 6/19/12: 122-23; GER 842-43.)  He also recalled that he wore certain clothing, and was pressured to obtain tattoos, once he became a member of the gang.  (RT 6/19/12: 125; GER 845.)

The witnesses testified that the gang held various functions and gatherings to reinforce the members' common objects and identity.  Officer Ruiz testified that the Pueblo Bishops would hold meetings among one other to "[e]stablish what's going on in the gang, [discuss] what needs to be done within the gang, within the neighborhood, whether more narco[tics] sales need to be made, more guns in the neighborhood.  (RT 6/12/12: 72; GER 541.)  Hill recalled that beginning in 1988, he personally attended about ten gang meetings with other Pueblo Bishop members.  (RT 6/8/12: 233; GER 253.)  Hill testified that members would discuss pooling their money to purchase drugs and guns at these meetings.  (Id.)  He also explained that members would often alert one another to circumstances that might draw exceptional police or rival gang attention to the projects.  (RT 6/11/12: 15-16; GER 281-82.)  Hill also testified that beginning in the 1980's, the gang would use the day of May 2 to celebrate "Hood Day," or a celebration of the gang's identity.  (RT 6/11/12: 18; GER 284.)  Hill explained that the purpose of PBB Hood Days was to "celebrate the [gang's] history, celebrate fallen soldiers that had passed,

9

and celebrat[e] each other because we didn't know who was going to be dead next year." (Id.) Cooperating witness Arthur Maiden testified that Hood Days were meant to "celebrate . . . the street, 52nd [one of the major streets crossing the gang's territory]." (RT 6/14/12: 190-91; GER 804-05.)

The trial defendants' own witnesses also characterized the Pueblo Bishops as a long-existing criminal association with a common identity. For instance, defendant's expert witness, Dr. Malcolm Klein (a psychologist and author of numerous books on gangs), testified that the Pueblo Bishops are a "traditional street gang" (RT 7/2/12: 128; GER 1224) characterized by a "long-term" existence (id.), animus against rival gangs (RT 7/2/12: 129; GER 1225), a predefined territory/geography (id.), a value system allowing members to promote themselves in reputation (RT 7/2/12: 130; GER 1226), and the use of common catchphrases and hand signals (RT 7/2/12: 131; GER 1227).

Co-defendant Jermaine Hardiman called witness and co-defendant Marquis Edwards, who had been previously convicted in this case of racketeering and murder conspiracy. (RT 7/3/12: 5-6; GER 1255-56.) Edwards identified himself as a Pueblo Bishop member who was still loyal to the gang. (RT 7/3/12: 15; GER 1265.) Edwards admitted that the gang was broken up into an age-based hierarchy of OG's and YG's. (RT 7/3/12: 21; GER 1271.) Edwards admitted that he considered "active" members of

10

the gang those who "commit[ed] criminal acts on behalf of the gang" and "[attended] gang meetings." (RT 7/3/12: 22-23; GER 1272-73.) Edwards testified that he committed a murder of someone he thought was a rival gang member in an effort to avenge an attack on the Pueblo Bishops. (RT 7/3/12: 24-25; GER 1274-75.) He admitted that he carried out the murder with other Pueblo Bishops. (Id.) Edwards testified that, in the course of that incident, he chased down and shot a 15-year-old boy in the head, and continued shooting at the victim even after the victim fell to the ground. (RT 7/3/12: 25; GER 1275.) Edwards admitted that after the murder, he felt that he had "put in work for the Pueblo Bishops to get back at" the rival gang. (RT 7/3/12: 24; GER 1274.) Edwards said that he would never cooperate with the government against other members of the gang. (RT 7/3/12: 30; GER 1280.) Edwards admitted that he had talked to other Pueblo Bishops, after his indictment, in an effort to identify potential "snitches." (RT 7/3/12: 39-40; GER 1289-90.) While Edwards insisted that "there were no rules in the Pueblo Bishops Bloods gang," he immediately thereafter admitted his expectation that if a rival gang member were ever to be caught selling drugs in the PDRHP, "he'd get killed [by] Pueblo Bishop Blood members." (RT 7/3/12: 48; GER 1298.)

In addition to the above testimony, the government presented, as Exhibit 52, a surreptitiously-made audio/video

11

recording of a meeting of the Pueblo Bishops that took place at the PDRHP on August 22, 2009. (RT 6/7/12: 109-112, 6/25/12: 74, 79; GER 109-112, 1046-1051.) Cooperating witness Leon testified that members of the gang called the meeting in order to discuss incursions by a rival gang into the Pueblo Bishops' territory. (Id.) Around 30 gang members were present during that meeting. (RT 6/25/12: 76; GER 1048.) During the recording, several OG members, including defendant, could be heard speaking about gang business and issues. (RT 6/25/12: 77-81; GER 1049-1053.) These OG's started the meeting by exhorting the gathered members to violently protect the gang's territory from rival gangs. (RT 6/25/12: 80-82; GER 1052-54.) Co-defendant Lee Henderson (who pleaded guilty before trial) spoke early in the meeting about how rival Hispanic gangs were steadily encroaching upon the Pueblo Bishops' domain:

> We gotta do our homework homie, on the real. These mutha-fuckin' Mexicans in the hood tryin' to do they thang. They, they sparkin' us. They ain't just moved over here, they been over here . . . It's more of them than there is us, but that don't mean shit. That don't mean nothin' on the real.

(Trial Exhibit 52; GER 1447-48.) Co-defendant Kevin Eleby (who went to trial in a second phase of this case) concurred:

> This shit around here, this is our neighborhood. It's not nobody else's. Don't nobody get to do what the fuck they wanna do over here. Unless we say so. You, me, all of us. It gotta be one say so . . . We gotta start stoppin' all this bullshit that's runnin' through here, all these mutha-fuckin' gangs in here.

12

This is ours man, and this I mean that is what I grew
up in from Pueblos, Pueblo Bishops.

(Trial Exhibit 52; GER 1450.)  Later, Eleby stated

I'm here because I'm with whatever is gonna go down
today.  Whatever it is about.  It's about us
protecting home, man.  This is home.  It's what we
call ourselves doin' n***s run around here with red
rags, red belts, and you know like they super hard.
Well, let's start protecting this.

(Trial Exhibit 52; GER 1452.)  Defendant himself also made

several extended comments during the meeting, emphasizing to the

others the importance of maintaining the gang's territorial

identity through violence and firearms:

Look security man, we keep losin' . . . let's start
catchin' mutha-fuckers if a mutha-fucker come over
here.  First of all blood, I'm'a say this, I don't
sell drugs, but I love projects.  N****s, it's
supposed to be a gun on every corner, period.  Every
day.  Every day.  Every day . . . There's n****s out
here till two or three in mornin' with nothin', with
nothin', you know what I'm sayin?  I'm talking 'bout .
. . our security, man, we losin', we losin'.

(Trial Exhibit 52; GER 1448-48.) (emphasis added.)  Defendant

also said:

So we most definitely gotta close that security, man,
on the real.  Quit lettin' mutha-fuckers come in here
and just have they way, man.

(Trial Exhibit 52; GER 1449.)

Later in the meeting, members began talking about

protecting the gang's economic interests and the fact that too

many non-Pueblo Bishops and non-Pueblo associates (including

women) had been selling drugs in the projects.  Defendant

13

exclaimed "it's dangerous out here [selling drugs] and all these bitches [women selling drugs in the projects] – you better just find a job.  Real talk."  (Trial Exhibit 52; GER 1473.)  Co-defendant Henderson concurred, and emphasized the importance of the Pueblo Bishops' drug sale monopoly over the PDRHP:

> Look, this our money.  Look, everybody that is out
> here right now.  This is our money.

(Trial Exhibit 52; GER 1473.)  Defendant and co-defendant Henderson both sharply criticized the existence of interlopers encroaching upon that monopoly.  Defendant exclaimed "fuck these bitches [referring to non-Pueblo Bishop drug dealers in the projects] . . . elbow them hos in the mouth.  You don't supposed to be out here anyway," to which co-defendant Henderson replied "if the sale is going to a mutha-fucker, slap her the fuck up. You do it anyway.  Stop the [drug] sales from goin' to these hoes."  (Trial Exhibit 52; GER 1472.)

b.    The Pueblo Bishops' Criminal Activities

The witnesses testified that criminal and racketeering activity were an integral part of the gang's culture and identity.  Cooperating witness Maiden testified that when he became a member of the gang, he engaged in "robberies, shootings, stuff like that" because he wanted to "gain more rep[utation] . . . to the hood [referring to the Pueblo Bishops] and myself.  Status to myself."  (RT 6/14/12: 176; GER 790.)

14

Maiden explained that while no one in the gang ever explicitly instructed or ordered him to carry out criminal acts for the gang, he knew that doing so (such as through "putting in work") would "increase [his] reputation in the gang." (RT 6/14/12: 178; GER 792.) In fact, Maiden recalled a specific instance in which a gang member was "disciplined" for "not putting in enough work." (Id.) Cooperating witness Jamal Payne repeated these points, and testified that "putting in work" in the form of killing rival gang members was the most prized activity among Pueblo Bishops. (RT 6/13/12: 34; GER 649.) Payne admitted that he had taken part in several shootings and murders on behalf of the gang, and he testified that he believed that his participation enhanced his reputation within the Pueblo Bishops. (RT 6/13/12: 36-37; GER 651-52.)

The witnesses testified that the Pueblo Bishops carry out extensive and coordinated drug activity within the PDRHP. Officer Ruiz testified that Pueblo Bishop members would routinely and openly sell drugs on the streets criss-crossing the PDRHP. (RT 6/12/12: 19; GER 488.) Witness Maiden, echoing several other cooperating witnesses, recalled that on an average day between 2003-2007, he would see about ten different gang members selling drugs in the projects, with each one interacting with about a dozen customers. (RT 6/14/12: 204-05; GER 818-19.) Officer Ruiz also explained that Pueblo Bishops would assist one

15

another in selling drugs by helping one another evade law
enforcement and rival gang members.  Officer Ruiz testified
that, during his patrol experience in the PDRHP, he would
observe Pueblo Bishop members "engaged in counter-surveillance
[by] standing on the block [and] notifying other gang members
that the police are coming.  They'll refer to police cars with
the lights on top as 'tops.'"  (RT 6/12/12: 83-84; GER 552-53.)
He explained "I've heard whistling . . . let[ting] other gang
members know that the police are coming in."  (RT 6/12/12: 84;
GER 553.)  Witness Leon affirmed this when he testified about a
rule among the gang members that "if the cops are coming to the
projects and a bunch of gang members are selling drugs . . .
Pueblo Bishops should alert other Pueblo Bishops of that fact."
(RT 6/19/12: 130; GER 850.)

Officer Ruiz explained that Pueblo Bishop members would
exclude all outsiders who were unassociated or unaffiliated with
the gang from carrying out drug sales within the PDRHP.  (RT
6/12/12: 34.)

> The rule is, if they're not a Pueblo Bishop, an
> associate, or have any ties to the Pueblo Bishops,
> **there is not going to be an outsider selling narcotics
> within the projects.**  You're not going to find Blood
> Stone Villains, 38th Street gang members, Barrio
> Mojados, any of those other gangs coming in and
> setting up shop within the Pueblo Bishops, because
> that's their territory, that's their money, that's how
> they make their living is through the drug sales.

16

(RT 6/12/12: 34-35; GER 503-04) (emphasis added.)  Officer Ruiz testified that in all of his experience conducting patrol of the PDRHP and the Newton Division, he had "never arrested an outside gang member for narcotics [offenses] in the projects."  (RT 6/12/12: 35; GER 504.)  Cooperating witness Anthony Hill corroborated this by testifying that in or around 1985, Pueblo Bishop members established an exclusive drug-selling territory around the projects, so that only "Pueblo Bishops or their associates could sell drugs in the projects."  (RT 6/11/12: 12; GER 278.)  In order to enforce that rule, Pueblo Bishop members would, when encountering outsiders attempting to sell drugs in the PDRHP, "run them off . . . or rob them, have them robbed, or something like that."  (Id.)  Hill testified that members of the gang would sometimes even target unaffiliated drug dealers:

> If a certain person was selling drugs, and we didn't benefit from it, or [other Pueblo Bishop members] didn't benefit from it . . . we would pinpoint to go after them.

(RT 6/11/12: 14; GER 280.)

Cooperating witness Hill testified that the Pueblo Bishops monopolize other forms of criminal activity, beyond drug trafficking, within the projects.  Hill testified that Pueblo Bishop members would "beat down" unaffiliated outsiders who committed robberies within the PDRHP.  (RT 6/8/12: 206; GER 226.)  Hill explained that Pueblo Bishops enforced this

17

restriction against outsiders because "they was taking money out of the Projects [and] they wasn't one of us." (Id.) Cooperating witness Leon testified about robberies that he saw Pueblo Bishops carry out within the projects. (RT 6/19/12: 168-71; GER 888-891.)

### c. Defendant's Involvement in the Pueblo Bishops

Witness Hill testified that defendant joined the Pueblo Bishops shortly after the group's founding, in the early 1980's. (RT 6/8/12: 196-97; GER 216-17.) Hill explained that defendant had "a lot" of family members in the gang. (RT 6/11/12: 23; GER 289.) Witness Leon testified that he knew defendant to be a Pueblo Bishop and described defendant as an "OG," or an original, high-ranking member. (RT 6/19/12: 136; GER 856.) Maiden testified that he recalled attending a gang meeting in which defendant told members of the group of the need to "protect the hood." (RT 6/14/12: 190; GER 804.)

At trial, the jury heard substantial evidence that defendant, as a Pueblo Bishop member, conspired with others to accomplish the goals of distributing controlled substances and carrying out other criminal activities in the projects. First, defendant took part in the Pueblo Bishops' overall project of protecting and buttressing the gang's territorial boundaries for the purpose of protecting its criminal activities therein. As

18

discussed above with respect to Trial Exhibit 52, defendant was recorded in a gang meeting exhorting other members to arm themselves and to protect the gang's boundaries. See Trial Exhibit 52 (GER 1448) ("N****s, it's supposed to be a gun on every corner, period. Every day. Every day. Every day.")

Second, defendant himself sold drugs within the area controlled by the Pueblo Bishops, indicating that he took advantage of the gang's territorial monopoly and mutual assistance. Witness Leon testified that he saw defendant sell drugs at Slauson Park, an area known to the witness as a place from which other Pueblo Bishops sold heroin. (RT 6/19/12: 195; GER 915.) Witness Leon testified that he saw defendant hide drugs there as well. (RT 6/19/12: 202-03; GER 922-23.) Leon said that he had previously sold defendant heroin "like three times . . . an ounce each time." (RT 6/19/12: 198-99; GER 918-19.) FBI Special Agent Michael Brown testified that, during surveillance operations in the underlying investigation, he also saw defendant carry out hand-to-hand heroin sales from that park. (RT 7/2/12: 30-32; GER 1126-28.) Witness Leon also testified about a government exhibit, in the form of an intercepted phone call, in which defendant asked Leon for "five to ten pounds" of marijuana. (RT 6/19/12: 200-202; GER 920-22.) Investigators also conducted two "controlled" purchases of heroin from the defendant on June 17 and June 22, 2010. (RT

19

6/7/12: 97-109; RT 7/2/12: 44-46, 79-84; Trial Exhibit 288; GER
GER 97-109, 1140-1142, 1175-1180.)  In these transactions, an
FBI informant, while fitted with audio and video recording
equipment, purchased heroin from defendant from within the area
controlled by the Pueblo Bishops gang.  (Id.; RT 7/3/12: 67-70;
Trial Exhibit 86; GER 1317-20.)

Third, witnesses testified that defendant carried out
robberies in connection with his gang status.  Witness Leon
testified about occasions in which defendant asked Leon "whether
[Leon] knew of any drug stashes to rob."  (RT 6/25/12: 9; GER
981.)  The witness testified that defendant asked the witness
"if I know somebody that got drugs that he could rob [sic]."
(RT 6/19/12: 205; GER 925.)  The witness recalled that this
occurred "like four times, three times."  (Id.)  Witness Hill
recalled that defendant would admit his robbery activities to
him.  (RT 6/8/12: 222; GER 242.)  Hill recalled an instance in
which defendant asked Hill to train one of defendant's sons in
how to do robberies.  (RT 6/8/12: 222-23; GER 242-43.)

### 3.  Post-Trial Motions

Defendant filed a motion for acquittal on August 22, 2012.
(CR 1599; GER 1505.)  In it, defendant argued that the
government failed to admit sufficient evidence to prove

20

defendant's liability under Counts One and Five.[2]  (Id.)  On
October 5, 2012, the district court denied this motion.  (CR
1766; GER 1515.)

    4.   Sentencing

       a.   The Parties' Positions

On October 9, 2012, the United States Probation Office
("USPO") filed its Presentence Investigation Report ("PSR") and
calculated defendant's guidelines as follows:

| | |
|---|---|
| Base Offense Level<br>(§ 2E1.1(a)(1)) | 19 |
| Role Enhancement<br>(§ 3B1.1) | +3 |
| Total Offense Level | 22 |

(PSR ¶¶ 77-99.)  The PSR placed defendant in criminal history
category IV.  (PSR ¶¶ 117-20.)  Thus, defendant's advisory
guidelines range was 63 to 78 months' imprisonment. (PSR ¶ 158.)
The PSR also detailed defendant's criminal history, which
included convictions for the following:

- Fighting (PSR ¶¶ 104-05);

- Voluntary manslaughter:  According to the LACPD report,
  two victims were murdered and a third was shot and
  wounded in retaliation for stealing drugs and money.

---

[2] Defendant did not at trial, and does not here, challenge the
sufficiency of the evidence supporting his conviction under
count sixteen (distribution of controlled substances near a
housing project).

[Defendant's] co-defendant gathered [defendant] and two co-defendants to confront the victims. They walked to an apartment where the victims were located. One victim was shot and killed as he sat in a car outside the apartment. The other victim was shot and killed inside the apartment. The third victim was shot and wounded inside the apartment. Defendant also violated parole on this charge. (PSR ¶¶ 106-07);

- Attempted murder and attempted second degree robbery: According to the LACPD report, the victim, an off-duty Los Angeles Police Department (LAPD) officer employed as a security guard, was opening a check cashing business when [defendant] and his co-participant attempted to rob the business. [Defendant] and his co-participant forced their way into the lobby of the business and exchanged gunfire with the victim. [Defendant] and his co-participant then fled without taking any money. [Defendant] was subsequently arrested after seeking medical attention for gunshot wounds. The victim sustained gunshot wounds to his shoulder and abdomen, but survived. (PSR ¶¶ 110-111);

- DUI: A bench warrant later issued for defendant's failure to comply with a court order. (PSR ¶¶ 113-14);

- Inflicting corporal injury on a spouse (PSR ¶¶ 115-16).

On November 6, 2012, defendant filed his sentencing position paper which calculated a base offense level of 19 and criminal history category IV. (ER 7-8.) Defendant requested a low-end sentence of 46 months' imprisonment. (ER 8.)

The government filed its sentencing position on November 15, 2012 and requested the following guidelines calculations:

| Base Offense Level (§ 2E1.1, § 2D1.1(c)(4)) Distribution of at least 280g of crack cocaine | 32 |
|---|---|
| Possession of a Dangerous Weapon | +2 |

| | |
|---|---|
| (§ 2D1.1(b)(1)) | |
| Credible Threat to Use Violence, or Direct Use of Violence (§ 2D1.1(b)(2)) | +2 |
| Aggravating Role (§ 3B1.1) | +4 |
| Total Offense Level | 40 |

(CR 1815; GER 1426-27.)  Because of the government's view that
"defendant's criminal history is among the most, if not the
most, egregious in this case," the government suggested varying
upward in the criminal history category from IV to V.  (GER
1427)  With this variance, the government calculated a range of
360 months' to life imprisonment and recommended a below-
guidelines term of 15 years' (180 months') imprisonment.  (GER
1426-27.)

     In its sentencing memorandum, the government asserted that
the USPO had ostensibly left open its guidelines' calculations
because it elected not include any of the voluminous evidence
from trial. (GER 1427-28) (citing PSR at p.13 n.3).  Thus, the
government "object[ed] to each of these [guidelines]
calculations in the PSR as inconsistent with the substantial
record."  (GER 1428) (citing PSR ¶¶ 87-89).

     The government averred that a significant sentence was
"necessary as to veteran, violent gang members who instead of

23

'retiring' from the gang come back and attempt to establish a leadership position and urge younger, more impressionable gang members to a life of crime and violence." (GER 1428.) In support, the government highlighted defendant's leadership role at the gang meeting and excerpted several of his notable quotes as he stood among the forefront of the Pueblo Bishop assembly, including:

- Let's start catching [attacking] muthafuckers and if a muthafucker come over here . . .

- Niggas, it's **supposed to be a gun on every corner, period**. Everyday, everyday, everyday

- [W]e done lost two or three homies ....and I mean the repercussion been alright, but **they wasn't supposed to make it out of here [alive]**.

- Nigga supposed to be able to send the cars [drug customers] down to the Deuce [52nd St.] block [for drug sales]. Woo, but since I don't fuck [hang out] with him, I can't hit [make referrals to] him. Naw that don't go, that's bad [drug] business.

- We gotta fortify this shit man.

- [W]hen shit happens now they want to look and say well what's up [what should we do] Killa [defendant]? I get calls from the pen all the time blood what the fuck going on.

- **We got homies in jail with life right now that will leave this crowd right now without you knowin' and go light [shoot] some shit up. . ... They knew what they had to do**, they knew what they business [retaliation] was.

- If they hooked up with a veteran, then that's on the veteran to lace that person [it is the OG's job to mentor a YG on gang life].

24

- Well tell [co-defendant Jermaine Hardiman] to go get em [Hardiman's guns] and bring em here [to the gang].

- Let's go we can get money blood...**this is who we are, I mean they say we gonna take shit, we do what the fuck we want to do**...But we gotta keep our fort secure.

- **I try to lead by example though** . . . . we gotta pull together as a one homie.

- **I got a thang [gun], but I ain't gonna relinquish to a nigga that ain't gonna [use it]** . . . . I wanna relinquish to a nigga that's for real and gonna babysit that muthafucka like do his money[.]

- First, let's fortify this muthafucka[.]

- A nigga was there when this [disrespect] happened too and on bloods, on the real you should have your chest stomped.

(GER 1430-32) (emphasis added).

       b. The Sentencing Hearing

On November 19, 2012, the district court sentenced defendant to 168 months' imprisonment. (ER 50.) The district court also imposed eight years of supervised release and included as special conditions that defendant not reside in the projects and that he be subject to a search condition. (ER 50-53.) The district court began the hearing by noting the PSR's finding of an advisory guideline range of 63-78 months', which was based on a total offense level of 22 and a criminal history category IV. (ER 6.) The district court also described the

parties' positions with respect to the Guidelines and an appropriate sentence. (ER 6-8.)

In imposing defendant's sentence, the district court made several significant findings about the Pueblo Bishops and defendant and noted that a mechanical calculation of the guidelines would be insufficient to capture defendant's true culpability. It stated that defendant was "one of the leaders of the original gangsters, which means that he's one of the leaders of the Pueblo Bishop gang." (ER 4-5.) It further found that "the evidence clearly established that the gang consistently commits robberies, drug trafficking activities. They continually purchase and sell [various] controlled substances. They have established a monopoly in the [projects][.]" (Id.) The district court described the projects as a "drug bazaar . . . that engaged heavily in the sales of drugs, along with the sale or exchange of arms[.] (Id.) It also noted the "retaliation hits against other persons who are gang members or . . . certain innocent persons were also targeted and killed because it was believed by certain of the gang members that they were associates or members of a rival gang[.]" (ER 5-6.)

As to defendant specifically, the district court highlighted that "the conduct in the PSR does not capture all of his conduct in light of all of the evidence that was brought to

the attention of the Court during the course of the trial." (ER 6.) The court also emphasized its concern with defendant's extremely violent criminal history:

> what's of significance in reference to his criminal history is that in that manslaughter -- voluntary manslaughter -- conviction, there were two victims who were murdered. A third person was shot. And that is serious, significant matter.

(ER 9-10.) The district court described its view of the murder as essentially a coldblooded "retaliation hit for theft of drug money." (ER 10.) It then noted defendant's role in yet another shooting shortly after he was paroled for his role in the drug hit murders. (ER 10-11.) The latter shooting involved the "attempted murder of a person who turned out to be a police officer." (ER 9.) The district court noted its particular "concern [] that it takes place two months after he's paroled in the manslaughter case." (ER 9-10.) Based on this violence perpetrated by defendant, the district court ruled that "criminal history 4 appears to seriously understate his criminal history." (ER 11.)

The district court found that that, based on its review of the evidence at trial, "defendant is a high level respected member of the Pueblo Bishop Blood gang," and that he "fully participated in the gang's activities, which is primarily drug trafficking." (ER 11-12.) Moreover, "the gang itself was organized and one of its primary goals and duties was to protect

27

the drug operations within the gang territory[.]" (ER 12.)
Thus, regarding the PSR's finding related to drug quantity, the
district court found that because defendant was "definitely one
of the most significant leaders . . . [he] should be held
accountable for significantly more than 18 grams of heroin, by
any calculation[.]" (ER 13.) Regarding the Pueblo Bishops' and
defendant's control of the drug trafficking in the projects, the
district court stated:

> **This is drug sales gone wild.** And Mr. White being a
> responsible high level member of that gang is
> responsible for far more than the 18 grams of heroin .
> . . that the probation officer has held him
> accountable for.

(ER 13.) (emphasis added).

> The court continued:

> This is a case . . . where the situation was so out of
> control that the federal authorities had to take
> action and to assert their authority over the area and
> they did that in a long investigation . . . . [T]he
> video that was displayed to the Court and the jury at
> trial reflects that there was so much drug activity
> it's hard to even begin to assess how you start
> counting the amount of contraband that Mr. White
> should be held responsible for.

(ER 14.)

> On defendant's integral role in the gang, the district

court explained:

> It was clear that [defendant]'s . . . leadership and
> his leadership ability really was directed at advising
> or making sure that the younger members did what was
> necessary to maintain control of the gang territory.
> He made it very clear that the gang territory should

> be secured; there should be a gun at various locations
> or on every corner. . . . [**B**]**ut for persons like Mr.**
> **White, the gang would not be effective as it is.**

(ER 15) (emphasis added).

On the need to protect the community:

> I thought that the federal investigation of this case,
> the work by the Federal Bureau of Investigation and
> the federal officers in this case was superb [because]
> the persons in the community who reside there who are
> not gang members . . . require this type of
> intervention.

(ER 18.)

On the senseless violence perpetrated by defendant's gang

and defendant's liability for such violence:

> [Pueblo Bishops] go out and target anyone in the
> community who fits a profile of a gang member; so any
> young male that's in the vicinity that looks like a
> rival gang member, whether they're a gang member or
> not, is a target. So . . . the leadership provided by
> Mr. White and others who caused this type of activity
> to take place. So, he in a very real sense is not only
> responsible for the numerous drug transactions,
> because he's one of the leaders, that takes place on a
> daily basis, **but in a very real sense he's responsible**
> **for the other, more violent activity that takes place.**

(ER 20.) (emphasis added).  More specifically, the district

court found that defendant was "responsible in some sense for

[the Pueblo Bishop perpetrated] murders" discussed in the

indictment.  (ER 21.)

On specific and general deterrence, the district court

explained:

> So, we have people in the community who are there who
> are . . . good individuals trying to eke out a living,
> trying to . . . move from that location to another

29

location and **persons in that location who are being
held hostage literally by the gang members.** And so, we
have to send a sentence that's going to, first of all,
provide specific [deterrence] and that's [deterrence]
of Mr. White, because after being released from prison
a couple of times he went back and did the same thing
over again. So, he needs to be deterred.

There has to be a message that is going to be sent to
other gang members that -- you saw the little kids . .
. dressed in gang attire . . . . So, **the message has
to be sent that if you want to aspire to be Mr. White,
there are consequences.**

(ER 21-22) (emphasis added).

Notwithstanding the foregoing, the district court also

discussed defendant's mitigating factors under § 3553(a). The

district court told defendant the he was going to give him the

"benefit of the doubt" in terms of his ultimate sentence. (ER

28.)  As to specific mitigating factors, the district court

noted defendant's age was "a major factor here." Id.  After

being informed by the district court that it was not going to

impose defendant's requested 46-month sentence, defense counsel

indicated his goal was to bring the court down from the

government's 180 month recommendation. (ER 30.)  Defendant then

modified his recommendation to request a sentence of 120 months'

custody. (ER 46.)

At the conclusion of the sentencing hearing, the district

court further explained the basis for its sentence and

reaffirmed the quantity of drugs attributable to defendant was

"far more than the 18.1 grams of heroin" stated in the PSR, "as

30

demonstrated by the evidence at trial." (ER 48-49.) Despite the court's repeated and clear finding that the drug quantity level in the PSR was inadequate, in its final guidelines calculations, the court did not increase defendant's drug quantity offense level. (ER 48-49.) Instead, it explained, "It's hard to engage in a mechanical process of determining the amount of crack cocaine and heroin and powder cocaine that defendant should be held responsible." (ER 49.) Accordingly, taking a conservative approach, the court deferred to the PSR's offense level of 19, which it had previously found underrepresented defendant's true drug quantity liability. The court then found that "by any measure the defendant was an organizer and leader and therefore" a four-level enhancement applied. (Id.) The court also found a two-level enhancement for defendant's criminal threats based on his instructions at the gang meeting. (Id.) The court found a total offense level of 25 and that the "criminal history category would be better reflected by a 6," which rendered an advisory range of 110 to 137 months. (Id.) The court imposed defendant's 168-month sentence, while noting that it had "reduced it by one year from the 180 recommended by the government." (ER 50.)

31

## III.

### SUMMARY OF ARGUMENT

The evidence at trial strongly supported defendant's conviction for racketeering conspiracy. RICO jurisprudence recognizes a broad and flexible test for determining the existence of a racketeering enterprise. The evidence showed that the Pueblo Bishops gang was a continuing unit that functioned with a common purpose. The evidence showed that the gang was established almost thirty years ago, that it had a strong focus on criminal activity and violent defense of its territory, and that its members maintain a common set of traditions and identity. Defendant's focus on the features that were absent from the Pueblo Bishops' enterprise ignores precedent. The evidence also showed that defendant agreed that either he, or one of his co-conspirators, would be a member or associate of that enterprise. The evidence showed that defendant was an older, well-respected member of the gang who was one of the first to join it. The evidence also showed that defendant took part in the gang's criminal activities, including through drug sales and encouraging gun possession by other members.

The evidence at trial also strongly supported defendant's conviction for drug trafficking conspiracy. The evidence showed that the Pueblo Bishops would work together for the common

32

purpose of selling drugs throughout the Projects.  PBB members would exclude all non-gang members and associates from their sales territory as well as routinely perform counter-surveillance duties.  Defendant took part in these activities by selling drugs within the gang's exclusive sales region as well as attempting to work with other gang members to steal from drug dealers.  Defendant was also recorded exhorting other gang members to violently protect the gang's exclusive drug-selling territory.

Each of defendant's arguments regarding his sentence is unsupported in the law and refuted by the extensive factual record in this case.  There was overwhelming evidence for the district court to find that defendant was a leading member of the Pueblo Bishops, that he issued credible threats, and that his criminal history category was dramatically understated. The district court made all of these findings under the proper legal framework for sentencing and thus committed no procedural error.  Finally, defendant's 14-year sentence was substantively reasonable based on the district court's findings about the exceedingly dangerous nature of defendant's gang and his criminal history, and combined with defendant's leadership in urging other members of his gang to engage in violence, gun possession, and other criminal conduct.

## IV.

### ARGUMENT

A.    THE GOVERNMENT PROVIDED SUFFICIENT EVIDENCE TO SUPPORT DEFENDANT'S CONVICTION FOR RACKETEERING CONSPIRACY

Defendant argues that the government did not present sufficient evidence to support the jury's finding of the existence of a racketeering enterprise (AOB 17) and defendant's membership and conspiracy within that enterprise.  Both of these assertions lack factual and legal merit, as the government's evidence firmly established that defendant agreed (1) to the existence of a racketeering enterprise, (2) that the enterprise would be engaged in racketeering activity, and (3) that defendant, or one or more of defendant's co-conspirators, would conduct or participate in the affairs of the enterprise through a pattern of racketeering activity.  United States v. Luong, 393 F.3d 913, 916 (9th Cir. 2004).

### 1.   Standard of Review

Where a defendant moves for acquittal at the close of the government's evidence, this Court reviews de novo whether sufficient evidence exists to support a guilty verdict.  United States v. Stewart, 420 F.3d 1007, 1014–15 (9th Cir. 2005).  The Court's review of the sufficiency of the evidence supporting a criminal conviction is to determine "whether the record evidence could reasonably support a finding of guilt beyond a reasonable

34

doubt." <u>United States v. Stargell</u>, ___ F.3d ___, 2013 WL 5645171, *2 (9th Cir. 2013) (citing <u>Jackson v. Virginia</u>, 443 U.S. 307, 318 (1979)). "We do not ask whether we believe that the evidence at the trial established guilt beyond a reasonable doubt." <u>Id.</u> (internal citations and quotations omitted). "Instead, the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." <u>Id.</u>

As to the charges under count one (racketeering conspiracy), the government must prove that the defendant knowingly agreed with others to facilitate a racketeering scheme. <u>Salinas v. United States</u>, 522 U.S. 52, 63-64 (1997). Stated otherwise, the government must prove that defendant "intend[ed] to further an endeavor which, if completed, would satisfy all of the elements of racketeering, chargeable under 18 U.S.C. § 1962(c) . . . it suffices that [defendant was shown to] adopt the goal of furthering or facilitating the criminal endeavor." <u>United States v. Fernandez</u>, 388 F.3d 1199, 1229 (9th Cir. 2004) (<u>citing</u> <u>Salinas</u>).

2.    The Government Provided Overwhelming Evidence That The Pueblo Bishops Was A Racketeering Enterprise Under Section 1961(4) And That Defendant Conspired And Agreed That The PBB Would Be A Racketeering Enterprise

The government presented overwhelming evidence to support defendant's conviction for racketeering conspiracy.  Defendant argues that the government failed to prove that the PBB constituted a racketeering enterprise primarily because the evidence adduced at trial showed only that, inter alia, "there was very little structure to the PBB," members did not commit crime "to benefit the gang," and "gang rules were rarely followed if at all."  (AOB 18.)  Defendant also argues that the government failed to establish defendant's agreement that he, or a co-conspirator, would be associated with the PBB.  (AOB 20.)  These arguments, however, misconstrue and ignore the letter and spirit of the court's jurisprudence on the definition of "enterprise" under 18 U.S.C. § 1961(4).

In United States v. Turkette, 452 U.S. 576 (1981), the Supreme Court held that "in order to secure a conviction under RICO, the government must prove both the existence of an 'enterprise' and the connected 'pattern of racketeering activity.'"  Id. at 583.  The Court held that an association-in-fact enterprise "is proved by evidence of an ongoing organization, formal or informal, and by evidence that the various associates function as a continuing unit."  Id.  It also

held that proof of the pattern of racketeering activity is "proved by evidence of the requisite number of acts of racketeering committed by the participants in the enterprise." Id.  Although the Court held that "proof of one does not necessarily establish the other," it made clear that the "proof used to establish these separate elements may in particular cases coalesce."  Id.

In Boyle v. United States, 556 U.S. 938 (2009), the Supreme Court reaffirmed its holding and analysis in Turkette and provided further elaboration on the definition of, and what proof is necessary to establish, the existence of, a RICO "enterprise" within the meaning of 18 U.S.C. § 1961(4).  The Court observed that "an association-in-fact enterprise is simply a continuing unit that functions with a common purpose." Boyle, 556 U.S. at 948 (citing United States v. Turkette, 452 U.S. 576 (1981)).  The Supreme Court in Boyle expressly rejected a number of proposed prerequisites for a racketeering enterprise beyond that broad formulation, such as:

> A structural "hierarchy," "role differentiation," a "unique modus operandi," a "chain of command," "professionalism and sophistication of organization," "diversity and complexity of crimes," "membership dues, rules and regulations," "uncharged or additional crimes aside from predicate acts," an "internal discipline mechanism," "regular meetings regarding enterprise affairs," an "enterprise 'name,' " and "induction or initiation ceremonies and rituals

37

Boyle, 556 U.S. at 948.  The Court held that the government need
only prove that the enterprise have "at least three structural
features": "a purpose, relationships among those associated with
the enterprise, and longevity sufficient to permit these
associates to pursue the enterprise's purpose."  556 U.S. at
945-46.  Federal appellate courts have recognized that, as
clarified in Boyle, the term "enterprise" under subsection (4)
is to be interpreted broadly.  See, e.g. United States v.
Harris, 695 F.3d 1125, 1136 (10th Cir. 2012) (holding that
different Crips gang sets spread throughout urban area could
together constitute an "enterprise"); United States v.
Swiderski, 593 F.2d 1246, 1249 (D.C. Cir. 1978), cert. denied,
441 U.S. 933 (1979) (nothing that the definition of the term
"enterprise" is of necessity a shifting one, given the fluid
nature of criminal associations).

By focusing on the absence of a formal structure within the
PBB, defendant ignores Boyle and its progeny.  Defendant also
ignores Turkette's finding that proof used to establish the
enterprise may in fact "coalesce" with proof of the pattern of
racketeering activity.  See Turkette, 452 U.S. at 583; see also
Boyle, 556 U.S. at 947; cf. Odom v. Microsoft Corp., 486 F.3d
541, 550-552 (9th Cir. 2007) (en banc) (overruling prior cases
indicating that a RICO enterprise must have some structure
beyond what is necessary to commit the alleged racketeering acts

38

and explaining that "[t]o require that an associated-in-fact enterprise has a structure beyond that necessary to carry out its racketeering activities would be to require precisely what the Court in Turkette held that RICO does not require").

In this case, the government overwhelmingly established that the co-conspirators in this case agreed that the PBB would constitute a "continuing unit that [would] function with a common purpose." Boyle, 566 U.S. at 942. The government provided substantial evidence to support both the intended and actual existence of an enterprise that goes beyond "several individuals, independently and without coordination, engag[ing] in a pattern of [racketeering] predicates." Boyle, 566 U.S. at 946 n.4. As to purpose, the government proved that the PBB were a Blood-affiliated street gang that set out to dominate the PDRHP, monopolize the criminal activity occurring within and around the PDRHP, establish a violent reputation for itself among other street gangs, and allow its members to financially profit from drug sales and other crimes. As to relationships among its members, the evidence showed that the PBB manifested a strong, communal identity that was reinforced through common language, clothing, gang signs, graffiti, annual celebrations, irregular meetings, and a hierarchy that prized seniority and experience. Finally, as to longevity, the evidence showed that the PBB were an inter-generational gang that remained active at

39

least from the mid-1970's until the time of the instant
investigation.

Defendant also argues that the government failed to
establish that defendant agreed that he or a co-conspirator
would be associated with this enterprise.  (AOB 20.)  To the
contrary, however, the government proved that defendant
conspired and agreed that he would be associated with the PBB
racketeering enterprise.  This proof went beyond what the
government must establish for a racketeering conspiracy
conviction, which does not require the government to prove
formal membership within a racketeering enterprise, but rather
that defendant agreed that he or a co-conspirator would have an
"association with the illegal activities of the enterprise."
United States v. Tille, 729 F.2d 615, 620 (9th Cir. 1984)
(emphasizing that even "associated outsiders who participate in
a racketeering enterprise's affairs fall within RICO's
strictures") (citing United States v. Starnes, 644 F.2d 673, 679
(7th Cir. 1981) (emphasizing that "the RICO net is woven tightly
to trap even the smallest fish, those peripherally involved with
the enterprise")).  As discussed above, cooperating witnesses
identified defendant as a high-ranking "OG" member who joined
the gang soon after it was first founded.  (RT 6/8/12: 196-97;
GER 216-17.)  Cooperating witness Anthony Hill said that
defendant carried out robberies, theft, and shootings within the

40

gang's territories.  (RT 6/8/12: 200, 222-23; GER 220, 242-43.)
They identified him as a prominent speaker at the August 2009
recorded gang meeting, where defendant emphasized the gang's
violent culture and the obligation of its members to enforce it.
(RT 7/10/12: 80; GER 1365.)  Cooperating witnesses also said
that defendant engaged in criminal activity with other gang
members, such as drug dealing and robbery.

Moreover, defendant's argument that the jury's special
verdict (finding defendant liable for only his two sales of
heroin as opposed to finding him liable for all of the drug
sales of his co-conspirators) nullifies the government's proof
of defendant's agreement to be associated with the PBB borders
on the frivolous.  (AOB 20-21.)  It is well-established that
seemingly "inconsistent verdicts may stand, even when a
conviction is rationally incompatible with an acquittal,
provided there is sufficient evidence to support a guilty
verdict." [3]  United States v. Suarez, 682 F.3d 1214, 1215 (9th
Cir. 2012) (quoting United States v. Guzman, 849 F.2d 447, 448
(9th Cir. 1988)); see also United States v. Dota, 33 F.3d 1179,
1187 (9th Cir. 1994) ("jury verdicts are insulated from review
for inconsistency").

---

[3] In any event, the jury's verdicts are not factually
inconsistent.

41

Accordingly, the evidence overwhelmingly established that
defendant, and others, agreed and conspired that the PBB would
be an "enterprise" as defined under section 1961(1).

3.  The Government Provided Overwhelming Evidence that
    Defendant Conspired to Conduct, or Participate in the
    Conduct, of the Affairs of a Racketeering Enterprise
    Through a Pattern of Racketeering Activity

Defendant also argues that "the government did not
establish that White was involved [in], and the government did
not establish, a pattern of racketeering." (AOB 21.)  The
government, however, proved that defendant agreed and conspired
that either he, or one of his co-conspirators, would conduct, or
participate in the conduct of, the affairs of the PBB enterprise
through a pattern of racketeering activity, namely in the form
of drug trafficking and robbery.  The government proved that
defendant agreed that either he, or his co-conspirators, would
commit two or more predicate acts of racketeering activity (that
is, in the form of drug trafficking and robbery), that were
related to one another and posed a threat of continued criminal
activity.  18 U.S.C. § 1961(5); United States v. Fernandez, 388
F.3d 1199, 1221 n.11 ("two predicate acts are necessary, but not
sufficient, to prove a violation of § 1962(c): the pattern
element also requires proof of "relatedness" and "continuity")
(9th Cir. 2004).  Specifically, the government showed that the
Pueblo Bishops' racketeering activities constituted "a series of

42

related predicates extending over a substantial period [that also] by its nature project[ed] into the future with a threat of repetition" and that bore "the same or similar purposes, results, participants, victims, or methods of commission, or otherwise [were] interrelated by distinguishing characteristics and [were] not isolated events." Howard v. America Online Inc., 208 F.3d 741, 750 (9th Cir. 2000); United States v. Bingham, 653 F.3d 983, 992 (9th Cir. 2011).

Critically, as to charges of racketeering conspiracy, the government need not prove that defendant himself carried out any racketeering predicate offenses. Salinas, 522 U.S. at 65-66 (recognizing that in a 1962(d) prosecution, "it suffices that [the government show that defendant] adopt[ed] the goal of furthering or facilitating the criminal endeavor . . . [defendant] may do so in any number of ways short of agreeing to undertake all of the acts necessary for the crime's completion"). The government must prove that defendant agreed or conspired that he, or another co-conspirator, would carry out a pattern of racketeering acts; this does not require the government to prove that defendant (or any other co-conspirator) would personal benefit from, or would direct or command, the commission of those acts. See, e.g. United States v. Yarbrough, 852 F.2d 1522, 1544 (9th Cir. 1988) (recognizing that proof of a pattern of racketeering activity does not require any showing

43

that "any benefit accrue to the enterprise because of a particular defendant's racketeering activity"). Rather, the government must prove that defendant agreed that some "nexus" would exist between the racketeering activity and the enterprise. Id. (emphasizing that "[the racketeering] enterprise is simply the means or structure through which the racketeering crimes occur . . . the racketeering activity must simply stem from the enterprise's activities or have some relationship to the enterprise to satisfy the 'through' requirement) (internal quotations omitted).

Here, ample evidence established that defendant conspired and agreed that either he, or one of his co-conspirators, would commit a pattern of racketeering acts that shared a strong nexus with the Pueblo Bishops enterprise. Witnesses repeatedly testified that one of the gang's central objects was the monopolization of criminal activity within its boundaries. (RT 6/8/12: 206; GER 226.) Pueblo Bishops benefited from this arrangement through reduced competition from rival gang members and cooperation with one another against law enforcement, among other circumstances. (RT 6/8/12: 206, RT 6/19/12: 130-132; GER 226, 850-52.) Defendant himself utilized this framework to carry out drug trafficking. (RT 6/19/12: 195; GER 915); Yarbrough, 852 F.2d at 1544 ("[a] nexus exists "when one is enabled to commit the predicate offenses solely by virtue of his

44

position in the enterprise or involvement in or control over the
affairs of the enterprise").  Witness Leon and Special Agent
Brown testified that defendant distributed heroin from a park
within the gang's boundaries.  (RT 6/19/12: 195, RT 7/2/12: 30-
31, RT 7/3/12: 68-69; GER 915, 1126-27, 1318-19, 1504.)  FBI
agents also conducted two controlled purchases of heroin from
defendant, within the gang's territory, in June 2010.  (RT
6/19/12: 195, RT 7/3/12: 68-69; Trial Exhibit 84; GER 915, 1318-
19, 1504.)  Further, as exemplified by defendant's statements at
the FBI-surveilled PBB gang meeting in August 2009, defendant
was aware that PBB members were conducting extensive drug sales
throughout the PDRHP, and contributed to that effort by
encouraging fellow members to "secure the turf" and "[maintain]
a gun on every corner . . . every day."  (RT 7/10/12: 128; GER
1413, 1448.)  And witnesses Leon and Hill testified that
defendant discussed and planned robberies with other PBB gang
members.  (RT 6/8/12: 222, 6/19/12: 204-5; GER 242, 924-25.)

       Contrary to defendant's arguments, the defendant's and
other Pueblo Bishops' crimes were not "isolated and sporadic"
activity that only benefited the individual perpetrators.  (AOB
22.)  There was more than sufficient evidence, resolving all
inferences in the prosecution's favor, to convince a single
rational juror beyond a reasonable doubt that defendant engaged
in a racketeering conspiracy.  Defendant agreed that the PBB

                                45

would constitute a racketeering enterprise, and he agreed that both he, and his co-conspirators, would engage in a pattern of racketeering activity through that enterprise.

B.   SUFFICIENT EVIDENCE SUPPORTS DEFENDANT'S CONVICTION
     FOR DRUG TRAFFICKING CONSPIRACY

Defendant argues that there was not sufficient evidence to establish his guilt under 21 U.S.C. § 846 (drug trafficking conspiracy).  Defendant's sole argument is that the government's evidence of defendant's conspiracy to traffic narcotics is insufficient because the jury –– by way of its special verdict –– limited the quantity of drugs reasonably foreseeable to defendant to the amount of drugs recovered during defendant's two controlled drug sales.  (AOB 23-25.)  These findings are not fatally inconsistent; as noted above, "jury verdicts are insulated from review for inconsistency."  Suarez, 682 F.3d 1214, 1218-19 (internal citations and quotations omitted) (upholding defendant's conviction on drug conspiracy charge even though he was acquitted of a possession charge that was based on "the only overt act on which a conviction for conspiracy could have been based").

Here, there was sufficient evidence to convict defendant under § 846.  "To establish a drug conspiracy, the government must prove (1) an agreement to accomplish an illegal objective; and (2) the intent to commit the underlying offense."  United

States v. Reed, 575 F.3d 900, 923 (9th Cir. 2009) (citations and quotations omitted).  Stated otherwise, the government must prove that the defendant "worked with at least one other individual with a single design for the accomplishment of a common purpose," that is, the sale of controlled substances. United States v. Duenas 691 F.3d 1070, 1085 (9th Cir. 2012). Because most conspiracies are clandestine in nature, the prosecution is seldom able to present direct evidence of the agreement . . . [c]oordination between conspirators is strong circumstantial proof of agreement."  Id.  Further, "it is not necessary that all persons directly involved in illicit drug dealing have personal knowledge of each and every actor in the conspiracy, and every act taken in furtherance of the conspiracy, to conclude that such persons share a conspiracy's common purpose."  United States v. Daychild, 357 F.3d 1082, 1098 (9th Cir. 2004).

In the context of street gangs, federal courts have recognized that gang members conspire to sell drugs together when they, among other factors, "respond as a group to threats from other gangs over 'drug spots' and 'territory'" (United States v. Pimentel, 346 F.3d 285, 301 (2d Cir. 2003) (holding that evidence was sufficient to support racketeering conspiracy conviction with drug conspiracy object)); maintain a "turf" in which it is "impossible [to sell drugs] absent membership in the

47

gang or without permission from one of the original gangsters, or "O.G.'s" (United States v. Wilson, 116 F.3d 1066, 1075 (5th Cir. 1997), abrogated on other grounds in United States v. Brown, 161 F.3d 256 (5th Cir. 1998)); and "monitor[] the presence of police and engage[] in violent activities to continue their profitable business" (United States v. Suggs, 374 F.3d 508, 518-19 (7th Cir. 2004) ("[f]actors considered in determining whether the association at issue amounts to a conspiracy include whether there was prolonged cooperation between the parties, a level of mutual trust, standardized dealings, sales on credit (or 'fronting'), and the quantity of drugs involved")).  These forms of cooperation can form the basis of a drug conspiracy even if the members of that conspiracy do not share drug profits or take positions within a hierarchy.  Wilson, 116 F.3d at 1075 (finding that although gang members sold drugs "in competition with one another, not in concert . . . the fact that individual dealers sold in competition with one another does not preclude a finding of a single conspiracy).  These holdings are consistent with this Court's holdings that defendants take part in a single, overarching drug conspiracy when "the[ir] entire operation . . . [is] heavily dependent on the reputation and strength of the . . . entire organization." Fernandez, 388 F.3d at 1228 (citing Kotteakos v. United States, 328 U.S. 750 (1946)).

48

In this case, the government provided substantial evidence, and certainly enough to convince a rational juror beyond a reasonable doubt, that members of the PBB "worked together with a single design for the accomplishment" of drug trafficking. Duenas, 691 F.3d at 1085.  The government showed that the PBB carried out a common project of selling drugs in the projects by enforcing a monopoly over drug dealers within the projects (RT 6/11/12: 11-12; GER 277-78), conducting counter-surveillance against law enforcement (RT 6/19/12: 130-31; GER 850-51), and encouraging one another to carry weapons in order to engage rival gang members and interlopers (Id).  For example, defense witness Marquise Edwards testified that he understood the obligation of Pueblo Bishop members to "kill [any] 38th Street Hispanic gang member [who was caught] selling drugs in the projects."  (RT 7/3/12: 48; GER 1298.)  These efforts make clear that Pueblo Bishop members cooperated extensively to sell drugs within the PDRHP, and did not merely act as independent retailers.

The government also proved that defendant was a knowing member of that conspiracy.  This Court has emphasized that "once a conspiracy exists, evidence establishing beyond a reasonable doubt a defendant's connection with the conspiracy, even though the connection is slight, is sufficient to convict the defendant of knowing participation in the conspiracy."  United States v.

49

Delgado, 357 F.3d 1061, 1066 (9th Cir. 2004).  The evidence here showed that defendant's connection to the Pueblo Bishops' drug trafficking conspiracy was more than slight.  Defendant carried out two FBI-monitored drug sales within the gang's exclusive territory.  (RT 7/3/12: 69-70; GER 1319-20.)  Cooperating witnesses testified that defendant sold heroin from a park located in the gang's territory.  (RT 6/19/12: 195; GER 915.)  Defendant talked to other gang members about robbing drug dealers.  (RT 6/19/12: 204-05; GER 924-25.)  Defendant also purchased heroin and other drugs for resale from other gang members.  (RT 6/19/12: 198-200; GER 918-20.)  And at the FBI-monitored gang meeting, defendant encouraged members of the gang to "secure the turf" through firearm-possession.  (GER 1448-49.) These facts establish that defendant not only worked with only Pueblo Bishop members to sell drugs, but that he took advantage of, and took steps to bolster, the gang's framework for drug dealing within the projects.

     C.    THE DISTRICT COURT'S GUIDELINES FINDINGS WERE OVERWHELMING SUPPORTED BY THE EVIDENCE AT TRIAL

The district court made repeatedly clear that it was not going to sentence defendant strictly based on the guidelines because such an analysis was too "mechanical" in defendant's case (ER 8-9, 19, 49), thus "the analysis under [§] 3553 is . . . the best way" (ER 19).  Nevertheless, defendant challenges the

three guidelines adjustments imposed by the district court: the role enhancement, the enhancement for credible threats, and the elevation of defendant's criminal history category from IV to VI. (AOB 25-30.)

### 1. Standard of Review

In determining facts relevant to sentencing the district court need only find them under a preponderance of the evidence standard. (AOB 25) (citing United States v. Armstead, 552 F.3d 769, 776 (9th Cir. 2008). The district court's interpretation of the guidelines is reviewed de novo, the district court's application of the guidelines to facts of the case for abuse of discretion, and the district court's factual findings for clear error. (Id.) (citing United States v. Lambert, 498 F.3d 963, 966 (9th Cir. 2007)). Abuse of discretion requires the reviewing court to determine that the district court's findings were "illogical, implausible, or without support in inferences that may be drawn from the facts in the record." United States v. Hinkson, 585 F.3d 1247, 1263 (9th Cir. 2009).

2.  Recorded Video Evidence and Trial Testimony
    Clearly Demonstrated Defendant's Leadership in
    the Pueblo Bishops

As the court repeatedly found, defendant clearly qualified
for a four-level role enhancement under USSG § 3B1.1.[4] (ER 4-5,
12- 16, 18, 20-21, 28, 49.)  This enhancement applies where "the
defendant was an organizer or leader of a criminal activity that
involved five or more participants[.]"  USSG § 3B1.1(a).
Defendant was a longtime, OG leader of the PBB, a gang that
numbered in the hundreds.  The district court found a wealth of
support in the record for this enhancement, primarily because of
its review of the gang meeting (Trial Exhibit 52), which
numerous members attended and where defendant spoke prominently
and passionately about steps he felt the gang needed to
undertake in order to improve its violent retaliation, secure
its gang borders, enhance gun possession, and more.  (ER 18; GER
1430-32.)  The district court also properly considered the fact
that defendant, as a violent OG, was essentially a role-model to
younger, impressionable gang members.  (ER 18, 22.)  Moreover,
defendant had been involved in a near triple murder and an
attempt to kill a law enforcement officer.  (PSR ¶¶ 106-11.)  As
the district court understood, such a deadly resume bolstered

---

[4] The PSR, even without benefit of the additional trial evidence,
also found defendant qualified for a role enhancement.  (PSR ¶
93.) (adding a three-level enhancement for manager/supervisor).

defendant's status and influence in the gang, particularly since "he had done time in prison and came back to the gang territory with [a] . . . heightened reputation because of his prison time." (ER 16.)  The testimony at trial demonstrated that younger gang members felt this was one of the factors that gave defendant his leadership status.  (ER 15) (during trial, district court noted it had opportunity to "assess [defendant's] stature in terms of how he was treated by other gang members, [which] establishe[d], at least to my satisfaction," defendant's leadership status).

In his brief, defendant does not contest any of this overwhelming evidence.  Instead, defendant makes the curious argument that "the jury soundly rejected [that defendant was a leader] when it found defendant not guilty on Count Nine (18 U.S.C. § 924(c))."  (AOB 28).  This argument is absurd and not supported by the law.  Suarez, 682 F.3d at 1215.  As an initial matter, such an argument makes logical leaps from a single count that are not supported by common sense and otherwise cannot be inferred from a jury verdict, particularly where the jury convicted defendant on all other counts.

Moreover, even if the jury verdict on count nine could somehow be translated into the wholly distinct finding defendant now seeks to transpose onto it (that he was not a leader), it still does nothing to take away from the district court's

sentencing finding that, by a preponderance of the evidence, defendant was a leader.  This is because it "is well established that a sentencing judge may take into account facts introduced at trial relating to other charges, even ones of which the defendant has been acquitted."  United States v. Donelson, 695 F.2d 583, 590 (1982) (citing United States v. Morgan, 595 F.2d 1134, 1136-37 (9th Cir. 1979); McMillan v. Pennsylvania, 477 U.S. 79, 91-92 (1986) ("the preponderance standard satisfies due process" with respect to a court's finding of relevant sentencing factors).

As set forth above, the record clearly shows defendant acted in a leadership capacity and that defendant's legal argument regarding the purported effect of defendant's count nine acquittal on this enhancement fails.  Thus, defendant has failed to show the district court's factual findings and application of the enhancement here were "illogical . . . or without support in inferences."  Hinkson, 585 F.3d at 1263.

3.    Defendant Made Several Credible Threats and Foreseeable Violence Occurred After the Gang Meeting

The district court imposed a two-level enhancement because defendant "used violence, made a credible threat to use violence, or directed the use of violence" under USSG § 2D1.1(b).  Defendant relies on the PSR to counter the district court's finding of this enhancement even though the PSR did not

54

consider trial evidence. (PSR at p.13 n.1.) The district court made clear, however, that it considered the trial evidence and felt the record was replete with evidence supporting this enhancement. (ER 3, 15.) Specifically, the court stated, "I think all of that is made clear in the video of 2009 [Trial Exhibit 52]." (ER 48.)

Indeed, at the gang meeting alone, violence was a common thread of defendant's repeated comments. (GER 1430-32). Defendant's instruction to a PBB assembly provided more than sufficient basis to find that defendant issued credible threats as part of his leadership role in the Pueblo Bishop gang. Moreover, defendant's comments proved much more than mere bluster as approximately two weeks later PBB gang members shot into the house of a rival's residence. (PSR ¶ 100).[5] The intended target was not there, but his mother and 11-year-old brother were (both survived the attack). (Id.)

The district court confirmed that it viewed threats issued by defendant and his gang as far from idle:

---

[5] PSR setting forth that "[o]n September 9, 2009, [co-defendant Anthony] Gabourel and other PBB members shot and wounded Rafael Garza (Garza), a rival 51st Street Locos gang member, while he sat on his front porch in the projects. Gabourel bragged of his involvement in the shooting to other PBB gang members. On September 11, 2009, several PBB YG members again targeted Garza, and shot at Garza's house, striking the residence with multiple bullets. Garza was not home, however, his mother and eleven year old brother were home, but were uninjured."

> [a lot has] occurred in this case: the number of
> persons who were killed, the number of persons who
> were victims of violent attacks, the attack on the
> 51st Street gang member family [referenced above];
> those are all significant factors.

(ER 23.)

> The district also articulated its view that:

> [Defendant]'s . . . leadership and his leadership
> ability really was directed at advising or making sure
> that the younger members did what was necessary to
> maintain control of the gang territory. He made it
> very clear that the gang territory should be secured;
> there should be a gun at various locations or on every
> corner. . . . [B]ut for persons like Mr. White, the
> gang would not be as effective as it is.

(ER 15); see also (ER 20 ("the leadership provided by Mr. White

and others . . . caused this type of activity to take place").)

Accordingly, there was sufficient evidence from the record

for the district court, both directly and by inference, to

support this enhancement.

### 4.    Defendant's Violent Criminal History Warrants Criminal History Category VI

The court properly varied upward with respect to

defendant's criminal history category.  Defendant assumes –

without support – that the court departed upwards and argues

that the district court failed to adequately explain its

reasoning for the departure.  (AOB 30.)  But here the court

simply varied upwards and the sentencing transcript refutes

defendant's contention that the court to failed to explain its

reasons for so doing.  The district court repeatedly made

explicit its well-founded concern that defendant had been involved in a cold-blooded "assassination attempt" followed by the near-killing of a security guard simply trying to do his job. (ER 9-11, 19, 36). Moreover, the court also properly noted that the proximity between defendant's release from the manslaughter offense and his commission of the attempted murder offense ("two months") exacerbated an already disturbing criminal history. (Id.) The district court's finding is buttressed by the fact that the manslaughter conviction -- where two of the victims died and a third was shot -- generated no points on defendant's criminal history. (PSR ¶ 106.)[6] In addition, defendant was on parole while committing the instant offenses, had previous parole/probation violations, and had other gun possession and robbery arrests. (PSR ¶¶ 105-06, 109, 112, 118, 121-27.)

For all of the foregoing reasons, the district court found that "criminal history 4 appears to seriously understate [defendant's] criminal history." (ER 11.) Accordingly, the variance was warranted and the district court adequately explained its justification.

---

[6] This was because the date of the conviction fell outside the required 15-year time frame. See USSG § 4A1.1.

D.    THE DISTRICT COURT DID NOT COMMIT PROCEDURAL ERROR

    1.    Standard of Review

"Appellate review is to determine whether the sentence is reasonable; only a procedurally erroneous or substantively unreasonable sentence will be set aside." United States v. Carty, 520 F.3d 984, 993 (9th Cir. 2008) (citations omitted). Here, "[b]ecause [defendant] failed to object at sentencing . . . his claim his reviewed for plain error." United States v. Evans-Martinez, 530 F.3d 1164, 1167 (9th Cir. 2008). Furthermore, this Court has explained that plain error is (1) error, (2) that is plain, and (3) that affects substantial rights. Id. If the district court's imposition of sentence amounts to plain error, we will grant relief only if it seriously affects the fairness, integrity, or public reputation of judicial proceedings. Id. (internal quotation marks and citations omitted).

    2.    Defendant Has Not Alleged, Much Less Proven, Any
           Procedural Error

Defendant's procedural error argument amounts essentially to a single paragraph. Defendant cursorily asserts that "the district court did use factors that had not been decided by a jury to increase the Guideline calculation." (AOB 32.) Defendant claims this is plain error amounting to "significant procedural error." (AOB 32-33.) First, this argument is incomplete because defendant never actually sets forth which

58

factors the district court purportedly relied on that had not
been decided by the jury; indeed, the section is devoid of any
facts or citation to the record.  The argument thus fails for
this reason alone.  United States v. Graf, 610 F.3d 1148, 1166
(9th Cir. 2010).  ("Arguments made in passing and not supported
by citations to the record or to case authority are generally
deemed waived.") (citation omitted) (citing Fed. R. App. P.
28(a)(9)(A)). Second, even if it were true that the district
court relied on factors not expressly found by the jury to
increase defendant's guidelines calculation, this is far from
plain error.  McMillan, 477 U.S. at 91-92 (1986) ("the
preponderance standard satisfies due process" with respect to a
court's finding of relevant sentencing factors).[7]  Third, the
only guideline enhancements found by the district court were for
aggravating role and credible threats, both of which the

---

[7] Defendant's reference to Alleyne v. United States, 133 S. Ct.
2151 (2013) is misguided.  (AOB 32.)  In Alleyne, the Supreme
Court overruled Harris v. United States, 536 U.S. 545 (2002),
which had held that judicial factfinding that increases the
mandatory minimum sentence for a crime is permissible under the
Sixth Amendment. The Supreme Court concluded that this
distinction was inconsistent with the decision in Apprendi v.
New Jersey, 530 U. S. 466 (2000), and with the original meaning
of the Sixth Amendment because any fact that increases the
mandatory minimum is an "element" and thus must be submitted to
the jury.  However, because the guidelines are advisory under
United States v. Booker 543 U. S. 220 (2005), and not mandatory,
Alleyne does not stand for the novel proposition that each
guideline enhancement must now be proven beyond a reasonable
doubt.

district court stated were easily surmised by review of the gang video and were not in any way "rejected by the jury's verdict." (AOB 32.)  In sum, defendant's argument here fails to even allege, must less establish, that the district court made any error, much less one that "seriously affect[ed] the fairness, integrity, or public reputation of judicial proceedings." Evans-Martinez, 530 F.3d at 1167.

    E.   DEFENDANT'S SENTENCE WAS SUBSTANTIVELY REASONABLE

        1.   Standard of Review

The substantive reasonableness of a sentence is reviewed under "the familiar abuse-of-discretion standard of review." United States v. Gall, 552 U.S. 38, 46 (2007).  Under this standard, this Court may reverse only if "upon reviewing the record, [it has] a definite and firm conviction that the district court committed a clear error of judgment in the conclusion it reached upon weighing the relevant factors." United States v. Ressam, 679 F.3d 1069, 1087 (9th Cir. 2012) (en banc) (quotation omitted).  This standard "afford[s] significant deference to a district court's sentencing decision."  Id. at 1086.  As stated in United States v. Carty, this Court "may not reverse just because [it] think[s] a different sentence is appropriate."  520 F.3d 984, 993 (9th Cir. 2008).

2.    The District Court Did Not Abuse its Discretion in Imposing a 14-Year Sentence on a Veteran Gang Leader Who Advocated for Violence and Drug Trafficking and Had a Deadly Criminal Past

The court's 14-year sentence was well supported by the record and complied with all legal sentencing principles.  At a gang meeting of dozens of Pueblo Bishops, defendant was one of the keynote speakers; defendant spoke repeatedly, pronouncing some of the more violent exhortations, and offered various instructions on how the gang should improve its operations and its stranglehold over an already suffering low-income community. (GER 1430-32.)  Defendant's central message was clear: the gang was not engaging in sufficient gang activity, particularly as it related to their drug monopoly and securing their turf.  (Id.)

In support of his argument here, defendant, again in cursory fashion, simply alleges that "the sentence is substantively unreasonable [because the district court] engaged in a § 3553(a) analysis based upon a clearly erroneous interpretation of 'the nature and circumstances of the offense' and the 'history and characteristics' of the [sic] White."  (AOB 35.)  But defendant fails to explain how the district court's analysis on these facts and factors was erroneous at all, much less "clearly erroneous."  Without any sort of meaningful

explication, this argument must also fail.[8] <u>Graf</u>, 610 F.3d at 1166 ("Arguments made in passing and not supported by citations to the record or to case authority are generally deemed waived.") (citations omitted).

In any event, defendant's leadership role combined with his advocating of violence, gun possession, and drug sales -- to a gang already well versed in each -- well supported the district court's sentence.  As it stated:

> I don't think there's any question . . . that he's a leader and organizer. He's one of the leaders of that gang because of his stature, age, longevity in the gang, prior history with the gang, prior time in custody which provides him with . . . a stature that few have in that gang.

(ER 18.)  The district court repeatedly emphasized its view that defendant's role at the gang meeting implicated numerous of the § 3553(a) factors relevant to sentencing; and the court meticulously went through every relevant sentencing factor.  (ER 19-24.)  In addition, defendant's role in the brutal murders of two individuals and the attempted murder of two others,

---

[8] Defendant also argues in this section that the sentence was unreasonable because it was "contrary to the Guideline calculations [and] the jury's verdict."  (AOB 35.)  This argument is legally and factually meritless and was rejected earlier in the government's brief because the guidelines are advisory and the jury's verdict does not control at sentencing. <u>See</u>, <u>supra</u>, Section IV(D)(2); <u>United States v. Laverdure</u>, 385 Fed. Appx. 737, 739 (9th Cir. 2010) (emphasis added) (a jury's determinations are "not controlling" at sentencing because of the differing burdens of proof).

including a security guard, warranted severe sanction and urgent protection of the community.  (ER 19.)  Defendant's conclusory arguments here do nothing to undermine these compelling and aggravating facts.  Moreover, the district court also provided significant benefit to the defendant by: (a) not increasing his drug quantity offense level; (b) giving him "every benefit of the doubt," and by (c) considering his age a "major [mitigating] factor."  (ER 27.)  Therefore, defendant has far from approached the necessary showing to undo the district court's sentence and its thoughtful reasoning.

## V.

### CONCLUSION

For the reasons set forth above, the judgment of conviction and sentence should be affirmed.

Dated: November 20, 2013      Respectfully submitted,

ANDRÉ BIROTTE JR.
United States Attorney

ROBERT E. DUGDALE
Assistant United States Attorney
Chief, Criminal Division


   /s/
_____
CHRISTOPHER K. PELHAM
MACK E. JENKINS
Assistant United States
Attorneys

Attorneys for Plaintiff-Appellee
UNITED STATES OF AMERICA

## <u>STATEMENT OF RELATED CASES</u>

The following pending appellate matters arise out of the same district court case at issue in the instant appeal:

1. <u>United States v. Robbionta Monson</u> (CA No. 12-50180)
2. <u>United States v. Steven Williams</u> (CA No. 12-50537)
3. <u>United States v. Marquis Edwards</u> (CA No. 13-50130)
4. <u>United States v. Anthony Gabourel</u> (CA No. 13-50183)
5. <u>United States v. Jermaine Hardiman</u> (CA No. 13-50184)
6. <u>United States v. Lee Henderson</u> (CA No. 13-50374)
7. <u>United States v. Jason Davis</u> (CA No. 13-50368)
8. <u>United States v. Kevin Eleby</u> (CA No. 13-50556)

**Form 6.      Certificate of Compliance With Type-Volume Limitation,
Typeface Requirements, and Type Style Requirements**

1.      This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because:

☒ this brief contains <u>13,901</u> words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii), *or*

☐ this brief uses a monospaced typeface and contains_____ lines of text, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

2.      This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because:

☐ this brief has been prepared in a proportionally spaced typeface using *(state name and version of word processing program)* _____ *(state font size and name of type style)* _____ *, or*

☒ this brief has been prepared in a monospaced spaced typeface using *(state name and version of word processing program)* Microsoft Word 2010 _____ with *(state number of characters per inch and name of type style)*
10 characters per inch Courier New font _____ .

Signature | /s/ Christopher K. Pelham

Attorney for | Plaintiff/Appellee United States

Date | Nov 20, 2013

| 9th Circuit Case Number(s) | 12-50589 |
|---|---|

**NOTE:** To secure your input, you should print the filled-in form to PDF (File > Print > *PDF Printer/Creator*).

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

## CERTIFICATE OF SERVICE
### When All Case Participants are Registered for the Appellate CM/ECF System

I hereby certify that I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system on (date)  | Nov 20, 2013 | .

I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

Signature (use "s/" format) | /s/ Christopher K. Pelham |

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

## CERTIFICATE OF SERVICE
### When <u>Not</u> All Case Participants are Registered for the Appellate CM/ECF System

I hereby certify that I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system on (date) |          | .

Participants in the case who are registered CM/ECF users will be served by the appellate CM/ECF system.

I further certify that some of the participants in the case are not registered CM/ECF users.  I have mailed the foregoing document by First-Class Mail, postage prepaid, or have dispatched it to a third party commercial carrier for delivery within 3 calendar days to the following non-CM/ECF participants:

Signature (use "s/" format) |          |