No. 12-50589

IN THE

UNITED STATES COURT OF APPEALS

FOR THE NINTH CIRCUIT

UNITED STATES OF AMERICA,

     Plaintiff-Appellee,

        v.

GARY WHITE,

     Defendant-Appellant.

_____

GOVERNMENT'S EXCERPT OF RECORD – VOLUME I

APPEAL FROM
THE UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF CALIFORNIA

_____

**ANDRÉ BIROTTE JR.**
**United States Attorney**

**ROBERT E. DUGDALE**
**Assistant United States Attorney**
**Chief, Criminal Division**

**CHRISTOPHER K. PELHAM (SBN 241068)**
**MACK E. JENKINS (SBN 242101)**
**Assistant United States Attorneys**

   1400 U.S. Courthouse
   312 North Spring Street
   Los Angeles, California 90012
   Telephone: (213) 894-0610/2091
   Facsimile: (213) 894-4021
   Email:
   christopher.pelham@usdoj.gov
   Email: mack.jenkins@usdoj.gov

**Attorneys for Plaintiff-Appellee**
**UNITED STATES OF AMERICA**

**TABLE OF CONTENTS**

DESCRIPTION                                                    PAGE

**VOLUME I**

Reporter's Transcript (Trial Day 3: 6/7/12) ......................1

**VOLUME II**

Reporter's Transcript (Trial Day 4: 6/8/12) ...................207

Reporter's Transcript (Trial Day 5: 6/11/12) ..................267

**VOLUME III**

Reporter's Transcript (Trial Day 6: 6/12/12) ..................470

Reporter's Transcript (Trial Day 7: 6/13/12) ..................616

**VOLUME IV**

Reporter's Transcript (Trial Day 8: 6/14/12) ..................719

Reporter's Transcript (Trial Day 10: 6/19/12) .................826

**VOLUME V**

Reporter's Transcript (Trial Day 11: 6/25/12) .................973

Reporter's Transcript (Trial Day 15: 7/2/12) .................1027

**VOLUME VI**

Reporter's Transcript (Trial Day 16: 7/3/12) .................1251

Reporter's Transcript (Trial Day 17: 7/10/12) ................1337

i

<u>DESCRIPTION</u>                                           <u>PAGE</u>

**VOLUME VI (Continued)**

Special Verdict Form as to Defendant Gary White..............1417

Government's Sentencing Position as to Defendant Gary White..1422

Government's Sentencing Position as to Defendant Gary White,
Exhibit A ................................................1446

Trial Exhibit 288.........................................1503

Trial Exhibit 86..........................................1504

Defendant's August 22, 2012 Motion for
Judgment of Acquittal ....................................1505

District Court's October 15, 2012 Minute Order Denying Defendant's
Motion for Judgment of Acquittal..........................1515

Reporter's Certification of Transcript for June 7, 2012......1517

Reporter's Certification of Transcript for June 8, 2012......1518

Reporter's Certification of Transcript for June 11, 2012.....1519

Reporter's Certification of Transcript for June 12, 2012.....1520

Reporter's Certification of Transcript for June 13, 2012.....1521

Reporter's Certification of Transcript for June 14, 2012.....1522

Reporter's Certification of Transcript for June 19, 2012.....1523

Reporter's Certification of Transcript for June 25, 2012.....1524

Reporter's Certification of Transcript for July 2, 2012......1525

Reporter's Certification of Transcript for July 3, 2012......1526

Reporter's Certification of Transcript for July 10, 2012.....1527

ii

1

1

2                     UNITED STATES DISTRICT COURT

3                    CENTRAL DISTRICT OF CALIFORNIA
                          WESTERN DIVISION

4

5
    UNITED STATES OF AMERICA,     )
6                                 )
                                  )
7          PLAINTIFF,             )
                                  )
8          VS.                    )   CASE NO. CR 10-00923-SJO
                                  )
9                                 )   LOS ANGELES, CALIFORNIA
    GARY WHITE, JERMAINE HARDIMAN,)   JUNE 7, 2012
10  ANTHONY GABOUREL,             )
                                  )   (8:36 A.M. TO 10:03 A.M.)
11                                )   (10:24 A.M. TO 11:30 A.M.)
           DEFENDANTS.            )   (12:58 P.M. TO 2:38 P.M.)
12  _____)   (3:00 P.M. TO 4:19 P.M.)

13
                      JURY TRIAL - VOLUME III
14
                   BEFORE THE HONORABLE S. JAMES OTERO
15                    UNITED STATES DISTRICT JUDGE

16

17

18
    APPEARANCES:              SEE NEXT PAGE
19
    COURT REPORTER:           RECORDED; COURT SMART
20
    COURTROOM DEPUTY:         VICTOR PAUL CRUZ
21
    TRANSCRIBER:              DOROTHY BABYKIN
22                            COURTHOUSE SERVICES
                              1218 VALEBROOK PLACE
23                            GLENDORA, CALIFORNIA  91740
                              (626) 963-0566
24

25  PROCEEDINGS RECORDED BY ELECTRONIC SOUND RECORDING;
    TRANSCRIPT PRODUCED BY TRANSCRIPTION SERVICE.

                                                              2

 1   APPEARANCES:  (CONTINUED)
     FOR THE PLAINTIFF:      ANDRÉ BIROTTE, JR.
 2                           UNITED STATES ATTORNEY
                             ROBERT DUGDALE
 3                           CHIEF, CRIMINAL DIVISION
                             ASSISTANT UNITED STATES ATTORNEY
 4                           BY:  CHRISTOPHER K. PELHAM
                                  MACK ERIC JENKINS
 5                           ASSISTANT UNITED STATES ATTORNEY
                             312 NORTH SPRING STREET
 6                           LOS ANGELES, CALIFORNIA  90012

 7   FOR DEFENDANT WHITE:    FREDRICO MC CURRY LAW OFFICES
                             BY:  FREDRICO MC CURRY
 8                                ATTORNEY AT LAW
                             P.O. BOX 3695
 9                           VAN NUYS, CALIFORNIA  91407

10
     FOR DEFENDANT HARDIMAN:  DAVID J. P. KALOYANIDES LAW OFFICES
11                            BY:  DAVID J. P. KALOYANIDES
                                   ATTORNEY AT LAW
12                            205 SOUTH BROADWAY
                              SUITE 901
13                            LOS ANGELES, CALIFORNIA  90012

14   FOR DEFENDANT GABOUREL:  LUDLOW B. CREARY, II, LAW OFFICES
                              BY:  LUDLOW BARRINGTON CREARY, II
15                                 ATTORNEY AT LAW
                              3250 WILSHIRE BOULEVARD
16                            SUITE 708
                              LOS ANGELES, CALIFORNIA  90010

17

18

19

20

21

22

23

24

25                      **GER 0002**

3

```
1                        I N D E X
     CASE NO. CR 10-00923-SJO                    JUNE 7, 2012
2
     PROCEEDINGS:  JURY TRIAL - VOLUME III
3
     MARK STRICKLAND, GOVERNMENT WITNESS:                 PAGE
4
        DIRECT EXAMINATION BY MR. PELHAM (RESUMED)           6
5       CROSS-EXAMINATION BY MR. MC CURRY                  131
        CROSS-EXAMINATION BY MR. KALOYANIDES               152
6       REDIRECT EXAMINATION BY MR. PELHAM                 191

7

8

9

10                       I N D E X
                      E X H I B I T S
11                                          MARKED   RECEIVED
     GOVERNMENT EXHIBITS:
12   102-108                                            11
     110                                                16
13   111                                                16
     115                                                19
14   116-121                                            22
     122-123                                            24
15   127-128                                            26
     125-126                                            27
16   129-130                                            31
     133-136                                            33
17   138                                                35
     131                                                36
18   140                                                37
     141-147                                            39
19   149                                                41
     150                                                42
20   152                                                42
     153-159                                            47
21   161                                                58
     162                                                58
22   167                                                60
     168-171                                            62
23   174-176                                            66
     180-187                                            73
24   190, 192, 193                                      74
     244                                                76
25
```

4

1

2
                                    I N D E X
                            E X H I B I T S

3                                               MARKED    RECEIVED

    GOVERNMENT EXHIBITS:

4
    245-247                                                   77
5   242, 243                                                  77
    249-251                                                   80
6   253-255                                                   82
    252                                                       82
7   256                                                       85
    257-261                                                   87
8   265                                                       88
    273, 275                                                  90
9   271                                                       92
    272                                                       97
10  277                                                      102
    283, 285, 291-297                                        103
11  276                                                      104
    288                                                      105
12  286                                                      107
    298                                                      108
13  52                                                       112
    53                                                       116
14

15

16

17

18

19

20

21

22

23

24

25

1    LOS ANGELES, CALIFORNIA; THURSDAY, JUNE 7, 2012; 8:36 A.M.

2              THE CLERK:  PLEASE REMAIN SEATED AND COME TO ORDER.

3    THIS COURT IS AGAIN IN SESSION.

4              THE COURT:  OKAY.  WE'RE BACK ON UNITED STATES VERSUS

5    WHITE, ET AL.

6              COUNSEL ARE PRESENT.  THE DEFENDANTS ARE PRESENT --

7    THE LAWYERS, THE GOVERNMENT.

8              JUST THE JURY IS ABOUT TO BE BROUGHT IN.  I BELIEVE

9    WE LEFT OFF YESTERDAY ON EXHIBIT 101.  THERE ARE NUMEROUS OR

10   VARIOUS AUDIO/VIDEO RECORDINGS THAT THE GOVERNMENT INTENDS TO

11   OFFER.  SO, I WANT TO MAKE SURE THAT YOU MOVE THE PROCESS ALONG

12   IN TERMS OF LAYING THE FOUNDATION FOR THE RECEIPT OF THOSE

13   EXHIBITS.

14             WE'RE STILL EARLY IN THE LITIGATION, BUT WE SPENT 49

15   MINUTES WITH THE SPECIAL AGENT YESTERDAY.

16             MR. PELHAM:  YES, YOUR HONOR.  A LOT OF THAT IS

17   PRELIMINARY FOUNDATION THAT'S APPLICABLE TO ALL THE EXHIBITS.

18   AND ONCE WE START GOING THROUGH THEM, I'LL BE ADMITTING THEM IN

19   GROUPS.  AND WE'RE PLAYING THEM IN THIS INSTANCE AS WELL.

20             I THINK THAT ALL THAT FOUNDATION IS NECESSARY AT THE

21   PRELIMINARY STAGE BECAUSE IT'S APPLICABLE TO ALL THE OTHERS.

22             THE COURT:  OKAY.  SO, LET'S BRING THE JURY IN.

23             (PAUSE IN PROCEEDINGS.)

24             THE CLERK:  OKAY.  WOULD YOU ALL RISE FOR THE JURY,

25   PLEASE.

**GER 0005**

1          (JURY ENTERS.)

2          THE COURT:  OKAY.  WE HAVE ALL OF THE JURORS

3    REASSEMBLED WITH THE ALTERNATES.  COUNSEL ARE PRESENT.

4          PLEASE HAVE A SEAT.  WE CONTINUE WITH THE

5    GOVERNMENT'S CASE IN CHIEF.  WE HAD SUPERVISORY SPECIAL AGENT

6    MARK STRICKLAND ON THE STAND.

7          THE CLERK:  GO AHEAD AND BE SEATED, PLEASE.

8          GOOD MORNING, SIR.

9          THE WITNESS:  GOOD MORNING.

10          THE CLERK:  ONCE AGAIN YOU ARE REMINDED THAT YOU ARE

11    STILL UNDER OATH.

12        GOVERNMENT'S WITNESS MARK STRICKLAND, PREVIOUSLY SWORN:

13          THE CLERK:  FOR THE RECORD, WOULD YOU PLEASE STATE

14    YOUR NAME AND SPELL YOUR LAST NAME.

15          THE WITNESS:  IT'S MARK P. STRICKLAND,

16    S-T-R-I-C-K-L-A-N-D.

17          THE COURT:  OKAY.  JUST YESTERDAY, I HEARD SOME

18    WHISPERING FROM THE JURY.  SO, PLEASE MAKE SURE THAT YOU'RE NOT

19    ENGAGING IN CONVERSATION IN THE COURSE OF THE TRIAL.

20          YOUR WITNESS.

21          MR. PELHAM:  THANK YOU, YOUR HONOR.

22                 DIRECT EXAMINATION (RESUMED)

23    BY MR. PELHAM:

24    Q    GOOD MORNING, SPECIAL AGENT STRICKLAND.

25    A    GOOD MORNING.          **GER 0006**

1  Q    ON SEPTEMBER -- ON FEBRUARY 22ND, 2008, DID YOU MEET WITH

2  CONFIDENTIAL SOURCE 2 TO CARRY OUT A CONTROLLED DRUG BUY

3  OPERATION?

4  A    YES, I DID.

5  Q    AND DID YOU -- DID YOU FIT CONFIDENTIAL SOURCE 2 WITH ANY

6  RECORDING EQUIPMENT?

7  A    YES, I DID.

8  Q    WHAT DID YOU -- WHAT DID YOU INSTRUCT HIM TO DO AFTER YOU

9  FITTED THAT EQUIPMENT?

10  A    TO GO AND MEET PATTY AND THEN TRAVEL TO, I BELIEVE, PUEBLO

11  DEL RIO HOUSING PROJECT TO PURCHASE COCAINE.

12  Q    AND JUST AS A ROUGH APPROXIMATION, HOW LONG WAS

13  CONFIDENTIAL SOURCE 2 GONE BEFORE HE RETURNED FROM THE END OF

14  THAT OPERATION?

15  A    I DON'T HAVE THE EXACT TIME.  SOME -- SOMEWHERE, AN HOUR,

16  THEREABOUTS.

17  Q    DID YOU INSTRUCT AN AGENT TO SEARCH SOURCE 2 ONCE HE

18  RETURNED?

19  A    YES.

20  Q    AND DID YOU -- DID YOU INSTRUCT THE AGENT TO SEARCH HIS --

21  SOURCE 2'S PERSON OR HIS VEHICLE?

22  A    BOTH.

23  Q    WERE THERE ANY UNEXPECTED RESULTS FROM THOSE SEARCHES?

24  A    NOT THAT I'M AWARE OF.

25  Q    WHAT DID YOU DO WITH THAT RECORDING EQUIPMENT ONCE SOURCE

1    2 RETURNED?

2    A    WE COLLECTED THE RECORDING DEVICE.

3    Q    OKAY.

4    A    TURNED THE RECORDING DEVICE OFF AND COLLECTED THE

5    RECORDING DEVICE.

6    Q    AND WHAT DID YOU DO WITH THE CONTENT OF THAT RECORDING

7    DEVICE?

8    A    THAT WAS SUBSEQUENTLY SUBMITTED TO OUR EVIDENCE TECH

9    PEOPLE.  AND THEY DOWNLOAD THE EQUIPMENT -- DOWNLOAD THE

10   CONTENTS.  AND MYSELF AND ANOTHER AGENT SUBSEQUENTLY REVIEWED

11   THAT CONTENT.

12   Q    AND WHEN YOU REVIEWED THAT CONTENT, DID THE VIDEO PORTION

13   OF THAT CONTENT APPEAR UNINTERRUPTED WHEN YOU REVIEWED IT?

14   A    TO THE BEST OF MY KNOWLEDGE.

15   Q    NOW, HAVE YOU REVIEWED THE FILES THAT THE GOVERNMENT HAS

16   MARKED AS EXHIBITS 102 TO 108?

17   A    IF I COULD HAVE A COPY TO RECOLLECT MY MEMORY OF THE

18   EXHIBIT SHEET.

19   Q    WOULD A COPY OF THE EXHIBIT LIST -- OF THE GOVERNMENT'S

20   EXHIBIT LIST REFRESH YOUR RECOLLECTION?

21   A    YES, IT WOULD.

22           MR. PELHAM:  YOUR HONOR, MAY THE AGENT REFER TO THE

23   GOVERNMENT'S FILED EXHIBIT LIST.

24           THE COURT:  YES.

25           MR. PELHAM:  THANK YOU.

1   BY MR. PELHAM:

2   Q   OKAY.  SO, PLEASE TAKE A LOOK AT THE ITEMS THAT THE

3   GOVERNMENT HAS MARKED FOR IDENTIFICATION AS EXHIBIT 102 --

4           MR. PELHAM:  YOUR HONOR, MAY THE AGENT APPROACH --

5   SPECIAL AGENT BROWN APPROACH AGENT STRICKLAND WITH THE --

6           THE CLERK:  I WILL.

7           MR. PELHAM:  THANK YOU.

8           THE WITNESS:  THANK YOU.

9   BY MR. PELHAM:

10  Q   AGENT STRICKLAND, HAVE YOU REVIEWED THE RECORDINGS THAT

11  THE GOVERNMENT -- OR THE ITEMS THAT THE GOVERNMENT HAS MARKED

12  FOR IDENTIFICATION AS EXHIBITS 102 TO 108?

13  A   YES, I HAVE.

14  Q   AND WHAT ARE THOSE EXHIBITS?

15  A   THOSE ARE SEGMENTS OF THE AUDIO/VIDEO RECORDINGS MADE ON

16  FEBRUARY 22ND, 2008.

17  Q   NOW, DID YOU HELP PREPARE TRANSCRIPTS THAT PERTAIN TO

18  THOSE EXHIBITS?

19  A   YES, I DID.

20  Q   AND HAVE YOU REVIEWED THOSE TRANSCRIPTS FOR ACCURACY?

21  A   YES.

22  Q   HAVE -- NOW, WHOSE -- WHOSE VOICES AND LIKENESSES AMONG

23  OTHERS DID YOU RECOGNIZE FROM YOUR REVIEW OF THOSE RECORDINGS,

24  102 TO 108?

25  A   ON THAT DAY OR ON -- RECOGNIZED C.S. NUMBER 2 WAS ON

```
 1   THERE.  ALSO, AN INDIVIDUAL WHO HAD IDENTIFIED HERSELF AS PATTY
 2   IN THERE AS WELL.
 3   Q    DID YOU RECOGNIZE ANYONE ELSE IN 102 TO 108?
 4   A    ALSO, DEFENDANT MR. HARDIMAN.
 5        MR. KALOYANIDES:  OBJECTION.  LACKS FOUNDATION.  MOVE
 6   TO STRIKE.
 7        THE COURT:  WELL, YOU'RE GOING TO HAVE TO ASK A
 8   COUPLE OF ADDITIONAL FOUNDATIONAL QUESTIONS TO ESTABLISH HIS
 9   RECOGNITION OF MR. HARDIMAN'S VOICE.
10        MR. PELHAM:  YES, YOUR HONOR.
11   BY MR. PELHAM:
12   Q    AGENT STRICKLAND, YOU'VE -- YOU'VE HAD A -- HAVE YOU EVER
13   HAD A FACE-TO-FACE ENCOUNTER WITH DEFENDANT HARDIMAN?
14   A    YES.
15   Q    AND HAVE YOU HEARD DEFENDANT HARDIMAN SPEAK IN PERSON?
16   A    YES.  AFTER THE TAKE-DOWN, YES.
17   Q    ARE YOU FAMILIAR WITH MR. HARDIMAN'S LIKENESS AND VOICE?
18   A    YES.
19   Q    DID YOU RECOGNIZE FROM YOUR REVIEW OF THOSE RECORDINGS,
20   THE ONES AT 102 TO 108, THE LIKENESS AND VOICE OF DEFENDANT
21   HARDIMAN?
22   A    YES.
23   Q    NOW, YOU STATED THAT YOU HELPED PREPARE TRANSCRIPTS FOR
24   EXHIBIT 102 TO 108.
25        HAVE YOU REVIEWED THOSE TRANSCRIPTS FOR GENERAL
```

1    ACCURACY?

2    A    YES, I HAVE.

3    Q    AND ARE THOSE TRANSCRIPTS REASONABLY ACCURATE

4    REPRESENTATIONS OF WHAT IS BEING SAID ON EXHIBITS 102 TO 108?

5            MR. KALOYANIDES:  OBJECTION.  RELEVANCE.

6            THE COURT:  OVERRULED.

7            IT'S UP TO THE JURY TO MAKE THAT DETERMINATION.  BUT

8    I WOULD INSTRUCT THE JURY TO -- IT'S UP TO THEM.

9    BY MR. PELHAM:

10   Q    AND ARE THOSE TRANSCRIPTS PRESENTED BY THE GOVERNMENT AS

11   EXHIBITS 102(A) TO 108(A)?

12   A    YES.

13           MR. PELHAM:  YOUR HONOR, THE GOVERNMENT OFFERS

14   EXHIBITS 102 TO 108.

15           THE COURT:  102 IS RECEIVED.

16           (GOVERNMENT'S EXHIBIT 102 RECEIVED.)

17           THE COURT:  103 IS RECEIVED.

18           (GOVERNMENT'S EXHIBIT 103 RECEIVED.)

19           THE COURT:  WELL, LET ME JUST -- IS THERE ANY

20   OBJECTIONS?

21           (NO AUDIBLE RESPONSE.)

22           THE COURT:  104, 105, 106, AND 107, 108.

23       (GOVERNMENT'S EXHIBITS 104, 105, 106, 107, 108 RECEIVED.)

24           THE COURT:  THE SAME NUMBERS WITH THE (A) ARE THE

25   TRANSCRIPTS.  THOSE WILL NOT BE RECEIVED.

1            MR. KALOYANIDES:  NO OBJECTION, YOUR HONOR.

2            MR. PELHAM:  AND, YOUR HONOR, THE GOVERNMENT --

3            THE COURT:  NO OBJECTION?

4            MR. CREARY:  NO.

5            MR. MC CURRY:  NO OBJECTION, YOUR HONOR.

6            THE COURT:  AND, AGAIN, THE JURY IS GOING TO HAVE --

7 I THINK YOU HAVE THE BOOKS -- THE BINDERS FROM YESTERDAY.

8 PLEASE ONLY READ THE AUDIO THAT'S BEING REPORTED -- BEING

9 PLAYED.  AND KEEP IN MIND MY INSTRUCTION YESTERDAY.  IT'S THAT

10 THE AUDIO IS THE EVIDENCE NOT THE TRANSCRIPT.  THERE'S A

11 DIFFERENCE.  IF THERE'S A DIFFERENCE BETWEEN THE TRANSCRIPT AND

12 THE AUDIO, YOUR UNDERSTANDING OF WHAT'S ON THE AUDIO CONTROLS.

13            MR. PELHAM:  AND, YOUR HONOR, WITH THE COURT'S

14 PERMISSION, WHAT THE GOVERNMENT WOULD LIKE TO DO IS PLAY

15 EXHIBITS 102 TO 108 WITH THE INSTRUCTION THAT THE JURY REFER TO

16 EACH OF THOSE TRANSCRIPTS ONE AT A TIME.

17            THE COURT:  YES.

18            MR. PELHAM:  SO, WE'LL PLAY 102 NOW.

19            (EXHIBIT 102, AUDIO/VIDEO PLAYING.)

20 BY MR. PELHAM:

21 Q   OKAY.  AGENT STRICKLAND, COULD YOU TELL US WHAT DID WE

22 JUST SEE IN EXHIBIT 102.

23 A   MYSELF FINISHING THE FITTING PROCESS OF THE RECORDING

24 DEVICE ON THE C.S. NUMBER 2.

25 Q   AND WHAT -- WHAT WAS C.S. 2 DOING AT THE END OF THAT

1   RECORDING?

2   A    HE APPEARED TO BE GETTING INTO HIS VEHICLE.

3            THE COURT:  WOULD YOU SPEAK INTO THE MICROPHONE,

4   PLEASE.

5            THE WITNESS:  I'M SORRY.

6            ENTERING HIS VEHICLE.

7   BY MR. PELHAM:

8   Q    AND WAS THAT FITTING PROCESS THE SAME AS TO ALL OF THE

9   CONTROLLED DRUG PURCHASE OPERATIONS THAT YOU OVERSAW IN THE

10  COURSE OF THIS INVESTIGATION?

11  A    GENERALLY SO.

12           MR. PELHAM:  LET'S PLAY EXHIBIT 103.

13           (EXHIBIT 103, AUDIO/VIDEO PLAYING.)

14           MR. PELHAM:  OKAY.  LET'S PLAY EXHIBIT 103.

15           AND, YOUR HONOR, JUST FOR CLARIFICATION, THE

16  TRANSCRIPTS HAVE ALSO BEEN VOTED IN REALTIME ON THE VIDEO

17  ITSELF.

18           (EXHIBIT 103 AUDIO/VIDEO PLAYING.)

19           (GOVERNMENT COUNSEL CONFERRING.)

20           MR. PELHAM:  THE NEXT ONE.  104.  MY APOLOGIES.

21           (EXHIBIT 104 AUDIO/VIDEO PLAYING.)

22           MR. PELHAM:  NOW, 105.

23           (EXHIBIT 105 AUDIO/VIDEO PLAYING.)

24  BY MR. PELHAM:

25  Q    AND FOR CLARIFICATION, AGENT STRICKLAND, IS THE MALE'S

```
 1   VOICE THAT IS HEARD IN THAT RECORDING THAT OF CONFIDENTIAL
 2   SOURCE 2?
 3   A   YES, IT IS.
 4           MR. PELHAM:  LET'S PLAY 106.
 5           (EXHIBIT 106 AUDIO/VIDEO PLAYING.)
 6           MR. PELHAM:  OKAY. 107.
 7           (EXHIBIT 107 AUDIO/VIDEO PLAYING.)
 8   BY MR. PELHAM:
 9   Q   AND, AGENT STRICKLAND, DID YOU HEAR DEFENDANT HARDIMAN'S
10   VOICE DURING THE COURSE OF THE PLAYING OF EXHIBIT 107?
11   A   YES, I DID.
12           MR. PELHAM:  LET'S PLAY EXHIBIT 108.
13           (EXHIBIT 108 AUDIO/VIDEO PLAYING.)
14   BY MR. PELHAM:
15   Q   NOW, AGENT STRICKLAND, I'M GOING TO SHOW YOU WHAT THE
16   GOVERNMENT HAS MARKED FOR IDENTIFICATION AS EXHIBIT 110.
17           MR. PELHAM:  YOUR HONOR, MAY AGENT BROWN HAND AGENT
18   STRICKLAND THE ITEM MARKED AS EXHIBIT 110?
19           THE COURT:  YES, PLEASE.
20   BY MR. PELHAM:
21   Q   AGENT STRICKLAND, DID AGENT BROWN HAND YOU AN ITEM MARKED
22   AS EXHIBIT 110?
23   A   YES, HE DID.
24   Q   DO YOU RECOGNIZE THAT EXHIBIT?
25   A   YES, I DO.
```

**GER 0014**

1   Q    WHAT IS IT?

2   A    IT IS A PLASTIC EVIDENCE ENVELOPE THAT IS -- CONTAIN A

3   WHITE POWDERY SUBSTANCE.

4   Q    AND WHAT -- HOW DO YOU RECOGNIZE IT?

5   A    I RECOGNIZE IT BECAUSE THE EVIDENCE -- THE FBI EVIDENCE

6   LABEL.  IT HAS THE DESCRIPTORS AS FAR AS BOOKING THE DRUG

7   EVIDENCE TO INCLUDE THE FILE NUMBER, THE DATE OF THE SEIZURE OR

8   THE COLLECTION, WHICH WAS FEBRUARY 22ND, 2008; DATE OF THE

9   SEALING, WHICH WAS FEBRUARY 22ND, 2008.  IT HAS MY NAME AS THE

10  SEALING OFFICIAL.  AND IT ALSO HAS AGENT BROWN'S NAME AS A

11  WITNESS AND OFFICIAL.

12  Q    WHEN DID YOU COLLECT EXHIBIT 110?

13  A    IT WAS COLLECTED ON FEBRUARY 22ND, 2008.

14  Q    AND DID YOU COLLECT IT FROM SOURCE 2 AT THE END OF THE

15  CONTROLLED DRUG PURCHASE OPERATION THAT WE JUST SAW?

16  A    YES.

17       MR. PELHAM:  YOUR HONOR, THE GOVERNMENT OFFERS

18  EXHIBIT 110.

19       MR. KALOYANIDES:   OBJECTION.  LACKS FOUNDATION AS TO

20  THE CONTENTS AND RELEVANCE.

21       THE COURT:  YOU'RE GOING TO BE OFFERING --

22       MR. PELHAM:  ANALYSIS.

23       THE COURT:   OKAY.  IT'S -- IT WILL BE RECEIVED

24  SUBJECT TO A MOTION TO STRIKE AND SUBJECT TO ANY OTHER

25  APPROPRIATE REQUESTS IF THE ADDITIONAL FOUNDATION IS NOT LAID.

**GER 0015**

1    BY MR. PELHAM:

2    Q    NOW --

3              THE COURT:  110 IS RECEIVED CONDITIONALLY.

4              MR. PELHAM:  THANK YOU, YOUR HONOR.

5              (GOVERNMENT'S EXHIBIT 110 RECEIVED CONDITIONALLY.)

6    BY MR. PELHAM:

7    Q    NOW, AGENT STRICKLAND, IF YOU COULD TAKE A LOOK AT THE

8    EXHIBIT BINDER IN FRONT OF YOU BEHIND -- PLEASE TAKE A LOOK AT

9    THE DOCUMENT BEHIND TAB 111.

10             OKAY.  WHAT DO YOU SEE BEHIND TAB 111, JUST IN

11   GENERAL TERMS.

12   A    IN GENERAL TERMS IT APPEARS TO BE A SCREEN CAPTURE FROM

13   THE AUDIO/VIDEO RECORDING THAT WAS ON FEBRUARY 22ND, 2008.

14             MR. PELHAM:  YOUR HONOR, THE GOVERNMENT OFFERS

15   EXHIBIT 111.

16             THE COURT:  ANY OBJECTION?

17             MR. KALOYANIDES:  NO OBJECTION.

18             MR. MC CURRY:  NO OBJECTION.

19             THE COURT:  MR. CREARY?

20             MR. CREARY:  NO OBJECTION, YOUR HONOR.

21             THE COURT:  OKAY. 111 IS RECEIVED.

22             (GOVERNMENT'S EXHIBIT 111 RECEIVED.)

23             MR. PELHAM:  WE'LL POST 111.

24   BY MR. PELHAM:

25   Q    AGENT STRICKLAND, DO YOU RECOGNIZE THE INDIVIDUAL DEPICTED

1    IN EXHIBIT 111?

2    A    YES.  IT APPEARS TO BE DEFENDANT MR. HARDIMAN.

3    Q    NOW --

4              MR. PELHAM:  WE CAN TAKE 111 DOWN.

5    BY MR. PELHAM:

6    Q    -- DID YOU CONDUCT ANOTHER CONTROLLED DRUG PURCHASE

7    OPERATION ON MARCH 18, 2008?

8    A    YES, I DID.

9    Q    AND DID YOU -- WHAT SOURCE DID YOU USE TO -- WHAT SOURCE

10   DID YOU USE TO INITIATE THAT OPERATION?

11   A    THAT WOULD BE CONFIDENTIAL SOURCE NUMBER 2.

12   Q    DID YOU INSTRUCT SOURCE 2 TO MAKE ANY PHONE CALLS TO

13   ESTABLISH THAT OPERATION?

14   A    YES.

15   Q    AND WHOM DID YOU HAVE SOURCE 2 CALL?

16   A    I BELIEVE I HAD HIM CALL DEFENDANT MR. HARDIMAN.

17   Q    WERE YOU PRESENT WHEN HE PLACED ONE OF THOSE CALLS?

18   A    YEAH, DURING ONE OF THE -- ONE OF THE CALLS I WAS PRESENT.

19   Q    OKAY.  AND DID HE -- DID YOU RECORD THAT CALL AS IT WAS

20   PLACED?

21   A    YES.

22   Q    WHEN DID HE PLACE THAT CALL?

23   A    I BELIEVE THAT WAS ON MARCH 18TH, 2008.

24   Q    AND HAVE YOU REVIEWED THE RECORDING FOR THAT CALL?

25   A    YES, I HAVE.    **GER 0017**

1    Q    WHOSE VOICES DO YOU RECOGNIZE ON THE RECORDING?

2    A    THAT WOULD BE C.S. NUMBER 2 AND MR. HARDIMAN.

3    Q    HAVE YOU REVIEWED THE RECORDING THAT THE GOVERNMENT -- THE

4    ITEM THAT THE GOVERNMENT HAS MARKED AS EXHIBIT 115?

5    A    YES, I HAVE.

6    Q    AND WHAT IS 115?

7    A    IT'S A RECORDING ON MARCH 18TH, 2008 OF A PHONE CALL.

8    Q    AND DID YOU -- HOW DO YOU RECOGNIZE IT?

9    A    I WAS PRESENT WHILE THE CALL WAS BEING PLACED.

10   Q    DID YOU HELP PREPARE TRANSCRIPTS FOR EXHIBIT 115?

11   A    YES.

12   Q    OKAY.  AND IS THAT TRANSCRIPT PRESENTED AS 115(A)?

13   A    YES.

14        MR. PELHAM:  YOUR HONOR, THE GOVERNMENT OFFERS 115.

15        MR. KALOYANIDES:  OBJECTION.  LACKS FOUNDATION.

16   RELEVANCE.

17        THE COURT:  ANY OTHER OBJECTIONS?

18        MR. MC CURRY:  JOINED, YOUR HONOR.

19        MR. CREARY:  JOINED, YOUR HONOR.

20        THE COURT:  MR. CREARY, I DIDN'T HEAR YOU.

21        MR. CREARY:  JOINED, YOUR HONOR.

22        THE COURT:  OKAY.  OBJECTION IS OVERRULED.

23        MR. PELHAM:  LET'S PLAY 115.

24        (EXHIBIT 115, AUDIO/VIDEO PLAYING.)

25        MR. PELHAM:  PAUSE IT FOR A MOMENT.

```
 1            (GOVERNMENT EXHIBIT 115 RECEIVED.)
 2  BY MR. PELHAM:
 3  Q    AGENT STRICKLAND, WHOSE VOICES DO YOU -- WHEN YOU REVIEWED
 4  THE RECORDING, WHOSE VOICES DO YOU RECALL HEARING IN THE COURSE
 5  OF EXHIBIT 115?
 6  A    I BELIEVE IT'S C.S. NUMBER 2 AND MR. HARDIMAN.
 7  Q    THANK YOU.
 8            MR. PELHAM:  WE'LL CONTINUE PLAYING.
 9            (EXHIBIT 115, AUDIO/VIDEO PLAYING.)
10  BY MR. PELHAM:
11  Q    NOW, AGENT STRICKLAND, WHAT DID YOU INSTRUCT SOURCE 2 TO
12  DO AFTER THAT CALL?
13  A    TRAVEL TO THE LOCATION AND CONDUCT THE CONTROLLED PURCHASE
14  OF COCAINE.
15  Q    FROM WHOM?
16  A    MR. HARDIMAN.
17  Q    AND ON WHAT DATE DID YOU ARRANGE FOR SOURCE 2 TO MAKE THAT
18  PURCHASE?
19  A    IT WOULD HAVE BEEN ON MARCH 18TH, 2008.
20  Q    AND DID YOU FOLLOW FOR THIS OPERATION THE SAME PROCEDURES
21  THAT YOU HAD FOLLOWED FOR THE FEBRUARY 22ND OPERATION?
22  A    YES.
23  Q    DID YOU FIT SOURCE 2 WITH AUDIO/VIDEO RECORDING EQUIPMENT
24  BEFORE THE OPERATION?
25  A    YES, I DID.
```

**GER 0019**

1    Q    OKAY.  AND DID YOU INSTRUCT AGENTS TO SEARCH HIS PERSON

2    AND VEHICLE BEFORE THE OPERATION?

3    A    YES.

4    Q    DID YOU INSTRUCT AGENTS TO CONDUCT VISUAL SURVEILLANCE OF

5    SOURCE 2 ONCE HE LEFT YOUR PRESENCE?

6    A    YES.

7    Q    DID SOURCE 2 RETURN TO THE MEET LOCATION AFTER THE

8    OPERATION?

9    A    YES.

10   Q    AND DID YOU REMOVE HIS RECORDING DEVICE AT THAT TIME?

11   A    YES.

12   Q    ALL RIGHT.  DID YOU REVIEW THE CONTENTS OF THAT RECORDING

13   DEVICE?

14   A    YES, I DID.

15   Q    AND WERE THE CONTENTS OF THOSE RECORDINGS UNINTERRUPTED

16   WHEN YOU REVIEWED THEM?

17   A    TO THE BEST OF MY KNOWLEDGE.

18   Q    HAVE YOU REVIEWED THE ITEMS THAT THE GOVERNMENT HAS MARKED

19   AS EXHIBITS 117 TO 123?

20   A    IS THAT 117?

21   Q    I'M -- ACTUALLY, LET'S START WITH 116.

22        HAVE YOU REVIEWED THE ITEM THAT THE GOVERNMENT HAS

23   MARKED FOR IDENTIFICATION AS EXHIBIT 116?

24   A    YES.

25   Q    AND IS 116 AN EXTRACT OF THE RECORDING THAT YOU'VE

Case 2:10-cr-00923-SJO Document 1519 Filed 07/31/12 Page 24 of 206 Page ID #:9214

```
 1   DOWNLOADED FROM THIS OPERATION?
 2   A    YES.
 3   Q    NOW, HAVE YOU ALSO REVIEWED GOVERNMENT'S EXHIBITS 117 TO
 4   123?
 5   A    YES, I HAVE.
 6   Q    OKAY.  AND WHAT ARE THOSE EXHIBITS?
 7   A    117 THROUGH 121 APPEAR TO BE AUDIO/VIDEO RECORDING OF AN
 8   OPERATION THAT TOOK PLACE ON MARCH 18TH.
 9   Q    OKAY.  MY APOLOGIES.  JUST REFERRING TO 117 TO 121, ARE
10   THOSE ALL EXTRACTS FROM THE RECORDING THAT WAS MADE FOR THE
11   MARCH 18 OPERATION?
12   A    YES.
13   Q    OKAY.  NOW, WHEN YOU REVIEWED THE ORIGINAL RECORDING, DID
14   YOU NOTICE ANY INTERRUPTIONS IN THE AUDIO OR VIDEO?
15   A    NOT THAT I'M AWARE OF.
16   Q    AND DID YOU HELP PREPARE TRANSCRIPTS FOR 117 TO 121?
17   A    YES, I DID.
18          MR. PELHAM:  OKAY.  YOUR HONOR, THE GOVERNMENT OFFERS
19   EXHIBITS 116 THROUGH 121.
20          THE COURT:  WHAT'S THE DATE OF THE OPERATION, SPECIAL
21   AGENT?
22          THE WITNESS:  THAT WAS ON MARCH 18TH, 2008.
23          THE COURT:  ANY OBJECTION?
24          MR. KALOYANIDES:  NO OBJECTION, YOUR HONOR.
25          MR. MC CURRY:  NO OBJECTION.
```

1            THE COURT:  AGAIN, THE AUDIO/VIDEO IS RECEIVED, NOT

2    THE TRANSCRIPTS.

3            (GOVERNMENT EXHIBITS 116-121 RECEIVED.)

4            THE COURT:  AND THE JURY IS AGAIN INSTRUCTED THAT THE

5    EVIDENCE IS THE AUDIO/VIDEO AND NOT THE WORDS WRITTEN IN THE

6    TRANSCRIPTS.  IF THERE'S ANY DISCREPANCY, THE AUDIO/VIDEO

7    CONTROLS.

8            MR. PELHAM:  YOUR HONOR, WE'LL START WITH EXHIBIT

9    116.

10            THE COURT:  YES.

11            MR. PELHAM:  THANK YOU.

12            (EXHIBIT 116, AUDIO/VIDEO PLAYING.)

13    BY MR. PELHAM:

14    Q    NOW, AGENT STRICKLAND, WHAT'S DEPICTED IN THAT RECORDING?

15    A    THAT IS THE -- FINISHED UP THE THING OF THE SOURCE WITH

16    THE AUDIO/VIDEO RECORDING AND THE SOURCE, C.S. 2, LEAVING THE

17    MEET LOCATION -- MEET VEHICLE AND ENTERING HIS VEHICLE.

18            MR. PELHAM:  OKAY.  LET'S PLAY EXHIBIT 117.

19            (EXHIBIT 117, AUDIO/VIDEO PLAYING.)

20    BY MR. PELHAM:

21    Q    NOW, AGENT STRICKLAND, WHOSE VOICES DID YOU RECOGNIZE IN

22    EXHIBIT 117?

23    A    I RECOGNIZED C.S. 2 AND ALSO MR. HARDIMAN.

24            MR. PELHAM:  LET'S PLAY EXHIBIT 118.

25            (EXHIBIT 118, AUDIO/VIDEO PLAYING.)

```
 1              MR. PELHAM:  AND NOW 119.

 2              (EXHIBIT 119, AUDIO/VIDEO PLAYING.)

 3    BY MR. PELHAM:

 4    Q    AGENT STRICKLAND, WHOSE VOICES DID YOU RECOGNIZE IN 119?

 5    A    I RECOGNIZED C.S. NUMBER 2 AND ALSO MR. HARDIMAN.

 6              MR. PELHAM:  WE'LL PLAY 120.

 7              (EXHIBIT 120, AUDIO/VIDEO PLAYING.)

 8              MR. PELHAM:  AND LET'S PLAY 121.

 9              (EXHIBIT 121, AUDIO/VIDEO RECORDING.)

10    BY MR. PELHAM:

11    Q    NOW, AGENT STRICKLAND, IN THE COURSE OF THESE RECORDINGS

12    DID YOU RECOGNIZE THE RESIDENCE IN WHICH THE RECORDINGS APPEAR

13    TO HAVE BEEN MADE?

14    A    YES, I DID.

15    Q    AND IS THAT RESIDENCE ONE THAT IS LOCATED NEAR THE PUEBLO

16    DEL RIO HOUSING PROJECTS?

17    A    YES, IT IS.

18    Q    NOW, DID YOU INSTRUCT SOURCE 2 TO PLACE ANY PHONE CALLS

19    FOLLOWING THIS TRANSACTION?

20    A    YES.

21    Q    AND WHOM DID YOU INSTRUCT SOURCE 2 TO CALL?

22    A    HAD HIM CALL MR. HARDIMAN.

23    Q    WERE YOU PRESENT WHEN HE -- WHEN SOURCE 2 PLACED THOSE

24    CALLS?

25    A    I DO NOT BELIEVE SO.
```

1  Q    DID YOU GIVE SOURCE 2 ANY RECORDING EQUIPMENT TO RECORD

2  THOSE CALLS?

3  A    YEAH, I THINK I GAVE HIM AN AUDIO CASSETTE RECORDER.

4  Q    DID SOURCE 2 RETURN ANY RECORDINGS TO YOU?

5  A    YES, HE DID.

6  Q    AND HAVE YOU REVIEWED THOSE RECORDINGS IN THEIR ENTIRETY?

7  A    YES, I HAVE.

8  Q    AND HAVE YOU LOOKED AT THE ITEMS THAT THE GOVERNMENT HAS

9  MARKED AS EXHIBITS 122 AND 123?

10  A    YES.

11  Q    DO YOU RECOGNIZE THOSE ITEMS?

12  A    YES.

13  Q    AND WHAT ARE THEY?

14  A    THOSE ARE THE TELEPHONE CALLS PLACED BY C.S. NUMBER 2 TO

15  MR. HARDIMAN.

16           MR. PELHAM:  YOUR HONOR, THE GOVERNMENT OFFERS 122

17  AND 123.

18           THE COURT:  ANY OBJECTION?

19           MR. KALOYANIDES:  NO OBJECTION.

20           MR. MC CURRY:  NO OBJECTION, YOUR HONOR.

21           MR. CREARY:  NO OBJECTION.

22           THE COURT:  122 AND 123 ARE RECEIVED.

23           (GOVERNMENT'S EXHIBITS 122 AND 123 RECEIVED.)

24  BY MR. PELHAM:

25  Q    AGENT STRICKLAND, DID YOU HELP PREPARE TRANSCRIPTS FOR 122

1    AND 123?

2    A    YES, I DID.

3    Q    DO YOU RECOGNIZE THE VOICES THAT ARE HEARD ON THOSE TWO

4    EXHIBITS?

5    A    YES.   I BELIEVE THEY WERE MR. HARDIMAN AND C.S. NUMBER 2.

6             MR. PELHAM:  WE'LL PLAY 122.

7             (EXHIBIT 122, AUDIO/VIDEO PLAYING.)

8             MR. PELHAM:  AND WE'LL PLAY EXHIBIT 123.

9             (EXHIBIT 123, AUDIO/VIDEO PLAYING.)

10   BY MR. PELHAM:

11   Q    NOW, AGENT STRICKLAND, IF YOU COULD REFER TO THE WITNESS

12   BINDER IN FRONT OF YOU.  AND PLEASE TAKE A LOOK AT EXHIBITS 127

13   AND 128.

14   A    YES.

15   Q    DO YOU RECOGNIZE THE DOCUMENTS AT EXHIBIT 127 AND 128?

16   A    YES.

17   Q    AND WHAT ARE THOSE?

18   A    THEY'RE THE SCREEN CAPTURES FROM THE AUDIO/VIDEO RECORDING

19   ON MARCH 18TH, 2008.

20   Q    DO YOU RECOGNIZE THE INDIVIDUAL DEPICTED IN THOSE SCREEN

21   CAPTURES?

22   A    IT APPEARS TO BE MR. HARDIMAN.

23   Q    OKAY.

24             MR. PELHAM:  YOUR HONOR, THE GOVERNMENT OFFERS 127

25   AND 128.

**GER 0025**

```
1              THE COURT:  OBJECTION?

2              MR. KALOYANIDES:  NO OBJECTION.

3              MR. MC CURRY:  NO OBJECTION.

4              MR. CREARY:  NO OBJECTION.

5              THE COURT: 127 AND 128 ARE RECEIVED.

6              (GOVERNMENT'S EXHIBIT 127 AND 128 RECEIVED.)

7              MR. PELHAM:  WE'LL SHOW BOTH.  AND WE CAN DO IT SIDE

8    BY SIDE.

9              (PAUSE IN PROCEEDINGS.)

10   BY MR. PELHAM:

11   Q    NOW, AGENT STRICKLAND, DID SOURCE 2 GIVE YOU ANYTHING THAT

12   HE HAD ACQUIRED DURING THE COURSE OF THE MARCH 18, 2008

13   OPERATION?

14   A    YES.

15   Q    OKAY.

16             MR. PELHAM:  YOUR HONOR, WITH THE COURT'S PERMISSION,

17   I'D LIKE TO HAVE SPECIAL AGENT BROWN HAND SPECIAL AGENT

18   STRICKLAND EXHIBITS 125 AND 126.

19             THE COURT:  PLEASE.

20             (PAUSE IN PROCEEDINGS.)

21   BY MR. PELHAM:

22   Q    DO YOU RECOGNIZE THOSE TWO ITEMS?

23   A    YES, I DO.

24   Q    AND WHAT ARE THEY?

25   A    ITEM 125 IS AN OFF-WHITE ROCK-LIKE SUBSTANCE CONTAINED IN
```

**GER 0026**

1    A PLASTIC EVIDENCE BAG.

2    Q    AND WHAT IS 126?

3    A    AND 126 IS AN OFF-WHITE POWDERY SUBSTANCE CONTAINED -- I'M

4    SORRY -- IN AN EVIDENCE -- IN AN EVIDENCE BAG.

5    Q    WHEN DID YOU RECEIVE THOSE TWO ITEMS?

6    A    THE DATE OF THE COLLECTION WAS ON -- FOR BOTH ITEMS, MARCH

7    18TH, 2008.  AND DATE OF SEALING WAS MARCH 18TH, 2008.  MY

8    NAME.  I WAS THE SEALING OFFICIAL.  AND AGENT BROWN WAS THE

9    WITNESSING OFFICIAL.

10   Q    AND DID YOU RECEIVE BOTH OF THOSE ITEMS FROM SOURCE 2 ON

11   -- AT THE END OF THAT OPERATION ON MARCH 18TH, 2008?

12   A    YES, I DID.

13          MR. PELHAM:  YOUR HONOR, THE GOVERNMENT OFFERS 12- --

14   EXHIBIT 125 AND 126.

15          MR. KALOYANIDES:  OBJECTION.  LACKS FOUNDATION.

16   RELEVANCE.

17          MR. MC CURRY:  JOINED.

18          MR. CREARY:  JOINED.

19          THE COURT:  THE OBJECTIONS ARE OVERRULED.  THEY'RE

20   RECEIVED.

21          (GOVERNMENT EXHIBITS 125 AND 126 RECEIVED.)

22          THE COURT:  BUT LET ME JUST INSTRUCT THE JURY.  IT

23   HAS NOT YET BEEN ESTABLISHED THAT THE CONTENTS OF 125 AND 126

24   IS COCAINE.  THAT REQUIRES CHEMICAL OPINION FROM AN EXPERT.

25                        **GER 0027**

1   BY MR. PELHAM:

2   Q    AGENT STRICKLAND, DO YOU HAVE ALL THE OTHER EXHIBITS UP

3   THERE?  SHOULD AGENT BROWN RECOLLECT THEM?

4   A    YES.  I HAVE THE --

5            MR. PELHAM:  YOUR HONOR, IF AGENT BROWN COULD COLLECT

6   THE PREVIOUS EXHIBITS FROM THE AGENT.

7            THE COURT:  YES.

8            (PAUSE IN PROCEEDINGS.)

9   BY MR. PELHAM:

10  Q    NOW, AGENT STRICKLAND, DID YOU CONDUCT ANOTHER SET OF

11  CONTROLLED DRUG PURCHASE OPERATIONS BETWEEN AND INCLUDING APRIL

12  18 AND APRIL 22ND, 2008?

13  A    YES.

14  Q    AND WHAT CONFIDENTIAL SOURCE -- AGAIN, GOING BY ALIAS OR

15  NICKNAME, DID YOU USE FOR THOSE OPERATIONS?

16  A    THAT WOULD BE C.S. NUMBER 2.

17  Q    AND FOR THOSE OPERATIONS DID YOU GENERALLY FOLLOW THE SAME

18  PROCEDURES THAT WE JUST DISCUSSED AS TO THE OTHER TWO

19  OPERATIONS?

20  A    YES.

21  Q    DID YOU INSTRUCT SOURCE 2 TO HAVE FACE-TO-FACE CONTACT

22  WITH DEFENDANT JERMAINE HARDIMAN ON BOTH APRIL 18 AND APRIL

23  22ND, 2008?

24  A    YES.

25  Q    AND WHAT DID YOU INSTRUCT HIM TO DO DURING THOSE

1    ENCOUNTERS?

2    A    INSTRUCTED HIM TO MEET WITH MR. HARDIMAN AND ACQUIRE

3    COCAINE.

4    Q    PLEASE REFER -- EXCUSE ME.  HAVE YOU LOOKED AT THE ITEMS

5    THAT THE GOVERNMENT HAS MARKED AS EXHIBITS 129 AND 130?

6    A    YES, I HAVE.

7    Q    AND DO YOU RECOGNIZE THOSE ITEMS OR DID YOU RECOGNIZE

8    THOSE ITEMS?

9    A    YES.

10   Q    AND WHAT ARE THOSE ITEMS?

11   A    AUDIO/VIDEO RECORDINGS.  SEGMENTS FROM APRIL 18TH, 2008.

12   Q    AND ARE THOSE SEGMENTS OF AUDIO/VIDEO RECORDINGS THAT YOU

13   DOWNLOADED FROM SOURCE 2 AFTER AN APRIL 18TH, 2008 OPERATION?

14   A    YEAH.  I RECEIVED THOSE.  AND THEN SUBSEQUENTLY THE

15   EVIDENCE TECHS DOWNLOADED THE CONTENTS.

16            MR. PELHAM:  YOUR HONOR, THE GOVERNMENT OFFERS 129

17   AND 130.

18            THE COURT:  OBJECTION?

19            MR. KALOYANIDES:  OBJECTION.  LACKS FOUNDATION.

20            MR. MC CURRY:  JOIN.

21            MR. CREARY:  JOIN.

22            THE COURT:  AGAIN, LAY THE FOUNDATION REGARDING

23   RECOGNITION OF THE SPEAKERS.

24            MR. PELHAM:  YES, YOUR HONOR.

25                          **GER 0029**

1   BY MR. PELHAM:

2   Q    AGENT STRICKLAND, DO YOU -- DO YOU RECOGNIZE -- DID YOU

3   RECOGNIZE THE VOICES OR LIKENESSES -- AND/OR LIKENESSES OF ANY

4   OF THE INDIVIDUALS WHO ARE DEPICTED IN EXHIBITS 129 AND 130?

5   A    YES.

6   Q    AND WHOM DID YOU RECOGNIZE?

7   A    C.S. NUMBER 2 AND ALSO MR. HARDIMAN.

8   Q    AND DURING THE COURSE OF THE OPERATION THAT YOU CONDUCTED

9   ON APRIL 18TH, 2008, IF YOU COULD EXPLAIN WHAT -- WHAT STEPS

10   DID YOU TAKE AS AN AGENT TO ENSURE THE INTEGRITY OF THE

11   RECORDINGS MADE BY SOURCE 2?

12   A    AGAIN, IT WAS FROM FITTING THE SOURCE WITH THE EQUIPMENT.

13   AND THE SOURCE WOULD THEN DEPART.  AND I WOULD COLLECT THE

14   EVIDENCE OR COLLECT THE RECORDING DEVICE FOLLOWING THE

15   OPERATION.

16   Q    AND DID THE SOURCE HAVE THE RECORDING DEVICE FOR MORE THAN

17   THREE HOURS DURING THE COURSE OF THIS OPERATION?

18   A    I DON'T BELIEVE SO, NO.

19         MR. PELHAM:  YOUR HONOR, AGAIN, THE GOVERNMENT OFFERS

20   129 AND 130.

21         THE COURT:  OBJECTION?

22         MR. KALOYANIDES:  NO OBJECTION.

23         MR. MC CURRY:  NO OBJECTION.

24         THE COURT:  OKAY.  RECEIVED.

25         MR. CREARY:  NO OBJECTION.

1         THE COURT:  RECEIVED.

2         (GOVERNMENT'S EXHIBITS 129 AND 130 RECEIVED.)

3         MR. PELHAM:  YOUR HONOR, PERMISSION TO PLAY BOTH OF

4    THOSE.

5         THE COURT:  YES, PLEASE.

6    BY MR. PELHAM:

7    Q    AND ACTUALLY -- AND BEFORE WE PLAY, AGENT STRICKLAND, DID

8    YOU HELP PREPARE TRANSCRIPTS FOR 129 AND 130?

9    A    YES, I DID.

10   Q    DID YOU PREPARE TRANSCRIPTS BASED ON THE VOICES AND

11   LIKENESSES THAT YOU RECOGNIZE IN THOSE RECORDINGS?

12   A    YES.

13        MR. PELHAM:  OKAY.  WE'LL PLAY 129 FIRST.

14        (EXHIBIT 129, AUDIO/VIDEO RECORDING.)

15        MR. PELHAM:  AND NOW 130.

16        (EXHIBIT 130, AUDIO/VIDEO PLAYING.)

17   BY MR. PELHAM:

18   Q    AND FOR CLARIFICATION, AGENT STRICKLAND, WHERE YOU USE THE

19   LETTERS "U.I." IN THE COURSE OF THE TRANSCRIPT, WHAT DO THOSE

20   LETTERS REFER TO?

21   A    THAT'S UNINTELLIGIBLE.

22   Q    OKAY.  DOES THAT REFER TO DIALOGUE THAT WAS HARD TO

23   UNDERSTAND?

24   A    YES.

25   Q    NOW, AGENT STRICKLAND, DID YOU CONDUCT A FURTHER

1  CONTROLLED DRUG PURCHASE OPERATION WITH SOURCE 2 ON APRIL 22ND,

2  2008?

3  A     YES.  THE ACTUAL DRUG ACQUISITION TOOK PLACE ON THE 22ND

4  OF APRIL 2008, YES.

5  Q     AND WHAT WAS THE PURPOSE OF THAT FURTHER OPERATION?

6  A     THE FURTHER OPERATION -- EXCUSE ME.  THE FURTHER -- THE

7  FURTHERANCE OF THAT OPERATION WAS TO OBTAIN ROCK COCAINE AND

8  POWDER COCAINE THAT WE DID NOT RECEIVE -- IT WAS NOT RECEIVED

9  BY C.S. 2 FROM AN EARLIER OPERATION.

10  Q     NOW, DID YOU -- FOR THE APRIL 22ND, 2008 OPERATION, DID

11  YOU FOLLOW THE SAME PROCEDURES THAT YOU HAVE FOR THE OTHER

12  CONTROLLED DRUG PURCHASE OPERATIONS THAT WE'VE DISCUSSED?

13  A     YES.

14  Q     AND DURING THE COURSE OF THOSE OPERATIONS, DID YOU ALLOW

15  THE CONFIDENTIAL SOURCE TO POSSESS THE AUDIO/VIDEO RECORDING

16  DEVICE FOR LONGER THAN THE LENGTH OF THE OPERATION.

17  A     I DON'T BELIEVE SO, NO.

18  Q     AND DID YOU REVIEW THE CONTENTS OF THOSE RECORDINGS AFTER

19  THEY WERE RECEIVED FROM THE SOURCE?

20  A     YES.

21  Q     HAVE YOU REVIEWED THE ORIGINAL RECORDINGS THAT WERE

22  RETURNED TO YOU BY THE SOURCE ON APRIL 22ND, 2008?

23  A     YES.

24  Q     AND WHOSE LIKENESSES AND VOICES DO YOU RECOGNIZE IN THE

25  COURSE OF THOSE RECORDINGS?

```
 1   A    THE C.S. 2 AND ALSO MR. HARDIMAN.

 2              MR. PELHAM:  YOUR HONOR, THE GOVERNMENT OFFERS

 3   EXHIBITS 133 THROUGH 136.

 4              MR. KALOYANIDES:  NO OBJECTION.

 5              MR. MC CURRY:  NO OBJECTION.

 6              MR. CREARY:  NO OBJECTION.

 7              (PAUSE IN PROCEEDINGS.)

 8              THE COURT:  OKAY.  RECEIVED.

 9              (GOVERNMENT'S EXHIBITS 133 THROUGH 136 RECEIVED.)

10              MR. PELHAM:  THANK YOU.

11   BY MR. PELHAM:

12   Q    AGENT STRICKLAND, DID YOU HELP PREPARE TRANSCRIPTS FOR 133

13   -- EXHIBITS 133 THROUGH 136?

14   A    YES, I DID.

15   Q    DID YOU PREPARE THOSE TRANSCRIPTS BASED ON THE VOICES AND

16   LIKENESSES THAT YOU RECOGNIZED FROM THE ORIGINAL RECORDING?

17   A    YES.

18              MR. PELHAM:  YOUR HONOR, THEN WITH PERMISSION, THE

19   GOVERNMENT WILL PLAY EXHIBITS 133 THROUGH --

20              THE COURT:  YES.  YES.

21              AND JUST TO REPEAT FOR CLARIFICATION, IT'S THE AUDIO

22   RECORDINGS THAT ARE RECEIVED AND NOT THE TRANSCRIPTS.

23              MR. PELHAM:  WE'LL START WITH 133.

24              (EXHIBIT 133, AUDIO/VIDEO PLAYING.)

25              MR. PELHAM:  OKAY.  WE'LL KEEP GOING WITH EXHIBIT
```

1   134.

2              (EXHIBIT 134, AUDIO/VIDEO PLAYING.)

3              MR. PELHAM:  AND 135.

4              (EXHIBIT 135, AUDIO/VIDEO PLAYING.)

5              MR. PELHAM:  OKAY.  WE'LL PLAY 135.

6              (EXHIBIT 135, AUDIO/VIDEO PLAYING.)

7              MR. PELHAM:  AND 136.

8              (EXHIBIT 136, AUDIO/VIDEO PLAYING.)

9   BY MR. PELHAM:

10  Q    AGENT STRICKLAND, WHAT'S DEPICTED IN EXHIBIT 136?

11  A    I BELIEVE MY SHIRT.  AND IT WOULD BE UPON RETURN OF THE

12  C.S. NUMBER 2 AFTER THE CONTROLLED OPERATION.

13  Q    AFTER C.S. 2 RETURNED AT THE END OF THAT OPERATION, DID

14  C.S. 2 HAND YOU ANYTHING?

15  A    YES.

16             MR. PELHAM:  OKAY.  YOUR HONOR, COULD AGENT BROWN

17  HAND AGENT STRICKLAND THE ITEM THAT THE GOVERNMENT HAS MARKED

18  AS EXHIBIT 138.

19             THE COURT:  PLEASE.

20             (PAUSE IN PROCEEDINGS.)

21  BY MR. PELHAM:

22  Q    AGENT STRICKLAND, DO YOU RECOGNIZE THAT AS WHAT THE SOURCE

23  HANDED YOU ON -- AT THE END OF THE APRIL 22ND, 2008 OPERATION?

24  A    YES.

25  Q    AND HOW DO YOU RECOGNIZE IT?

1 A I RECOGNIZE IT.  ON THE EVIDENCE LABEL HERE IT HAS THE

2 DATE OF THE SEIZURE -- THE DATE OF THE COLLECTION, THE DATE OF

3 THE SEIZURE, THE DATE OF THE SEALING.  THE DATE OF THE

4 COLLECTION WAS ON 4/22/2008.  THE DATE OF THE SEALING WAS ALSO

5 APRIL 22ND, 2008.  IT HAS MY NAME AS THE SEALING OFFICIAL.  AND

6 IT HAS ANOTHER AGENT'S NAME AS THE WITNESSING OFFICIAL.

7 Q AND, AGENT STRICKLAND, IF YOU COULD PLEASE -- EXCUSE ME.

8    MR. PELHAM:  YOUR HONOR, THE GOVERNMENT OFFERS 138.

9    THE COURT:  ANY OBJECTION?

10    MR. KALOYANIDES:  SAME OBJECTION.  LACKS FOUNDATION.

11 RELEVANCE.

12    MR. MC CURRY:  JOIN.

13    MR. CREARY:  JOINED, YOUR HONOR.

14    THE COURT:  IT'S RECEIVED.

15    (GOVERNMENT EXHIBIT 138 RECEIVED.)

16    THE COURT:  IT'S -- AGAIN, JUST TO INSTRUCT THE JURY,

17 THIS IS THE ITEM RETRIEVED FROM SOURCE NUMBER 2 ON APRIL 22ND.

18 IT HAS NOT BEEN ESTABLISHED THAT THE CONTENTS OF THE EXHIBIT IS

19 COCAINE.

20 BY MR. PELHAM:

21 Q AND, AGENT STRICKLAND, IF YOU COULD TURN IN YOUR BINDER TO

22 THE ITEMS -- TO FIRST THE ITEM THAT IS MARKED AS GOVERNMENT'S

23 EXHIBIT 131.

24 A YES.

25 Q DO YOU RECOGNIZE THAT?

1  A   IT APPEARS TO BE A SCREENING CAPTURE FROM THE AUDIO/VIDEO

2  RECORDING THAT WAS TAKEN ON APRIL 22ND, 2008.

3  Q   AND DO YOU RECOGNIZE THE INDIVIDUAL DEPICTED THERE?

4  A   YES.  IT APPEARS TO BE MR. HARDIMAN.

5          MR. PELHAM:  YOUR HONOR, THE GOVERNMENT OFFERS 131.

6          MR. KALOYANIDES:  NO OBJECTION.

7          MR. MC CURRY:  NO OBJECTION, YOUR HONOR.

8          MR. CREARY:  NO OBJECTION.

9          THE COURT:  RECEIVED.

10         (GOVERNMENT EXHIBIT 131 RECEIVED.)

11         MR. PELHAM:  WE CAN POST 131.

12         (PAUSE IN PROCEEDINGS.)

13  BY MR. PELHAM:

14  Q   AND, AGENT STRICKLAND, IF YOU COULD ALSO LOOK IN THE

15  BINDER AT EXHIBIT 140.

16         (PAUSE IN PROCEEDINGS.)

17  BY MR. PELHAM:

18  Q   DO YOU RECOGNIZE THAT?

19  A   AGAIN, IT APPEARS TO BE A SCREEN CAPTURE FROM THE APRIL

20  22ND, 2008 OPERATION.

21  Q   DO YOU RECOGNIZE THE INDIVIDUAL DEPICTED IN 140?

22  A   AGAIN, IT APPEARS TO BE MR. HARDIMAN.

23         MR. PELHAM:  YOUR HONOR, 140 IS OFFERED.

24         MR. KALOYANIDES:  NO OBJECTION.

25         MR. MC CURRY:  NO OBJECTION.

```
 1          MR. CREARY:  NO OBJECTION, YOUR HONOR.

 2          THE COURT:  RECEIVED.

 3          (GOVERNMENT'S EXHIBIT 140 RECEIVED.)

 4          MR. PELHAM:  WE'LL POST 140 FOR THE JURY.

 5   BY MR. PELHAM:

 6   Q    AGENT STRICKLAND, DID YOU CONDUCT ANOTHER CONTROLLED DRUG

 7   PURCHASE OPERATION ON MAY 15, 2008?

 8   A    YES.

 9   Q    AND WHAT WAS THE NICKNAME FOR THE SOURCE THAT WAS UTILIZED

10   FOR THIS OPERATION?

11   A    IT WOULD BE C.S. NUMBER 2.

12   Q    AND DID YOU FOLLOW THE SAME PROCEDURES THAT WE HAVE --

13   THAT WE HAVE BEEN TALKING ABOUT ON THE MAY 15, 2008 OPERATION

14   AS YOU HAD FOR THE PREVIOUS ONES?

15   A    YES.

16   Q    AND DID YOU FIT SOURCE 2 WITH AUDIO AND VIDEO RECORDING

17   EQUIPMENT FOR THAT OPERATION?

18   A    YES.

19   Q    WHAT DID YOU INSTRUCT SOURCE 2 TO DO DURING THE MAY 15TH,

20   2008 OPERATION?

21   A    I BELIEVE I INSTRUCTED HIM TO GO MEET MR. HARDIMAN AND

22   MAKE A CONTROLLED PURCHASE OF COCAINE.

23   Q    AND DID YOU INSTRUCT OTHER AGENTS TO CONDUCT VISUAL

24   SURVEILLANCE OF THE SOURCE DURING THE COURSE OF THAT OPERATION?

25   A    YES.
```

**GER 0037**

1  Q    NOW, DID SOURCE 2 RETURN RECORDINGS TO YOU AT THE END OF

2  THAT OPERATION?

3  A    YES.

4  Q    AND HAVE YOU REVIEWED THAT RECORDING?

5  A    YES, I HAVE.

6  Q    IF YOU COULD PLEASE -- EXCUSE ME.

7         HAVE YOU REVIEWED THE ITEMS THAT THE GOVERNMENT HAS

8  MARKED AS EXHIBITS 141 THROUGH 147.

9  A    YES, I HAVE.

10  Q    AND WHAT ARE THOSE ITEMS?

11  A    THOSE ARE EXCERPTS OF THE RECORDING FROM MAY 15TH, 2008.

12  Q    NOW, WHEN YOU REVIEWED THE RECORDING THAT WAS RETURNED TO

13  YOU ON MAY 15TH, 2008, DO YOU RECALL IT HAVING ANY

14  INTERRUPTIONS IN THE AUDIO OR VIDEO?

15  A    I DO NOT BELIEVE SO.

16  Q    DID YOU HELP -- EXCUSE ME.

17         DID YOU RECOGNIZE -- WHOSE, AMONG OTHERS, LIKENESSES

18  AND VOICES DO YOU RECOGNIZE FROM EXHIBITS 141 THROUGH 147?

19  A    IT WAS C.S. NUMBER 2 AND ALSO MR. HARDIMAN.

20         MR. PELHAM:  YOUR HONOR, THE GOVERNMENT OFFERS 141

21  THROUGH 147.

22         MR. KALOYANIDES:  NO OBJECTION.

23         MR. MC CURRY:  NO OBJECTION.

24         MR. CREARY:  NO OBJECTION.

25         THE COURT:  ALL RECEIVED.

```
 1              (GOVERNMENT'S EXHIBITS 141 THROUGH 147 RECEIVED.)

 2    BY MR. PELHAM:

 3    Q    AND, AGENT STRICKLAND, DID YOU HELP PREPARE TRANSCRIPTS

 4    FOR 141 THROUGH 147?

 5    A    YES, I DID.

 6    Q    AND DID YOU HAVE TO PREPARE THOSE TRANSCRIPTS BASED ON

 7    YOUR RECOGNITION OF THE LIKENESSES AND VOICES OF THE PEOPLE

 8    INVOLVED.

 9    A    YES.

10              MR. PELHAM:  YOUR HONOR, WITH THE COURT'S PERMISSION,

11    THE GOVERNMENT WILL PLAY 141 THROUGH 147.

12              THE COURT:  PLEASE.

13              MR. PELHAM:  STARTING WITH 141.

14              (EXHIBIT 141, AUDIO/VIDEO PLAYING.)

15              MR. PELHAM:  LET'S PLAY EXHIBIT 142.

16              (EXHIBIT 142, AUDIO/VIDEO PLAYING.)

17    BY MR. PELHAM:

18    Q    NOW, AGENT STRICKLAND, DID YOU RECOGNIZE THE EXTERIOR OF

19    THE PREMISES THAT ARE DEPICTED IN EXHIBIT 142?

20    A    YEAH.  IT APPEARED TO BE THE LOCATION OF THE PUEBLO DEL

21    RIO HOUSING PROJECT.

22    Q    AND DO YOU KNOW THAT FROM YOUR -- FROM YOUR -- YOUR VISUAL

23    SURVEILLANCE AND OPERATIONAL EXPERIENCE DURING THE COURSE OF

24    THIS INVESTIGATION WITHIN THE PUEBLO DEL RIO HOUSING PROJECTS?

25    A    YES.
```

```
 1              MR. PELHAM:  WE'LL PLAY 143.

 2              (EXHIBIT 143, AUDIO/VIDEO PLAYING.)

 3              MR. PELHAM:  OKAY.  LET'S PLAY EXHIBIT 143.

 4              (EXHIBIT 143, AUDIO/VIDEO PLAYING.)

 5              MR. PELHAM:  LET'S PLAY THE NEXT ONE, EXCUSE ME.

 6   144.

 7              (EXHIBIT 144, AUDIO/VIDEO PLAYING.)

 8              MR. PELHAM:  WE'LL CONTINUE WITH EXHIBIT 145.

 9              (EXHIBIT 145, AUDIO/VIDEO PLAYING.)

10              MR. PELHAM:  146.

11              (EXHIBIT 146, AUDIO/VIDEO PLAYING.)

12              MR. PELHAM:  FINALLY, 147.

13              (EXHIBIT 147, AUDIO/VIDEO PLAYING.)

14   BY MR. PELHAM:

15   Q    AGENT STRICKLAND, WHAT DOES 147 DEPICT?

16   A    AGAIN, IT APPEARS TO BE C.S. NUMBER 2 AND MYSELF MEETING

17   AFTER THE CONTROLLED PURCHASE.

18   Q    AND AT THE END OF THE CONTROLLED PURCHASE, DID C.S. 2 HAND

19   YOU ANYTHING?

20   A    YES.

21              MR. PELHAM:  YOUR HONOR, WITH THE COURT'S PERMISSION,

22   AGENT BROWN WILL GIVE AGENT STRICKLAND EXHIBIT 148.

23              THE COURT:  YES, PLEASE.

24              MR. PELHAM:  EXCUSE ME.  149.  149.

25              THE COURT:  THANK YOU.
```

GER 0040

1    BY MR. PELHAM:

2    Q    DO YOU RECOGNIZE THAT AS WHAT SOURCE 2 GAVE YOU AFTER THE

3    MAY 15, 2008 OPERATION?

4    A    YES, I DO.

5    Q    AND HOW DO YOU RECOGNIZE IT?

6    A    IT IS IN THE EVIDENCE PACK ALONG WITH THE FBI EVIDENCE

7    LABEL THAT WAS AFFIXED WHILE SEALING THE EVIDENCE.

8            MR. PELHAM:  YOUR HONOR, THE GOVERNMENT OFFERS

9    EXHIBIT 149.

10           MR. KALOYANIDES:  SAME OBJECTION AS THE PRIOR.

11           MR. MC CURRY:  JOIN.

12           MR. CREARY:  JOIN.

13           THE COURT:  OKAY.  SAME RULING.  IT HAS NOT YET BEEN

14   ESTABLISHED THAT THE CONTENTS IS COCAINE.

15           MAY I SEE IT?

16           THE WITNESS:  SURE.

17           (PAUSE IN PROCEEDINGS.)

18           THE WITNESS:  THANK YOU.

19           THE COURT:  IT'S RECEIVED.

20           (GOVERNMENT'S EXHIBIT 149 RECEIVED.)

21   BY MR. PELHAM:

22   Q    AGENT STRICKLAND, IF YOU COULD ALSO PLEASE TURN IN YOUR

23   EXHIBIT BINDER TO THE ITEM THAT IS MARKED AS EXHIBIT 150.

24   A    YES.

25   Q    DO YOU RECOGNIZE THAT?

```
 1   A    YES.  IT APPEARS TO BE A SCREEN CAPTURE FROM THE OPERATION

 2   THAT TOOK PLACE ON MAY 15TH, 2008.

 3   Q    IS THERE AN INDIVIDUAL DEPICTED ON THAT SCREEN CAPTURE?

 4   A    IT APPEARS TO BE MR. HARDIMAN.

 5        MR. PELHAM:  YOUR HONOR, THE GOVERNMENT OFFERS 150.

 6        MR. KALOYANIDES:  NO OBJECTION.

 7        MR. MC CURRY:  NO OBJECTION.

 8        MR. CREARY:  NO OBJECTION.

 9        THE COURT:  150 IS RECEIVED.

10        (GOVERNMENT'S EXHIBIT 150 RECEIVED.)

11        MR. PELHAM:  LET'S PLACE 150 UP.

12   BY MR. PELHAM:

13   Q    AND, FINALLY, AGENT STRICKLAND, IF YOU COULD TAKE A LOOK

14   AT EXHIBIT 152, IS THAT ALSO A PHOTOGRAPH?

15   A    YES, IT IS.

16   Q    DO YOU RECOGNIZE THAT PHOTOGRAPH?

17   A    AGAIN, IT APPEARS TO BE A SCREEN CAPTURE FROM THE VIDEO --

18   AUDIO/VIDEO RECORDING ON MAY 15TH, 2008.

19        MR. PELHAM:  YOUR HONOR, THE GOVERNMENT OFFERS 152.

20        MR. KALOYANIDES:  NO OBJECTION.

21        MR. MC CURRY:  NO OBJECTION, YOUR HONOR.

22        MR. CREARY:  NO OBJECTION.

23        THE COURT:  152 IS RECEIVED.

24        (GOVERNMENT'S EXHIBIT 152 RECEIVED.)

25        MR. PELHAM:  AND WE'LL POST IT BRIEFLY FOR THE JURY.
```

1    BY MR. PELHAM:

2    Q    NOW, AGENT STRICKLAND, DID YOU CONDUCT ANOTHER CONTROLLED

3    DRUG PURCHASE OPERATION ON JUNE 4TH, 2008?

4    A    YES, I DID.

5    Q    AND HOW MANY DID YOU CONDUCT ON THAT DAY?

6    A    ON THAT DAY THERE WERE TWO OPERATIONS CONDUCTED.

7    Q    AND WHOM DID YOU TARGET WITH THOSE OPERATIONS?

8    A    DURING THE FIRST OPERATION WE WERE ATTEMPTING TO PURCHASE

9    NARCOTICS FROM STEVEN PATTERSON.

10    Q    AND ON THE SECOND.

11    A    AND ON THE SECOND, WE WERE INTENDING TO PURCHASE FROM MR.

12    HARDIMAN.

13    Q    DID -- WHAT SOURCES BY NICKNAME DID YOU UTILIZE FOR EACH

14    OF THOSE OPERATIONS ON JUNE 4TH, 2008?

15    A    I BELIEVE FOR THE FIRST OPERATION WE UTILIZED C.S. NUMBER

16    8. AND FOR THE SECOND OPERATION, WE UTILIZED C.S. NUMBER 2.

17    Q    DID YOU OVERSEE BOTH OF THE OPERATIONS THAT DAY?

18    A    YES.

19    Q    NOW, EVEN WITH TWO SOURCES -- EXCUSE ME. LET ME STEP

20    BACK.

21          DID YOU -- DID YOU RUN BOTH OF THOSE OPERATIONS

22    SIMULTANEOUSLY THAT DAY?

23    A    NO. THEY WERE NOT RUN SIMULTANEOUSLY.

24    Q    NOW, EVEN WITH TWO SOURCES DID YOU GENERALLY FOLLOW THE

25    SAME PROCEDURES FOR BOTH AS WE HAVE PREVIOUSLY DISCUSSED WITH

44

1  THE OTHER OPERATION?

2  A    YES.

3  Q    DID YOU FIT BOTH CONFIDENTIAL SOURCE 8 AND CONFIDENTIAL

4  SOURCE 2 WITH AUDIO/VIDEO RECORDING EQUIPMENT FOR THOSE

5  OPERATIONS?

6  A    YEAH, THEY WERE FITTED WITH AUDIO/VIDEO RECORDING DEVICES.

7  Q    OKAY.  AND DID EITHER OF THOSE SOURCES POSSESS THOSE

8  DEVICES OR WERE EITHER OF THOSE SOURCES ALLOWED TO POSSESS

9  THOSE DEVICES FOR LONGER THAN THE LENGTH OF THE OPERATIONS

10  THEMSELVES?

11  A    I DO NOT BELIEVE SO.

12  Q    AS TO THE FIRST -- OR, EXCUSE ME, AS TO BOTH OF THOSE

13  OPERATIONS, WHO COLLECTED THE AUDIO/VIDEO RECORDING EQUIPMENT

14  THAT THE CONFIDENTIAL SOURCES USED?

15  A    I BELIEVE I DID.

16  Q    NOW, AS TO THE FIRST OF THE TWO JUNE 4TH, 2008 OPERATIONS,

17  WHAT DID YOU INSTRUCT SOURCE 8 TO DO?

18  A    GO TO THE PUEBLO DEL RIO HOUSING PROJECT AND PURCHASE

19  NARCOTICS.

20  Q    AND, AGAIN, WAS THAT AS TO AN INDIVIDUAL BY THE NAME OF

21  STEVEN PATTERSON?

22  A    YES.

23  Q    AND DID YOU COLLECT -- EXCUSE ME, DID YOU REVIEW THE

24  RECORDINGS THAT YOU COLLECTED FROM SOURCE 8 THAT DAY?

25  A    YES, I DID.

**GER 0044**

1   Q    AND WHEN YOU REVIEWED THOSE RECORDINGS, DID ANY OF THEM

2   CONTAIN ANY INTERRUPTIONS IN AUDIO OR VIDEO?

3   A    I DO NOT BELIEVE SO.

4   Q    OKAY.  HAVE YOU REVIEWED THE ITEMS THAT THE GOVERNMENT HAS

5   MARKED AS EXHIBITS 153 TO 159?

6   A    YES, I HAVE.

7   Q    AND WHAT ARE THOSE ITEMS?

8   A    IT'S THE AUDIO/VIDEO RECORDING FROM JUNE 4TH, 2008 OF THE

9   FIRST OPERATION.

10  Q    AND ARE THESE -- ARE THESE CLIPS -- ARE 153 TO 159 CLIPS

11  OF THE ORIGINAL RECORDING?

12  A    YES, THEY ARE EXCERPTS OR SEGMENTS FROM THAT RECORDING.

13  Q    AMONG OTHERS, WHOSE LIKENESSES AND VOICES DO YOU RECOGNIZE

14  FROM 153 TO 159?

15  A    C.S. NUMBER 8.  AND ALSO MR. HARDIMAN WAS ALSO PRESENT.

16  Q    AND WAS THE INDIVIDUAL WHO IDENTIFIES HIMSELF AS STEVEN

17  PATTERSON DEPICTED IN THOSE RECORDINGS?

18  A    YES.

19  Q    NOW, DID YOU HELP PREPARE TRANSCRIPTS FOR 153 TO 159?

20  A    YES, I DID.

21  Q    AND DID YOU PREPARE THEM BASED ON YOUR RECOGNITION OF THE

22  LIKENESSES AND VOICES OF INDIVIDUALS DEPICTED IN THOSE

23  RECORDINGS?

24  A    YES.

25           MR. PELHAM:  YOUR HONOR, THE GOVERNMENT OFFERS 153 TO

```
 1   159.
 2              THE COURT:  WE'RE GOING TO TAKE THE MORNING RECESS.
 3              PLEASE RETURN -- WE'LL BE ABOUT A 20-MINUTE RECESS.
 4   PLEASE RETURN AT 20 AFTER THE HOUR.  WE WILL CONTINUE THE
 5   TRIAL.
 6              DURING YOUR ABSENCE DO NOT DISCUSS THE CASE AMONGST
 7   YOURSELVES OR WITH ANY OTHER PERSON.
 8              THE CLERK:  WOULD YOU ALL RISE FOR THE JURY.
 9              (JURY EXITS.)
10              THE CLERK:  COURT IS IN RECESS.
11              (RECESS AT 10:03 A.M. TO 10:24 A.M.)
12              (JURY ENTERS.)
13              THE COURT:  OKAY.  WE HAVE EVERYBODY REASSEMBLED.
14   PLEASE HAVE A SEAT.
15              THE JURORS ARE REASSEMBLED WITH THE ALTERNATES.  AND
16   COUNSEL AND DEFENDANTS ARE PRESENT WITH COUNSEL FOR THE
17   GOVERNMENT.  THE SPECIAL AGENTS ARE PRESENT.
18              I'M INFORMED THAT ONE JUROR MAY HAVE A QUESTION.
19              PLEASE, IF YOU HAVE A QUESTION, PLACE IT IN WRITING
20   IN A NOTE FORM WITH YOUR NAME SIGNED TO IT AND WITH THE DATE.
21   AND I'LL REVIEW IT AND GENERALLY SHARE IT WITH COUNSEL BEFORE
22   AN ANSWER IS PROVIDED.
23              AND WITH THAT, WE CONTINUE WITH THE DIRECT
24   EXAMINATION OF SPECIAL AGENT STRICKLAND.
25              MR. PELHAM:  THANK YOU, YOUR HONOR.
```

1          THE COURT:  AND I BELIEVE WE WERE ABOUT -- YOU WERE
2     ABOUT TO OFFER 153 TO 159.
3          MR. PELHAM: YES.  AND THE GOVERNMENT DOES SO OFFER,
4     YOUR HONOR.
5          THE COURT:  OBJECTION?
6          MR. KALOYANIDES:  OBJECT ON FOUNDATION, YOUR HONOR.
7          MR. MC CURRY:  JOIN.
8          MR. CREARY:  JOINED, YOUR HONOR.
9          THE COURT:  REFRESH MY MEMORY IF THE OFFICER -- IF
10    THE SPECIAL AGENT WAS ASKED QUESTIONS REGARDING RECOGNIZING THE
11    PERSONS ON THE AUDIO.  I BELIEVE THE ANSWER WAS YES, BUT I JUST
12    WANT TO CHECK.
13         MR. PELHAM:  YES.
14         YOUR HONOR, WE -- I ASKED AGENT STRICKLAND WHETHER OR
15    NOT HE RECOGNIZED LIKENESSES AND VOICES FROM BOTH OF THE
16    OPERATIONS CONDUCTED THAT DAY.
17         THE COURT:  AND AS I RECALL, HE MENTIONED C.S. 8, MR.
18    PATTERSON, AND THEN MR. HARDIMAN.
19         MR. PELHAM:  YES.
20         THE COURT:  OKAY.  MY NOTES ARE CORRECT.
21         THE OBJECTION IS OVERRULED.  AND ALL OF THE EXHIBITS
22    ARE RECEIVED.
23         (GOVERNMENT'S EXHIBITS 153 TO 159 RECEIVED.)
24         MR. PELHAM:  THANK YOU, YOUR HONOR.
25         THE COURT:  AGAIN, THE RECORDING, NOT THE

1  TRANSCRIPTS, AND WITH THE SAME ADMONITION, IT'S THE RECORDINGS

2  THAT ARE EVIDENCE NOT THE TRANSCRIPT.

3  BY MR. PELHAM:

4  Q    AGENT STRICKLAND, BEFORE WE PLAY 153 TO 159, COULD YOU

5  INDICATE FOR THE COURT HOW MANY -- APPROXIMATELY AS AN FBI

6  AGENT, HOW MANY OR AT LEAST HOW MANY CONTROLLED DRUG OPERATIONS

7  HAVE YOU PARTICIPATED IN THAT INVOLVED COCAINE?

8  A    AGAIN, I DON'T HAVE AN EXACT NUMBER.  AND I KNOW -- I

9  THINK I MENTIONED YESTERDAY, AT LEAST 50 WOULD BE A VERY LIMIT

10  -- THAT WOULD BE A VERY CONSERVATIVE ESTIMATE.  IT WOULD BE

11  MORE THAN THAT.

12  Q    AND DID YOU RECEIVE ANY TYPE OF NARCOTICS TRAINING AS AN

13  FBI AGENT AT QUANTICO WHEN -- DURING THE FBI ACADEMY?

14  A    I BELIEVE THERE IS A SECTION ON NARCOTICS TRAINING.  I

15  ALSO HAD ATTENDED SOME NARCOTICS TRAINING AS WELL --

16  Q    NOW --

17  A    -- BEYOND THAT.

18  Q    NOW, IN YOUR EXPERIENCE, AGENT STRICKLAND, WHEN COCAINE IS

19  SOLD ON THE STREET, IS IT SOLD IN MULTIPLE FORMS?

20          MR. KALOYANIDES:  OBJECTION.  LACKS FOUNDATION.

21  CALLS FOR SPECULATION.

22          THE COURT:  OVERRULED.

23  BY MR. PELHAM:

24  Q    YOU MAY ANSWER.

25  A    YES.

1  Q    AND WHAT ARE THE -- WHAT ARE THE FORMS IN WHICH COCAINE IS

2  SOLD?

3  A    THE FORMS IN WHICH WERE SOLD THAT WE'RE AWARE OF OR, AT

4  LEAST, I'M FAMILIAR WITH WOULD BE POWDER COCAINE AND ROCK

5  COCAINE OR CRACK COCAINE.

6  Q    AND ARE EACH OF THOSE -- ARE EACH OF THOSE FORMS

7  DERIVATIVES OF THE SAME BASIC SUBSTANCE?

8        MR. KALOYANIDES:  OBJECTION.  CALLS FOR SPECULATION.

9  LACKS FOUNDATION.

10        MR. MC CURRY:  JOIN.

11        THE COURT:  OVERRULED.

12        MR. CREARY:  JOINED, YOUR HONOR.

13        THE COURT:  OVERRULED.

14  BY MR. PELHAM:

15  Q    YOU MAY ANSWER.

16  A    THAT'S MY UNDERSTANDING.

17  Q    NOW, WHEN -- WHEN DRUG TRAFFICKERS SELL NARCOTICS, IS IT

18  COMMON FOR THEM TO USE NICKNAMES IN PLACE OF THE ACTUAL NAMES

19  OF THE DRUGS THAT THEY ARE SELLING?

20        MR. KALOYANIDES:  OBJECTION.  LACKS FOUNDATION.

21        THE COURT:  OKAY.  IS ANYONE ELSE JOINING?

22        MR. MC CURRY:  YES, YOUR HONOR.

23        MR. CREARY:  JOIN, YOUR HONOR.

24        THE COURT:  OKAY.  I GUESS WE CAN WORK OUT A PROTOCOL

25  WHERE IF MR. KALOYANIDES ENTERS AN OBJECTION, I'M ASSUMING THAT

GER 0049

1  THE OTHER TWO ARE JOINING UNLESS YOU INDICATE OTHERWISE.

2            MR. MC CURRY:  YES, YOUR HONOR, AS TO MR. WHITE.

3            MR. CREARY:  YES, YOUR HONOR.

4            THE COURT:  OKAY.  AND THAT WILL APPLY TO ALL THREE

5  COUNSEL.  SO, IF ANY COUNSEL ENTERS AN OBJECTION, THE OTHER TWO

6  ARE JOINING UNLESS OTHERWISE STATED.

7            MR. MC CURRY:  YES, YOUR HONOR.

8            MR. KALOYANIDES:  YES, YOUR HONOR.

9            MR. CREARY:  YES, YOUR HONOR.

10            THE COURT:  OVERRULED.

11  BY MR. PELHAM:

12  Q    OKAY.  YOU MAY ANSWER, AGENT STRICKLAND.

13  A    CAN YOU REPHRASE THE QUESTION THAT I --

14  Q    IS IT COMMON FOR DRUG TRAFFICKERS TO REFER TO THE DRUGS

15  THAT THEY ARE SELLING BY NICKNAMES OR BY CODE PHRASES RATHER

16  THAN THE ACTUAL NAMES OF THE DRUGS THEMSELVES?

17  A    YES.

18  Q    SO, IN YOUR EXPERIENCE, WHAT SORT OF CODE PHRASES DO DRUG

19  TRAFFICKERS USE WHEN REFERRING TO, FOR EXAMPLE, CRACK COCAINE?

20  A    CRACK COCAINE AT TIMES CAN BE CALLED "HARD."  POWDER

21  COCAINE "SOFT."  "HARD AND SOFT."  A LOT OF TIMES THAT'S

22  SOMETHING YOU WOULD HEAR IN A RECORDING OR ON A STREET -- ON

23  THE STREET.

24  Q    NOW, DID YOU HEAR THE TERMS "SOFT" AND "HARD" USED BY

25  JERMAINE HARDIMAN DURING THE COURSE OF SOME OF THE EXHIBITS WE

1    PLAYED EARLIER?

2    A    YES, I BELIEVE SO.

3    Q    NOW, ARE YOU ALSO FAMILIAR WITH THE COMMON UNITS OF

4    MEASUREMENT BY -- THROUGH WHICH DRUG TRAFFICKERS SELL COCAINE?

5    A    YES.

6    Q    AND AS TO THE POWDER FORM OF COCAINE, WHAT ARE THOSE

7    COMMON UNITS OF MEASUREMENT?

8    A    A COMMON UNIT WE HEAR ARE "ZIPS," WHICH WOULD BE AN OUNCE,

9    A ZIP.

10           MR. KALOYANIDES:  OBJECTION.  LACKS FOUNDATION.

11   SPECULATION.  MOVE TO STRIKE.

12           THE COURT:  OVERRULED.

13   BY MR. PELHAM:

14   Q    YOU MAY CONTINUE.

15   A    OTHER -- OTHER TERMS COULD BE A "BIRD."  A BIRD IS

16   UTILIZED TO IDENTIFY A FULL KILO. "HALF A BIRD" WOULD BE HALF A

17   KILO.  IT WOULD BE AN EXAMPLE OF SOME TERMINOLOGY TO DETERMINE

18   WEIGHT OF NARCOTICS.

19   Q    AND WHAT ARE SOME OF THE COMMON CODE PHRASES THAT ATTACH

20   TO UNITS OF MEASUREMENT FOR THE CRACK FORM OF COCAINE?

21   A    "ZIPS, HALF A ZIP."

22   Q    AND WHAT DO THOSE TERMS REFER TO?

23   A    ROCK COCAINE.

24   Q    AND WHAT UNITS OF MEASUREMENT?

25   A    OH, I'M SORRY.  IT'S REFERRED TO "OUNCES, HALF OUNCES,

1  3.5'S, 7'S."

2  Q    AND IN THE COURSE OF SOME OF THE RECORDINGS THAT WE HEARD

3  THIS MORNING, DID YOU HEAR JERMAINE HARDIMAN USE SUCH PHRASES

4  WHEN REFERRING TO -- WELL, WHEN SPEAKING WITH THE CONTROLLED --

5  WITH THE CONFIDENTIAL SOURCES?

6  A    I BELIEVE SO, YES.

7  Q    NOW, AT THE BEGINNING OF EACH OF THESE CONTROLLED DRUG

8  PURCHASE OPERATIONS, IS IT CUSTOMARY FOR AGENTS TO GIVE THE

9  CONFIDENTIAL SOURCE MONEY?

10  A    YES.

11  Q    AND WHAT IS THE PURPOSE OF GIVING THE CONFIDENTIAL SOURCE

12  MONEY AT THE BEGINNING OF THE CONTROLLED DRUG PURCHASE

13  OPERATION?

14  A    FIRST WE GIVE THEM THE C.S. MONEY.  THE CONFIDENTIAL

15  SOURCE MONEY IS TO PURCHASE NARCOTICS, COCAINE IN THIS CASE, ON

16  OUR BEHALF -- ON THE GOVERNMENT'S BEHALF.

17          MR. PELHAM:  YOUR HONOR, WITH PERMISSION, THE

18  GOVERNMENT WILL PLAY 153 THROUGH 159.

19          THE COURT:  YES.

20          MR. PELHAM:  THANK YOU.

21          (EXHIBIT 153, AUDIO/VIDEO PLAYING.)

22  BY MR. PELHAM:

23  Q    AGENT STRICKLAND, I'M JUST GOING TO PAUSE BRIEFLY.

24          DID YOU RECOGNIZE AN INDIVIDUAL WHO IS DEPICTED

25  MIDWAY THROUGH THE PORTION THAT WE'VE PLAYED SO FAR WHO IS

 1   STANDING BY THE TREE THAT'S PRESENTED IN THAT VIDEO?

 2   A    YES.  IF YOU COULD REWIND THAT FOR -- TO REFRESH MY --

 3   MAKE SURE WE'RE TALKING ABOUT THE SAME PERSON.

 4        (EXHIBIT 153, AUDIO/VIDEO PLAYING.)

 5   BY MR. PELHAM:

 6   Q    LET ME PAUSE IT THERE.

 7        DO YOU RECOGNIZE THAT INDIVIDUAL?

 8   A    YES, I DO.

 9   Q    AND HOW DO YOU RECOGNIZE THAT PERSON?

10   A    I RECOGNIZE THAT INDIVIDUAL AS JOSE LEON.

11   Q    IS THAT SOMEONE YOU'VE ENCOUNTERED DURING THE COURSE OF

12   THIS INVESTIGATION?

13   A    YES, I HAVE.

14   Q    AND DOES JOSE LEON REFER TO HIMSELF BY ANY NICKNAME?

15   A    YES, "BETO."

16        MR. PELHAM:  IF WE COULD MOVE IT FORWARD A LITTLE BIT

17   AND RESUME.

18        (EXHIBIT 153, AUDIO/VIDEO PLAYING.)

19        MR. PELHAM:  WE'LL PLAY 154.

20        (PAUSE IN PROCEEDINGS.)

21        (EXHIBIT 154, AUDIO/VIDEO PLAYING.)

22   BY MR. PELHAM:

23   Q    NOW, AGENT STRICKLAND, DID YOU -- DID YOU HEAR DEFENDANT

24   HARDIMAN'S VOICE DURING THE COURSE OF THAT RECORDING?

25   A    YES, I DID.

**GER 0053**

1    Q    AND YOU HEARD HIM USE THE PHRASES -- USE THE PHRASE "HALF

2    A ZIP"?

3    A    YES.

4    Q    AND IN YOUR EXPERIENCE AS A -- IN YOUR EXPERIENCE

5    INVESTIGATING DRUG-TRAFFICKING CRIMES WITHIN THE FBI, WHAT IS

6    THE TERM "HALF A ZIP" MEAN?

7    A    A HALF OUNCE.  I ALSO HEARD THE TERM "BIRD," I BELIEVE,

8    WHICH REFERS TO KILOGRAM, KILO.

9    Q    AND DID YOU ALSO HEAR MR. -- DEFENDANT HARDIMAN DURING THE

10   COURSE OF THIS RECORDING USE THE PHRASE "HALF A BIRD"?

11   A    YES.  THAT WOULD --

12   Q    OKAY.

13   A    -- REFER TO HALF A KILO.

14             MR. PELHAM:  LET'S PLAY 155.

15             (EXHIBIT 155, AUDIO/VIDEO PLAYING.)

16   BY MR. PELHAM:

17   Q    NOW, AGENT STRICKLAND, DO YOU RECOGNIZE THE INDIVIDUAL WHO

18   IS -- WHO PREDOMINATES THAT RECORDING?

19   A    IN THAT RECORDING I BELIEVE THAT'S STEVEN PATTERSON.

20   Q    AND WAS THE VOICE OF THE OTHER INDIVIDUAL THAT WE HEARD

21   CONFIDENTIAL SOURCE 8?

22   A    YES, IT IS.

23   Q    NOW, WHAT WAS THE -- WHAT WAS THE PHYSICAL LOCATION THAT

24   WAS DEPICTED IN THAT RECORDING?

25   A    THAT WAS AT THE PUEBLO DEL RIO HOUSING PROJECTS.

1   Q    OKAY.  AND DID YOU RECOGNIZE THE AREA THAT WAS THE FOCUS

2   OF THE RECORDING?

3   A    I BELIEVE IT WAS OUTSIDE THE FRONT OF THE PROJECTS RIGHT

4   ALONG LONG BEACH AVENUE.

5   Q    OKAY.  AND WHAT STREET?

6   A    I DIDN'T -- I DIDN'T -- I THINK I SAW THE STREET MAYBE

7   5253, BUT I'M NOT FOR SURE WITHOUT SEEING THE SIGN.

8           MR. PELHAM:  OKAY.  LET'S PLAY 156.

9           (EXHIBIT 156, AUDIO/VIDEO PLAYING.)

10          MR. PELHAM:  SO, LET'S PAUSE THE RECORDING.

11  BY MR. PELHAM:

12  Q    AGENT STRICKLAND, DO YOU RECOGNIZE THE INDIVIDUAL WHO IS

13  CURRENTLY VISUALLY DEPICTED ON EXHIBIT 155?

14  A    YES.

15  Q    AND WHO IS THAT INDIVIDUAL?

16  A    THAT IS LEE HENDERSON.

17  Q    AND, AGAIN, IS THIS -- IS THE LOCATION, THE PHYSICAL

18  LOCATION DEPICTED IN THIS -- CURRENTLY DEPICTED IN THE VIDEO A

19  LOCATION WITHIN THE PUEBLO DEL RIO HOUSING PROJECTS?

20  A    YES, IT IS.

21  Q    OKAY.  DO YOU RECOGNIZE THAT STAIRCASE, SORT OF STAIRCASE

22  ORIENT -- THE STAIRCASE RESEMBLING STRUCTURE TO THE RIGHT OF

23  MR. HENDERSON'S HEAD?

24  A    THE -- FROM MY VIEW IT APPEARS THAT IT IS OFF TO THE LEFT.

25  AND THAT WOULD BE A STAIRCASE THAT GOES OVER THE RAILROAD

1    TRACKS AND ACROSS LONG BEACH AVENUE.

2    Q    THANK YOU.

3              MR. PELHAM:  WE CAN FINISH PLAYING IT.)

4              (EXHIBIT 156, AUDIO/VIDEO PLAYING.)

5    BY MR. PELHAM:

6    Q    NOW, AGENT STRICKLAND, DID YOU HEAR MR. PATTERSON IN THE

7    COURSE OF THE RECORDING AT 1:55 USE THE TERM "HARD"?

8    A    THAT'S WHAT IT SOUNDED LIKE, YES.

9    Q    AND DID YOU ALSO HEAR HIM USE THE TERM "PAPER"?

10   A    YES. "PAPER" IS A TERM REFERRING TO MONEY.

11   Q    AND DO --

12   A    IT'S COMMONLY REFERRED TO AS MONEY.

13   Q    AND DO YOU KNOW THAT -- DO YOU KNOW THAT DRUG TRAFFICKERS

14   -- FROM YOUR EXPERIENCE AS A DRUG-INVESTIGATING FBI AGENT, DO

15   YOU KNOW THAT DRUG TRAFFICKERS COMMONLY USE THE TERM "PAPER" TO

16   REFER TO DRUG PROCEEDS?

17   A    YES.

18             MR. KALOYANIDES:  OBJECTION.  LEADING.

19             THE COURT:  OBJECTION OVERRULED.

20             MR. PELHAM:  WE'LL PLAY 156 -- 157.

21             (EXHIBIT 157, AUDIO/VIDEO PLAYING.)

22   BY MR. PELHAM:

23   Q    NOW, AT THE -- AT THE CONCLUSION OF THE FIRST JUNE 4TH,

24   2008 OPERATION, AGENT STRICKLAND, DID CONFIDENTIAL SOURCE 8

25   HAND YOU ANYTHING?                **GER 0056**

1  A    YES.

2  Q    I'M GOING TO --

3           MR. PELHAM:  YOUR HONOR, WITH THE COURT'S PERMISSION,

4  I'M GOING TO DIRECT SPECIAL AGENT BROWN TO HAND AN ITEM TO

5  AGENT STRICKLAND.

6           THE COURT:  YES.

7           MR. PELHAM:  THANK YOU.

8           THE COURT:  WHICH ITEM?

9           MR. PELHAM:  IT IS GOING TO BE THE ITEM MARKED AS

10  GOVERNMENT'S EXHIBIT 161.

11           (PAUSE IN PROCEEDINGS.)

12  BY MR. PELHAM:

13  Q    DO YOU RECOGNIZE THAT ITEM, AGENT STRICKLAND?

14  A    YES, I DO.

15  Q    AND DO YOU -- HOW DO YOU RECOGNIZE IT?

16  A    I RECOGNIZE THE FACT THAT IT HAS THE FBI EVIDENCE SEAL

17  AFFIXED TO THE TOP.  AND IT'S SEALED IN A PLASTIC -- CLEAR

18  PLASTIC EVIDENCE CONTAINER.  THE DATE OF SEIZURE, DATE OF

19  COLLECTION ON 6/4/2008.  DATE OF SEALINGS, 6/4/2008.  MY NAME

20  IS THE SEALING OFFICIAL.  AND SPECIAL AGENT KEVIN FALLS IS THE

21  WITNESSING OFFICIAL.

22           MR. PELHAM:  YOUR HONOR, THE GOVERNMENT OFFERS 161.

23           THE COURT:  AND THIS IS RETRIEVED FROM WHICH SOURCE?

24           THE WITNESS:  THIS IS RETRIEVED FROM C.S. NUMBER 8.

25           MR. KALOYANIDES:  THE SAME OBJECTION AS APPLIED

1  BEFORE, YOUR HONOR.

2          THE COURT:  IT'S RECEIVED.  AGAIN, IT'S JUST -- IT'S

3  THE -- THE EXHIBIT ESTABLISHES THAT IT WAS RECEIVED FROM C.S.

4   -- THE JURY CAN CONSIDER IT AS BEING RECEIVED FROM C.S. 8.  IT

5  HAS NOT BEEN ESTABLISHED THAT THE EXHIBIT CONTAINS COCAINE.

6          (GOVERNMENT EXHIBIT 161 RECEIVED.)

7  BY MR. PELHAM:

8  Q    AND, AGENT STRICKLAND, IF YOU COULD LOOK AT THE BINDER IN

9  FRONT OF YOU AT EXHIBIT 162.

10          (PAUSE IN PROCEEDINGS.)

11          THE WITNESS:  YES.

12  BY MR. PELHAM:

13  Q    AND DO YOU RECOGNIZE THAT PHOTOGRAPH?

14  A    YES, I DO.

15  Q    AND WHAT IS THAT -- WHAT IS DEPICTED IN EXHIBIT 162?

16  A    A SCREEN CAPTURE FROM THE JUNE 4TH, 2008 FIRST OPERATION.

17  A SCREEN CAPTURE OF DEFENDANT HARDIMAN.

18          MR. PELHAM:  YOUR HONOR, THE GOVERNMENT OFFERS 162.

19          MR. KALOYANIDES:  NO OBJECTION.

20          THE COURT:  RECEIVED.

21          (GOVERNMENT'S EXHIBIT 162 RECEIVED.)

22          MR. PELHAM:  AND WE'LL POST IT FOR THE JURY.

23  BY MR. PELHAM:

24  Q    NOW, AGENT STRICKLAND, AS TO THE SECOND OF THE OPERATIONS

25  THAT YOU CONDUCTED ON JUNE 4, 2008, WHAT CONFIDENTIAL SOURCE

1    DID YOU USE?

2    A    THE C.S. NUMBER 2.

3    Q    AND DID YOU -- DID YOU FOLLOW THE SAME PROCEDURES ON THAT

4    OPERATION AS YOU HAD WITH THE ONES THAT WE PREVIOUSLY

5    DISCUSSED?

6    A    YES.

7    Q    NOW, DID YOU INSTRUCT C.S. 2 OR CONFIDENTIAL SOURCE 2 TO

8    PLACE A PHONE CALL IN ADVANCE OF THAT OPERATION?

9    A    YES.

10   Q    AND WHOM DID YOU INSTRUCT C.S. 2 TO CALL?

11   A    DEFENDANT HARDIMAN.

12   Q    AND WHAT DID YOU TELL C.S. 2 TO -- TO REQUEST WHEN HE

13   PLACED THAT -- WHEN C.S. 2 PLACED THAT CALL TO DEFENDANT

14   HARDIMAN?

15   A    I BELIEVE I REQUESTED THE -- TO ASK ABOUT THE AVAILABILITY

16   OF COCAINE.

17   Q    WERE YOU PRESENT WHEN C.S. 2 PLACED THAT CALL?

18   A    YES.

19   Q    AND DID YOU RECORD THAT CALL?

20   A    YES.

21   Q    HAVE YOU REVIEWED GOVERNMENT'S EXHIBIT 167?

22   A    YES.

23   Q    AND DO YOU RECOGNIZE IT -- OR EXCUSE ME, WHAT IS

24   GOVERNMENT'S EXHIBIT 167?

25   A    IT'S A RECORDING OF A TELEPHONE CALL PLACED ON JUNE 4TH,

GER 0059

1    2008.

2              MR. PELHAM:  YOUR HONOR, THE GOVERNMENT OFFERS 167.

3              MR. KALOYANIDES:  NO OBJECTION.

4              THE COURT:  167 IS RECEIVED.

5              (GOVERNMENT'S EXHIBIT 167 RECEIVED.)

6    BY MR. PELHAM:

7    Q    AND, AGENT STRICKLAND, DID YOU HELP TO MAKE TRANSCRIPTS

8    FOR EXHIBIT 167?

9    A    YES, I DID.

10   Q    AND WHOSE VOICES DO YOU RECOGNIZE ON THE RECORDING THAT'S

11   SET FORTH AT 167?

12   A    I RECOGNIZE C.S. NUMBER 2 AND ALSO DEFENDANT HARDIMAN.

13             MR. PELHAM:  YOUR HONOR, WITH PERMISSION, THE

14   GOVERNMENT WILL PLAY 167.

15             THE COURT:  YES.

16             (EXHIBIT 167, AUDIO/VIDEO PLAYING.)

17   BY MR. PELHAM:

18   Q    IS THAT YOUR VOICE AT THE END OF THE RECORDING, AGENT

19   STRICKLAND?

20   A    YES, IT IS.

21   Q    NOW, WHAT QUANTITY DID YOU INSTRUCT SOURCE 2 TO PURCHASE

22   FROM DEFENDANT HARDIMAN AT THE BEGINNING OF THAT CALL?

23   A    FROM THE CONTEXT OF THE CALL, IT APPEARS THAT IT WAS AN

24   OUNCE, "A WHOLE ONE."

25             AND DURING THE -- DURING THE CONVERSATION, C.S.

1    NUMBER 2 ASKED TO GET "HALF AND HALF," REFERRING TO "HALF WHOLE

2    HALF SOFT," OR HALF AN OUNCE OF POWDER COCAINE AND AN HALF OF

3    OUNCE OF ROCK COCAINE.

4    Q    NOW, WHAT DID YOU INSTRUCT SOURCE 2 TO DO AFTER THIS PHONE

5    CALL?

6    A    TO CONDUCT A PURCHASE OF COCAINE FROM DEFENDANT HARDIMAN.

7    Q    NOW, DID YOU -- DID YOU FIT SOURCE 2 WITH ANY EQUIPMENT IN

8    ADVANCE OF THAT OPERATION?

9    A    YES, A RECORDING DEVICE -- AUDIO AND VIDEO RECORDING

10   DEVICE.

11   Q    AND WITH RESPECT TO THAT AUDIO/VIDEO RECORDING DEVICE, DID

12   YOU FOLLOW THE SAME PROCEDURES FOR THAT RECORDING THAT WE'VE

13   DISCUSSED WITH RESPECT TO THE OTHER CONTROLLED DRUG PURCHASE

14   OPERATIONS?

15   A    YES.

16   Q    AND DID YOU COLLECT THE AUDIO RECORDING DEVICE FROM SOURCE

17   2 AT THE END OF THAT OPERATION?

18   A    I BELIEVE I DID, YES.

19   Q    AND DID YOU REVIEW THE CONTENTS OF THAT RECORDING?

20   A    YES.

21   Q    ALL RIGHT.  WAS THE VIDEO PORTION OF THAT RECORDING

22   UNINTERRUPTED WHEN YOU REVIEWED IT?

23   A    YEAH, TO THE BEST OF MY KNOWLEDGE, YES, IT WAS.

24   Q    NOW, HAVE YOU REVIEWED GOVERNMENT'S EXHIBIT 168 TO 171?

25   A    YES, I HAVE.    **GER 0061**

1    Q    AND WHAT ARE THOSE?

2    A    THOSE ARE SEGMENTS OF THE JUNE 4TH, 2008, THE SECOND

3    OPERATION AUDIO/VIDEO RECORDING.

4    Q    AND DID YOU ASSIST IN PREPARING TRANSCRIPTS FOR THOSE

5    RECORDINGS?

6    A    YES.

7    Q    WHOSE VOICES DO YOU RECOGNIZE FROM THOSE RECORDINGS SET

8    FORTH AT 168 THROUGH 171?

9    A    C.S. NUMBER 2 AND DEFENDANT HARDIMAN.

10            MR. PELHAM:  YOUR HONOR, THE GOVERNMENT OFFERS 168 TO

11   171.

12            MR. KALOYANIDES:  NO OBJECTION.

13            THE COURT:  RECEIVED.

14            (GOVERNMENT'S EXHIBITS 168 THROUGH 171 RECEIVED.)

15            THE COURT:  JUST FOR CLARIFICATION, THE CONFIDENTIAL

16   SOURCES ARE REFERRED TO BY NUMBERS, YES?

17            THE WITNESS:  YES, IN THIS CASE --

18            THE COURT:  AND YOU'VE TESTIFIED CONFIDENTIAL SOURCES

19   AND IDENTIFIED THEM BY NUMBERS, YES?

20            THE WITNESS:  THAT'S CORRECT.

21            THE COURT:  AND THEN THERE'S BEEN A REFERENCE TO C.S.

22   NUMBER 2 ON SEVERAL OCCASIONS.

23            THE WITNESS:  YES.

24            THE COURT:  IS THAT THE SAME PERSON?

25            THE WITNESS:  YES, IT IS.

1        THE COURT:  OKAY.

2   BY MR. PELHAM:

3   Q    AND, AGENT STRICKLAND, DID YOU PREPARE -- DID YOU HELP TO

4   PREPARE TRANSCRIPTS FOR 168 TO 171 BASED ON YOUR RECOGNITION OF

5   THE VOICES THAT YOU HEAR IN THOSE RECORDINGS?

6   A    YES.

7        MR. PELHAM:  YOUR HONOR, WITH PERMISSION, THE

8   GOVERNMENT WILL PLAY THIS SERIES OF EXHIBITS.

9        THE COURT:  GO AHEAD.

10        MR. PELHAM:  THANK YOU.

11        (EXHIBIT 168, AUDIO/VIDEO PLAYING.)

12   BY MR. PELHAM:

13   Q    NOW, AGENT STRICKLAND, BASED ON YOUR EXPERIENCE

14   INVESTIGATING GANGS AND INVESTIGATING DRUG-TRAFFICKING

15   ORGANIZATIONS, HAVE YOU EVER ENCOUNTERED THE CODE PHRASE OR THE

16   SLANG "BURNER"?

17   A    YES.

18   Q    AND WHAT IN YOUR EXPERIENCE DOES THAT TERM REFER TO?

19   A    IN MY EXPERIENCE IT REFERS TO A GUN.

20        THE COURT:  I DIDN'T HEAR YOU.  I'M SORRY.

21        THE WITNESS:  MY EXPERIENCE IT REFERS TO A GUN.

22   BY MR. PELHAM:

23   Q    YES.  AGENT STRICKLAND, COULD YOU MOVE THE MICROPHONE --

24   A    OH.

25   Q    -- JUST A LITTLE BIT CLOSER TO YOURSELF.  ALL RIGHT.

1   THANK YOU.

2           MR. PELHAM:  LET'S PLAY 169.

3           (EXHIBIT 169, AUDIO/VIDEO PLAYING.)

4           MR. PELHAM:  WE'LL CONTINUE WITH 170.

5           (EXHIBIT 170, AUDIO/VIDEO PLAYING.)

6           MR. PELHAM:  AND THEN FINALLY 171.

7           (EXHIBIT 171, AUDIO/VIDEO PLAYING.)

8   BY MR. PELHAM:

9   Q    AGENT STRICKLAND, DID YOU SEE SOURCE 2 HANDLING SOME SORT

10  OF ITEM AT THE END OF THE RECORDING PRESENTED AT 171?

11  A    YES, I DID.

12  Q    AND BASED ON YOUR EXPERIENCE AS A DRUG INVESTIGATOR, WHAT

13  DID THAT SUBSTANCE LOOK LIKE?

14  A    IT APPEARED TO BE COCAINE.

15  Q    COULD --

16          MR. PELHAM:  YOUR HONOR, WITH PERMISSION, THE

17  GOVERNMENT WILL DIRECT AGENT BROWN TO HAND AGENT STRICKLAND

18  EXHIBIT 173.

19          THE COURT:  YES, PLEASE.

20  BY MR. PELHAM:

21  Q    AGENT STRICKLAND, DID SOURCE 2 GIVE YOU SOMETHING AT THE

22  END OF THE OPERATION THAT WE'VE JUST DISCUSSED?

23  A    YES.

24  Q    AND IS WHAT HE GAVE YOU THE ITEM THAT YOU ARE CURRENTLY

25  HOLDING AND THAT IS MARKED AS EXHIBIT 173?

1    A    YES, IT APPEARS THAT WAY.

2    Q    AND HOW DO YOU RECOGNIZE IT?

3    A    ACTUALLY, GO BACK.  I BELIEVE MR. FALLS RECEIVED THIS

4    EVIDENCE IF I'M CORRECT.

5         MR. KALOYANIDES:  OBJECTION.  SPECULATIVE -- IT'S

6    SPECULATIVE.  MOVE TO STRIKE.

7         MR. PELHAM:  YOUR HONOR, I'LL WITHDRAW THE QUESTION.

8         IF I COULD DIRECT AGENT BROWN TO --

9         THE COURT:  THE MOTION WOULD BE GRANTED.

10        MR. PELHAM:  YOUR HONOR, IF I COULD HAVE AGENT BROWN

11   RECOLLECT THAT OBJECT FROM AGENT STRICKLAND.

12        THE COURT:  173.  YES.

13        MR. PELHAM:  YES.

14   BY MR. PELHAM:

15   Q    NOW, IF I CAN HAVE YOU TURN TO EXHIBITS 174 THROUGH 176 IN

16   THE BINDER IN FRONT OF YOU.

17        (PAUSE IN PROCEEDINGS.)

18   BY MR. PELHAM:

19   Q    OKAY.  DO YOU RECOGNIZE THE DOCUMENT AS SET FORTH AS

20   GOVERNMENT'S EXHIBITS 174 TO 176?

21   A    YES, I DO.

22   Q    AND WHAT ARE THOSE?

23   A    THEY APPEAR TO BE -- THEY APPEAR TO BE SCREEN CAPTURES

24   FROM THE SECOND OPERATION CONDUCTED ON JUNE 4TH, 2008 --

25   Q    AND HOW DO YOU --

GER 0065

1   A    -- THE AUDIO/VIDEO RECORDINGS.

2   Q    OKAY.  AND HOW DO YOU RECOGNIZE THEM?

3   A    BECAUSE I REVIEWED THE VIDEO.

4        MR. PELHAM:  YOUR HONOR, THE GOVERNMENT OFFERS 174,

5   175, AND 176.

6        THE COURT:  I ASSUME NO OBJECTION.

7        MR. KALOYANIDES:  YOUR HONOR, NO OBJECTION TO 174.

8   RELEVANCE AS TO 175 AND 176.

9        THE COURT:  OBJECTION IS OVERRULED AS TO RELEVANCE.

10       ALL EXHIBITS ARE RECEIVED.

11       (GOVERNMENT'S EXHIBITS 174, 175, 176 RECEIVED.)

12       MR. PELHAM:  AND WE'LL -- YOUR HONOR, WITH

13  PERMISSION, WE'LL POST THEM FOR THE JURY.

14       THE COURT:  YES.

15  BY MR. PELHAM:

16  Q    THIS IS EXHIBIT 174, AGENT STRICKLAND.  WHO IS DEPICTED IN

17  EXHIBIT 174?

18  A    THAT IS DEFENDANT HARDIMAN.

19  Q    AND LET'S REVIEW 176.

20       AND WHO IS DEPICTED THERE?

21  A    THAT IS DEFENDANT HARDIMAN.

22  Q    OKAY.

23       MR. PELHAM:  YOUR HONOR, THE GOVERNMENT IS GOING TO

24  RENEW A REQUEST TO HAVE AGENT BROWN HAND -- THE ITEM MARKED AS

25  EXHIBIT 173 TO AGENT STRICKLAND, WITH YOUR PERMISSION, YOUR

```
 1    HONOR.
 2              THE COURT:  YES.
 3              MR. PELHAM:  THANK YOU.
 4              (PAUSE IN PROCEEDINGS.)
 5    BY MR. PELHAM:
 6    Q    NOW, AGENT STRICKLAND, DO YOU SEE A -- IF YOU TAKE JUST A
 7    MOMENT TO READ THAT LABEL ON EXHIBIT 173.
 8    A    YES.  YES.
 9    Q    AND DO YOU SEE YOUR NAME ON THAT LABEL?
10    A    YES, IT IS.
11    Q    OKAY.  WHAT IS -- WHAT DOES THAT ENTRY INDICATE ON THAT
12    EXHIBIT?
13    A    I WAS THE WITNESSING OFFICIAL ON THE SEALING OF THE
14    EVIDENCE.
15    Q    DOES THAT INDICATE THAT YOU SAW THE AGENT -- THAT YOU SAW
16    THAT --
17              MR. KALOYANIDES:  OBJECTION.  LEADING.
18              THE COURT:  SUSTAINED.
19              MR. PELHAM:  OKAY.
20    BY MR. PELHAM:
21    Q    WHAT DOES THAT INDICATE THEN ABOUT WHAT OCCURRED THAT DAY
22    WITH RESPECT TO THAT ITEM?
23    A    THAT IDENTIFIES THAT I OBSERVED THE EVIDENCE BEING SEALED
24    IN THIS EVIDENCE BAG.
25    Q    DID YOU SEE THE SOURCE HAND THAT ITEM TO ANOTHER AGENT?
```

1   A    I CANNOT RECALL AT THIS TIME.

2           MR. PELHAM:  YOUR HONOR, THE GOVERNMENT WILL WITHDRAW

3   THAT -- WITHDRAW THE EXHIBIT AGAIN FROM AGENT STRICKLAND.

4           THE COURT:  YES.

5   BY MR. PELHAM:

6   Q    REFERRING TO EXHIBIT 176, ON THE RIGHT-HAND SIDE OF THE

7   SCREEN, I'M JUST GOING TO INSTRUCT MY CO-COUNSEL TO ZOOM IN ON

8   THE ARM -- THE ARM THAT'S DEPICTED OF DEFENDANT HARDIMAN.

9           DO YOU SEE A TATTOO DEPICTED THERE ON EXHIBIT 176 ON

10  DEFENDANT HARDIMAN'S ARM, AGENT STRICKLAND?

11          MR. KALOYANIDES:  OBJECTION.  SPECULATIVE.

12          THE COURT:  OVERRULED.

13          THE WITNESS:  IT APPEARS TO BE A TATTOO.

14  BY MR. PELHAM:

15  Q    NOW, AGENT STRICKLAND, DID YOU CONDUCT OR OVERSEE

16  CONTROLLED DRUG PURCHASE OPERATIONS OTHER THAN THE ONES WE JUST

17  TALKED ABOUT?

18  A    YES.

19  Q    AND WHAT WAS THE GOAL FOR THOSE CONTINUED OPERATIONS?

20  A    TO COLLECT FURTHER EVIDENCE AND TO COLLECT FURTHER

21  INTELLIGENCE OF GANG ACTIVITY, ACTIVITY THAT'S GOING ON IN THE

22  PUEBLO DEL RIO HOUSING PROJECT.

23  Q    AND DID YOU OVERSEE ALL OF THOSE ADDITIONAL OPERATIONS?

24  A    YES, I DID.

25  Q    HOW MANY -- IN TOTAL, HOW MANY CONFIDENTIAL SOURCES,

1  CIVILIAN CONFIDENTIAL SOURCES WERE USED IN THE OPERATIONS THAT

2  WERE CONDUCTED IN THE PUEBLO DEL RIO HOUSING PROJECTS?

3  A    I BELIEVE IN TOTAL USED APPROXIMATELY NINE THAT WERE

4  OPERATIONAL ACTIVE.

5  Q    AND WHERE DID ALL THOSE OPERATIONS TAKE PLACE?

6  A    GENERALLY IN AND AROUND THE PUEBLO DEL RIO HOUSING

7  PROJECT.

8  Q    WHAT WERE SOME OF THE DATES FOR THOSE ADDITIONAL

9  OPERATIONS?

10  A    THOSE DATES INCLUDED SEPTEMBER 17TH, 2008, NOVEMBER 21ST,

11  2008, DECEMBER 12TH, 2008, DECEMBER 15TH, 2008.  THERE'S

12  DECEMBER 19TH, 2008.  FEBRUARY 23RD, 2009, FEBRUARY 24TH, 2009,

13  APRIL 16TH, 2009, JUNE 20 -- I'M SORRY, JUNE 17TH, 2010, AND

14  JUNE 22ND, 2010.

15  Q    NOW, DID YOU UTILIZE FOR EACH OF THOSE OPERATIONS THE SAME

16  TYPE OF AUDIO/VIDEO RECORDING DEVICE THAT WE'VE PREVIOUSLY

17  DISCUSSED?

18  A    YES.  FOR THE MOST PART, YES.

19  Q    AND WERE YOU THE AGENT WHO COLLECTED THE RECORDING DEVICES

20  -- OR, EXCUSE ME.

21      DID AGENTS COLLECT THE RECORDING DEVICES FROM THE

22  CONFIDENTIAL SOURCES WHO WERE USED IN EACH OF THOSE OPERATIONS?

23      MR. KALOYANIDES:  OBJECTION.  CALLS FOR SPECULATION.

24      THE COURT:  SUSTAINED.

25

**GER 0069**

1    BY MR. PELHAM:

2    Q    HAVE YOU REVIEWED THE RECORDINGS THAT WERE COLLECTED AFTER

3    EACH OF THOSE OPERATIONS?

4    A    YES, I HAVE.

5    Q    AND FOR THESE ADDITIONAL OPERATIONS, DID YOU FOLLOW THE

6    SAME BASIC PROCEDURES AS YOU HAD WITH THE OTHER OPERATIONS TO

7    ENSURE THE INTEGRITY OF EVIDENCE?

8    A    YES.

9    Q    AND WHAT WERE THOSE PROCEDURES IN SUMMARY.

10   A    IN SUMMARY, THE SEARCH OF THE CONFIDENTIAL SOURCE BEFORE

11   AND AFTER THE OPERATION, VISUAL SURVEILLANCE OF THE SOURCE TO

12   AND FROM AS BEST AS PRACTICALLY POSSIBLE WITHOUT COMPROMISING

13   THE OPERATION DURING THE OPERATION, UTILIZATION OF THE

14   AUDIO/VIDEO RECORDING DEVICE DURING THE OPERATION IN WHICH

15   AGENTS, MYSELF AND OTHER AGENTS COULD REVIEW FOLLOWING THE

16   OPERATION.

17   Q    NOW, HAVE YOU REVIEWED GOVERNMENT'S EXHIBITS 180 TO 188?

18   A    YES.  YES.

19   Q    NOW, YOU MENTIONED THAT AGENTS HAD CONDUCTED A CONTROLLED

20   BUY OPERATION ON SEPTEMBER 17, 2008.

21            DID YOU COLLECT -- OR, EXCUSE ME.

22            WHAT CONFIDENTIAL SOURCE WAS UTILIZED FOR THAT

23   OPERATION?

24   A    THAT WAS C.S. 2.

25   Q    DID YOU SUPERVISE THAT OPERATION?

1    A    YES.

2    Q    AND DID YOU INSTRUCT AGENTS TO FIT CONFIDENTIAL SOURCE 2

3    WITH AN AUDIO/VIDEO RECORDING DEVICE THAT DAY?

4    A    YES.

5    Q    DID YOU COLLECT THE AUDIO/VIDEO RECORDING DEVICE AT THE

6    END OF THAT OPERATION?

7    A    I BELIEVE IN THE OPERATION ANOTHER AGENT COLLECTED.  AND I

8    WAS SUBSEQUENTLY HANDED THE --

9            MR. KALOYANIDES:  OBJECTION.  SPECULATION.  MOVE TO

10   STRIKE.

11           THE COURT:  I DIDN'T --

12           ASK THE QUESTION AGAIN.

13   BY MR. PELHAM:

14   Q    DID YOU -- I'LL REPHRASE.

15           DID YOU INSTRUCT ANOTHER AGENT TO COLLECT THE

16   AUDIO/VIDEO RECORDING DEVICE THAT SOURCE 2 UTILIZED THAT DAY?

17   A    YES.

18   Q    NOW, HAVE YOU -- YOU SAID THAT YOU'VE REVIEWED THE

19   RECORDING THAT WAS -- EXCUSE ME.

20           WAS THERE ANOTHER FBI AGENT WHO PARTICIPATED IN THAT

21   OPERATION WHO HANDED YOU THE AUDIO/VIDEO RECORDING DEVICE?

22   A    YES.

23   Q    AND WHAT -- WHAT WAS THE NAME OF THAT AGENT?

24   A    I BELIEVE IT WAS KEVIN SHAD.

25   Q    AND CAN YOU RECALL HOW LONG THE TIME PERIOD BETWEEN WHICH

1  AGENT SHAD COLLECTED THE AUDIO/VIDEO RECORDING DEVICE FROM THE

2  SOURCE AND WHEN AGENT SHAD HANDED IT TO YOU?

3  A    IT WAS LESS THAN TEN MINUTES.  I BELIEVE APPROXIMATELY SIX

4  MINUTES OR SO.

5  Q    NOW, HAVE YOU REVIEWED THE RECORDING THAT WAS DOWNLOADED

6  FROM THE DEVICE THAT AGENT SHAD COLLECTED THAT DAY?

7  A    YES, I HAVE.

8  Q    AND BASED ON YOUR REVIEW, CAN YOU RECALL ANY INTERRUPTIONS

9  IN THE AUDIO OR VIDEO DURING THE COURSE OF THAT RECORDING?

10  A    I DON'T BELIEVE SO, NO.

11  Q    AND ARE EXHIBITS 180 THROUGH 188 EXCERPTS OF THE RECORDING

12  THAT WAS DOWNLOADED FROM THE DEVICE THAT WAS COLLECTED FROM THE

13  SOURCE FOLLOWING THE SEPTEMBER 17, 2008 OPERATION?

14  A    IT APPEARS UP TO 187.  THAT'S WHAT IT APPEARS AS FAR AS

15  THE --

16          THE COURT:  188 IS NOT --

17          THE WITNESS: -- THE RESERVED.

18          THE COURT:  IT'S NOT IDENTIFIED IN THE EXHIBIT LIST.

19  BY MR. PELHAM:

20  Q    EXCUSE ME.  JUST 180 THROUGH 187.

21  A    YES.

22  Q    OKAY.  NOW, DO YOU RECOGNIZE THE LIKENESS OR VOICE OF ANY

23  OF THE INDIVIDUALS DEPICTED IN EXHIBITS 180 THROUGH 188 -- 187?

24  A    YES.  THAT WOULD BE C.S. NUMBER 2 AND DEFENDANT HARDIMAN.

25          MR. PELHAM:  YOUR HONOR, THE GOVERNMENT OFFERS 180

1    THROUGH 187.

2              MR. KALOYANIDES:  NO OBJECTION.

3              THE COURT:  RECEIVED.

4              (GOVERNMENT'S EXHIBITS 180 THROUGH 187 RECEIVED.) BY

5    MR. PELHAM:

6    Q    AND, AGENT STRICKLAND, DID YOU HELP PREPARE TRANSCRIPTS

7    FOR EXHIBITS 180 THROUGH 187?

8    A    YES.

9    Q    AND WAS YOUR PREPARATION OF THOSE TRANSCRIPTS BASED ON

10   WHAT YOU RECOGNIZE OF THE LIKENESSES AND VOICES OF INDIVIDUALS

11   DEPICTED IN THOSE RECORDINGS?

12   A    YES.

13   Q    NOW, IF YOU COULD ALSO LOOK IN YOUR BINDER AT EXHIBITS 190

14   AND 192.

15             AND EXCUSE ME.  190, 192, AND 193.

16             (PAUSE IN PROCEEDINGS.)

17   BY MR. PELHAM:

18   Q    AND WHAT DO YOU RECOGNIZE THOSE ITEMS TO BE?

19   A    SCREEN CAPTURES FROM THE OPERATION THAT WAS CONDUCTED ON

20   -- ON THE AUDIO/VIDEO RECORDING THAT WAS FROM THE OPERATION ON

21   SEPTEMBER 17TH, 2008.

22             MR. PELHAM:  YOUR HONOR, THE GOVERNMENT OFFERS

23   EXHIBITS 190, 192, AND 193.

24             MR. KALOYANIDES:  NO OBJECTION.

25             THE COURT:  190, 192, AND 193 ARE RECEIVED.

1          (GOVERNMENT'S EXHIBITS 190, 192, AND 193 RECEIVED.)

2     BY MR. PELHAM:

3     Q    NOW, AGENT STRICKLAND, YOU MENTIONED AN OPERATION THAT

4     TOOK PLACE ON NOVEMBER 21ST, 2008.  WHAT WAS THE NICKNAME OF

5     THE CONFIDENTIAL SOURCE UTILIZED IN THAT OPERATION OR THE

6     NUMBER?

7     A    IT WOULD BE C.S. NUMBER 6.

8     Q    OKAY.  DID YOU INSTRUCT AGENTS TO FIT SOURCE 6 WITH AN

9     AUDIO/VIDEO RECORDING DEVICE FOR THAT OPERATION THAT DAY?

10    A    YES.

11    Q    AND DID YOU COLLECT THE AUDIO/VIDEO RECORDING DEVICE FROM

12    SOURCE 6 AT THE END OF THAT OPERATION?

13    A    YES.

14    Q    DID YOU INSTRUCT AGENTS TO CONDUCT SURVEILLANCE DURING

15    THAT OPERATION?

16    A    YES.

17    Q    HAVE YOU REVIEWED THE ITEM THAT THE GOVERNMENT HAS MARKED

18    AS EXHIBIT 244?

19    A    YES, I HAVE.

20    Q    AND WHAT IS --

21    A    YES.

22    Q    OKAY.  AND WHAT IS THAT ITEM?

23    A    IT'S -- 224 IS AN AUDIO/VIDEO RECORDING OF THE NOVEMBER

24    21ST, 2008 OPERATION.

25          MR. PELHAM:  YOUR HONOR, THE GOVERNMENT OFFERS 244.

1          MR. KALOYANIDES:  OBJECTION.  LACKS FOUNDATION.

2     RELEVANCE.

3          THE COURT:  YOU'RE GOING TO HAVE TO LAY SOME

4     ADDITIONAL FOUNDATION.

5          MR. PELHAM:  YES, YOUR HONOR.

6     BY MR. PELHAM:

7     Q    ON NOVEMBER 21ST, 2008, AGENT STRICKLAND, WHAT DID YOU

8     INSTRUCT SOURCE 6 TO DO?

9     A    TO GO TO THE PUEBLO DEL RIO HOUSING PROJECT TO PURCHASE

10    NARCOTICS.

11    Q    AND DID YOU INSTRUCT AGENTS TO FIT SOURCE 6 WITH ANY

12    EQUIPMENT TO ACCOMPLISH THAT?

13    A    SURE.  EITHER MYSELF OR ANOTHER AGENT FITTED THE SOURCE

14    WITH AN AUDIO/VIDEO RECORDING DEVICE.

15    Q    AND DID YOU COLLECT THAT RECORDING DEVICE AT THE END OF

16    THAT OPERATION?

17    A    YES.

18    Q    DURING THE COURSE OF THAT -- EXCUSE ME.

19          APPROXIMATELY, HOW LONG DID THAT OPERATION LAST?

20    A    CAN'T -- CAN'T RECALL EXACT TIMES.  LESS THAN TWO HOURS.

21    Q    AND DID SOURCE 6 HAVE ACCESS TO THAT AUDIO/VIDEO RECORDING

22    DEVICE BEYOND THE LENGTH OF THAT OPERATION?

23    A    I DO NOT BELIEVE SO, NO.

24    Q    AND DID YOU INSTRUCT AGENTS TO CONDUCT VISUAL SURVEILLANCE

25    OF SOURCE 6 DURING AT LEAST PART OF THAT OPERATION?

1    A    YES.

2    Q    AND DID YOU INSTRUCT AGENTS TO SEARCH SOURCE 6 -- SOURCE

3    6'S PERSON BEFORE AND AFTER THE OPERATION?

4    A    YES.

5    Q    DID YOU INSTRUCT AGENTS TO ALSO SEARCH SOURCE 6'S CAR

6    BEFORE AND AFTER THE OPERATION?

7    A    I BELIEVE SO, YES.

8    Q    WHOSE -- AMONG OTHERS, WHOSE LIKENESSES AND VOICES DO YOU

9    RECOGNIZE FROM EXHIBIT 244?

10   A    C.S. NUMBER 6 AND ALSO C.S. -- I'M SORRY, C.S. NUMBER 6

11   AND DEFENDANT HARDIMAN.

12          MR. PELHAM:  YOUR HONOR, THE GOVERNMENT RENEWS ITS

13   OFFER OF 244.

14          MR. KALOYANIDES:  NO OBJECTION.

15          THE COURT:  IT'S RECEIVED.

16          (GOVERNMENT'S EXHIBIT 244 RECEIVED.)

17   BY MR. PELHAM:

18   Q    AND IF YOU COULD ALSO PLEASE TAKE A LOOK, AGENT

19   STRICKLAND, AT EXHIBITS 245 THROUGH 247 IN THAT BINDER.

20          DO YOU RECOGNIZE THOSE ITEMS?

21   A    YES.

22   Q    AND WHAT ARE THEY?

23   A    SCREEN CAPTURES FROM THE AUDIO/VIDEO -- EXCUSE ME,

24   AUDIO/VIDEO RECORDING DEVICE FROM NOVEMBER 21ST, 2008.

25          MR. PELHAM:  YOUR HONOR, THE GOVERNMENT OFFERS 245

1       THROUGH 247.

2                   THE COURT:  THAT'S 245, 246, AND 247.  NOT --

3                   MR. KALOYANIDES:  OBJECTION TO 246.  FOUNDATION AND

4       RELEVANCE.

5                   THE COURT:  245?

6                   MR. KALOYANIDES:  24- -- NO OBJECTION TO 245 AND 247.

7                   THE COURT:  IT WILL -- THE OBJECTION IS OVERRULED.

8                   (GOVERNMENT'S EXHIBITS 245, 246, AND 247 RECEIVED.)

9       BY MR. PELHAM:

10      Q    AND MY APOLOGIES -- AGENT STRICKLAND, I OMITTED EXHIBITS

11      242 AND 243.

12                  HAVE YOU REVIEWED THE ITEMS THAT THE GOVERNMENT HAS

13      MARKED AS EXHIBITS 242 AND 243?

14      A    YES.

15      Q    AND WHAT ARE 242 AND 243?

16      A    THOSE WOULD BE SEGMENTS OF THE AUDIO/VIDEO RECORDING FROM

17      NOVEMBER 21ST, 2008.

18                  MR. PELHAM:  YOUR HONOR, THE GOVERNMENT OFFERS 242

19      AND 243.

20                  MR. KALOYANIDES:  NO OBJECTION.

21                  THE COURT:  RECEIVED.

22                  (GOVERNMENT'S EXHIBITS 242 AND 243 RECEIVED.)

23      BY MR. PELHAM:

24      Q    NOW, YOU MENTIONED THE DECEMBER 19, 2008 OPERATION, AGENT

25      STRICKLAND.

**GER 0077**

1        WHAT CONFIDENTIAL SOURCE WAS UTILIZED FOR THIS

2  OPERATION?

3  A   C.S. 2.

4  Q   NOW, DID YOU SUPERVISE A SERIES OF OPERATIONS INVOLVING

5  C.S. 2 OR SOURCE 2 THAT PRECEDED THE DECEMBER 19, 2008

6  OPERATION?

7  A   YES.

8  Q   AND WAS SOURCE 2 INVOLVED IN EACH OF THOSE PRECEDING

9  OPERATIONS?

10  A   YES.

11  Q   WHAT WERE THE DATES OF THOSE -- OF THOSE PRECEDING

12  OPERATIONS?

13  A   DECEMBER 12TH, 2008 AND ALSO DECEMBER 15TH, 2008.

14  Q   AND WHOM DID YOU INSTRUCT SOURCE 2 TO MEET WITH ON EACH OF

15  THOSE OPERATIONS?

16  A   JERMAINE HARDI- -- OR DEFENDANT HARDIMAN.

17  Q   DID YOU OVERSEE EACH OF THOSE OPERATIONS?

18  A   YES.

19  Q   AND DID YOU INSTRUCT AGENTS OR DID YOU YOURSELF FIT

20  AUDIO/VIDEO RECORDING EQUIPMENT ON SOURCE 2 DURING THE COURSE

21  OF THOSE OPERATIONS?

22  A   YES.

23  Q   AND DID YOU COLLECT THE AUDIO/VIDEO RECORDING DEVICE FROM

24  SOURCE 2 AT THE END OF EACH OF THOSE OPERATIONS?

25  A   I BELIEVE SO.  **GER 0078**

1      MR. KALOYANIDES:  OBJECTION.  SPECULATION.  MOVE TO

2  STRIKE.

3      THE COURT:  THE OBJECTION IS OVERRULED.

4  BY MR. PELHAM:

5  Q   NOW, DURING THOSE -- EACH OF THOSE OPERATIONS IN DECEMBER

6  OF 2008, DID YOU GENERALLY FOLLOW THE SAME PROCEDURES THAT

7  WE'VE BEEN DISCUSSING?

8  A   YES.

9  Q   AND VERY GENERALLY, WHAT PROCEDURES DID YOU FOLLOW DURING

10  THE DECEMBER 2008 OPERATIONS TO ENSURE THE INTEGRITY OF

11  COLLECTED EVIDENCE?

12  A   THE -- PRIOR TO THE OPERATIONS, THE SEARCH OF THE SOURCE,

13  C.S. 2, AS WELL AS C.S. 2'S VEHICLE.  UTILIZED VISUAL

14  SURVEILLANCE OF THE SOURCE DURING THE OPERATION WITH THE BEST

15  POTENTIAL THAT YOU COULD WITHOUT COMPROMISING THE OPERATION.

16  AND ALSO UTILIZATION OF THE AUDIO/VIDEO RECORDING DEVICE THAT

17  ALLOWED US -- THAT RECORDED THE OPERATION.

18  Q   AND DID YOU ALLOW THE SOURCE TO POSSESS THE AUDIO/VIDEO

19  RECORDING DEVICE BEYOND THE LENGTH OF EACH OF THESE OPERATIONS

20  IN DECEMBER OF 2008?

21  A   I DON'T BELIEVE SO, NO.

22  Q   NOW, HAVE YOU REVIEWED THE RECORDINGS THAT WERE GENERATED

23  FROM THE DECEMBER 2008 OPERATIONS?

24  A   YES.

25  Q   DID YOU OBSERVE ANY INTERRUPTIONS OR BREAKS IN THE AUDIO

1  OR VIDEO FROM THOSE RECORDINGS?

2  A    I DON'T -- I DON'T RECALL.  I DON'T BELIEVE SO, NO.

3  Q    HAVE YOU REVIEWED THE ITEMS THAT THE GOVERNMENT HAS MARKED

4  AS EXHIBITS 249, 250, AND 251?

5  A    YES, I HAVE.

6  Q    AND WHAT ARE THOSE ITEMS?

7  A    THOSE ARE THE EXCERPTS, SEGMENTS OF THE AUDIO/VIDEO

8  RECORDING FROM DECEMBER 12TH, 2008.

9  Q    AND WHOSE -- AMONG OTHERS, WHOSE LIKENESS OR VOICE DO YOU

10  RECOGNIZE FROM EXHIBITS 249, 250, AND 251?

11  A    IT WAS C.S. NUMBER 2 AND DEFENDANT HARDIMAN.

12         MR. PELHAM:  YOUR HONOR, THE GOVERNMENT OFFERS 249,

13  250, 251.

14         MR. KALOYANIDES:  NO OBJECTION.

15         THE COURT:   RECEIVED.

16         (GOVERNMENT'S EXHIBITS 249, 250, AND 251 RECEIVED.)

17  BY MR. PELHAM:

18  Q    NOW, DID YOU ALSO INSTRUCT SOURCE 2 TO PLACE PHONE CALLS

19  TO DEFENDANT HARDIMAN IN DECEMBER OF 2008?

20  A    YES.

21  Q    AND ON WHAT DATE DID YOU HAVE HIM MAKE THOSE CALLS?

22  A    I BELIEVE THAT WAS ON DECEMBER 15TH --

23  Q    AND --

24  A    -- 2008.

25  Q    -- WERE YOU PRESENT WHEN THOSE CALLS WERE MADE?

1   A    YES.

2   Q    DID YOU RECORD THOSE CALLS?

3   A    YES.

4   Q    HAVE YOU REVIEWED GOVERNMENT'S EXHIBITS 253, 254, AND 255?

5   A    YES, I HAVE.

6   Q    AND WHAT ARE THOSE ITEMS?

7   A    PHONE CALLS THAT WERE PLACED ON -- BY C.S. NUMBER 2 ON

8   DECEMBER 15TH, 2008.

9          MR. PELHAM:  YOUR HONOR, THE GOVERNMENT OFFERS 253,

10  254, AND 255.

11         MR. KALOYANIDES:  OBJECTION.  LACKS FOUNDATION.

12         THE COURT:  ADDITIONAL FOUNDATION.

13         MR. PELHAM:  YES, YOUR HONOR.

14  BY MR. PELHAM:

15   Q    HAVE YOU REVIEWED THE PHONE CALLS THAT YOU RECORDED WITH

16  SOURCE 2 ON DECEMBER 15TH, 2008?

17   A    YES, I HAVE.

18   Q    AND WHOSE VOICES DO YOU RECOGNIZE IN THOSE RECORDED PHONE

19  -- IN THOSE RECORDINGS.

20   A    RECOGNIZE C.S. 2 AND ALSO DEFENDANT HARDIMAN.

21         MR. PELHAM:  ALL RIGHT.  YOUR HONOR, THE GOVERNMENT

22  RENEWS ITS OFFER.

23         THE COURT:  IT'S 253, 2-  WHAT NUMBER?

24         MR. PELHAM:  253, 254, AND 255.

25         THE COURT:  ANY OBJECTION?

82

```
 1              MR. KALOYANIDES:  NO OBJECTION.

 2              THE COURT:  RECEIVED.

 3              (GOVERNMENT'S EXHIBITS 253, 254, AND 255 RECEIVED.)

 4  BY MR. PELHAM:

 5  Q    AND, AGENT STRICKLAND, DID YOU REVIEW EXHIBIT 252? -- OR

 6  THE ITEM THAT THE GOVERNMENT HAS MARKED AS EXHIBIT 252.

 7  A    YES.

 8  Q    AND WHAT IS EXHIBIT 252?

 9  A    IT'S THE AUDIO/VIDEO RECORDING FROM DECEMBER 15TH, 2008.

10              MR. PELHAM:  YOUR HONOR, THE GOVERNMENT OFFERS 252.

11              MR. KALOYANIDES:  NO OBJECTION.

12              THE COURT:  RECEIVED.

13              (GOVERNMENT'S EXHIBIT 252 RECEIVED.)

14              THE COURT:  AND WE'RE GOING TO CONCLUDE THIS MORNING.

15  WE'LL RESUME AT ONE O'CLOCK.

16              DURING YOUR ABSENCE DO NOT DISCUSS THE CASE AMONGST

17  YOURSELVES OR WITH ANY OTHER PERSON.

18              THE CLERK:  OKAY.  ALL RISE FOR THE JURY.

19              (JURY EXITS.)

20              THE COURT:  WE'RE IN RECESS FOR THE MORNING FOR THE

21  NOON LUNCH.

22              ANY ADDITIONAL ISSUES TO HANDLE?

23              MR. KALOYANIDES:  NO, YOUR HONOR.

24              MR. MC CURRY:  NO, YOUR HONOR.

25              THE COURT:  THANK YOU.
```

```
 1              MR. CREARY:  THANK YOU, YOUR HONOR.

 2              MR. PELHAM:  THANK YOU, YOUR HONOR.

 3              THE CLERK:  COURT IS IN RECESS.

 4              (LUNCHEON RECESS 11:30 A.M. TO 12:58 P.M.)

 5              (JURY ENTERING, 12:58 P.M.)

 6              THE COURT:  WE HAVE ALL --

 7              PLEASE HAVE A SEAT.

 8              WE HAVE ALL JURORS REASSEMBLED WITH THE ALTERNATES.

 9              COUNSEL ARE PRESENT WITH THE DEFENDANTS.  COUNSEL FOR

10      THE GOVERNMENT.

11              WE CONTINUE WITH THE DIRECT EXAMINATION OF

12      SUPERVISORY SPECIAL AGENT MARK STRICKLAND.

13              MR. PELHAM:  THANK YOU, YOUR HONOR.

14                    DIRECT EXAMINATION (RESUMED)

15      BY MR. PELHAM:

16      Q    SPECIAL AGENT STRICKLAND, JUST TO CATCH UP, YOU MADE A --

17      YOU INSTRUCTED SOURCE 2 TO PLACE A NUMBER OF PHONE CALLS IN

18      CONNECTION WITH THE CONTROLLED PURCHASE -- DRUG PURCHASE

19      OPERATIONS THAT YOU CONDUCTED IN DECEMBER OF 2008?

20      A    THAT'S CORRECT.

21      Q    AND WERE YOU PRESENT WHEN THE SOURCE PLACED THOSE PHONE

22      CALLS?

23      A    YES.

24      Q    AND WHOM DID YOU INSTRUCT THE SOURCE TO CALL?

25      A    DEFENDANT HARDIMAN.
```

1   Q    AND ON WHAT DATE DID YOU HAVE HIM PLACE THOSE CALLS?

2   A    DECEMBER 15TH, 2008.

3   Q    NOW, AFTER -- EXCUSE ME.  AFTER THOSE CALLS DID YOU

4   INSTRUCT THE SOURCE TO MEET WITH DEFENDANT HARDIMAN ON DECEMBER

5   19, 2008?

6   A    YES.  AND I BELIEVE THERE'S ALSO ANOTHER TELEPHONE CALL ON

7   DECEMBER 19TH AS WELL.

8   Q    EXCUSE ME.

9        DID YOU INSTRUCT THE SOURCE TO PLACE A PHONE CALL TO

10  DEFENDANT HARDIMAN ON DECEMBER 19, 2008?

11  A    YES.

12  Q    AND WERE YOU PRESENT DURING THE MAKING OF THAT CALL?

13  A    YES.

14  Q    DID YOU RECORD THAT CALL?

15  A    YES.

16  Q    HAVE YOU REVIEWED THAT RECORDING?

17  A    YES, I HAVE.

18  Q    BASED ON YOUR REVIEW OF THAT RECORDING CAN YOU RECOGNIZE

19  ANYONE'S VOICES ON -- ON THAT RECORDING?

20  A    C.S. NUMBER 2 AND ALSO DEFENDANT HARDIMAN.

21  Q    AND TO BE CLEAR, WHEN YOU SAY "C.S.," YOU'RE REFERRING TO

22  THE SOURCE?

23  A    YES.

24  Q    AND HAVE YOU REVIEWED THE ITEM THAT THE GOVERNMENT HAS

25  MARKED FOR IDENTIFICATION AS EXHIBIT 256?

1    A    YES, I HAVE.

2    Q    AND WHAT IS 256?

3    A    IT IS A TELEPHONE CALL PLACED ON DECEMBER 19TH, 2008.

4         MR. PELHAM:  YOUR HONOR, THE GOVERNMENT OFFERS 256.

5         MR. KALOYANIDES:  NO OBJECTION.

6         THE COURT:  RECEIVED.

7         (GOVERNMENT'S EXHIBIT 256 RECEIVED.)

8    BY MR. PELHAM:

9    Q    AND, AGENT STRICKLAND, DID YOU HELP TO PRODUCE A

10   TRANSCRIPT FOR EXHIBIT 256?

11   A    YES.

12   Q    AND DID YOU -- HAVE YOU CHECKED THAT -- THAT TRANSCRIPT?

13   A    YES, I HAVE.

14   Q    AND DID YOU CHECK THAT TRANSCRIPT BASED ON YOUR

15   FAMILIARITY WITH THE VOICES THAT WERE USED IN THAT RECORDING?

16   A    YES.

17   Q    NOW, AFTER YOU INSTRUCTED SOURCE 2 TO PLACE THAT PHONE

18   CALL ON DECEMBER 19, WHAT DID YOU INSTRUCT THE SOURCE TO DO

19   NEXT?

20   A    TO TRAVEL TO MEET DEFENDANT HARDIMAN TO PURCHASE COCAINE

21   AND A FIREARM.

22   Q    AND WHERE DID YOU INSTRUCT SOURCE 2 TO GO TO MEET

23   DEFENDANT HARDIMAN?

24   A    I BELIEVE HE WAS GOING TO A RESIDENCE WHICH HE LIVED NEAR

25   THE PROJECTS.

1          MR. KALOYANIDES:  OBJECTION.  SPECULATION.  MOVE TO

2    STRIKE.

3          THE COURT:  SUSTAINED.  MOTION GRANTED.

4    BY MR. PELHAM:

5    Q    DID YOU INSTRUCT THE SOURCE TO DRIVE TO A LOCATION NEAR

6    THE PROJECTS TO MEET WITH DEFENDANT HARDIMAN?

7    A    YES.

8    Q    NOW, DID YOU INSTRUCT AGENTS TO FIT SOURCE 2 WITH AN

9    AUDIO/VIDEO RECORDING DEVICE AT THE BEGINNING OF THAT DECEMBER

10   19, 2008 OPERATION?

11   A    IT WAS EITHER MYSELF OR ANOTHER AGENT FITTED THE SOURCE

12   WITH A RECORDING DEVICE, AN AUDIO/VIDEO.

13   Q    AND DID YOU COLLECT THE AUDIO/VIDEO RECORDING DEVICE FROM

14   THE SOURCE AT THE END OF THAT OPERATION?

15   A    YES.

16   Q    HAVE YOU REVIEWED GOVERNMENT'S EXHIBITS 257, 258, 259,

17   260, AND 261?

18   A    YES.

19   Q    AND WHAT ARE THOSE?

20   A    THOSE ARE EXCERPTS FROM THE AUDIO/VIDEO RECORDING FROM

21   DECEMBER 19TH, 2008.

22   Q    AND DO YOU RECOGNIZE ANYONE'S LIKENESS OR VOICES FROM

23   EXHIBITS 256 THROUGH 261? -- EXCUSE ME, 257 THROUGH 251 -- 261.

24   A    YES.

25   Q    AND WHOSE VOICE OR LIKENESS DID YOU RECOGNIZE FROM THOSE

1    RECORDINGS?

2    A    C.S. NUMBER 2 AND DEFENDANT HARDIMAN.

3         MR. PELHAM:  YOUR HONOR, THE GOVERNMENT OFFERS 257,

4    258, 259, 260, AND 261.

5         MR. KALOYANIDES:  NO OBJECTION.

6         THE COURT:  RECEIVED.

7         (GOVERNMENT'S EXHIBITS 257-261 RECEIVED.)

8    BY MR. PELHAM:

9    Q    AND, AGENT STRICKLAND, DID YOU HELP TO PRODUCE TRANSCRIPTS

10   THAT CORRESPOND WITH EACH OF THOSE RECORDINGS?

11   A    YES.

12   Q    AND DID YOU -- DID YOU HELP TO MAKE THOSE TRANSCRIPTS

13   BASED ON YOUR FAMILIARITY WITH SOME OF THE VOICES THAT YOU HEAR

14   ON THOSE RECORDINGS?

15   A    YES.

16   Q    NOW, AGENT STRICKLAND, DID YOU COLLECT ANY ITEMS FROM THE

17   -- FROM THE CONFIDENTIAL SOURCE AT THE END OF THIS -- AT THE

18   END OF THIS OPERATION?

19   A    YES.

20   Q    OKAY.

21        MR. PELHAM:  YOUR HONOR, COULD I PLEASE INSTRUCT

22   AGENT BROWN TO BRING ITEM 256 TO AGENT STRICKLAND.

23        THE COURT:  YES, PLEASE.

24        MR. PELHAM:  EXCUSE ME.  265.

25        (PAUSE IN PROCEEDINGS.)

1  BY MR. PELHAM:

2  Q    AGENT STRICKLAND, TAKE A LOOK AT ITEM 265.

3       DO YOU RECOGNIZE IT?

4  A    YES.

5  Q    OKAY.  IS THAT THE ITEM THAT THE SOURCE -- THAT SOURCE 2

6  GAVE YOU AT THE END OF THE DECEMBER 19, 2008 OPERATION?

7  A    YES.

8  Q    AND HOW DO YOU RECOGNIZE THAT ITEM AS SUCH?

9  A    I RECOGNIZE IT BECAUSE IT WAS IN THE -- IN THIS PACKAGING

10 THAT WAS -- THAT THE SOURCE GAVE TO ME.

11 Q    AND WHAT ABOUT THAT PACKAGING INDICATES TO YOU THAT YOU

12 RECEIVED IT?

13 A    WELL, THE PACKAGING HAS THE INITIALS OR THE SIGNATURE OF

14 THE SEALING OFFICIAL, WHICH WAS SPECIAL AGENT KEVIN FALLS, AND

15 WITNESSING OFFICIAL ALFREDO DURAN.  BUT I DO RECALL PROVIDING

16 THIS TO AGENT FALLS FOLLOWING THE OPERATION AFTER I COLLECTED

17 IT.

18      MR. PELHAM:  YOUR HONOR, THE GOVERNMENT OFFERS 265.

19      MR. KALOYANIDES:  NO OBJECTION.

20      THE COURT:  265 IS RECEIVED.

21      (GOVERNMENT'S EXHIBIT 265 RECEIVED.)

22      THE COURT:  AGAIN, IT HAS NOT BEEN ESTABLISHED THAT

23 THE CONTENTS ARE COCAINE.

24 BY MR. PELHAM:

25 Q    NOW, AGENT STRICKLAND, YOU MENTIONED A FEBRUARY 23RD, 2009

1    OPERATION.

2    A    YES.

3    Q    WHAT CONFIDENTIAL SOURCE DID YOU UTILIZE FOR THAT

4    OPERATION?

5    A    THAT WOULD BE C.S. NUMBER 4.

6    Q    DID YOU SUPERVISE THAT OPERATION?

7    A    YES.

8    Q    DID YOU UTILIZE DURING THE COURSE OF THAT OPERATION THE

9    SAME PROCEDURES THAT WE DISCUSSED EARLIER REGARDING THE

10   PRESERVATION OF THE INTEGRITY OF EVIDENCE?

11   A    YES.

12   Q    WHAT DID YOU INSTRUCT THE SOURCE TO DO THAT DAY?

13   A    THAT DAY I BELIEVE THE SOURCE WENT TO THE PUEBLO DEL RIO

14   HOUSING PROJECTS TO MEET WITH PEOPLE.

15   Q    DID YOU COLLECT ANY RECORDINGS FROM THE SOURCE AT THE END

16   OF THAT OPERATION?

17   A    YES.

18   Q    HAVE YOU REVIEWED THE ITEMS THAT THE GOVERNMENT HAS MARKED

19   AS EXHIBITS 273 AND 275?

20   A    YES.

21   Q    AND DID YOU -- DID YOU RECOGNIZE THOSE ITEMS?

22   A    YES.  THEY'RE AUDIO AND VIDEO RECORDINGS OF THE FEBRUARY

23   23RD, 2009 OPERATION.

24   Q    AND DO YOU RECOGNIZE ANYONE'S LIKENESS OR VOICE DURING THE

25   COURSE OF THOSE RECORDINGS?

1   A    C.S. NUMBER 4 AND ALSO DEFENDANT HARDIMAN.

2             MR. PELHAM:  YOUR HONOR, THE GOVERNMENT OFFERS 273

3   AND 275.

4             MR. KALOYANIDES:  NO OBJECTION.

5             THE COURT:  RECEIVED.

6             (GOVERNMENT'S EXHIBIT 273 AND 275.)

7   BY MR. PELHAM:

8   Q    IN THE BINDER IN FRONT OF YOU, AGENT STRICKLAND, IF YOU

9   COULD PLEASE TAKE A LOOK AT EXHIBIT 274.

10            (PAUSE IN PROCEEDINGS.)

11  BY MR. PELHAM:

12  Q    DO YOU RECOGNIZE THAT ITEM?

13  A    IT APPEARS TO BE A SCREEN CAPTURE FROM THE OPERATION ON

14  FEBRUARY 23RD, 2009.

15            MR. PELHAM:  YOUR HONOR, THE GOVERNMENT OFFERS 274.

16            MR. KALOYANIDES:  NO OBJECTION.

17            THE COURT:  IS IT FEBRUARY 23RD OR FEBRUARY 24TH?

18  BY MR. PELHAM:

19  Q    AGENT STRICKLAND, WHAT WAS THE -- WAS THIS SCREEN CAPTURE

20  TAKEN FROM THE FEBRUARY 24TH OR FEBRUARY 23RD RECORDING, IF YOU

21  KNOW?

22  A    AND THIS EXHIBIT IS?

23  Q    274.

24  A    THIS WOULD BE THE FEBRUARY 24TH.  I APOLOGIZE.

25  Q    DO YOU --

1           MR. PELHAM:  WELL, THEN, I'LL WITHDRAW THE OFFER,

2    YOUR HONOR, AND LAY A FOUNDATION FOR IT IN A MOMENT.

3    BY MR. PELHAM:

4    Q    NOW, AGENT STRICKLAND, DID YOU -- WHAT CONFIDENTIAL SOURCE

5    DID YOU USE FOR YOUR CONTROLLED DRUG PURCHASE OPERATION ON

6    FEBRUARY 24TH, 2009?

7    A    ON FEBRUARY 24TH, 2009, WE UTILIZED C.S. NUMBER 4.

8    Q    THE SAME SOURCE AS FEBRUARY 23RD?

9    A    YES.

10   Q    AND WHAT DID YOU INSTRUCT SOURCE 4 TO DO ON FEBRUARY 24,

11   2009?

12   A    TO GO TO THE PUEBLO DEL RIO HOUSING PROJECT TO PURCHASE

13   NARCOTICS.

14   Q    HAVE YOU -- DID YOU DURING THE COURSE OF THAT OPERATION ON

15   FEBRUARY 24TH, 2009 UTILIZE THE SAME SAFEGUARDS THAT WE'VE

16   TALKED ABOUT WITH RESPECT TO THE OTHER CONTROLLED DRUG PURCHASE

17   OPERATIONS?

18   A    YES.

19   Q    NOW, DID YOU HELP -- EXCUSE ME, DID YOU REVIEW OR HAVE YOU

20   REVIEWED THE ITEM THAT THE GOVERNMENT HAS MARKED AS EXHIBIT

21   271?

22   A    YES, I HAVE.

23   Q    AND BASED ON YOUR REVIEW DO YOU RECOGNIZE OR CAN YOU

24   RECOGNIZE ANYONE'S LIKENESS OR VOICE WITHIN EXHIBIT 271?

25   A    YES.

1    Q    AND WHO WOULD THAT BE?

2    A    C.S. NUMBER 4 AND MR. -- OR DEFENDANT HARDIMAN.

3    Q    DID YOU COLLECT THE RECORDING DEVICE THAT C.S. 4 USED

4    DURING THE COURSE OF THE FEBRUARY 24, 2009 OPERATION?

5    A    YES.

6              MR. PELHAM:  YOUR HONOR, THE GOVERNMENT OFFERS 271.

7              MR. KALOYANIDES:  NO OBJECTION.

8              THE COURT:  271 IS RECEIVED.

9              (GOVERNMENT'S EXHIBIT 271 RECEIVED.)

10   BY MR. PELHAM:

11   Q    NOW, AGENT STRICKLAND, DID YOU HELP PREPARE TRANSCRIPTS

12   FOR THE RECORDINGS AT 271, 273, AND 274?

13   A    COULD YOU REPEAT THE NUMBERS.

14   Q    271, 273, AND 274.

15   A    274 IS A PHOTOGRAPH --

16   Q    EXCUSE ME, 275.  271, 73, AND 75.

17   A    YES.

18   Q    OKAY.

19              AND DID YOU PREPARE THOSE TRANSCRIPTS BASED ON YOUR

20   FAMILIARITY WITH THE VOICES AND THE LIKENESSES THAT ARE

21   DEPICTED IN THOSE RECORDINGS?

22   A    YES.

23              MR. PELHAM:  YOUR HONOR, WITH THE COURT'S PERMISSION,

24   THE GOVERNMENT WOULD ASK TO PLAY FOR THE JURY 271, 273, AND

25   275.

1           THE COURT:  YES.

2           AND, AGAIN, WITH THE SAME DIRECTIVE THAT IT'S THE

3   RECORDING THAT'S THE EVIDENCE NOT THE TRANSCRIPT.  IF THERE'S A

4   DISCREPANCY, WHAT YOU HEAR IN THE RECORDING CONTROLS.

5           (AUDIO/VIDEO PLAYING.)

6           MR. PELHAM:  WE CAN PAUSE IT HERE.

7   BY MR. PELHAM:

8   Q    AGENT STRICKLAND, ARE YOU FAMILIAR WITH THE PREMISES THAT

9   ARE DEPICTED IN THIS RECORDING?

10  A    YES, THE PUEBLO DEL RIO HOUSING PROJECT.

11  Q    AND COULD YOU IDENTIFY FOR US WHO WAS ONE OF THE

12  INDIVIDUALS THAT APPEARED AT THE BEGINNING OF THE RECORDING?

13  A    DEFENDANT HARDIMAN.

14  Q    OKAY.  AND ARE YOU FAMILIAR WITH THE INDIVIDUAL WHO

15  APPEARED TOWARD THE END OF THE RECORDING?

16  A    YES.

17  Q    AND WHO WAS THAT?

18  A    JOSE LEON.

19  Q    AND I APOLOGIZE.  I PLAYED THESE OUT OF ORDER.

20          WHAT WAS THE DATE ON WHICH THIS VIDEO WAS RECORDED --

21  WAS RECEIVED?

22  A    THIS WAS -- THIS WOULD BE RECEIVED ON FEBRUARY 24TH, 2009.

23  Q    AND WERE THERE -- WAS THERE A RECORDING YOU HAD MADE THE

24  PREVIOUS DAY WITH THIS SAME CONFIDENTIAL SOURCE?

25  A    YES.

1  Q   WE'LL FINISH PLAYING THIS.  AND THEN I'LL PLAY THE OTHER

2  TWO FOR YOU.

3            (AUDIO/VIDEO PLAYING.)

4            MR. PELHAM:  OKAY.  AND NOW LET'S PLAY -- AGAIN, OUT

5  OF ORDER, 273 AND 275.

6            (AUDIO/VIDEO PLAYING.)

7  BY MR. PELHAM:

8  Q   NOW, AGENT STRICKLAND, WHO WAS THE DOMINANT SPEAKER DURING

9  THE COURSE OF THAT RECORDING?

10  A   THE DEFENDANT HARDIMAN.

11  Q   DID YOU HEAR DEFENDANT HARDIMAN USE THE TERM "FRONT"

12  DURING THE COURSE OF THE RECORDING?

13  A   YES.

14  Q   AS A DRUG INVESTIGATOR, ARE YOU -- HAVE YOU EVER

15  ENCOUNTERED THE USE OF THAT PHRASE IN THE CONTEXT OF DRUG

16  DEALING?

17  A   YEAH. "FRONTING" IS THE PRACTICE OF PROVIDING DRUGS BEFORE

18  YOU RECEIVE PAYMENT.  SO, YOU FRONT SOMEONE DRUGS.  AND THEN

19  YOU WILL PAY THEM BACK ONCE YOU HAVE SOLD THE DRUGS OR MOVED

20  THE DRUGS.

21  Q   DID YOU HEAR DEFENDANT HARDIMAN DURING THE COURSE OF THE

22  RECORDING USE THE TERM "BLOW"?

23  A   BLOW, YES.

24  Q   ARE YOU FAMILIAR WITH THAT TERM IN YOUR EXPERIENCE AS A --

25  AS A -- EXCUSE ME, AS A DRUG AND GANG INVESTIGATOR?

1    A    YES. "BLOW" WOULD BE A SLANG TERM FOR COCAINE.

2    Q    AND DID YOU ALSO HEAR DEFENDANT HARDIMAN USE THE PHRASE "4

3    AND A HALF"?

4    A    "FOUR AND A HALF," YES.  FOUR AND A HALF REFERS TO FOUR AND

5    A HALF OUNCES.

6    Q    OF WHAT MATERIAL?

7    A    OF COCAINE, NARCOTICS.

8    Q    NOW, DURING THE COURSE OF THE RECORDING DID YOU ALSO HEAR

9    DEFENDANT HARDIMAN USE THE PHRASES "9" "DESERT EAGLE" AND "45"?

10   A    YEAH.  9 --

11   Q    AS -- AS AN FBI INVESTIGATOR, BASED ON YOUR TRAINING AND

12   EXPERIENCE, HAVE YOU EVER ENCOUNTERED THOSE PHRASES BEFORE IN

13   THE CONTEXT OF GUN AND GANG -- EXCUSE ME, DRUG AND GANG

14   INVESTIGATIONS?

15   A    YEAH. "9" REFERS TO A 9 MILLIMETER -- GENERALLY, 9

16   MILLIMETER HANDGUN.

17        "4-5" OR "45" REFERS TO A .45 CALIBER GUN, HANDGUN

18   GENERALLY.

19        AND "DESERT EAGLE," I BELIEVE THAT'S A BRAND OF GUN

20   OR TYPE.

21        MR. KALOYANIDES: OBJECTION.  SPECULATION.  MOVE TO

22   STRIKE.

23        THE COURT:  THE OBJECTION IS OVERRULED.  THE MOTION

24   IS DENIED.

25        MR. PELHAM:  WE'LL PLAY 273 AT THIS TIME, YOUR HONOR.

1          275, YOUR HONOR.  EXCUSE ME.

2          THE COURT:  I THINK IT HELPS IF THE JURY ALSO LOOKS

3    AT THE TRANSCRIPT OF 275 BECAUSE NOT ALL OF IT IS ON THE

4    MONITOR.

5          (EXHIBIT 275, AUDIO/VIDEO PLAYING.)

6    BY MR. PELHAM:

7    Q    NOW, AGENT STRICKLAND, AGAIN, REFERRING TO THE SECOND TO

8    THE LAST RECORDING THAT WE PLAYED, DID YOU HEAR DEFENDANT

9    HARDIMAN USE THE PHRASE "TECH"?

10   A    TECH?

11   Q    YES.

12   A    I BELIEVE SO -- YES.  TECH.  "TECH" REFERS TO GENERALLY A

13   TECH-9 GUN.

14   Q    NOW, AGENT STRICKLAND, I'M GOING TO --

15          MR. PELHAM:  EXCUSE ME, YOUR HONOR.  WITH THE COURT'S

16   PERMISSION, I'M GOING TO INSTRUCT AGENT BROWN TO HAND AGENT

17   STRICKLAND THE ITEM MARKED AS EXHIBIT 272.

18          THE COURT:  YES.  GO AHEAD.

19   BY MR. PELHAM:

20   Q    AGENT STRICKLAND, FOLLOWING A SOURCE -- THE SOURCE'S

21   CONTROLLED PURCHASE OPERATION ON FEBRUARY 24TH, 2008, DID YOU

22   COLLECT SOMETHING FROM THE SOURCE?

23   A    YES, I DID.

24   Q    AND IS -- IS THE THING THAT YOU COLLECTED SET FORTH AS THE

25   ITEM THAT THE GOVERNMENT HAS MARKED AS EXHIBIT 272?

1  A    YES.

2  Q    AND COULD YOU EXPLAIN HOW YOU WOULD -- HOW YOU CAN

3  IDENTIFY THAT OBJECT.

4  A    I IDENTIFIED THIS THROUGH THE MARKINGS HERE ON THE BAG.

5  AND I DID SEAL THIS -- COLLECTED IT AND ALSO SEALED THIS ITEM.

6  IT WAS COLLECTED ON FEBRUARY 24TH, 2009.  AND IT SUBSEQUENTLY

7  WAS SEALED THAT SAME DAY, FEBRUARY 24TH, 2009.

8            MR. PELHAM:  YOUR HONOR, THE GOVERNMENT OFFERS 272.

9            MR. KALOYANIDES:  NO OBJECTION.

10           THE COURT:  WELL, AGAIN, WITH THE SAME DIRECTIVE.  IT

11  HAS NOT YET BEEN ESTABLISHED THE CONTENT IS COCAINE.

12           RECEIVED.

13           (GOVERNMENT'S EXHIBIT 272 RECEIVED.)

14  BY MR. PELHAM:

15  Q    NOW, AGENT STRICKLAND, DID YOU CONDUCT A SERIES OF

16  OPERATIONS IN 2010 ON APRIL 16, JUNE 17, AND JUNE 22ND?

17  A    YES.

18  Q    AND WHAT SOURCE DID YOU UTILIZE FOR THOSE OPERATIONS?

19  A    C.S. NUMBER 1.

20  Q    AND FOR THOSE OPERATIONS, WHOM DID YOU INSTRUCT THIS

21  CONFIDENTIAL SOURCE TO PURCHASE NARCOTICS FROM?

22  A    FROM THOSE OPERATIONS THE DEFENDANT WHITE.

23  Q    AND HAVE -- EXCUSE ME, COULD YOU USE THE FULL NAME OF THE

24  TARGET OF THOSE OPERATIONS.

25  A    DEFENDANT GARY WHITE.

1   Q    HAVE YOU ENCOUNTERED GARY WHITE PREVIOUSLY OUTSIDE OF

2   THESE PROCEEDINGS?

3   A    YES.

4   Q    OKAY.  SO, COULD YOU IDENTIFY FOR US IN COURT WHO YOU ARE

5   REFERRING TO.

6   A    DEFENDANT WHITE IS THE GENTLEMAN IN THE FRONT TABLE WITH A

7   WHITE LONG-SLEEVED DRESS SHIRT ON.

8             MR. PELHAM:  YOUR HONOR --

9             THE COURT:  YES.  IDENTIFYING MR. WHITE.

10  BY MR. PELHAM:

11  Q    NOW, AGENT STRICKLAND, DID YOU UTILIZE RECORDING EQUIPMENT

12  FOR THESE OPERATIONS?

13  A    YES, I DID.

14  Q    AND DID YOU UTILIZE THE SAME SAFEGUARDS THAT WE'VE

15  DISCUSSED EARLIER TO PROTECT THE INTEGRITY OF THOSE RECORDINGS

16  AND ANY EVIDENCE?

17  A    YES.

18  Q    DID YOU INSTRUCT AGENTS TO CONDUCT SURVEILLANCE DURING

19  EACH OF THESE OPERATIONS?

20  A    YES.

21  Q    AND WHEN I SAY "SURVEILLANCE," I MEAN, DID YOU INSTRUCT

22  AGENTS TO CONDUCT VISUAL SURVEILLANCE OF THE CONFIDENTIAL

23  SOURCE THROUGH -- AS MUCH AS POSSIBLE THROUGHOUT THE COURSE OF

24  THE OPERATIONS?

25  A    YES.

**GER 0098**

1  Q    AND DID YOU INSTRUCT THE SOURCE TO MAKE VIDEO AND AUDIO

2  RECORDINGS OF THOSE OPERATIONS?

3  A    YES.  THE SOURCE WERE PROVIDED WITH AUDIO AND VIDEO

4  RECORDING DEVICE.

5  Q    NOW, HAVE YOU -- DID YOU COLLECT RECORDINGS FROM THE

6  SOURCE AT THE END OF EACH OF THESE OPERATIONS ON APRIL 16, JUNE

7  17, AND JUNE 22, 2010?

8  A    YES.

9  Q    AND HAVE YOU -- DID YOU INSTRUCT THE FBI TECHNICIANS TO

10  DOWNLOAD THE CONTENTS OF THOSE RECORDINGS FROM EACH OF THOSE

11  DATES?

12  A    YES.  THE AUDIO/VIDEO RECORDING DEVICE WAS SUBMITTED TO

13  EVIDENCE FOR DOWNLOADING.

14  Q    AND HAVE YOU REVIEWED THE ENTIRETY OF THOSE DOWNLOADED

15  RECORDINGS?

16  A    YES.

17  Q    BASED ON YOUR REVIEW OF THOSE RECORDINGS, WHOSE LIKENESS

18  AMONG OTHERS OR VOICE CAN YOU RECOGNIZE FROM THOSE RECORDINGS?

19  A    THE C.S. NUMBER 1 AND DEFENDANT WHITE.

20         MR. MC CURRY:  OBJECTION.  FOUNDATION.

21         THE COURT:  OVERRULED.

22  BY MR. PELHAM:

23  Q    NOW, HAVE YOU REVIEWED THE ITEMS THAT THE GOVERNMENT HAS

24  MARKED AS EXHIBITS 277, 283, 285, 291, 292, 293, 294, 295, 296,

25  AND 297?

1    A    YES.

2    Q    AND ARE THOSE RECORDINGS -- EXCUSE ME, ARE THOSE ITEMS

3    THAT ARE MARKED AS THESE EXHIBITS EXCERPTS OF THE RECORDINGS

4    THAT WERE MADE ON -- DURING THE OPERATIONS ON APRIL 16, JUNE

5    17, AND JUNE 22?

6    A    YES.

7             MR. PELHAM:  YOUR HONOR, THE GOVERNMENT OFFERS

8    EXHIBITS 277, 283 --

9             THE COURT:  WAIT.  WAIT.  283.

10            MR. PELHAM:  285, 291, 292, 293, 294, 295, 296, AND

11   297.

12            MR. MC CURRY:  THERE WOULD BE AN OBJECTION AS TO

13   FOUNDATION, YOUR HONOR.

14            THE COURT:  YOU'RE GOING TO HAVE TO ESTABLISH OR LAY

15   ADDITIONAL FOUNDATION.

16   BY MR. PELHAM:

17   Q    ALL RIGHT.  NOW, AGENT STRICKLAND, YOU INDICATED THAT

18   YOU'VE REVIEWED THE RECORDINGS ON WHICH THESE -- EACH OF THESE

19   ITEMS ARE BASED?

20   A    YES.

21   Q    ARE YOU FAMILIAR WITH -- ARE YOU FAMILIAR WITH THE VOICE

22   -- THE SOUND OF THE VOICE FOR A SOURCE -- THE SOURCE THAT IS

23   UTILIZED FOR EACH OF THESE RECORDINGS?

24   A    YES.

25   Q    AND CAN YOU RECOGNIZE THE SOURCE'S VOICE IN THE COURSE OF

**GER 0100**

1    EACH OF THESE RECORDINGS?

2    A    YES.

3    Q    OKAY.  AND WHEN I SAY RECORDINGS, I'M REFERRING TO THE

4    EXHIBIT NUMBERS THAT WE'VE JUST LISTED.

5    A    YES.

6    Q    OKAY.  NOW, DURING THE COURSE OF THESE -- EACH OF THESE

7    OPERATIONS FOR APRIL 16, JUNE 17, AND JUNE 22ND, DESCRIBE FOR

8    US WHAT GENERAL SAFEGUARDS DID YOU USE IN EACH ONE OF THOSE

9    OPERATIONS TO ENSURE THE INTEGRITY OF THE RECORDINGS?

10   A    AGAIN, BEFORE AND AFTER THE OPERATIONS A SOURCE WAS

11   SEARCHED, UTILIZED VISUAL SURVEILLANCE TO THE BEST AS

12   PRACTICALLY POSSIBLE.  AND THE SOURCE IS AFFIXED WITH AN

13   AUDIO/VIDEO RECORDING DEVICE THAT WAS COLLECTED IN A -- SHORTLY

14   THEREAFTER THE OPERATION TOOK PLACE.

15   Q    NOW, FOR ANY ONE OF THESE OPERATIONS, DID THE SOURCE HAVE

16   THE RECORDING DEVICE FOR LONGER THAN THE ACTUAL DURATION OF THE

17   OPERATION ITSELF?

18   A    NO.

19   Q    AND DID ANY ONE OF THESE OPERATIONS LAST LONGER THAN THREE

20   HOURS?

21   A    I DO NOT BELIEVE SO, NO.

22   Q    NOW, REFERRING TO THE RECORDING DEVICE, IS THE RECORDING

23   DEVICE THAT YOU USED FOR EACH OF THESE OPERATIONS THE SAME AS

24   THAT THAT YOU HAD USED FOR -- FOR ALL THE EARLIER OPERATIONS

25   THAT WE'VE DISCUSSED?    **GER 0101**

1   A    SIMILAR, YES.

2   Q    OKAY.  AND DOES THE RECORDING DEVICE THAT YOU USED FOR

3   EACH OF THESE THREE OPERATIONS HAVE ANY USER INTERFACE ON IT

4   OTHER THAN A PORT AND AN ON AND OFF SWITCH?

5   A    NOT THAT I BELIEVE SO, NO.

6   Q    OKAY.  IN OTHER WORDS, IS THERE A REWIND BUTTON ON THE

7   RECORDING DEVICE?

8   A    NOT THAT I'M AWARE OF.

9   Q    OKAY.  IS THERE A PLAYBACK BUTTON ON THE DEVICE?

10   A    NOT THAT I'M AWARE OF.

11   Q    AND FOR EACH OF THESE OPERATIONS, WERE YOU THE AGENT WHO

12   COLLECTED THE RECORDING DEVICE FROM THE SOURCE?

13   A    YES.

14   Q    AND DID YOU YOURSELF SHUT OFF THE RECORDING DEVICE AT THE

15   END OF EACH OF THESE THREE OPERATIONS?

16   A    YES.

17         MR. PELHAM:  YOUR HONOR, THE GOVERNMENT RENEWS ITS

18   OFFER FOR THESE EXHIBITS.

19         THE COURT:  ANY OBJECTION?

20         MR. MC CURRY:  NO OBJECTION.

21         THE COURT:  OKAY.  SO, WE START AGAIN.  YOU'RE

22   STARTING AT --

23         MR. PELHAM:  277.

24         THE COURT:  277 IS RECEIVED.

25         (GOVERNMENT'S EXHIBIT 277 RECEIVED.)

1              MR. PELHAM:  283.

2              283, 285, 291, 292, 293, 294, AND 295, 296, AND 297

3    ARE RECEIVED.

4              (GOVERNMENT'S EXHIBITS 283, 285, 291-297 RECEIVED.)

5    BY MR. PELHAM:

6    Q    NOW, GOING BACK TO APRIL 16, 2010, AGENT STRICKLAND, DID

7    YOU INSTRUCT THE SOURCE AT SOME POINT TO PLACE A PHONE CALL TO

8    DEFENDANT WHITE IN ADVANCE OF THAT OPERATION?

9    A    YES.

10   Q    AND WERE YOU PRESENT WHEN THE SOURCE PLACED THAT CALL?

11   A    I MAY NOT HAVE BEEN PRESENT.  BUT DURING THE PHONE CALL,

12   IF I WASN'T PRESENT DURING THE PHONE CALLS WITH THIS C.S.

13   NUMBER 1, CONDUCTED A THREE-WAY PHONE CALL IN WHICH I WOULD

14   LISTEN REALTIME INTO THE PHONE CALL ON MUTE AND THEN RECORD

15   REMOTELY THE TELEPHONE CALL.

16   Q    DID YOU INSTRUCT THE -- DID YOU MAKE A RECORDING OF A CALL

17   THAT YOU INSTRUCTED THE SOURCE TO MAKE TO "DEFENDANT" ONE ON

18   APRIL 16TH, 2010?

19   A    YES.

20   Q    AND HAVE YOU REVIEWED THAT RECORDING --

21   A    YES --

22   Q    -- SINCE YOU MADE IT?

23   A    YES, I HAVE.

24   Q    NOW, HAVE YOU ALSO REVIEWED GOVERNMENT'S EXHIBIT 276?

25   A    YES.

```
 1   Q    DO -- DO YOU RECOGNIZE GOVERNMENT'S EXHIBIT 276 AS

 2   ANYTHING?

 3   A    IT'S AN AUDIO RECORDING OF DEFENDANT WHITE --

 4   Q    IS IT A --

 5   A    -- AND C.S. 1.

 6   Q    IS IT A SEGMENT -- IS 276 A SEGMENT OF THE PHONE CALL THAT

 7   YOU RECORDED ON APRIL 16TH, 2010?

 8   A    I BELIEVE SO.

 9   Q    AND WHOSE VOICES CAN YOU RECOGNIZE IN THE COURSE OF THAT

10   RECORDING, 276?

11   A    C.S. --

12             MR. MC CURRY:  OBJECTION.  FOUNDATION.

13             THE COURT:  OBJECTION OVERRULED.

14             THE WITNESS:  C.S. 1 AND DEFENDANT WHITE.

15             MR. PELHAM:  YOUR HONOR, THE GOVERNMENT OFFERS 276.

16             MR. MC CURRY:  NO OBJECTION.

17             THE COURT:  276 IS RECEIVED.

18             (GOVERNMENT'S EXHIBIT 276 RECEIVED.)

19   BY MR. PELHAM:

20   Q    NOW, PLEASE TAKE A LOOK AT EXHIBIT 288 IN THE BINDER IN

21   FRONT OF YOU.

22             THE COURT:  2-?

23             MR. PELHAM:  88.

24             (PAUSE IN PROCEEDINGS.)

25
```

**GER 0104**

1    BY MR. PELHAM:

2    Q    IT SHOULD BE SEVERAL DOCUMENTS IN THAT EXHIBIT.

3    A    I HAVE ONE.

4    Q    ONE DOCUMENT?

5    A    EXHIBIT 288?

6    Q    YEAH.

7    A    I HAVE ONE DOCUMENT.

8    Q    OKAY.  DO YOU RECOGNIZE EXHIBIT -- THE DOCUMENT IN EXHIBIT

9    288?

10   A    IT APPEARS TO BE A SCREEN CAPTURE FROM AN OPERATION

11   CONDUCTED ON JUNE 17TH, 2010.

12   Q    AND, ACTUALLY, TAKE A LOOK AT THE DOCUMENT AT EXHIBIT 287.

13   A    OKAY.

14   Q    OKAY.  DO YOU RECOGNIZE THAT?

15   A    IT APPEARS TO BE A SURVEILLANCE PICTURE FROM THE OPERATION

16   ON JUNE 17TH, 2010.

17   Q    NOW, IS EXHIBIT 288 A SCREEN SHOT OF THE RECORDING THAT

18   YOU -- THAT YOU COLLECTED FROM THE SOURCE ON JUNE 17TH, 2010?

19   A    I BELIEVE SO, YES.

20        MR. PELHAM:  YOUR HONOR, THE GOVERNMENT OFFERS 288.

21        MR. MC CURRY:  NO OBJECTION.

22        THE COURT:  RECEIVED.

23        (GOVERNMENT'S EXHIBIT 288 RECEIVED.)

24        MR. PELHAM:  YOUR HONOR, WITH THE COURT'S PERMISSION,

25   I'M GOING TO ASK SPECIAL AGENT --

1           THE COURT:  ARE YOU OFFERING 287?

2           MR. PELHAM:  I WILL -- WITH THAT FOUNDATION I WILL

3    THROUGH ANOTHER AGENT, YOUR HONOR.

4           YOUR HONOR, WITH THE COURT'S PERMISSION, I AM GOING

5    TO ASK AGENT BROWN TO HAND SPECIAL AGENT STRICKLAND THE ITEM

6    MARKED AS EXHIBIT 286.

7           (PAUSE IN PROCEEDINGS.)

8    BY MR. PELHAM:

9    Q    AGENT STRICKLAND, DO YOU RECOGNIZE THE ITEM THAT'S BEEN

10   MARKED AS GOVERNMENT'S EXHIBIT 286?

11   A    IT'S THE EVIDENCE PACKAGING FROM THE NARCOTICS THAT WERE

12   OBTAINED DURING A CONTROLLED PURCHASE ON JUNE 17TH, 2010.

13   Q    DOES THAT -- DOES THE ITEM THAT'S MARKED AS GOVERNMENT'S

14   EXHIBIT 286 CONTAIN THE ITEM THAT YOU COLLECTED FROM THE SOURCE

15   AFTER THE JUNE 17, 2010 OPERATION?

16   A    IT APPEARS TO HAVE THE RESIDUAL EVIDENCE OBTAINED DURING

17   THAT DAY.

18   Q    BUT IS THAT THE ITEM THAT YOU -- IS THAT PART OF THE ITEM

19   THAT YOU COLLECTED FROM THE SOURCE THAT DAY?

20   A    YES.

21   Q    FOLLOWING THAT OPERATION?

22   A    YES.

23   Q    AND HOW DO YOU RECOGNIZE IT?

24   A    LOOKING AT THE EVIDENCE LABEL HERE.  I SEALED THE ITEM.  I

25   COLLECTED THE ITEM ON THE 17TH OF JUNE 2010 AND SEALED IT ON

1    THE 17TH OF JUNE 2010.

2          MR. PELHAM:  YOUR HONOR, THE GOVERNMENT OFFERS

3    EXHIBIT 286.

4          THE COURT:  ANY OBJECTION?

5          MR. MC CURRY:  NO OBJECTION, YOUR HONOR.

6          THE COURT:  286 IS RECEIVED.

7          (GOVERNMENT'S EXHIBIT 286 RECEIVED.)

8          THE COURT:  MAY I SEE IT, PLEASE.

9          MR. PELHAM:  I'M SORRY?

10         THE COURT:  MAY I SEE IT, PLEASE.

11         (PAUSE IN PROCEEDINGS.)

12         MR. KALOYANIDES:  YOUR HONOR, I'M GOING TO ADD WITH

13   THE SAME CONDITION AS TO THE OTHER EVIDENCE SIMILAR THAT.

14         THE COURT:  YES.  IT HASN'T BEEN ESTABLISHED THAT THE

15   CONTENTS OF 286 IS ANY CONTROLLED SUBSTANCE.

16         MR. PELHAM:  AND, YOUR HONOR, WITH THE COURT'S

17   PERMISSION, I'D LIKE TO INSTRUCT AGENT BROWN TO HAND AGENT

18   STRICKLAND THE ITEM MARKED AS EXHIBIT 298.

19         (PAUSE IN PROCEEDINGS.)

20   BY MR. PELHAM:

21   Q    AGENT STRICKLAND, FOLLOWING THE JUNE 22ND, 2010 CONTROLLED

22   BUY OPERATION, DID YOU COLLECT AN ITEM FROM THE -- FROM THE

23   SOURCE?

24   A    YES, I DID.

25   Q    AND IS THAT ITEM SET FORTH AS GOVERNMENT'S EXHIBIT 298?

1   A    YES.

2   Q    AND HOW DO YOU RECOGNIZE IT?

3   A    IT APPEARS TO BE THE ITEM THAT I COLLECTED FROM C.S.

4   NUMBER 1 IN WHICH I SEALED -- ACTUALLY, I COLLECTED ON JUNE

5   22ND, 2010.  SEALED THE ITEM ON JUNE 22ND, 2010.

6        MR. PELHAM:  YOUR HONOR, THE GOVERNMENT OFFERS

7   EXHIBIT 298.

8        THE COURT:  298.

9        MR. MC CURRY:  NO OBJECTION, SUBJECT TO THE SAME

10  CONDITIONS AS THE SIMILAR EXHIBITS.

11       MR. CREARY:  YES, YOUR HONOR.

12       THE COURT:  LET ME EXAMINE IT, PLEASE.

13       (GOVERNMENT'S EXHIBIT 298 RECEIVED.)

14       THE COURT:  OKAY.  AGAIN, BECAUSE EXPERT TESTIMONY IS

15  REQUIRED, IT HAS NOT BEEN ESTABLISHED THAT THE CONTENTS ARE

16  CONTROLLED SUBSTANCES.

17  BY MR. PELHAM:

18  Q    NOW, AGENT STRICKLAND, DID YOU HELP TO PRODUCE TRANSCRIPTS

19  FOR THE -- ALL THE EXHIBITS THAT WE'VE REFERRED TO FOR THE

20  APRIL 16, JUNE 17, AND JUNE 22ND, 2010 OPERATIONS?

21  A    YES.

22  Q    AND DID YOU REVIEW THOSE TRANSCRIPTS BASED ON YOUR

23  FAMILIARITY WITH THE LIKENESSES AND THE VOICES OF THE PEOPLE

24  REPRESENTED IN THOSE RECORDINGS?

25  A    YES, I DID.

1  Q    NOW, AGENT STRICKLAND, DID YOU CONDUCT OTHER OPERATIONS IN

2  THIS CASE THAT INVOLVE SURVEILLANCE BUT NOT THE ACQUISITION OF

3  NARCOTICS?

4  A    YES.

5  Q    AND WHAT WAS THE PURPOSE OF THESE ADDITIONAL OPERATIONS?

6  A    THESE ADDITIONAL OPERATIONS WAS TO GATHER INTELLIGENCE, TO

7  GATHER INFORMATION REGARDING THE WORKINGS OF THE PUEBLO BISHOP

8  GANG.

9  Q    AND DID YOU -- DID YOU UTILIZE CONFIDENTIAL SOURCE 1 FOR

10 SOME OF THOSE OPERATIONS?

11 A    YES, I DID.

12 Q    DID YOU SUPERVISE ALL OF THE SURVEILLANCE OPERATIONS THAT

13 INVOLVED SOURCE 1?

14 A    YES, I BELIEVE SO.

15 Q    AND WHERE DID -- WHERE DID THOSE OPERATIONS TAKE PLACE?

16 A    THE OPERATIONS TOOK PLACE IN AND AROUND THE PUEBLO DEL RIO

17 HOUSING PROJECT AND THE GENERAL VICINITY.

18 Q    NOW, DID YOU CONDUCT SUCH A SURVEILLANCE OPERATION ON

19 AUGUST 22ND, 2009?

20 A    YES, I DID.

21 Q    WHAT DID YOU INSTRUCT SOURCE 1 TO DO DURING THE COURSE OF

22 THAT OPERATION?

23 A    DURING THAT OPERATION I INSTRUCTED THE SOURCE TO ATTEND A

24 PUEBLO BISHOP GANG MEETING.

25          MR. MC CURRY:  OBJECTION.  FOUNDATION.  SPECULATION.

```
 1            THE COURT:  OBJECTION IS OVERRULED.

 2   BY MR. PELHAM:

 3   Q    WHAT PROCEDURES DID YOU USE TO CARRY OUT THAT SURVEILLANCE

 4   OPERATION?

 5   A    WE PROVIDED THE C.S. 1 WITH A RECORDING DEVICE IN WHICH WE

 6   FITTED THE SOURCE WITH PRIOR TO THE OPERATION.

 7   Q    AND, AGAIN, AS WITH THE -- DID THE PROCEDURES THAT YOU

 8   FOLLOWED AS TO THE FITTING OF THE AUDIO -- THE FITTING AND THE

 9   COLLECTION OF THE AUDIO/VIDEO RECORDING DEVICE PARALLEL THE

10   PROCEDURES THAT YOU USED FOR THE DRUG PURCHASE OPERATIONS WE'VE

11   DISCUSSED?

12   A    YEAH.  WITH THIS OPERATION WE PROVIDED THE SOURCE WITH THE

13   RECORDING DEVICE.  AND THE SOURCE HAD THE RECORDING DEVICE

14   DURING THE OPERATION.  AND THEN THE RECORDING DEVICE WAS

15   SUBSEQUENTLY COLLECTED FOLLOWING THE OPERATION.  AND THEN

16   SUBMITTED TO EVIDENCE FOR DOWNLOADING AND THEN FOR REVIEW BY

17   THE AGENTS.

18   Q    AND DID YOU COLLECT THE RECORDING DEVICE THAT SOURCE 1

19   USED FOR THE AUGUST 22ND, 2009 OPERATION?

20   A    YES.

21   Q    AND DID YOU INSTRUCT FBI TECHNICIANS TO DOWNLOAD THE

22   CONTENTS OF THAT RECORDING?

23   A    IT WAS EITHER MYSELF OR ANOTHER AGENT WOULD INSTRUCT --

24   HAVE INSTRUCTED THE EVIDENCE TECH TO HAVE IT DOWNLOADED.

25   Q    HAVE YOU REVIEWED THAT RECORDING?
```

1    A    YES, I HAVE.

2    Q    AMONG THE OTHER -- AMONG THE INDIVIDUALS DEPICTED IN THAT

3    RECORDING, ARE THERE INDIVIDUALS THAT YOU RECOGNIZE BASED ON

4    YOUR FAMILIARITY WITH THEIR VOICE AND LIKENESS FROM THAT

5    RECORDING?

6    A    YES.

7    Q    WELL, STARTING WITH THE SOURCE, DO YOU RECOGNIZE SOURCE

8    1'S VOICE AT CERTAIN POINTS THROUGHOUT THAT RECORDING?

9    A    YES, I DO.

10   Q    DO YOU RECOGNIZE DEFENDANT WHITE'S VOICE OR LIKENESS

11   DURING THE COURSE OF THAT RECORDING?

12   A    YES.

13              MR. PELHAM:  YOUR HONOR, THE GOVERNMENT OFFERS

14   EXHIBIT -- EXCUSE ME.

15   BY MR. PELHAM:

16   Q    AGENT STRICKLAND, HAVE YOU REVIEWED THE ITEM THAT THE

17   GOVERNMENT HAS MARKED AS EXHIBIT 52?

18   A    YES, I HAVE.

19   Q    AND WHAT IS THAT EXHIBIT?

20   A    THAT IS ACTUALLY THE GANG VIDEO -- THE GANG -- I'M SORRY,

21   THE GANG -- AUDIO/VIDEO RECORDING OF THE GANG MEETING.

22   Q    THAT WAS TAKEN ON --

23              THE COURT:  I DIDN'T HEAR THE RESPONSE.

24              AUDIO/VIDEO RECORDING OF?  I DIDN'T HEAR YOUR

25   RESPONSE.

**GER 0111**

```
 1              THE WITNESS:  I'M SORRY.

 2              THE ITEM 52 IS THE AUDIO/VIDEO RECORDING OF THE

 3    PUEBLO BISHOP GANG MEETING THAT TOOK PLACE ON AUGUST 22ND,

 4    2009.

 5              THE COURT:  JUST FOR THE -- JUST TO INSTRUCT THE

 6    JURY, IT'S FOR THE JURY TO DETERMINE WHETHER IT WAS, IN FACT, A

 7    GANG MEETING.

 8    BY MR. PELHAM:

 9    Q    AND, SO, TO REPHRASE, AGENT STRICKLAND, IS EXHIBIT 52 A

10    PORTION OF THE RECORDING THAT WAS MADE DURING YOUR SURVEILLANCE

11    OPERATION, AUGUST 22ND, 2009?

12    A    YES.

13              MR. PELHAM:  YOUR HONOR, THE GOVERNMENT OFFERS

14    EXHIBIT 52.

15              MR. MC CURRY:  NO OBJECTION.

16              THE COURT:  52 IS RECEIVED.

17              (GOVERNMENT'S EXHIBIT 52 RECEIVED.)

18              MR. PELHAM:  NOW, YOUR HONOR -- ACTUALLY, LET ME --

19    I'LL LAY THIS FOUNDATION.  EXCUSE ME.  STRIKE THAT.

20              CAN I HAVE JUST A MOMENT TO CONFER WITH CO-COUNSEL,

21    YOUR HONOR.  THANKS.

22              (GOVERNMENT COUNSEL CONFERRING.)

23    BY MR. PELHAM:

24    Q    NOW, SPECIAL AGENT STRICKLAND, DID YOU INSTRUCT SOURCE 1

25    TO MAKE ANY OTHER INTELLIGENCE GATHERING RECORDINGS
```

113

1   SURREPTITIOUS AUDIO/VIDEO RECORDINGS IN THIS CASE?

2           ALL RIGHT.  EXCUSE ME.  I SHOULDN'T SAY -- LET ME --

3           MR. PELHAM:  CAN I STRIKE THAT QUESTION, YOUR HONOR.

4   WITHDRAW THAT QUESTION.

5   BY MR. PELHAM:

6   Q    DID YOU INSTRUCT SOURCE 1 TO MAKE ANY OTHER RECORDINGS IN

7   THIS INVESTIGATION?

8   A    YES.

9   Q    ON WHAT OTHER DATES DID YOU INSTRUCT SOURCE 1 TO MAKE

10  RECORDINGS?

11  A    ONE OF THE DAYS IN WHICH I INSTRUCTED THE SOURCE TO MAKE A

12  -- C.S. 1 TO MAKE A RECORDING WAS ON MAY 2ND, 2010.

13  Q    AND WHAT DID YOU INSTRUCT SOURCE 1 TO DO ON THAT DAY?

14  A    ON MAY 2ND, 2010, THAT IS THE PUEBLO BISHOP HOOD DAY --

15          MR. MC CURRY:  OBJECTION --

16          MR. KALOYANIDES:  OBJECTION.

17          MR. MC CURRY: -- FOUNDATION.  SPECULATION.

18          THE COURT:  HE MAY CONTINUE.

19          GO AHEAD.

20  BY MR. PELHAM:

21  Q    GO AHEAD.

22  A    ON MAY 2ND --

23          THE COURT:  THE OBJECTION IS OVERRULED.

24          THE WITNESS:  MAY 2ND IS THE FIVE DEUCE PUEBLO BISHOP

25  HOOD DAY.  THE FIFTH MONTH, SECOND DAY, FIVE TWO.  AND THAT IS

1    THE DAY IN WHICH THEY HOLD THEIR ANNUAL GANG CELEBRATION HELD

2    IN THE PUEBLO DEL RIO HOUSING PROJECT.

3             THAT DAY I HAD -- I INSTRUCTED C.S. NUMBER 1 TO

4    ATTEND THE MEETING AND ALSO CONDUCT A RECORDINGS -- AUDIO/VIDEO

5    WITH A HANDYCAM, RECORDINGS OF THE -- OF THE CELEBRATION.

6    BY MR. PELHAM:

7    Q    SO, WHAT RECORDING -- EXCUSE ME.  WHAT RECORDING EQUIPMENT

8    DID YOU PROVIDE TO SOURCE 1 FOR SURVEILLANCE ON MAY 2ND, 2010?

9    A    THAT DAY IT WAS A STANDARD HANDYCAM THAT YOU WOULD BUY AT

10   ANY ELECTRONICS RETAILER -- JUST A STANDARD HANDYCAM.

11   Q    AND WHEN DID YOU-- WHEN DID YOU PROVIDE HIM WITH THAT

12   EQUIPMENT APPROXIMATELY?

13   A    APPROXIMATELY, EITHER DAY OR THE DAY BEFORE.  I MEAN, IT

14   WAS -- YES.  SOMETIME PRIOR TO THE DAY --

15   Q    AND --

16   A    -- NOT THAT MORNING.

17   Q    AND WHEN DID YOU COLLECT THE EQUIPMENT BACK FROM HIM?

18   A    I BELIEVE I COLLECTED THAT EQUIPMENT THE NEXT DAY ON MAY

19   3RD.

20   Q    DID YOU REVIEW THE CONTENTS -- OR, EXCUSE ME, WHEN YOU

21   COLLECTED THE EQUIPMENT, DID YOU NOTE WHETHER OR NOT ANY

22   RECORDINGS HAD BEEN MADE ON THE EQUIPMENT?

23   A    YES.

24   Q    AND DID YOU REVIEW THOSE RECORDINGS?

25   A    YES.

1   Q    WHEN YOU REVIEWED THOSE RECORDINGS, DID YOU RECOGNIZE THE

2   VOICE OR LIKENESS OF SOURCE 1 ON THOSE RECORDINGS?

3   A    YES, I DID.

4   Q    OKAY.  DID YOU RECOGNIZE THE VOICE OR LIKENESS OF ANY

5   OTHER INDIVIDUALS WITH WHOM YOU'VE BECOME FAMILIAR OUTSIDE OF

6   -- OUTSIDE OF THAT RECORDING?

7   A    YES.

8   Q    AS -- SUCH AS WHOM?

9   A    THERE WERE SEVERAL OF THE PUEBLO BISHOP GANG MEMBERS IN

10  WHICH WE'VE, YOU KNOW, BECOME AWARE OF OVER THE YEARS DURING

11  THE INVESTIGATION.

12  Q    HAVE YOU REVIEWED GOVERNMENT'S EXHIBITS 53 AND 50 --

13  EXCUSE ME, 53, THE --

14          HAVE YOU REVIEWED THE ITEMS THAT THE GOVERNMENT HAS

15  MARKED COLLECTIVELY AS EXHIBIT 53?

16  A    YES.

17  Q    AND WHAT -- WHAT IS IN EXHIBIT 53?

18  A    CLIPS FROM THE HOOD-DAY CELEBRATION ON MAY 2ND,

19  AUDIO/VIDEO CLIPS FROM THE HOOD-DAY CELEBRATION ON MAY 2ND,

20  2010.

21  Q    ARE THOSE ITEMS IN EXHIBIT 53 EXCERPTS OF THE RECORDING

22  THAT YOU COLLECTED FROM SOURCE 1 ON MAY 3RD, 2010?

23  A    YES.

24          MR. PELHAM:  YOUR HONOR, THE GOVERNMENT OFFERS

25  EXHIBIT 53.

**GER 0115**

1          THE COURT:  ANY OBJECTION?

2          MR. MC CURRY:  NO OBJECTION.

3          THE COURT:  RECEIVED.

4          (GOVERNMENT'S EXHIBIT 53 RECEIVED.)

5    BY MR. PELHAM:

6    Q    NOW, AGENT STRICKLAND, DID YOU ENCOUNTER DEFENDANT

7    JERMAINE HARDIMAN ON SEPTEMBER 14TH, 2010?

8    A    YES.

9    Q    AND WHAT WAS THE NATURE OF THAT ENCOUNTER?

10   A    THE DAY IN WHICH MYSELF ALONG WITH OTHER LAW ENFORCEMENT

11   OFFICERS ARRESTED DEFENDANT HARDIMAN.

12   Q    AND CAN YOU RECALL APPROXIMATELY THE LOCATION IN WHICH YOU

13   CARRIED OUT THAT ARREST?

14   A    IT WAS ON VERNON AVENUE, THEREABOUTS, IN LOS ANGELES.

15   Q    WAS THAT IN A LOCATION NEAR THE PUEBLO DEL RIO HOUSING

16   PROJECTS?

17   A    IT'S IN THE GENERAL VICINITY.

18   Q    WHAT OCCURRED DURING THAT -- DURING THAT ARREST?

19   A    AGENTS AND OFFICERS WENT TO THE RESIDENCE, KNOCKED AND

20   ANNOUNCED -- ATTEMPTED TO GET THE ATTENTION OF THE INDIVIDUALS

21   INSIDE THE RESIDENCE.  AND NO ONE WOULD COME TO THE DOOR.  I'D

22   SAY MINIMUM A HALF HOUR.

23   Q    SO, AGENTS WERE --

24   A    WITHIN --

25   Q    AGENTS WERE WAITING OUTSIDE THE HOUSE FOR HALF AN HOUR

```
 1   WHILE CALLING OUT DEFENDANT HARDIMAN'S NAME?

 2   A    YES.

 3   Q    DID AGENTS MAKE ENTRY AT SOME POINT?

 4   A    YES.

 5   Q    WHAT HAPPENED AFTER THAT?

 6   A    AT THAT POINT DEFENDANT HARDIMAN WAS DISCOVERED INSIDE THE

 7   RESIDENCE AS WELL AS A FEMALE.

 8   Q    WAS DEFENDANT HARDIMAN DETAINED AT THAT POINT?

 9   A    YES, HE WAS.

10   Q    WHAT WAS THE -- WHAT WAS DEFENDANT HARDIMAN'S APPEARANCE

11   DURING THE COURSE OF THAT ARREST?

12   A    HIS APPEARANCE?

13   Q    YEAH.  HOW WAS HE DRESSED?

14   A    I BELIEVE HE DIDN'T HAVE CLOTHES -- HE -- VERY -- EITHER

15   NAKED OR VERY LITTLE CLOTHING.  I THINK WE ALLOWED HIM TO GET

16   SOME CLOTHES ON.

17   Q    WAS THERE A FIREARM SEIZED DURING THE COURSE OF THAT

18   ARREST?

19   A    YES.

20        THE COURT:  WHAT WAS THE TIME? -- THE TIME OF THE

21   ARREST.

22        THE WITNESS:  THE EXACT TIME, UNCLEAR.  I BELIEVE IT

23   WAS IN THE MORNING, THOUGH.

24   BY MR. PELHAM:

25   Q    WAS THE ARREST BEFORE NOON?
```

1   A    I BELIEVE SO.

2   Q    WHAT --

3        MR. PELHAM:  EXCUSE ME.  YOUR HONOR, WITH THE COURT'S

4   PERMISSION, I'D LIKE TO INSTRUCT AGENT BROWN TO HAND AGENT

5   STRICKLAND THE ITEM MARKED AS EXHIBIT 557.

6        (PAUSE IN PROCEEDINGS.)

7   BY MR. PELHAM:

8   Q    BEFORE YOU REVIEW THAT ITEM, AGENT STRICKLAND, WAS THERE A

9   FIREARM RECOVERED DURING THE COURSE OF THAT ARREST?

10  A    YES, THERE WAS.

11  Q    AND WHO RECOVERED THAT FIREARM?

12  A    I DID.

13  Q    AND WHERE DID YOU RECOVER THAT FIREARM?

14  A    I BELIEVE THE FIREARM WAS IN A BEDROOM OR ROOM THAT WAS

15  USED AS A BEDROOM.

16  Q    AGENT BROWN HAS HANDED YOU THE ITEM MARKED AS GOVERNMENT'S

17  EXHIBIT 557.  COULD YOU OPEN THAT UP AND THEN TAKE A LOOK AT

18  IT.

19        DESCRIBE FOR US WHAT IS EXHIBIT 557.

20  A    EXHIBIT 557 IS A GLOCK HANDGUN.  IT'S A GLOCK HANDGUN.

21        THE COURT:  YOU CAN PULL IT OUT OF THE BOX AS LONG AS

22  IT'S NOT POINTED AT ANYONE.

23        THE WITNESS: (WITNESS COMPLIES.)

24  BY MR. PELHAM:

25  Q    AND DO YOU RECOGNIZE EXHIBIT 557, AGENT STRICKLAND?

 1   A    YES.

 2   Q    AND WHAT IS THAT?

 3   A    IT'S THE HANDGUN THAT WAS SEIZED DURING THE ARREST OF

 4   DEFENDANT HARDIMAN.

 5   Q    NOW, WHEN YOU SEIZED THAT HANDGUN, DID YOU SEIZE IT FROM

 6   DEFENDANT HARDIMAN'S PERSON?

 7   A    NO.

 8   Q    OKAY.  FROM WHOSE PERSON DID YOU ACQUIRE THE GUN, IF

 9   ANYONE?

10   A    THERE WAS A -- THE FEMALE THAT WAS INSIDE THE RESIDENCE.

11   Q    AND DID YOU -- YOU ACQUIRED THE GUN FROM HER?

12   A    YES.

13   Q    OKAY.  DID YOU NOTIFY HER THAT YOU WERE SEIZING THE GUN?

14   A    YES.

15   Q    DID THAT WOMAN MAKE ANY CLAIM OR --

16        MR. KALOYANIDES:  OBJECTION.  CALLS FOR HEARSAY.

17        THE COURT:  SUSTAINED.

18   BY MR. PELHAM:

19   Q    DID THAT WOMAN CONTACT YOU AFTER THAT SEIZURE WITH RESPECT

20   TO THAT FIREARM?

21   A    I DON'T RECALL BEING CONTACTED BY HER.

22        MR. PELHAM:  YOUR HONOR, THE GOVERNMENT OFFERS

23   EXHIBIT 557.

24        MR. KALOYANIDES:  OBJECTION.  RELEVANCE AND 403.

25        THE COURT:  THE OBJECTION IS OVERRULED.

1    AND 557 IS RECEIVED.

2         MR. PELHAM:  AND, YOUR HONOR, IF I CAN INSTRUCT AGENT

3    BROWN TO COLLECT SOME OF THE ITEMS FROM AGENT STRICKLAND.

4         THE COURT:  LET ME -- LET ME -- LET ME SEE COUNSEL AT

5    SIDEBAR.

6         THE COURT IS GOING TO VACATE AND SET ASIDE ITS RULING

7    AND SEE COUNSEL AT SIDEBAR.

8         (AT SIDEBAR:)

9         THE COURT:  THE TESTIMONY IS THAT THE HANDGUN WAS

10   ACQUIRED FROM THE FEMALE.  BUT I DON'T KNOW WHAT THAT MEANS.

11        MR. PELHAM:  OUR POSITION IN ARGUMENT, YOUR HONOR, IS

12   GOING TO BE THAT THE DEFENDANT -- IT WAS THE DEFENDANT'S GUN.

13   IT WAS IN THE -- AND I CAN -- ADDITIONAL TESTIMONY -- IT WAS IN

14   THE WOMAN'S PURSE.  THE AGENT GOT IT FROM HER.

15        NOW, WE'RE NOT TRYING TO ADMIT ANY OUT-OF-COURT

16   STATEMENTS.  BUT THE AGENT WAS NEVER CONTACTED AGAIN BY THE

17   WOMAN FOR THE GUN BACK.

18        THE COURT:  BUT IT'S NOT CLEAR AS TO WHERE THE GUN

19   WAS LOCATED IN THE RESIDENCE.

20        MR. PELHAM:  I CAN SPECIFY THAT THROUGH THE AGENT.

21        THE COURT:  AND IS THE GUN REGISTERED TO ANY PERSON?

22   DO YOU KNOW?  HAS THAT BEEN RUN?

23        MR. PELHAM:  IT'S NOT REGISTERED TO HARDIMAN.

24        THE COURT:  IT'S NOT REGISTERED TO HARDIMAN.

25        MR. PELHAM:  RIGHT.  AND WE CAN BRING IN THAT

1   ADDITIONAL EVIDENCE, TOO.

2            THE COURT:  OKAY.  SO, YOU WANT TO BE HEARD FURTHER?

3            MR. KALOYANIDES:  JUST BRIEFLY, YOUR HONOR.  I MEAN,

4   I'M ASSUMING THE AGENT IS GOING TO SAY WHAT THE DISCOVERY SAYS

5   IS THAT IT WAS FOUND IN A PURSE IN A CLOSET.  IT WAS NOT ON MR.

6   HARDIMAN.  THIS IS NOT HIS HOUSE.  THIS IS NOT HIS BEDROOM.  HE

7   WAS STAYING THERE CLEARLY, BUT THERE'S NO LINK THAT THIS IS HIS

8   GUN.  IF IT'S NOT HIS GUN, IT'S NOT RELEVANT.  AND IT'S HIGHLY

9   PREJUDICIAL.

10           THE COURT:  WHAT'S THE RELEVANCE?

11           MR. JENKINS:  YOUR HONOR, DEFENDANT HARDIMAN OVER

12  NUMEROUS RECORDINGS TALKS ABOUT OWNING A GLOCK PISTOL.  HE'S

13  ALSO A FUGITIVE AT THAT TIME.  THIS IS MANY MONTHS AFTER THE

14  TAKE-DOWN.  DEFENDANT HARDIMAN'S MOTHER AND BROTHER HAVE BEEN

15  ARRESTED AS A RESULT OF THE TAKE-DOWN.

16           OUR POSITION IS HE'S BEEN HIDING OUT THERE.  THAT'S

17  WHY HE'S THERE.  THAT'S WHY THE GUN IS THERE.  THAT'S WHY HE

18  DIDN'T COME TO THE DOOR FOR -- IT WAS MUCH LONGER THAN A HALF

19  AN HOUR.

20           AND OUR POSITION IS THAT HE GAVE THE WEAPON TO HIS

21  GIRLFRIEND OR FEMALE FRIEND TO HIDE THE WEAPON.  SHE WAS GIVEN

22  THE RECEIPT.  AND SHE NEVER MADE ANY CLAIM THAT IT WAS HER GUN

23  OR THAT SHE WANTED IT BACK.  SHE, IN FACT, SAYS THAT IT'S NOT

24  MY GUN.  THERE'S NO ONE ELSE IN THE HOUSE.  IT'S A VERY SMALL

25  HOUSE.  I BELIEVE IT'S A

1       THE COURT:  ARE YOU GOING TO CALL HER AS A WITNESS TO

2 ESTABLISH THAT SHE SAID THAT IT WAS NOT HER GUN?

3       MR. JENKINS:  NO.  THAT'S JUST ONE PART.  BUT THE

4 REST OF IT, I'M JUST LETTING THE COURT KNOW WE CAN BRING IN SHE

5 MADE NO ATTEMPTS TO GET IT.  SHE MADE NO ATTEMPTS TO GET IT --

6       THE COURT:  BUT THE GUN -- THE GUN WAS FOUND IN A

7 PURSE IN A CLOSET.

8       MR. PELHAM:  RIGHT.  YES.

9       WELL, HE WAS HIDING IT --

10       THE COURT:  WHAT DO YOU MEAN HE WAS HIDING IT IN A

11 CLOSET?

12       MR. PELHAM:  WHEN THE AGENTS -- WE CAN LAY --

13       THE COURT:  YOU'RE GOING TO HAVE TO CLEAR IT UP --

14       MR. PELHAM:  WE CAN.

15       THE COURT:  -- BECAUSE IT'S EXTREMELY VAGUE.

16       MR. PELHAM:  YES.  WE CAN.  AND I ALSO EMPHASIZE JUST

17 FOR THE RECORD, YOUR HONOR, ANY PREJUDICE THAT WOULD COME FROM

18 THE GUN IS GOING TO BE MITIGATED -- THE NEXT AGENT IS GOING TO

19 TESTIFY THAT THEY PURCHASED THE GUN FROM DEFENDANT HARDIMAN.

20 AND THAT'S VISIBLE ON VIDEO.  THERE ARE OTHER WEAPONS THAT ARE

21 DIRECTLY LINKED TO DEFENDANT HARDIMAN.

22       THE COURT:  OKAY.  THE COURT IS GOING TO SUSTAIN THE

23 OBJECTION.

24       YOU CAN LAY ADDITIONAL FOUNDATION.  AND THEN IF YOU

25 OFFER IT INTO EVIDENCE, I'LL ENTERTAIN ANOTHER OBJECTION.

 1              MR. PELHAM:  UNDERSTOOD, YOUR HONOR.

 2              MR. KALOYANIDES:  I'M GOING TO ALSO MOVE THAT THE

 3   COURT INSTRUCT THE JURY TO -- THAT TESTIMONY UNTIL OTHERWISE

 4   INSTRUCTED.  AND IT'S GOT TO BE DISREGARDED.

 5              MR. PELHAM:  AS TO WHAT POINT?

 6              MR. KALOYANIDES:  THE GUN ISSUE --

 7              THE COURT:  I CAN INSTRUCT THE JURY THAT IT HAS NOT

 8   YET -- IT HAS NOT BEEN -- THERE'S NO EVIDENCE THAT'S BEEN

 9   OFFERED AND RECEIVED THAT ESTABLISHES THAT THE GUN IS LINKED TO

10   MR. HARDIMAN.

11              MR. KALOYANIDES:  THANK YOU, YOUR HONOR.

12              (SIDEBAR CONCLUDES.)

13              THE COURT:  OKAY.  JUST TO INSTRUCT THE JURY THERE

14   HAS BEEN NO EVIDENCE THAT HAS BEEN OFFERED AND RECEIVED THAT

15   ESTABLISHES THAT THE GUN IS LINKED TO MR. HARDIMAN.

16              MR. KALOYANIDES:  AND YOUR HONOR --

17              THE COURT:  AND YOU MAY --

18              MR. KALOYANIDES:  JUST FOR CLARIFICATION, THE

19   OBJECTION IS SUSTAINED?

20              THE COURT:  THE OBJECTION -- THE PREVIOUS OBJECTION

21   IS SUSTAINED.  AND THE GOVERNMENT CAN LAY ADDITIONAL

22   FOUNDATION.

23   BY MR. PELHAM:

24   Q    NOW, SPECIAL AGENT STRICKLAND, GOING BACK TO THE ARREST

25   THAT OCCURRED THAT DAY ON SEPTEMBER 14, 2010, DESCRIBE FOR US

1   WHAT HAPPENED ONCE AGENTS BREACHED THE HOUSE?

2   A    ONCE THE AGENTS ENTERED THE HOUSE, WE CLEARED THE

3   RESIDENCE AND LOCATED MR. -- DEFENDANT HARDIMAN AND THE FEMALE

4   IN THE RESIDENCE.

5   Q    AND WHERE WAS DEFENDANT HARDIMAN WHEN AGENTS LOCATED HIM?

6   A    WITHOUT REVIEWING MY -- THE ARREST REPORT, I BELIEVE --

7   I'M NOT SURE.

8   Q    DO YOU RECALL WHERE THE FEMALE OCCUPANT WAS LOCATED?

9   A    I BELIEVE BACK IN THE -- AT LEAST I KNOW THEY WERE IN THE

10  BEDROOM OR IN THE ROOM THAT WAS BELIEVED TO BE THE BEDROOM.

11        MR. PELHAM:  MAY I HAVE ONE MOMENT, YOUR HONOR, TO

12  CONFER WITH CO-COUNSEL.  THANK YOU.

13        (GOVERNMENT COUNSEL CONFERRING.)

14        MR. PELHAM:  YOUR HONOR, AT THIS TIME THE GOVERNMENT

15  WILL WITHDRAW ITS OFFER OF EXHIBIT 557 BUT WOULD REQUEST AFTER

16  FURTHER CONSIDERATION BY THE COURT THE OPPORTUNITY TO RENEW

17  THAT OFFER DURING REDIRECT.

18        THE COURT:  THEN THE COURT WOULD INSTRUCT THE JURY TO

19  DISREGARD AGENT STRICKLAND'S TESTIMONY REGARDING -- REGARDING

20  EXHIBIT 557.  THAT IS STRUCK.  THAT IS THE GLOCK THAT HAS BEEN

21  REFERENCED.  THE JURY IS NOT TO CONSIDER THE OFFICER'S -- OR

22  THE AGENT'S TESTIMONY REGARDING THAT.

23        MR. PELHAM:  BUT TO BE CLEAR, YOUR HONOR, MAY THE

24  JURY CONTINUE TO CONSIDER THE TESTIMONY REGARDING THE NATURE

25  AND CIRCUMSTANCE OF THE AGENT'S ENCOUNTER WITH DEFENDANT

1    HARDIMAN ON SEPTEMBER 14TH, 2010.

2            THE COURT:  YES.  JUST THE INSTRUCTION TO THE JURY IS

3    TO DISREGARD THE AGENT'S TESTIMONY IN REFERENCE TO EXHIBIT 557

4    ONLY, WHICH IS THE -- WHICH HAS BEEN IDENTIFIED AS A GLOCK

5    PISTOL.  THERE'S NO EVIDENCE THAT HAS BEEN OFFERED THAT HAS

6    LINKED IT TO MR. HARDIMAN.

7            MR. PELHAM:  THANK YOU, YOUR HONOR.

8    BY MR. PELHAM:

9    Q    NOW, AGENT STRICKLAND, AS THE CASE AGENT, DID YOU OVERSEE

10   IN ADDITION TO THAT CONTROLLED-BUY PHASE TO THIS INVESTIGATION

11   A TELEPHONE INTERCEPTION PHASE?

12   A    YES, I DID.

13   Q    NOW, IS THERE A NICKNAME FOR THAT PROCESS?

14   A    A COUPLE OF NICKNAMES.  EITHER A "T-3" OR "WIRETAP."

15   Q    WHAT IS A FEDERAL WIRETAP?

16   A    A FEDERAL WIRETAP IS WHEN THE GOVERNMENT SEEKS AND GAINS

17   THE ABILITY TO INTERCEPT AND LISTEN IN TO SPECIFIED TARGET

18   TELEPHONE INCOMING AND OUTGOING CALLS.

19   Q    AND DID YOU CARRY OUT SUCH INTERCEPTION IN THE COURSE OF

20   THIS CASE?

21   A    YES.

22   Q    OVER WHAT PERIOD DID YOU CONDUCT THAT WIRETAP?

23   A    THAT WAS FROM ON OR ABOUT THE 1ST OF AUGUST, 2009 THROUGH

24   THE MIDDLE OF OCTOBER 2009.  SO, I BELIEVE IT WAS AUGUST 5TH OR

25   6TH THROUGH THE MIDDLE OF OCTOBER 2009.

1    Q    DID YOU OBTAIN COURT AUTHORIZATION TO CARRY OUT THAT

2    INTERCEPTION?

3    A    YES, I DID.

4    Q    AND WHAT TELEPHONE NUMBER DID AGENTS INTERCEPT UNDER THAT

5    AUTHORIZATION?

6    A    TELEPHONE NUMBER (323) 218-3743.

7    Q    NOW, DURING THE COURSE OF TITLE 3 INTERCEPTION, WHAT DOES

8    -- WHAT DOES THE FBI DO RELATIVE THE PHONE PROVIDER FOR THAT

9    PHONE NUMBER?

10   A    PROVIDE THE COURT ORDER AUTHORIZING THE INTERCEPTION OF

11   THE WIRETAP.

12   Q    TO WHOM?

13   A    TO THE TELEPHONE COMPANY.

14   Q    AND WHAT DOES THE PHONE COMPANY DO IN RESPONSE?

15   A    THE TELEPHONE COMPANY ALLOWS THE FBI TO MONITOR THE TARGET

16   TELEPHONE IN THIS CASE, (323) 218-3743.

17   Q    ARE FBI AGENTS ABLE TO MONITOR THOSE CALLS FROM THE FBI

18   OFFICE?

19   A    YES.

20   Q    IS THERE ANYTHING OTHER THAN THE ACTUAL CONTENT OF THE

21   CALLS THAT THE PHONE COMPANY PROVIDES IN RESPONSE TO THAT

22   AUTHORIZATION?

23   A    INCOMING AND OUTGOING DIALED NUMBERS, THE DIGITS THAT ARE

24   COMING IN AND BEING DIALED OUT.

25   Q    SO, THE PHONE COMPANY ALLOWS THE AGENTS TO SEE WHAT

**GER 0126**

1  NUMBERS -- THE ACTUAL NUMBERS BEING CALLED AND WHOSE CALLS ARE

2  BEING RECEIVED?

3  A    YES.

4  Q    DOES THE PHONE COMPANY ALSO PROVIDE DATE AND TIME

5  INFORMATION FOR THOSE CALLS?

6  A    YES.

7  Q    NOW, AS THE CASE AGENT FOR THIS INVESTIGATION, AGENT

8  STRICKLAND, DID YOU YOURSELF CARRY OUT TITLE 3 MONITORING AT

9  THE FBI OFFICE IN THIS CASE?

10 A    YES.

11 Q    AND DID YOU LISTEN TO SOME OF THOSE INTERCEPTIONS IN

12 REALTIME?

13 A    I LISTENED TO SOME OF THEM IN REALTIME, YES.

14 Q    WHAT WAS THE PROCEDURE AT THE MONITORING STATION FOR

15 PRESERVING THOSE CALLS AS THEY WERE RECEIVED FROM THE PHONE

16 COMPANY?

17 A    AGAIN, NOT BEING -- AS FAR AS THE TECHNICAL ASPECT, THE

18 PHONES -- THE CALLS WOULD COME IN.  THEY WOULD BE RECEIVED AND

19 STORED ON A MASTER DISK OR A MASTER -- DISK, I BELIEVE.

20 Q    WAS THERE ANOTHER COPY OF THOSE CALLS MADE SEPARATE FROM

21 THE MASTER DISK?

22 A    YES, THERE WAS.

23 Q    AND WERE AGENTS ABLE TO ACCESS THE RECORDINGS FROM THE --

24 FROM THE COPY?

25 A    YES.

1  Q    WHAT WOULD HAPPEN TO THE MASTER DISK -- EXCUSE ME.

2       HOW LONG ARE AGENTS AUTHORIZED TO CARRY OUT PHONE

3  INTERCEPTION UNDER EACH COURT AUTHORIZATION?

4  A    THERE'S COURT AUTHORIZATION FOR 30 DAYS.

5  Q    WHAT HAPPENS AT THE END OF THAT 30-DAY PERIOD WITH THE

6  RECORDINGS THAT ARE PLACED ON THE MASTER DISK?

7  A    ON THE MASTER DISK FOLLOWING THE INTERCEPTION DATE, THE

8  DISK OR THE MAGNETIC DEVICE IN WHICH HOLDS THE DATA AND CALLS

9  IS ESSENTIALLY SEALED BY A JUDGE.

10 Q    AND WHEN YOU SAY "SEALED BY A JUDGE," DO YOU MEAN THAT

11 AGENTS SEAL THE RECORDING IN THE PRESENCE OF A JUDGE?

12 A    YES.

13 Q    AND WHERE IS THAT MASTER DISK STORED AFTER IT IS SEALED IN

14 FRONT OF A JUDGE?

15 A    IN THE EVIDENCE.

16 Q    ARE AGENTS ABLE TO ACCESS THE WORKING COPY EVEN WITH THE

17 MASTER COPY SEALED?

18 A    YES, THEY ARE.

19 Q    NOW, FOR THIS INVESTIGATION, AGENT STRICKLAND, HAVE YOU

20 REVIEWED THE -- HAVE YOU REVIEWED MANY OF THE CALLS THAT WERE

21 RECORDED DURING THE COURSE OF TITLE 3 INTERCEPTION?

22 A    YES.  I REVIEWED SEVERAL OF THE CALLS, YES.

23 Q    WHO WAS THE PRIMARY USER OF THE PHONE THAT WAS TARGETED?

24 A    THE PRIMARY USER WAS JOSE LEON.

25 Q    AND HAVE YOU ENCOUNTERED JOSE LEON OUTSIDE OF THE COURSE

1    OF INTERCEPTION OVER THAT PHONE?

2    A    YES.

3    Q    AND HAVE YOU HAD THE OPPORTUNITY TO HEAR MR. JOSE LEON

4    SPEAK IN PERSON?

5    A    YES, I HAVE.

6    Q    DO YOU RECOGNIZE JOSE LEON'S VOICE DURING THE COURSE OF

7    THOSE TITLE 3 RECORDINGS?

8    A    YES.

9    Q    DID YOU IDENTIFY ANY OTHER INDIVIDUALS OTHER THAN LEON

10   WHOSE VOICES YOU'RE FAMILIAR WITH OUTSIDE OF INTERCEPTION

11   DURING THE COURSE OF THAT INTERCEPTION?

12   A    YES, SEVERAL OF THE PUEBLO BISHOPS AND WHICH WERE

13   ENCOUNTERED DURING THE INVESTIGATION.

14   Q    DID YOU -- HAVE YOU SPOKEN TO AN INDIVIDUAL BY THE NAME OF

15   ANTHONY HILL IN CONNECTION WITH THIS INVESTIGATION?

16   A    YES, I HAVE.

17   Q    AND HAVE YOU HEARD MR. ANTHONY HILL SPEAK IN PERSON?

18   A    YES.

19   Q    AND DO YOU RECOGNIZE MR. ANTHONY HILL'S VOICE IN THE

20   COURSE OF THOSE TITLE 3 INTERCEPTIONS?

21   A    I BELIEVE SO.

22   Q    AND AS TO JOHN TERRELL, HAVE YOU INTERVIEWED AN INDIVIDUAL

23   -- OR, EXCUSE ME, HAVE YOU SPOKEN WITH AN INDIVIDUAL NAMED

24   JOHN TERRELL IN PERSON?

25   A    YES.

**GER 0129**

1    Q    AND YOU'VE HEARD MR. TERRELL SPEAK IN PERSON?

2    A    YES.

3    Q    HAVE YOU REVIEWED SOME OF THESE TITLE 3 RECORDINGS IN

4    WHICH YOU CAN HEAR MR. -- YOU CAN RECOGNIZE MR. TERRELL'S

5    VOICE?

6    A    YES.

7    Q    NOW, AGENT STRICKLAND, HAVE YOU REVIEWED GOVERNMENT'S --

8    THE ITEMS THAT THE GOVERNMENT HAS MARKED AS EXHIBITS 350 TO

9    401?

10    A    YES, I HAVE.

11    Q    AND WHAT ARE THOSE ITEMS?

12    A    THOSE ARE INTERCEPTED TELEPHONE CALLS FROM THE WIRETAP.

13            MR. PELHAM:  YOUR HONOR, THE GOVERNMENT OFFERS

14    EXHIBITS 350 TO 401.

15            MR. KALOYANIDES:  OBJECTION.  FOUNDATION.  RELEVANCE.

16            (PAUSE IN PROCEEDINGS.)

17            THE COURT:  350 THROUGH 401?  DID YOU SAY?

18            MR. PELHAM:  JUST DOUBLE-CHECKING.  YES, YOUR HONOR.

19            THE COURT:  YOU'RE GOING TO HAVE TO LAY THE

20    FOUNDATION.

21            SUSTAINED ON FOUNDATION.

22            MR. PELHAM:  YOUR HONOR, AT THIS TIME I'LL WITHDRAW.

23    AND WE'LL RENEW THE OFFER AT A FURTHER POINT.

24            AT THIS TIME NOTHING FURTHER.

25            THE COURT:  THANK YOU.

```
 1              AND THEN DO WE HAVE AN ORDER FOR CROSS-EXAMINATION?
 2              MR. MC CURRY:  YES, YOUR HONOR.  I'LL BE GOING FIRST.
 3    FOLLOWED BY MR. KALOYANIDES.  AND THEN MR. CREARY.
 4              THE COURT:  OKAY.  MR. MC CURRY, YOUR WITNESS.
 5              MR. MC CURRY:  MAY IT PLEASE THE COURT.
 6              THE COURT:  PLEASE.
 7                         CROSS-EXAMINATION
 8    BY MR. MC CURRY:
 9    Q    AGENT STRICKLAND, GOOD AFTERNOON.
10    A    GOOD AFTERNOON.
11    Q    YOU HAVE BEEN AN AGENT FOR TEN YEARS?
12    A    A LITTLE BIT UNDER TEN YEARS, YEAH.  AUGUST OF '02 IS WHEN
13    I --
14    Q    AND THIS WAS NOT YOUR FIRST INVESTIGATION, CORRECT?
15    A    NO, IT'S NOT.
16    Q    YOU'VE DONE SEVERAL INVESTIGATIONS PRIOR TO THE ONE
17    INVOLVING THE PUEBLO BISHOPS?
18    A    I'VE DONE OTHER INVESTIGATIONS, YES.
19    Q    WERE YOUR OR WAS YOUR ROLE IN ANY OF THOSE PRIOR
20    INVESTIGATIONS AS SUPERVISING AGENT?
21    A    AS A SUPERVISOR OR THE LEAD CASE AGENT?
22    Q    WE'LL SAY THE LEAD CASE AGENT.
23    A    OKAY.  YES.
24    Q    SO, THIS ISN'T YOUR FIRST TIME AS THE CAPTAIN OF THE SHIP,
25    LET'S SAY.
```

1   A    NO.

2   Q    NOW, WITH ANY OF YOUR PRIOR INVESTIGATIONS, HAVE YOU USED

3   UNDERCOVER LAW ENFORCEMENT AS OR, LET'S SAY, UNDERCOVER AGENTS?

4   A    I DON'T BELIEVE SO.  NO.

5   Q    COULD YOU BRIEFLY EXPLAIN WHAT AN UNDERCOVER AGENT DOES.

6   A    AN UNDERCOVER AGENT IS AN AGENT WHO HAS RECEIVED TRAINING

7   TO GO AND ACQUIRE EVIDENCE IN FURTHERANCE OF AN INVESTIGATION.

8   Q    SO, ESSENTIALLY SOMEBODY WHOSE JOB IS TO INFILTRATE

9   DIFFERENT GROUPS OR TRY TO GET INSIDE OF DIFFERENT SITUATIONS

10  IN ORDER TO GATHER EVIDENCE, CORRECT?

11  A    YES.

12  Q    NOW, YOUR TESTIMONY WAS YOU DECIDED NOT TO USE UNDERCOVER

13  AGENTS IN THIS CASE.

14  A    THAT IS CORRECT.

15  Q    BECAUSE YOU DIDN'T FEEL IT WOULD BE SUCCESSFUL?

16  A    YES.

17  Q    BUT NOW IN YOUR EXPERIENCE HAVE UNDERCOVER AGENTS BEEN

18  SUCCESSFUL IN THE PAST?

19  A    IN THE PAST HAVE -- IN WHAT KIND OF INVESTIGATIONS?

20  Q    IN PAST INVESTIGATIONS THAT EITHER YOU WERE A PART OF OR

21  THAT YOU WERE AWARE OF AS AN FBI AGENT.

22  A    YEAH.  I DON'T REALLY RECALL TOO MANY INVESTIGATIONS I WAS

23  INVOLVED WITH UNDERCOVER AGENTS.

24  Q    BUT IT IS SOMETHING THAT THE BUREAU HAS USED IN THE PAST?

25  A    SURE.  **GER 0132**

1    Q    NOW, FOR THIS OPERATION YOU DECIDED TO USE, AS WE ALREADY

2    SAID, CONFIDENTIAL SOURCES?

3    A    YES.

4    Q    AND THOSE ARE ALSO COMMONLY REFERRED TO AS "INFORMANTS,"

5    CORRECT?

6    A    THAT'S ANOTHER TERM, YES.

7    Q    AND HOW MANY CONFIDENTIAL SOURCES HAVE YOU HANDLED OVER

8    YOUR CAREER?

9    A    SEVERAL.  I CAN'T GIVE YOU A NUMBER RIGHT NOW, BUT MORE

10   THAN -- MORE THAN TEN.

11   Q    SO, AT LEAST TEN BUT PROBABLY MORE THAN THAT?

12   A    OH, YEAH.  YES.

13   Q    AND DOES THAT INCLUDE THE INFORMANTS THAT WERE USED IN

14   THIS CASE --

15   A    YES.

16   Q    -- OR IS THAT IN ADDITION TO?

17   A    NO.  YEAH.  THAT -- I'M SORRY.  THAT INCLUDES THE ONES

18   HERE.

19   Q    AND YOU, OF COURSE, HAVE USED THEM IN PRIOR

20   INVESTIGATIONS?

21   A    YES.

22   Q    BUT NOW DO INFORMANTS COME WITH THEIR OWN SETS OF ISSUES?

23   A    SURE.

24   Q    SO, SOME ARE DRUG ADDICTS?

25   A    I'M SURE SOME HAVE BEEN, YES.

1 Q WELL, TO YOUR KNOWLEDGE HAVE ANY OF THE ONES THAT YOU'VE

2 HANDLED EVER BEEN DRUG ADDICTS?

3 A BEEN DRUG ADDICTS?

4 Q YES.

5 A I -- WITHOUT ASKING THEM DIRECTLY AND WITHOUT -- I'M SURE

6 THEY HAVE UTILIZED DRUGS.

7 Q OKAY.  BUT YOU'RE AN EXPERIENCED LAW ENFORCEMENT OFFICER.

8    THE COURT:  ARE YOU REFERRING TO THE INFORMANTS IN

9 THIS CASE OR JUST GENERALLY?

10    MR. MC CURRY:  I'M TALKING JUST GENERALLY AT THIS

11 POINT, YOUR HONOR.

12    THE WITNESS:  HAVE I -- CAN YOU REPHRASE THE

13 QUESTION.  I'M SORRY.

14    MR. MC CURRY:  WELL, LET ME WITHDRAW THAT QUESTION.

15 I'LL ASK -- ASK IT A LITTLE DIFFERENT WAY.

16 BY MR. MC CURRY:

17 Q SO, TO YOUR KNOWLEDGE SOME OF THE INFORMANTS THAT YOU HAVE

18 USED IN THE PAST HAVE HAD DRUG ISSUES?

19 A OH, THEY USE DRUGS, YES.

20 Q AND SOME HAVE CRIMINAL ACTIVITY, CRIMINAL HISTORY?

21 A YES.

22 Q SO, IT KIND OF COMES WITH THE WORLD OF USING AN INFORMANT

23 YOU GET SOME BAGGAGE.

24 A YES.

25 Q AND INFORMANTS OFTEN GET SOME BENEFIT FOR ASSISTING YOUR

1  INVESTIGATIONS, CORRECT?

2  A    YES.

3  Q    AND SOMETIMES IT'S IN THE FORM OF MONEY?

4  A    YES, IT IS.

5  Q    AND SOMETIME IT'S IN THE FORM OF LEGAL HELP AS IN THEY'VE

6  BEEN CHARGED WITH A CASE OR A CRIME?

7  A    THEY CAN GET CONSIDERATION, YES.

8  Q    CONSIDERATION.  AND SOMETIMES BY COOPERATING, IT'S A WAY

9  FOR THEM TO WORK OFF THOSE CRIMES, CORRECT?

10  A    YEAH, THAT'S -- (SNEEZING.)

11  Q    SO, DEFINITELY, AGAIN, THEY DO HAVE A -- THEY DO RECEIVE A

12  BENEFIT?

13  A    SOURCES?

14  Q    YES.

15  A    YES.

16  Q    NOW, YOU'VE TESTIFIED ABOUT THE PROTOCOL THAT YOU FOLLOWED

17  IN THIS CASE SUCH AS YOU WOULD SEARCH THE SOURCE BEFORE THEY

18  WOULD GO TO A MEETING.

19  A    UH-HUM.

20  Q    SEARCH THEIR VEHICLE.  AND THEN YOU WOULD SEARCH THEM WHEN

21  THEY WERE DONE WITH THE MEETING.

22  A    YES.

23  Q    NOW, THE PURPOSE OF SEARCHING AN INFORMANT IS TO MAKE SURE

24  THAT THEY HAVE, LET'S SAY, NO OTHER TYPE OF DRUGS ON THEM

25  BEFORE THEY GO INTO A MEETING, RIGHT?

1   A     YES.

2   Q     AND TO MAKE SURE THEY HAVE NO WEAPONS?

3   A     YES.

4   Q     AND THAT'S AGAIN BECAUSE INFORMANTS BY THEIR NATURE CAN BE

5   UNTRUSTWORTHY?

6   A     JUST TO CLEAR THE -- TO MAKE IT MORE OF A CLEANER

7   OPERATION, YES.

8   Q     BUT THERE IS ALWAYS ROOM FOR THE POSSIBILITY THAT AN

9   INFORMANT MIGHT DO SOMETHING WHICH WOULD JEOPARDIZE YOUR CASE.

10  A     SURE.

11  Q     AND THAT'S A BIG REASON WHY YOU CONDUCT THESE SEARCHES,

12  CORRECT?

13  A     THE SEARCH IS TO MAKE IT ADMINISTRATIVELY CLEAN AS

14  POSSIBLE.

15  Q     NOW, IS THERE A -- WAS THAT A STANDARD PROTOCOL IN THE

16  BUREAU OR IS THAT A PROTOCOL THAT YOU CAME UP WITH FOR THIS

17  CASE SPECIFICALLY?

18  A     I THINK THAT'S -- I THINK THAT'S A PRETTY STANDARD

19  PROCEDURE.

20  Q     SO, IT'S SOMETHING THAT THEY TRAIN YOU TO DO WHEN YOU --

21  WHEN THEY TEACH YOU HOW TO DEAL WITH INFORMANTS?

22  A     YEAH.  I THINK -- YEAH, I THINK THAT'S PRETTY MUCH SO.

23  Q     WELL, I'D LIKE TO TALK A LITTLE BIT ABOUT CONFIDENTIAL

24  SOURCE NUMBER 1, IF THAT'S OKAY.

25          HOW WAS CONFIDENTIAL SOURCE 1 BROUGHT TO YOUR

1    ATTENTION?

2    A    I BELIEVE LAPD OFFICER BROOKS BROUGHT C.S. NUMBER 1 TO OUR

3    ATTENTION.

4    Q    AND WAS HE BROUGHT TO YOU -- HAD HE BEEN ARRESTED?  I

5    MEAN, WHAT WAS KIND OF THE CIRCUMSTANCES OF C.S. 1 --

6    A    SURE.  I BELIEVE HE HAD BEEN ARRESTED ON STATE NARCOTICS

7    CHARGES.

8    Q    AND, SO, THEN THE INITIAL PURPOSE FOR C.S. 1 WAS TO HAVE

9    HIM WORK FOR YOU TO HOPEFULLY GET SOME CONSIDERATION FOR THOSE

10   OTHER CHARGES, CORRECT?

11   A    YEAH.  WE HAD -- YES.

12   Q    SO, INITIALLY, THAT WAS ONE OF THE BENEFITS TO C.S. 1?

13   A    UH-HUM.  YES.

14   Q    AND TO YOUR KNOWLEDGE DID C.S. 1 HAVE A MONIKER?

15   A    YES.

16   Q    WHAT WAS THAT MONIKER?

17          MR. PELHAM:  YOUR HONOR, OBJECTION.  RELEVANCE.

18          THE COURT:  OVERRULE.

19          THE WITNESS: "TIC."

20   BY MR. MC CURRY:

21   Q    TIC?  IS THAT SHORT FOR ANYTHING?

22   A    IT WAS -- I BELIEVE IT'S SHORT FOR LUNATIC.

23   Q    SO, SHORT FOR LUNATIC?

24   A    I BELIEVE SO.

25   Q    DID C.S. 1 RECEIVE ANY OTHER BENEFITS FOR HIS COOPERATION

1    WITH FBI?

2    A    YES.

3    Q    AND WHAT WERE THOSE?

4    A    MONETARY.

5    Q    SO, HE WAS PAID MONEY?

6    A    YES.

7    Q    IS THERE ANYTHING ELSE?

8    A    I THINK -- AS FAR AS?

9    Q    OKAY.  WELL, TO YOUR KNOWLEDGE IN 2011 DID HE HAVE A

10   TRAFFIC CITATION DISMISSED?

11   A    YEAH, THAT -- LAPD OFFICER BROOKS WOULD HAVE TO SPEAK TO

12   AN ITEM SUCH AS THAT.

13   Q    BUT NOW YOU'RE THE LEAD CASE AGENT?

14   A    YEAH.  THE HANDLING AGENT.  AS FAR AS HOW THAT WAS

15   HANDLED, HOW THAT WAS ADMINISTERED, I DON'T KNOW THE SPECIFICS

16   REGARDING THAT.

17   Q    BUT TO YOUR KNOWLEDGE DID IT OCCUR?

18   A    I WOULD HAVE -- I DO RECALL SOMETHING LIKE THAT, BUT I'M

19   -- I'D HAVE TO DISCUSS IT WITH OFFICER BROOKS.

20   Q    WELL, C.S. 1 FOUND A JOB?

21   A    I BELIEVE -- I BELIEVE SO.

22   Q    AND THAT WAS BASED ON THE ASSISTANCE FROM TASK FORCE

23   OFFICERS?

24   A    I -- I BELIEVE SO.

25   Q    SO, THEN, THAT'S ANOTHER BENEFIT HE RECEIVED FOR HIS

1    COOPERATION?

2    A    YOU CAN LOOK AT IT THAT WAY, YES.

3    Q    WELL, HOW DO YOU LOOK AT IT?

4         MR. PELHAM:  OBJECTION.  RELEVANCE.

5         THE COURT:  OVERRULE.

6         THE WITNESS:  I BELIEVE HE WAS -- YOU KNOW, IF THAT'S

7    WHAT HAPPENED, WELL, THEN, AND HE PROVIDED A JOB OR AT LEAST

8    THE POSSIBILITY TO HELP START A NEW -- A NEW LIFE AND WORK AT

9    THE, YOU KNOW, AFTER PROVIDING INFORMATION FOR US.  YES.

10   BY MR. MC CURRY:

11   Q    AND TO YOUR KNOWLEDGE WERE ANY CHARGES PURSUED BASED ON

12   THE ARREST THAT HE HAD WHEN HE WAS BROUGHT TO YOU BY OFFICER

13   BROOKS?

14   A    YEAH.  I BELIEVE WE CHARGED HIM IN FEDERAL COURT.  I

15   BELIEVE THAT'S WHAT HAPPENED.

16   Q    NOW, HE WAS ALSO PAID MONEY.

17   A    YES.

18   Q    AND DO YOU RECALL HOW MUCH HE WAS PAID?

19   A    DURING THE COURSE OF THE OPERATION, I DON'T KNOW THE EXACT

20   NUMBER BUT SOMEWHERE IN THE BALLPARK OF ABOUT $80,000.  THAT'S,

21   AGAIN, A PRETTY REALISTIC ESTIMATE.

22        THE COURT:  DID YOU SAY 8 --

23        THE WITNESS:  I'M SORRY.

24        THE COURT:  -- OR 80?

25        THE WITNESS:  80.

1            THE COURT:  80, 8-0?

2            THE WITNESS:  80,000.

3    BY MR. MC CURRY:

4    Q    AND APPROXIMATELY 50,000 OF THAT WAS FOR ACTUALLY

5    PROVIDING INFORMATION?

6    A    WITHOUT LOOKING AT THE BREAKDOWN, THAT'S REASONABLE.

7    Q    AND THE BALANCE HAD TO DO WITH EXPENSES THAT WERE PAID FOR

8    HIM BY -- WAS IT BY THE FBI?

9    A    YES.

10   Q    AND THIS IS FOR THE PERIOD FROM JANUARY OF 2009 UP TILL

11   WHEN?

12   A    UP THROUGH -- WELL, I LEFT L.A. IN JULY OF 2011.  SO, UP

13   THROUGH THEN AND THEN POSSIBLY -- I'M NOT SURE THERE'S MUCH

14   MORE AFTER THAT.

15   Q    SO, APPROXIMATELY -- APPROXIMATELY TWO YEARS?

16   A    BALLPARK, YES.

17   Q    SO, HE RECEIVED ABOUT 80,000 DOLLARS' WORTH OF

18   COMPENSATION OVER A TWO-YEAR PERIOD?

19   A    YES.

20   Q    LET ME ASK A LITTLE BIT ABOUT -- A LITTLE ABOUT THE

21   PAYMENT AND HOW THAT WORKS.

22            SO, IS THERE A STANDARD PROTOCOL THAT YOU FOLLOW IN

23   REGARDS TO PAYING INFORMANTS?

24   A    NO.  THERE'S NOT A STANDARD AS FAR AS, YOU KNOW, A

25   BREAKDOWN OF HOW MUCH PER -- NO, THERE'S NOT A STANDARD.

1   Q    SO, THE AMOUNT THAT SOMEBODY IS PAID DEPENDS ON A

2   CASE-BY-CASE BASIS?

3   A    CASE BY CASE.  ALSO, ACCESS TO INFORMATION.

4   Q    BUT THERE'S NOTHING WRITTEN TO YOUR KNOWLEDGE ON HOW THAT

5   PROCESS IS SUPPOSED TO WORK?

6   A    AS FAR AS -- ARE WE TALKING ABOUT HOW MUCH -- OR --

7   Q    WELL, LET ME -- LET ME BE CLEAR.

8        DOES YOUR BUREAU HAVE A STANDARD OPERATING PROCEDURE

9   ON HOW COMPENSATION FOR AN INFORMANT IS HANDLED, NOT

10  NECESSARILY YOU GET SO MUCH MONEY FOR SO MUCH OF A CERTAIN TYPE

11  OF INFORMATION, BUT THE GENERAL PROCESS ON HOW A PERSON IS

12  PAID?

13  A    ADMINISTRATIVE PROCESS AS FAR AS HOW I REQUEST A PAYMENT,

14  AS FAR AS HOW I MAKE A PAYMENT, THAT -- I'M UNCLEAR AS FAR AS

15  THAT -- AS FAR AS THAT GOES.

16  Q    WELL, LET ME MAKE --

17  A    THERE ARE PROCEDURES WE FOLLOW TO REQUEST A PAYMENT AND

18  THEN RECEIVE THE PAYMENT THEN SUBSEQUENTLY MAKE THE PAYMENT.

19  Q    IS THAT PAYMENT MADE IN CASH?  WHAT'S THE FORM OF PAYMENT?

20  HOW DO YOU PAY THE INFORMANT?

21  A    YES, IN CASH.

22  Q    CASH MONEY.

23        AND HOW DO YOU DOCUMENT THE CASH THAT'S PAID TO THE

24  INFORMANT?

25  A    THERE IS A RECEIPT IN WHICH WE SIGN.

GER 0141

1   Q    SO, YOU GIVE THE INFORMANT CASH.  THEY SIGN A RECEIPT.

2   A    YES.

3   Q    AND THEN LET'S TALK ABOUT THE AMOUNTS THEMSELVES.

4        SO, WHO ACTUALLY DETERMINES WHAT AN INFORMANT SHOULD

5   BE PAID?  WOULD THAT BE YOU?

6   A    I CAN PUT A REQUEST IN.  ULTIMATELY, THE SUPERVISOR OF OUR

7   SQUAD WOULD MAKE THE DETERMINATION WHETHER OR NOT THE SERVICES

8   THAT WERE PROVIDED BY THE SOURCE WERE COMMENSURATE WITH WHAT

9   THE SOURCE WAS ACTUALLY PAID.

10  Q    SO, YOU MAKE A RECOMMENDATION?

11  A    I CAN MAKE A RECOMMENDATION, YES.

12  Q    BUT THEN IT'S A LEVEL ABOVE YOU OR HOWEVER MANY LEVELS

13  ABOVE YOU THE ACTUAL AMOUNT IS DECIDED?

14  A    YES.  AS FAR AS -- YOU KNOW, I CAN MAKE A RECOMMENDATION.

15  AND THEN IT GETS SUBMITTED FOR APPROVAL.

16  Q    NOW, TO YOUR KNOWLEDGE, ARE YOUR INFORMANTS -- OR LET ME

17  WITHDRAW THAT QUESTION AND ASK IT THIS WAY.

18       DO YOU INSTRUCT THE INFORMANTS THAT THEY HAVE TO

19  REPORT THAT MONEY FOR TAX PURPOSES?

20  A    YES.

21  Q    IS THAT BASED ON -- IS THAT ORALLY OR IS THAT SOME TYPE OF

22  SIGNED AGREEMENT?  HOW IS THAT -- HOW IS THE PERSON OR THE

23  INFORMANT TOLD?

24  A    NO.  WHEN WE MAKE THE PAYMENT, THERE'S -- WE ADVISE THEM

25  THAT THEY NEED TO MAKE A PAYMENT.  AND THEN I BELIEVE THEY

1    INITIAL OFF ON THE PAYMENT FORM.  BUT THEY ACKNOWLEDGE.

2    Q    OKAY.  SO, THEY ACKNOWLEDGE RECEIPT OF PAYMENT.  AND PART

3    OF THAT ACKNOWLEDGMENT IS THEY UNDERSTAND OR THEY MARK THAT

4    THEY UNDERSTAND THEY HAVE TO REPORT THAT MONEY FOR TAX

5    PURPOSES?

6    A    YES.

7    Q    AND WAS THAT THE SAME PROCESS YOU FOLLOWED FOR C.S. NUMBER

8    1?

9    A    YES.

10   Q    NOW, YOU TESTIFIED THAT YOU INSTRUCTED C.S. NUMBER 1 TO

11   CALL MR. WHITE ON APRIL 16TH, 2009?

12   A    YES.

13   Q    AND THE PURPOSE OF THAT CALL WAS TO TRY TO HAVE A OR TRY

14   TO STIMULATE A DRUG TRANSACTION, CORRECT?

15   A    I BELIEVE SO.

16   Q    SO, IT WAS YOUR IDEA TO HAVE A DRUG TRANSACTION OCCUR

17   BETWEEN THE SOURCE AND MR. WHITE?

18   A    IT WAS THE -- THE SOURCE HAD A RELATIONSHIP WITH DEFENDANT

19   WHITE IN WHICH HE WAS IN A POSITION TO MAKE A PURCHASE FROM

20   DEFENDANT WHITE.

21           MR. MC CURRY:  I WOULD OBJECT AS NON-RESPONSIVE, YOUR

22   HONOR.

23           THE COURT:  THE OBJECTION IS OVERRULED.

24

25   BY MR. MC CURRY:                **GER 0143**

144

1   Q    WHEN YOU TOLD THE SOURCE TO CALL MR. WHITE --

2   A    YES.

3   Q    -- YOUR PURPOSE WAS SO THAT A DRUG TRANSACTION COULD TAKE

4   PLACE?

5   A    YES.

6   Q    BECAUSE THAT'S THE PURPOSE OF HAVING THE SOURCE, CORRECT?

7   A    THAT'S ONE OF THE PURPOSES.

8   Q    YOU WANT THEM TO GO OUT AND STIMULATE SOME ACTIVITY?

9   A    SURE.

10  Q    SO, THAT WAY THEY STIMULATE ACTIVITY, YOU HAVE A CASE?

11  A    THEY STIMULATE ACTIVITY, BUT THEY HAVE ACCESS IN ORDER TO

12  MAKE CONTROLLED PURCHASES.  ALSO, ACCESS TO INFORMATION IN

13  WHICH I'M ABLE TO GATHER TO IDENTIFY FURTHER INFORMATION ABOUT

14  THE SOURCE OR -- I'M SORRY -- ABOUT THE PUEBLO BISHOPS IN THIS

15  CASE THAT WE'RE INVESTIGATING.

16  Q    BUT, AGAIN, THE PURPOSE OF YOU HAVING THE SOURCE CALL MR.

17  WHITE IS BECAUSE YOU WANTED A DRUG DEAL TO TAKE PLACE?

18  A    YES.

19  Q    AND THAT'S PRETTY STANDARD FOR -- OR LET ME ASK THIS -- OR

20  ASK IT THIS WAY.

21       THAT'S A STANDARD REASON WHY YOU USE INFORMANTS,

22  CORRECT?

23  A    IT'S A REASON, YES.  THEY HAVE ACCESS TO INDIVIDUALS WHO

24  SELL NARCOTICS.  AND IN ORDER TO PURCHASE NARCOTICS,

25  UTILIZATION OF THE CONFIDENTIAL SOURCE IS USED.

**GER 0144**

1    Q    YOU WANT THESE DEALS TO HAPPEN?

2              MR. PELHAM:  OBJECTION.

3              THE COURT:  I DIDN'T HEAR THE QUESTION.

4    BY MR. MC CURRY:

5    Q    I SAID YOU, AGENT STRICKLAND, BY USE OF THE INFORMANTS

6    WANT THESE DEALS TO HAPPEN.

7              MR. PELHAM:  OBJECTION.  ARGUMENTATIVE.

8              THE COURT:  SUSTAINED.

9    BY MR. MC CURRY:

10   Q    DO YOU, AGENT STRICKLAND, WANT THESE DEALS TO HAPPEN --

11             MR. PELHAM:  SAME --

12   BY MR. MC CURRY:

13   Q    -- AS PART OF YOUR CASE?

14             MR. PELHAM:  SAME OBJECTION.

15             THE COURT:  SUSTAINED.

16   BY MR. MC CURRY:

17   Q    THE CALL TOOK PLACE IN APRIL OF 2009 BETWEEN MR. WHITE AND

18   THE SOURCE?

19   A    YES.

20   Q    THEN ON JUNE 17TH, 2010, THAT'S WHEN AN ACTUAL TRANSACTION

21   TOOK PLACE BETWEEN MR. WHITE AND THE SOURCE?

22   A    YES.

23   Q    WERE YOU IN CONTACT WITH THE SOURCE FROM APRIL 9TH -- OR,

24   ACTUALLY, APRIL OF 2009 UNTIL -- THROUGH JUNE OF 2010?

25   A    YES, I WAS.

1   Q    SO, YOU HAD REGULAR CONTACT WITH SOURCE 1?

2   A    YES.

3   Q    AGENT STRICKLAND, PRIOR -- OR LET ME ASK IT THIS WAY.

4        YOUR PRIOR INVESTIGATIONS ALSO DEALT WITH NARCOTIC

5   ACTIVITY?

6   A    YES.

7   Q    SO, BASICALLY THEY DEALT WITH DRUG DEALING?

8   A    YES.

9   Q    AND WERE THERE SOME COMMON -- WELL, COMMON THINGS THAT YOU

10  WOULD SEE IN THESE DIFFERENT INVESTIGATIONS IN RELATION TO DRUG

11  DEALING?

12  A    SURE.

13  Q    WOULD YOU OFTEN FIND SOMETHING CALLED A "PAY & OWE SHEET"

14  AS PART OF YOUR INVESTIGATION?

15  A    I'M SORRY.  COULD YOU --

16  Q    PAY & OWE SHEET.

17  A    OH, YEAH.  I -- I DIDN'T WHAT YOU WERE -- WHAT YOU SAID

18  THERE.

19  Q    AND CAN YOU DESCRIBE WHAT A PAY & OWE SHEET IS.

20  A    I'M NOT THAT WELL VERSED ON THOSE -- ON PAY & OWE SHEETS,

21  BUT, AGAIN, MY UNDERSTANDING IS THAT THEY ARE SHEETS THAT

22  SOMEONE WHO OWES MONEY OR SOMEONE PAYS MONEY.  IS THAT WHAT

23  YOU'RE ASKING?  AND I'M NOT FAMILIAR WITH THOSE.  SO, IT'S HARD

24  FOR ME TO TESTIFY TO THAT.

25  Q    OKAY.  WELL, ARE SCALES SOMETHING YOU WOULD OFTEN FIND IN

**GER 0146**

1  A DRUG INVESTIGATION?

2  A    YES.

3  Q    AND WHAT'S THE PURPOSE OF THE SCALES?

4  A    A SCALE IS USED TO MEASURE WEIGHTS FOR DRUGS.  FOR

5  INSTANCE, IF YOU'RE GOING TO MAKE A BUY -- AND WE'VE DISCUSSED

6  WEIGHT, SUCH AS A 7, 7 GRAMS, THEY WOULD BRING A SCALE -- THEY,

7  AS IN MAYBE A DRUG DEALER OR -- POTENTIALLY A SOURCE, BRING A

8  SCALE TO AN OPERATION TO WEIGH THE DOPE TO MAKE SURE IT WEIGHED

9  OUT PROPERLY.

10 Q    AND HOW ABOUT A CUSTOMER LIST IS SOMETHING YOU MAY

11 COMMONLY FIND IN A DRUG INVESTIGATION?

12 A    A CUSTOMER LIST?

13 Q    YES.

14 A    YES.

15 Q    AND WHAT IS A CUSTOMER LIST?

16 A    A CUSTOMER LIST WOULD BE A LIST IN WHICH YOU HAVE A LIST

17 OF NAMES OF PEOPLE WHO MIGHT BE -- IF A DRUG DEALER HAS A LIST

18 OF NAMES OF PEOPLE WHO ARE THEIR CUSTOMERS.  THEY SELL DRUGS

19 TO.

20 Q    AND WOULD YOU SOMETIMES FIND CUTTING AGENTS AS PART OF A

21 DRUG INVESTIGATION?

22 A    SURE YOU COULD.  YES.

23 Q    OKAY.  AND CAN YOU EXPLAIN WHAT A CUTTING AGENT IS.

24 A    YEAH.  THAT I'M NOT -- AGAIN, I'M NOT A CHEMIST.  AND I'M

25 NOT THAT WELL-VERSED ON CUTTING AGENTS.

1    Q    OKAY.  AND SOMETIMES YOU'LL FIND SUMS OF MONEY?

2    A    SURE.

3    Q    AND SOMETIMES YOU'LL FIND FIREARMS?

4    A    YES.

5    Q    AND OFTEN THESE ARE BASED ON SEARCHES OF A DRUG DEALER'S

6    LOCATION OR A RESIDENCE OR WHATEVER LOCATION THEY DO BUSINESS

7    OUT OF, CORRECT?

8    A    YES.

9    Q    AND SEARCHES WERE CONDUCTED AS PART OF THIS INVESTIGATION

10   OF THE PUEBLO BISHOPS, CORRECT?

11   A    YES.

12   Q    DID YOU EVER DETERMINE WHERE MR. WHITE WAS LIVING DURING

13   THE TIME OF THIS INVESTIGATION?

14   A    DURING THE INVESTIGATION OR AT THE CONCLUSION OF THE

15   INVESTIGATION?

16   Q    WELL, LET'S SAY DURING THE INVESTIGATION.

17   A    MY -- MY UNDERSTANDING, AGAIN, WAS THAT MR. WHITE HAD A

18   COUPLE OF DIFFERENT RESIDENCES AND WAS NOT, YOU KNOW,

19   STATIONARY IN JUST ONE.  NOW, THAT'S MY UNDERSTANDING.

20   Q    WELL, I MEAN, DID YOU DETERMINE IF HE WAS LIVING AT THE

21   PUEBLO DEL RIO HOUSING PROJECT AT THE TIME?

22   A    AT THE TIME I'M NOT SO SURE.  AND I DON'T HAVE AN EXACT

23   ADDRESS IN THE PDRHP THAT HE WOULD BE LIVING.

24   Q    HOW ABOUT TOWARDS THE END OF THE INVESTIGATION WERE YOU

25   AWARE OF WHERE HIS RESIDENCE WAS OR WHERE HE WAS LIVING?

1   A    YEAH.  I KNOW WE HAD -- WE HAD IDEAS.  AS FAR AS AN EXACT

2   LOCATION, I DIDN'T HANDLE THE OPERATIONAL PLAN AS FAR AS THE

3   TAKE-DOWN.  SO, I'M PROBABLY NOT THE BEST PERSON TO ASK FOR

4   THAT.

5   Q    OKAY.  FAIR ENOUGH.

6        WHO WAS THE ONE WHO WAS OPERATIONAL -- IN CHARGE OF

7   THAT OPERATIONAL ASPECT?

8   A    IT WOULD BE SPECIAL AGENT MIKE BROWN.

9        (PAUSE IN PROCEEDINGS.)

10       MR. MC CURRY:  JUST A MOMENT, YOUR HONOR.

11       (PAUSE IN PROCEEDINGS.)

12       MR. MC CURRY:  THAT'S ALL I HAVE.  THANK YOU.

13       THE COURT:  BEFORE WE START MR. KALOYANIDES, WE'LL

14  TAKE THE AFTERNOON RECESS.

15       PLEASE RETURN BACK TO THE COURTROOM -- WE'LL MAKE IT,

16  LET'S SEE, AT -- COME BACK AT THREE O'CLOCK.  AND DURING YOUR

17  ABSENCE DO NOT DISCUSS THE CASE AMONGST YOURSELVES OR WITH ANY

18  OTHER PERSON.

19       THE CLERK:  ALL RISE FOR THE JURY.

20       (JURY EXIT.)

21       (RECESS, 2:38 P.M. TO 3:00 P.M.)

22       THE CLERK:  PLEASE REMAIN SEATED AND COME TO ORDER.

23  THIS COURT IS AGAIN IN SESSION.

24       THE COURT:  BE SEATED.

25       OKAY.  WE'RE BACK ON THE RECORD ON WHITE VERSUS --

1    THE UNITED STATES VERSUS WHITE.

2          COUNSEL ARE PRESENT.  THE DEFENDANTS ARE PRESENT.

3          ARE WE READY FOR THE JURY?

4          MR. KALOYANIDES:  YOUR HONOR, ONE BRIEF ISSUE I

5    WANTED TO TAKE UP WITH THE COURT BEFORE WE GOT STARTED.

6          CURRENTLY THERE IS A PROTECTIVE ORDER THAT RESTRICTS

7    THE DEFENSE FROM REFERRING IN ANY PUBLICLY FILED DOCUMENT THE

8    NAMES OF THE INFORMANTS THAT HAVE BEEN DISCLOSED TO US.  C.S. 1

9    HAS BEEN DISCLOSED TO US.  AND C.S. 2 HAVE BEEN DISCLOSED TO

10    US.  SO, WE KNOW WHO THEY ARE.

11          I'M CONCERNED THAT BY CONTINUING TO REFER TO THEM AS

12    -- UNDER THESE CODE NAMES, THE JURY IS GETTING THE WRONG

13    IMPRESSION THAT THERE IS SOME DANGER TO THEM.  WE KNOW WHO THEY

14    ARE.  THEY'VE BEEN DISCLOSED.  AND I WOULD LIKE TO BE ABLE TO

15    REFER TO THEM BY NAME DURING MY CROSS-EXAMINATION.

16          THE COURT:  MR. PELHAM.

17          MR. PELHAM:  OBJECTION, YOUR HONOR.  THERE IS A

18    PROTECTIVE ORDER IN PLACE AS TO THESE CONFIDENTIAL INFORMANTS.

19    I DON'T BELIEVE THAT THEIR TRUE NAMES HAVE ANY RELEVANCE IN

20    THESE PROCEEDINGS.  AND I BELIEVE -- WELL, I BELIEVE THAT ALL

21    THREE -- AND I CAN CONFIRM WITH THE AGENTS -- CONTINUE TO BE

22    OPEN AS SOURCES WITH THE FBI.

23          THE GOVERNMENT'S INTENT ALL ALONG HAS BEEN TO, WHILE

24    MEETING OUR DISCOVERY OBLIGATIONS, LIMIT THE AMOUNT IN WHICH

25    THOSE NAMES ARE DISSEMINATED.  WE JUST DON'T BELIEVE IT PLAYS

1   ANY ROLE IN THIS CASE.  ESPECIALLY BECAUSE THE DETAILS OF WHAT

2   BENEFITS THE C.I'S RECEIVED IS ALREADY COMING OUT IN CROSS.

3          THE COURT:  OKAY.  BUT THE NEED TO MAINTAIN THE

4   SECRECY REGARDING THEIR IDENTITY IS FOR WHAT REASON?

5          MR. PELHAM:  NUMBER ONE, I BELIEVE THAT IF THEY

6   HAVEN'T BEEN FORMALLY CLOSED BY THE FBI -- EXCUSE ME, I DON'T

7   BELIEVE ANY OF THEM HAVE BEEN FORMALLY CLOSED BY THE FBI.  AND

8   ONE OR MORE OF THE THREE COULD STILL BE USED IN OPERATIONS

9   EITHER NOW OR INTO THE FUTURE.

10         SECOND, THERE'S, OF COURSE, A GREATER RISK THAT

11  ACCOMPANIES THE PRINTED FACT -- THE PRINTED VERIFICATION OF

12  SOMEONE'S PROVISION OF TESTIMONY IN OPEN COURT AGAINST --

13  AGAINST DEFENDANTS IN CASES LIKE THIS.

14         THE COURT:  OKAY.  THE COURT WOULD DENY THE REQUEST.

15         MR. PELHAM:  THANK YOU, YOUR HONOR.

16         MR. KALOYANIDES:  THANK YOU, YOUR HONOR.

17         THE CLERK:  WOULD YOU ALL RISE FOR THE JURY, PLEASE.

18         (JURY ENTERS, 3:02 P.M.)

19         THE COURT:  OKAY.  WE HAVE --

20         (PAUSE IN PROCEEDINGS.)

21         THE COURT:  OKAY.  ALL JURORS ARE NOW IN COURT WITH

22  THE ALTERNATES.

23         PLEASE HAVE A SEAT.  WE CONTINUE WITH THE

24  CROSS-EXAMINATION OF THE SPECIAL AGENT, SPECIAL AGENT

25  STRICKLAND, BY MR. KALOYANIDES ON BEHALF OF MR. HARDIMAN.

1          MR. KALOYANIDES:  THANK YOU, YOUR HONOR.

2                   CROSS-EXAMINATION

3    BY MR. KALOYANIDES:

4    Q    AGENT STRICKLAND, DURING YOUR TRAINING TO BECOME AN FBI

5    AGENT, DID YOU RECEIVE ANY TRAINING ON THE PROPER USE AND

6    HANDLING OF CONFIDENTIAL INFORMANTS?

7    A    I'M SURE I -- I'M SURE I HAD HAD SOME TRAINING IN THE USE

8    OF C.I.'S.

9    Q    AND THE FBI HAS PROTOCOLS REGARDING HOW YOU SIGN UP AN

10   INFORMANT, CORRECT?

11   A    YES.

12   Q    AND THAT INVOLVES LITTLE DIFFERENT PROTOCOLS FOR THE

13   DIFFERENT KINDS OF INFORMANTS.  FOR EXAMPLE, IF SOMEBODY IS

14   JUST A CIVILIAN HUMAN SOURCE WHO JUST WANTS TO GIVE A TIP,

15   THAT'S ONE KIND OF INFORMANT, CORRECT?

16   A    I MEAN, AS FAR AS THE ACTUAL -- YOU KNOW, ARE THERE

17   DIFFERENT LEVELS OF SOURCES.  IS THAT THE QUESTION YOU'RE

18   ASKING?

19   Q    THAT'S SORT OF.  BUT LET'S GO WITH THAT.  THERE ARE

20   DIFFERENT LEVELS OF SOURCES, RIGHT?  YES?

21   A    SOME SOURCES WOULD LIKE TO JUST PROVIDE INFORMATION.

22   SOME SOURCES WOULD LIKE TO DO MORE THAN JUST PROVIDE JUST

23   INFORMATION.

24   Q    AND SOME WILL JUST BE REGULAR CITIZENS WHO DECIDE THEY

25   WANT TO HELP LAW ENFORCEMENT, AND THEY'LL BE SIGNED UP AS A

1    SOURCE, RIGHT?

2    A    SURE.

3    Q    OTHERS ARE AS WE HEARD FROM MR. MC CURRY WILL, IN FACT,

4    HAVE A CRIMINAL MATTER THAT THEY'RE HOPING TO WORK OFF, RIGHT?

5    A    THAT COULD HAPPEN, YES.

6    Q    NOW, IF THE BUREAU IS GOING TO SIGN UP AN INFORMANT, THEY

7    ACTUALLY ENTER INTO A WRITTEN AGREEMENT WITH THAT INFORMANT,

8    DON'T THEY?

9    A    AS FAR AS A WRITTEN AGREEMENT, RULES AS FAR AS

10   AUTHORIZATIONS AS FAR AS -- YOU KNOW, IF WE'RE GOING TO SIGN A

11   SOURCE UP, BASICALLY THERE ARE AGREEMENTS IN WHICH THE SOURCE

12   HAS TO ABIDE BY AN ORDER TO MAINTAIN A RELATIONSHIP WITH THE

13   FBI?

14   Q    AND IT SPELLS OUT WHAT -- IF THEY'RE GOING TO BE

15   COMPENSATED, WHAT THAT COMPENSATION MIGHT ENTAIL, CORRECT?

16   A    AS FAR AS, LIKE, HOW MUCH MONEY OR HOW MUCH -- I MEAN,

17   THERE'S --

18   Q    WELL, LET ME BE CLEAR.

19   A    SURE.

20   Q    IF I'M NOT CLEAR, PLEASE JUST LET ME KNOW.  AND I'LL --

21   A    SURE.  I WILL.  THANKS.

22   Q    -- REPHRASE THE QUESTION.

23        IF A SOURCE IS GOING TO BE COMPENSATED MONETARILY --

24   A    YES.

25   Q    -- REGARDLESS TO AMOUNT

1  A    OKAY.

2  Q    -- IT WILL BE STATED IN AN AGREEMENT THAT THIS IS -- YOU

3  WILL BE GETTING SOME KIND OF MONETARY REMUNERATION, RIGHT?

4  A    I DON'T KNOW IF THERE'S SOMETHING THAT ACTUALLY SAYS

5  YOU'RE GOING TO RECEIVE THIS -- YOU'RE GOING TO RECEIVE THIS

6  PAYMENT FOR CARRYING OUT THIS JOB.

7  Q    NOT THAT SPECIFIC, BUT IT WILL IDENTIFY THAT THIS IS A

8  SOURCE WHO IS RECEIVING MONEY.

9         THERE IS SOMETHING IN THE FILE WITH THE FBI THAT

10  IDENTIFIES C.S. 2, FOR EXAMPLE, RECEIVES MONEY, CORRECT?

11  A    THERE ARE ITEMS -- THERE'S PAYMENT RECEIPTS THAT WOULD BE

12  IN THE FILE THAT IDENTIFY THAT C.S. 2 HAS RECEIVED MONEY.

13  Q    OKAY.  AND THE SAME WAS WITH C.S. 1, RIGHT?

14  A    SURE.

15  Q    NOW, ALSO, IN THAT FILE YOU REFERENCED SOME SORT OF

16  DOCUMENT THAT IDENTIFIES THE TERMS AND CONDITIONS OF THERE

17  BEING A SOURCE FOR THE FBI, RIGHT?

18  A    TERMS AND CONDITIONS, YOU KNOW, AGREEMENTS IN WHICH THEY

19  HAVE TO ABIDE BY.

20  Q    AND ONE OF THE CONDITIONS THEY HAVE TO ABIDE BY IS THAT

21  THEY HAVE TO FOLLOW THE DIRECTION OF THE AGENT WHO IS IN CHARGE

22  OF THEM, RIGHT?

23  A    WELL, WITHOUT SEEING THE ACTUAL ADMONISHMENTS IN FRONT OF

24  ME, YOU KNOW, THAT SOUNDS LIKE A REASONABLE --

25  Q    ARE YOU FAMILIAR WITH THE TERMS AND CONDITIONS UNDER WHICH

1    C.S. 2 WAS SIGNED UP?

2    A    OH, YEAH, YEAH.  DEFINITELY.

3    Q    OKAY.  AND ONE OF THEM IS THAT THEY CAN'T COMMIT CRIMES,

4    RIGHT?

5    A    IF THEY COMMIT A CRIME, THEY NEED TO LET -- LET ME KNOW.

6    YES.

7    Q    OKAY.  AND, IN FACT, THAT CAN BE A CONDITION UNDER WHICH

8    THEY WILL BE TERMINATED AS A SOURCE, CORRECT?

9    A    SURE.

10   Q    THEY CANNOT GO OUT -- IF THEY'RE ON A -- IF A SOURCE IS

11   BEING USED IN A DRUG INVESTIGATION, THEY CANNOT GO OUT AND

12   SOLICIT A DRUG TRANSACTION WITHOUT PRIOR APPROVAL FROM THE FBI

13   OR THE SPECIFIC AGENT HANDLING THEM, CORRECT?

14   A    AS FAR AS SOLICITING ON OUR BEHALF, IF A -- SOURCE --

15   SOURCES WHO HAVE ACCESS TO NARCOTICS, YOU KNOW, THEY MAY IF

16   THEY IDENTIFY SOMEONE THAT THEY MAY BRING TO OUR ATTENTION,

17   THAT COULD VERY WELL HAPPEN.

18           NOW, IF YOU WANT TO LOOK AT IT AS FAR AS IF THEY'RE

19   OUT FREELANCING AND SOLICITING INFORMATION ON THEIR OWN, AND IF

20   THEY BRING US INFORMATION, THAT'S -- THAT WOULDN'T BE A

21   PROBLEM.

22   Q    OKAY.  BUT THEY'RE NOT ALLOWED TO GO AND BUY DRUGS WITHOUT

23   THE AGENT'S APPROVAL, RIGHT?

24   A    YEAH.

25   Q    THEY'RE NOT ALLOWED TO SELL DRUGS WITHOUT THE AGENT'S

GER 0155

1    SPECIFIC APPROVAL, RIGHT?

2    A    THAT IS CORRECT.

3    Q    AND YOU'RE GOING TO HAVE VERY STRICT PROTOCOLS BEFORE YOU

4    LET DRUGS GET OUT INTO THE COMMUNITY, RIGHT?

5    A    I -- I DON'T THINK WE PUT DRUGS OUT IN THE COMMUNITY AS

6    FAR AS THAT.

7    Q    ARE YOU FAMILIAR THAT OTHER FEDERAL AGENCIES DO?

8    A    I CAN'T SPEAK FOR OTHER FEDERAL AGENCIES.

9    Q    ALL RIGHT.  IN YOUR EXPERIENCE, YOU'VE NEVER DONE A DRUG

10   --

11        THE COURT:  OKAY.  THE JURY IS TO DISREGARD THE

12   INSINUATION SUGGESTED IN THE QUESTION THAT THEY DO.  THERE'S NO

13   EVIDENCE OF THAT.  AND IT'S AN INSINUATION.

14        MR. KALOYANIDES:  THANK YOU, YOUR HONOR.

15   BY MR. KALOYANIDES:

16   Q    ARE YOU AWARE -- IN YOUR EXPERIENCE YOU'VE NEVER BEEN

17   INVOLVED WHERE THE BUREAU HAS USED AN INFORMANT TO SELL DRUGS,

18   CORRECT?

19   A    IN MY INVESTIGATIVE EXPERIENCE, AS FAR AS BEING AWARE OF

20   THE ACTUAL OPERATION ITSELF?

21   Q    YES.

22   A    OR ARE WE TALKING ABOUT SELLING DRUGS AND LETTING THEM

23   WALK ON THE STREET AND WALK AWAY, OR?

24   Q    LET ME BE MORE CLEAR.

25   A    WHAT KIND OF OPERATION ARE WE TALKING ABOUT?

GER 0156

1  Q    LET ME BE MORE CLEAR.

2         HAVE YOU EVER BEEN INVOLVED IN AN OPERATION OF ANY

3  KIND IN WHICH THE BUREAU USED AN INFORMANT TO SELL DRUGS?

4  A    I DON'T -- I DON'T BELIEVE SO.  I DON'T RECALL THAT.

5  Q    ALL RIGHT.  MOST OF THE TYPE OF TRANSACTIONS THAT YOU'VE

6  USED INFORMANTS ARE THE TYPES THAT YOU'VE TESTIFIED HERE TODAY

7  WHERE THE INFORMANT BUYS DRUGS, CORRECT?

8  A    THAT'S CORRECT.

9  Q    OKAY.  AND THE INFORMANT IS NOT ALLOWED TO DO THAT WITHOUT

10 PRIOR APPROVAL IN AN OPERATION SETTING, CORRECT?

11 A    YES.

12 Q    AND IF THE INFORMANT DOES THAT, THAT CAN BE GROUNDS TO

13 TERMINATE THE INFORMANT UNDER THE TERMS AND CONDITIONS OF THE

14 AGREEMENT WITH THE FBI?

15 A    YEAH.  THAT WOULD BE A FACTOR IN WHICH WE WOULD LOOK TO

16 SEE IF THE SOURCE WOULD CONTINUE THEIR COOPERATION WITH US.

17 Q    ANOTHER CONDITION FOR BEING A SOURCE IS THAT THE SOURCE

18 CANNOT USE ILLEGAL DRUGS, CORRECT?

19 A    HUM.  YEAH, THAT'S -- I WOULD HAVE TO -- THAT SOUNDS FAIR,

20 BUT I WOULD HAVE TO LOOK AT THE -- I DON'T THINK THAT'S --

21 THEY'RE ABLE TO DO THAT.

22 Q    WELL, THAT WOULD BE A CRIME, WOULDN'T IT?

23 A    THAT WOULD BE A CRIME.  THAT'S RIGHT.

24 Q    SO, THEREFORE, THEY CAN'T COMMIT A CRIME, CORRECT?

25 A    THAT'S CORRECT.  **GER 0157**

1   Q    I DON'T WANT TO PUT WORDS IN YOUR MOUTH, BUT I JUST WANT

2   TO BE CLEAR --

3   A    NO.  I UNDERSTAND WHAT YOU'RE SAYING.

4   Q    AND WE'VE ALREADY COVERED -- AND I JUST WANT TO BE CLEAR

5   -- THAT IF THEY GET MONETARY REMUNERATION THEY ARE TOLD THIS

6   IS INCOME THAT IS TAXABLE.  AND YOU'RE OBLIGATED TO PAY YOUR

7   TAXES.

8   A    THAT IS CORRECT.

9   Q    THE BUREAU DOESN'T DO ANYTHING TO VERIFY THAT -- THAT

10  THEY'VE ACTUALLY PAID TAXES, THOUGH, DOES IT?

11  A    I HAVE NOT.  NO.

12  Q    DO YOU KNOW IF THE BUREAU REPORTS THE MONEY PAID TO THE

13  IRS?

14  A    THAT I'M NOT AWARE OF, NO.

15  Q    NOW, YOU -- WOULD YOU BE CONSIDERED THE HANDLER FOR C.S.

16  2?

17  A    YES.  AT THAT TIME I WAS, YES.

18  Q    AND DID YOU ACTUALLY SIGN UP C.S. 2 FOR THE BUREAU AS AN

19  INFORMANT?

20  A    I BELIEVE I DID, YES.

21  Q    AND TO THE BEST OF YOUR RECOLLECTION, DID YOU REVIEW THE

22  TERMS AND CONDITIONS OF C.S. 2'S BEING AN INFORMANT WITH THE

23  FBI?

24  A    YES.

25  Q    ALL RIGHT.  AND C.S. 2 RECEIVED PAYMENT OF MONEY, RIGHT?

1    A    YES, HE DID.

2    Q    AND DO YOU REMEMBER THE AMOUNT -- ABOUT HOW MUCH C.S. 2

3    RECEIVED DURING HIS TIME ON THIS CASE?

4    A    ON THIS CASE I BELIEVE -- AND, AGAIN, IT'S A BALLPARK

5    FIGURE.  I THINK IT'S SOMEWHERE AROUND $20,000.  I'M -- AND,

6    AGAIN, THAT'S NOT EXACT NUMBERS, BUT I THINK THAT'S A FAIR

7    ESTIMATE.

8    Q    AND THAT WAS PARTLY FOR ACTUAL MONETARY PAYMENT AND PARTLY

9    FOR COVERING OF EXPENSES, CORRECT?

10   A    SERVICES AND EXPENSES, YES.

11   Q    AND THE PAYMENT FOR SERVICES WAS IN CASH?

12   A    YES.

13   Q    NOW, IN ADDITION, C.S. 2 ALSO -- LET ME BACK UP.

14        TO YOUR KNOWLEDGE DID C.S. 2 BECOME AN INFORMANT

15   BECAUSE OF A PENDING CRIMINAL MATTER?

16   A    I DON'T BELIEVE SO, NO.

17   Q    NOW, ALSO, AS PART OF THE BENEFITS TO C.S. 2, C.S. 2 WAS

18   PROVIDED WITH GOVERNMENT HOUSING AT NO COST TO C.S. 2, RIGHT?

19   A    THAT IS CORRECT.

20   Q    AND THE FBI PAID C.S. 2'S UTILITIES, RIGHT?

21   A    YES.

22   Q    AND, ALSO, SOME RELOCATION COSTS, RIGHT?

23   A    YES.

24   Q    AND THE FBI ALSO PAID FOR THE COSTS OF THE CELLULAR PHONE,

25   RIGHT?

1   A    YES.

2   Q    NOW, DID C.S. 2 HAVE HIS OWN PHONE OR WAS IT ONE THAT WAS

3   PROVIDED BY THE FBI?

4   A    I BELIEVE I BOUGHT THE -- I -- I -- I BELIEVE I EITHER

5   BOUGHT THE PHONE.  I KNOW I BOUGHT HIM PHONE -- I KNOW I BOUGHT

6   C.S. 2 PHONE CARDS.  YES.

7   Q    WAS THE -- DO YOU KNOW IF C.S. 2'S PHONE WAS -- THE

8   ACCOUNT WAS UNDER HIS OWN NAME AS OPPOSED TO UNDER THE BUREAU,

9   AND THAT THE BUREAU HAD CONTROL OVER THE ACCOUNT?

10   A    IT'S BEEN FOUR YEARS -- IT'S BEEN OVER FOUR YEARS.  I --

11   AS FAR AS AN ACCOUNT THAT THE BUREAU MAINTAINED THE ACCOUNT,

12   BOY, I JUST CAN'T RECALL AS FAR AS WHETHER I -- WHETHER I

13   MAINTAINED THE ACCOUNT OR -- I THINK I -- I THINK I BOUGHT HIM

14   PHONE -- I THINK THE C.S. 2 A PHONE.  AND THEN WE UTILIZED --

15   YOU KNOW, I CONTINUED TO PAY -- MAKE PAYMENTS ON THAT PHONE.

16   Q    DO YOU RECALL IF YOU EVER REVIEWED THE PHONE RECORDS FOR

17   C.S. 2'S PHONE DURING THE TERM OF THE INVESTIGATION IN WHICH HE

18   WAS ACTIVE?

19   A    I DON'T THINK I REVIEWED.

20   Q    ON DIRECT YOU TESTIFIED THAT SOME -- IF THE -- IF C.S. 2

21   WAS GOING TO MAKE A PHONE CALL, THE IDEA WAS THAT IT SHOULD BE

22   RECORDED, CORRECT?

23   A    IN MOST CIRCUMSTANCES WE'D LIKE TO AS FAR AS -- YOU KNOW,

24   THE THEORY BEHIND RECORDING A PHONE CALL IS TO COLLECT THE

25   EVIDENCE.  AND IN ORDER TO COLLECT THE BEST EVIDENCE WOULD BE

1    RECORDED EVIDENCE.  AND DURING THE INVESTIGATION, WE WOULD LIKE

2    TO HAVE THE EVIDENCE RECORDED.

3    Q    NOW, IF YOU WERE NOT PRESENT, BUT HE HAD BEEN INSTRUCTED

4    -- AND I BELIEVE YOU TESTIFIED THAT YOU DID INSTRUCT HIM TO

5    MAKE CERTAIN PHONE CALLS EVEN IF YOU WERE NOT PHYSICALLY

6    PRESENT, AND HE WAS SUPPOSED TO TRY TO RECORD THOSE CALLS,

7    CORRECT?

8    A    THAT IS CORRECT.

9    Q    ALL RIGHT.  I BELIEVE YOU ALSO TESTIFIED THAT NOT ALL THE

10   CALLS HE MADE WERE RECORDED.

11   A    YEAH.  I DON'T BELIEVE SO.  THERE MAY HAVE BEEN SOME CALLS

12   THAT WERE NOT RECORDED.

13   Q    SO, YOUR OWN PERSONAL KNOWLEDGE, YOU DON'T KNOW WHO ELSE

14   HE MAY HAVE CALLED USING THAT PHONE, CORRECT?

15   A    THAT IS CORRECT.

16   Q    AND JUST TO BE CLEAR, YOU NEVER CHECKED HIS RECORDS

17   REGULARLY TO SEE WHAT KIND OF ACTIVITY WAS ON HIS PHONE, RIGHT?

18   A    YEAH.  I WOULDN'T SAY I CHECKED THEM REGULARLY.

19        (PAUSE IN PROCEEDINGS.)

20   BY MR. KALOYANIDES:

21   Q    YOU TESTIFIED ON DIRECT THAT AT THE END OF A CONTROLLED

22   BUY ONE OF THE AGENTS WOULD RECEIVE FROM C.S. 2 THE ITEMS

23   PURCHASED, RIGHT?

24   A    YES.

25   Q    SOMETIMES THAT WAS YOU?

1   A    YES.

2   Q    SOMETIMES IT WAS OTHER AGENTS?

3   A    YES.

4   Q    NOW, WHERE WERE YOU WHEN YOU PLACED THE ITEMS PURCHASED

5   INTO THE ENVELOPE, THE EVIDENCE ENVELOPE, IN DEALING WITH C.S.

6   2?

7   A    AFTER I RECEIVED THE ITEMS, AFTER I RECEIVED THE EVIDENCE,

8   THE ITEMS THAT WERE PROCESSED OR SEALED, IS THAT WHAT YOU'RE

9   ASKING, SIR?

10  Q    I'M ASKING WHERE YOU WERE WHEN THEY WERE SEALED --

11  A    I WAS AT THE -- AT THE OFFICE --

12  Q    ALL RIGHT.

13  A    AT THE FBI OFFICE.

14  Q    BUT YOU RECEIVED THE ITEMS AT SOME OTHER LOCATION WHERE

15  YOU WOULD MEET UP WITH C.S. 2 AFTER THE TRANSACTION, RIGHT?

16  A    YES.

17  Q    NOW, IS THAT THE STANDARD PROTOCOL FOR A CONTROLLED BUY

18  FOR THE AGENT TO SEAL THE ITEM RECEIVED BACK AT HEADQUARTERS OR

19  THEIR OFFICE?

20  A    THAT'S THE PROTOCOL WHICH I FOLLOWED, YES.

21  Q    AND ARE YOU AWARE IF ANY OTHER AGENT IN THIS INVESTIGATION

22  UNDER YOUR DIRECTION FOLLOWED A DIFFERENT PROTOCOL?

23           MR. PELHAM:  OBJECTION.  LACKS FOUNDATION.

24           THE COURT:  YOU'RE ASKING --

25           MR. KALOYANIDES:  I'M ASKING IF HE'S AWARE.

```
1              THE COURT:  -- IF HE'S AWARE.

2              OVERRULED.

3              THE WITNESS:  I'M NOT AWARE OF THAT.

4    BY MR. KALOYANIDES:

5    Q    THANK YOU.

6              SO, AT LEAST FOR THE ITEMS THAT WERE GIVEN TO YOU,

7    YOU HAD TO TRANSPORT THEM YOURSELF BACK TO YOUR OFFICE,

8    CORRECT?

9    A    YES.  THAT'S CORRECT.

10   Q    AND THAT'S WHERE YOU WOULD SEAL THEM IN THE ENVELOPE?

11   A    YES.

12   Q    DIRECTING YOUR ATTENTION TO THE FEBRUARY 22ND, 2008

13   OPERATION, AFTER C.S. 2 BROUGHT BACK THE ITEMS, DO YOU RECALL

14   IF C.S. 2 HANDED THEM TO YOU?

15   A    I BELIEVE HE DID, YES.

16   Q    DID YOU GO DIRECTLY FROM THE MEET-UP LOCATION WITH C.S. 2

17   BACK TO YOUR OFFICE?

18   A    DIRECTLY?  I CAN'T SAY I MADE A DIRECT BEELINE BACK TO THE

19   OFFICE.  BUT SHORTLY THEREAFTER, THAT SAME DAY I BELIEVE, IF I

20   RECALL, THE ITEMS WERE PLACED INTO EVIDENCE.

21   Q    SO, IT'S YOUR RECOLLECTION IT WAS THE SAME DAY?

22   A    YES.

23   Q    BUT YOU DON'T KNOW HOW LONG AFTER ACQUIRING THE ITEMS

24   YOURSELF YOU ARRIVED BACK AT THE OFFICE, RIGHT?

25   A    YEAH.  WITHOUT LOOKING AT THE EXACT TIMES.  I MEAN, AGAIN,
```

1   THERE WERE MULTIPLE BUYS.  WE'RE TALKING OVER 50 BUYS.  SO,

2   EXACTLY THE TIME IN WHICH I HAD FOR EACH BUY, RECALLING THAT

3   WITHOUT SEEING DOCUMENTATION MIGHT BE -- YOU KNOW, IT WOULDN'T

4   BE FAIR FOR ME TO SAY.

5   Q    AND IN THESE NUMEROUS BUYS, A LOT OF THINGS WERE GOING ON,

6   RIGHT?

7   A    SURE.

8   Q    AND EACH AGENT HAD A DIFFERENT AREA OF RESPONSIBILITY,

9   CORRECT?

10  A    YEP.

11  Q    AND WE ARE TALKING ABOUT --

12          THE COURT:  YES?

13          THE WITNESS:  I'M SORRY.  YES.

14  BY MR. KALOYANIDES:

15  Q    AND WE ARE TALKING ABOUT FOUR YEARS AGO, CORRECT?

16  A    YES.

17  Q    AND SOMETIMES YOUR MEMORY WILL FADE A BIT.  YES?

18  A    I'M SURE IT WILL.

19  Q    AND IN YOUR TRAINING YOU ARE -- AND IN YOUR EXPERIENCE YOU

20  KNOW THAT WITNESS'S MEMORIES FADE, CORRECT?

21  A    I'M SURE.  YES.

22  Q    THAT'S ONE OF THE REASONS WHY YOU WRITE REPORTS, CORRECT?

23  A    YES.

24  Q    AND YOU'VE RECEIVED TRAINING IN WRITING REPORTS, CORRECT?

25  A    YES.

GER 0164

1   Q    AND THE IDEA IS TO BE ABLE TO REFRESH YOUR RECOLLECTION OF

2   WHAT HAPPENED ON A PARTICULAR DAY AT A PARTICULAR TIME,

3   CORRECT?

4   A    YES.

5   Q    DIRECTING YOUR ATTENTION TO THE OPERATION ON MARCH 18TH,

6   DO YOU RECALL IF YOU WERE THE INDIVIDUAL WHO RECEIVED THE ITEMS

7   PURCHASED?

8   A    ON THE 18TH, I BELIEVE I WAS.

9   Q    AND DO YOU RECALL WHETHER OR NOT YOU TOOK THOSE ITEMS BACK

10  TO YOUR OFFICE THE SAME DAY?

11  A    YEAH, I THINK SO.  YES.

12  Q    AND DO YOU HAVE A RECOLLECTION HOW LONG AFTER RECEIVING

13  THEM YOU ARRIVED AT YOUR OFFICE?

14  A    NOT -- NOT EXACTLY.

15  Q    DIRECTING YOUR ATTENTION TO THE APRIL 22ND, 2008, DO YOU

16  RECALL IF YOU WERE THE AGENT THAT RECEIVED THE ITEMS FROM C.S.

17  2?

18  A    YES.

19  Q    AND DO YOU RECALL IF YOU TOOK THOSE ITEMS BACK TO YOUR

20  OFFICE THAT SAME DAY?

21  A    YES.

22  Q    AND DO YOU HAVE ANY RECOLLECTION HOW LONG AFTER RECEIVING

23  THEM YOU ARRIVED AT YOUR OFFICE?

24  A    I DON'T HAVE THE EXACT TIME, NO.

25  Q    WOULD THAT BE THE SAME ANSWER TO THOSE SAME QUESTIONS FOR

1    EACH OF THE OPERATIONS THAT YOU TESTIFIED ABOUT AS RELATES TO

2    MR. HARDIMAN?

3    A    I'D BE VERY CONSISTENT.

4    Q    AND TO BE CLEAR, YOUR RECOLLECTION WOULD BE THAT FOR THOSE

5    ITEMS THAT YOU RECEIVED FROM C.S. 2 --

6    A    UH-HUM.

7    Q    -- YOU WOULD HAVE TAKEN THEM BACK THE SAME DAY.

8    A    YES.

9    Q    BUT YOU DON'T KNOW HOW LONG AFTER RECEIVING THEM YOU GOT

10   BACK TO THE OFFICE?

11   A    YES.

12   Q    AND IS IT ALSO CORRECT THAT YOU DID NOT RECEIVE THE -- YOU

13   DID NOT RECEIVE THE ITEMS COLLECTED BY C.S. 2 IN EVERY

14   INSTANCE?

15   A    NOT IN EVERY INSTANCE.

16   Q    GOING BACK TO THE FEBRUARY 22ND, 2008 CONTROLLED BUY --

17   A    UH-HUM.

18   Q    -- PRIOR TO C.S. 2 GOING TO MEET UP WITH THE FEMALE

19   INDIVIDUAL, YOU TESTIFIED THAT YOU INSTRUCTED AGENTS TO SEARCH

20   C.S. 2, CORRECT?

21   A    YES.

22   Q    YOU DID NOT YOURSELF SEARCH C.S. 2?

23   A    I DID NOT.

24   Q    YOU DID NOT YOURSELF SEARCH C.S. 2'S VEHICLE?

25   A    NO.

**GER 0166**

1   Q    ON THE MARCH 18TH, 2008 OPERATION, YOU DID NOT SEARCH C.S.

2   2 FOR THAT OPERATION, CORRECT?

3   A    I DON'T BELIEVE SO.

4   Q    YOU DID NOT SEARCH C.S. 2'S VEHICLE FOR THAT OPERATION?

5   A    NO.  AS THE AGENT WHO IS LEADING THE OPERATIONS, YOU KNOW,

6   I HAVE A RESPONSIBILITY TO ASSIGN OTHER AGENTS TO HANDLE THOSE

7   RESPONSIBILITIES.  I -- THERE'S ONLY SO MUCH THAT I COULD DO.

8   THEREFORE, I ASSIGNED AGENTS AND OFFICERS, TASK FORCE OFFICERS,

9   LAPD, TO HANDLE THOSE JOBS.

10  Q    OKAY.

11  A    YOU KNOW, SO I CAN HANDLE OTHER ISSUES.

12  Q    OKAY.  AND GOING BACK TO THE FEBRUARY 22ND, 2008, YOU

13  DIDN'T SEARCH C.S. 2 UPON RETURN?

14  A    I DON'T BELIEVE SO.

15  Q    WOULD THAT BE THE SAME ANSWER FOR THE MARCH 18TH, 2008?

16  A    MOST LIKELY, YES.

17  Q    DO YOU HAVE ANY RECOLLECTION IN ANY OF THE CONTROLLED BUY

18  OPERATIONS INVOLVING MR. HARDIMAN AND C.S. 2, DID YOU -- DO YOU

19  HAVE ANY RECOLLECTION THAT YOU WERE THE PERSON WHO SEARCHED

20  C.S. 2 PRIOR TO THE CONTROLLED BUY?

21  A    I DON'T RECALL THAT I DID.

22  Q    DO YOU HAVE ANY RECOLLECTION IF YOU WERE THE PERSON WHO

23  SEARCHED C.S. 2'S VEHICLE?

24  A    I DON'T RECALL, BUT THAT DOESN'T MEAN I -- MAYBE ON ONE

25  OCCASION I DID.  BUT FOR THE MOST PART, NO.

1    Q    IF YOU DON'T RECALL, THAT'S FINE.  AND JUST LET ME KNOW

2    THAT YOU DON'T RECALL.

3              DO YOU HAVE ANY RECOLLECTION FOR ANY OF THE

4    CONTROLLED BUY OPERATIONS INVOLVING MR. HARDIMAN WHETHER OR NOT

5    YOU SEARCHED C.S. 2 UPON THE MEET-UP AFTER THE TRANSACTION?

6    A    YEAH.  I DON'T BELIEVE I DID.

7    Q    NOW, CORRECT ME IF I'M WRONG, THERE WAS ALSO A CONTROLLED

8    BUY OPERATION INVOLVING C.S. 4 AND MR. HARDIMAN; IS THAT

9    CORRECT?

10   A    THAT IS CORRECT.

11   Q    DID YOU SEARCH C.S. 4 PRIOR TO THAT OPERATION?

12   A    I DON'T BELIEVE I DID.

13   Q    DID YOU SEARCH C.S. 4 UPON RETURN?

14   A    I DON'T BELIEVE SO.

15   Q    THERE WAS ON JUNE 4TH, 2008 AN OPERATION INVOLVING C.S. 8,

16   CORRECT?

17   A    THAT IS CORRECT.

18   Q    AND THAT WAS A -- THE OBJECT OF THAT OPERATION WAS A

19   CONTROLLED BUY, CORRECT?

20   A    YES.

21   Q    AND MR. HARDIMAN WAS ONE OF THE TARGETS IN THAT OPERATION,

22   CORRECT?

23   A    INITIALLY WE WENT TO THE PUEBLO DEL RIO HOUSING PROJECT TO

24   MAKE A BUY I BELIEVE FROM STEVEN PATTERSON AT THAT BUY.  BUT IN

25   THE MEANTIME DURING THAT TIME, DURING THE BUY, THAT C.S. 8

1   HAPPENED TO RUN INTO DEFENDANT HARDIMAN DURING THAT BUY.

2   Q    OKAY.  SO, WAS THERE ANYTHING RECOVERED FROM C.S. 8 AFTER

3   THAT OPERATION?

4   A    YES.

5   Q    DID YOU SEARCH C.S. 8 PRIOR TO THAT OPERATION TAKING

6   PLACE?

7   A    I DON'T BELIEVE SO.

8   Q    DID YOU SEARCH HIM YOURSELF UPON RETURN?

9   A    I DON'T BELIEVE SO.

10  Q    AND YOU TESTIFIED ABOUT A NOVEMBER 21ST, 2008 OPERATION

11  INVOLVING C.S. 6.

12  A    YES.

13  Q    AND PRIOR TO THAT OPERATION, DID YOU SEARCH C.S. 6 BEFORE

14  GOING ON THE CONTROLLED BUY?

15  A    NO.

16  Q    AND UPON C.S. 6'S RETURN DID YOU YOURSELF SEARCH C.S. 6?

17  A    NO.

18  Q    TO THE BEST OF YOUR RECOLLECTION DID YOU PERFORM ANY

19  SEARCH IN ANY CONTROLLED BUY OPERATION INVOLVING C.S. 1?

20  A    I -- I DON'T RECALL SEARCHING DURING THE OPERATIONS, YOU

21  KNOW, C.S. 1.

22  Q    EITHER BEFORE THE OPERATION --

23  A    YEAH.

24  Q    -- OF AFTER?

25  A    NO.  ALTHOUGH THE SEARCHES WERE CONDUCTED.  WHETHER IT'S

1    SOMEONE AT MY BEHALF.  I INSTRUCTED SOMEONE TO SEARCH, ANOTHER

2    AGENT OR A TASK FORCE OFFICER TO SEARCH THE SOURCES.  I MEAN,

3    THE SOURCES -- THE SEARCHES WERE CONDUCTED AGAIN AS --

4            MR. KALOYANIDES:  YOUR HONOR, MOVE TO STRIKE.

5    NON-RESPONSIVE.

6            THE COURT:  MOTION GRANTED.

7    BY MR. KALOYANIDES:

8    Q    DID YOU WITNESS ANY OFFICER SEARCH C.S. 1 PRIOR TO A DRUG

9    BUY OPERATION?

10   A    I'M SURE THEY WERE SEARCHED -- YES, THEY WERE SEARCHED AT

11   A NEARBY WHERE I WAS --

12           MR. KALOYANIDES:  MOVE TO STRIKE.

13           THE WITNESS:  -- YES.

14           MR. KALOYANIDES:  NON-RESPONSIVE.

15           THE COURT:  THE QUESTION IS DID YOU OBSERVE THAT

16   BEING DONE.  THAT'S THE QUESTION.

17           THE WITNESS:  OKAY.  YES.  I MEAN, YEAH, THEY WERE --

18   YES.

19           MR. KALOYANIDES:  THANK YOU.

20   BY MR. KALOYANIDES:

21   Q    NOW, PRIOR TO A DRUG-BUY OPERATION, YOU HAVE AS YOU'VE

22   INDICATED SEVERAL OFFICERS ARE ASSISTING YOU, CORRECT?

23   A    THAT'S CORRECT.

24   Q    AND EACH ONE IS TASKED WITH A DIFFERENT -- SORRY TO BE

25   REDUNDANT BUT A DIFFERENT TASK, RIGHT?

1    A    THAT'S CORRECT.

2    Q    WHAT ARE YOU AS THE CASE AGENT DOING WHILE THE OTHER

3    OFFICERS ARE GETTING THE INFORMANT READY, GENERALLY SPEAKING,

4    WHAT ARE YOUR RESPONSIBILITIES AND DUTIES?

5    A    OVERSEE THE OPERATION AS FAR AS MAKING SURE PEOPLE ARE

6    CONDUCTING THE SEARCHES, ALSO PREPARING THE RECORDING DEVICE,

7    MAKING SURE OF THE MONEY, MAKING SURE A RECEIPT, MAKING SURE

8    THE ITEMS IN WHICH WE USED IN ORDER TO CONDUCT THE CONTROLLED

9    BUY, MAKING SURE THOSE ITEMS ARE IN LINE.

10   Q    SOMETIMES YOU'LL BE THE ONE WHO WILL ATTACH THE RECORDING

11   DEVICE TO THE INFORMANT?

12   A    MOST OF THE TIMES I WAS RESPONSIBLE FOR ATTACHING THE

13   RECORDING DEVICE TO THE COOPERATING SOURCE.

14   Q    ABOUT HOW LONG DOES IT TAKE ONCE YOU MEET UP WITH AN

15   INFORMANT TO GET THEM READY FOR A CONTROLLED BUY?

16        HOW MANY MINUTES DOES IT TAKE TO GET ALL THAT STUFF

17   READY TO GO SO THE INFORMANT CAN GO ON THEIR WAY?

18   A    IT JUST DEPENDS.  SOMETIMES IT COULD TAKE A COUPLE OF

19   MINUTES.  IT DEPENDS IF THE SOURCE IS NOT DRIVING THEIR OWN

20   CAR.  OBVIOUSLY, THERE ARE MINUTES THAT ARE ACCOUNTED FOR.  IF

21   THEY'RE DRIVING THEIR OWN VEHICLE, WELL, THEN, THAT REQUIRES AN

22   EXTRA SEARCH.  THAT COULD TAKE SOME EXTRA MINUTES.

23        IF THE SOURCE IS GOING TO BE MAKING A TELEPHONE CALL

24   PRIOR TO THE OPERATION, THOSE ARE ALL MINUTES THAT ARE INTO

25   ACCOUNT AS FAR AS HOW THE OP GOES AS FAR AS THE PREPLANNING.

GER 0171

1        SO, IT COULD RANGE FROM 10 TO 15 MINUTES TO MAYBE --

2    MAYBE A HALF HOUR IF A PHONE CALL IS PLACED.

3    Q    WELL, LET ME STOP YOU.  I'M TALKING ABOUT JUST THE

4    PREOPERATION PREPARATIONS.

5    A    SURE.

6    Q    SO, LET'S BE REAL SPECIFIC.

7    A    THAT WOULD BE --

8    Q    DO YOU HAVE AN ESTIMATE OF HOW LONG IT TOOK TO GET C.S. 2

9    READY TO GO ON HIS WAY TO CONDUCT A CONTROLLED BUY?

10   A    ARE WE TALKING READY AS FAR AS ALL THE ITEMS AS FAR AS

11   SEARCHING?

12   Q    LET ME CLEAR.  FROM THE MOMENT C.S. 2 MEETS UP WITH YOU TO

13   THE MOMENT C.S. 2 DEPARTS TO GO MEET WITH THE TARGET, DO YOU

14   HAVE AN ESTIMATE HOW LONG THAT TAKES?

15   A    AGAIN, IT COULD BE ANYWHERE FROM 15 MINUTES TO UP TO HALF

16   AN HOUR.  PHONE CALLS ARE MADE.  MAYBE THEY'RE -- WE NEED TO

17   WAIT.  IT'S NOT AN EXACT TIME.

18   Q    ANY -- DO YOU HAVE ANY RECOLLECTION OF IT EVER TAKING

19   LONGER THAN HALF AN HOUR?

20   A    IT MAY HAVE.  AGAIN, IF WE COULDN'T HAVE CONTACTED SOME

21   PEOPLE.  YEAH.

22   Q    SO, THERE MAY BE WAITING TIME AS WELL --

23   A    YEAH, BUT --

24   Q    -- INVOLVED --

25   A    SURE.

1    Q    -- UNTIL YOU'RE SURE THAT THEY CAN GO ON THEIR WAY.

2         THAT'S WHAT YOU'RE SAYING, RIGHT?

3    A    SURE.  COULD BE.

4         (PAUSE IN PROCEEDINGS.)

5    BY MR. KALOYANIDES:

6    Q    AGENT STRICKLAND, DIRECTING YOUR ATTENTION TO WHAT HAS

7    PREVIOUSLY BEEN ENTERED AS GOVERNMENT'S EXHIBIT 105, THIS IS

8    PART OF THE VIDEO -- THE VIDEO THAT C.S. 2 WAS CAPTURING ON

9    FEBRUARY 22ND, 2008, CORRECT?

10   A    YES.

11   Q    NOW, FOR FEBRUARY 22ND, THERE WAS A FULL CAPTURE OF ALL

12   THE EVENTS FROM THE TIME THAT -- TO YOUR RECOLLECTION FROM THE

13   TIME THAT C.S. 2 LEFT TILL THE TIME C.S. 2 CAME BACK, CORRECT?

14   A    THAT IS CORRECT.

15   Q    NOW, THE EXHIBITS THAT WE'VE SEEN IN COURT TODAY ARE ONLY

16   PORTIONS OF THAT, RIGHT?

17   A    YES.

18   Q    THERE ARE -- YOU TESTIFIED THAT YOU DID NOT -- IN

19   REVIEWING THE WHOLE VIDEO, YOU DIDN'T SEE ANY GAPS IN THE WHOLE

20   VIDEO, RIGHT?

21   A    RIGHT.

22   Q    BUT HERE THERE ARE GAPS, RIGHT?  THESE EXHIBITS?

23   A    YEAH, YEAH.  THESE ARE SEGMENTS OF THE -- OF THE ENTIRE

24   OPERATION.

25   Q    SO, THESE ARE PORTIONS -- THE EXHIBITS THAT WE'VE SEEN

174

1    TODAY AND YESTERDAY ARE PORTIONS.

2    A    YES.

3    Q    OKAY.  NOW, C.S. 2 MET UP WITH A FEMALE INDIVIDUAL, RIGHT?

4    A    YES.

5    Q    CALLED HERSELF PATTY, RIGHT?

6    A    THAT'S CORRECT.

7    Q    DID YOU EVER INVESTIGATE PATTY?

8    A    I MEAN, I THINK WE INITIALLY LOOKED AT HER AS FAR AS WHAT

9    HER -- WHAT HER ASSOCIATION WAS.

10   Q    IS THIS INDIVIDUAL IN THE SCREEN PATTY?

11   A    TO THE BEST OF MY KNOWLEDGE IT IS.

12   Q    IN THIS INVESTIGATION DID YOU LEARN IF PATTY WAS A MEMBER

13   OF THE PUEBLO BISHOP BLOODS GANG?

14   A    AS FAR AS HER BEING A MEMBER OR AN ASSOCIATE, SHE'S

15   OBVIOUSLY AN ASSOCIATE.

16   Q    WAS SHE A MEMBER?

17   A    I'M NOT SO SURE SHE WAS A MEMBER.

18   Q    NOW, THIS STILL THAT WE HAVE OF THIS VIDEO, THIS IS AT THE

19   PROJECTS, RIGHT?

20   A    YES.

21   Q    PATTY IS TAKING C.S. 2 FOR A PURCHASE OF SOMETHING, RIGHT?

22   A    THAT IS CORRECT.

23   Q    YOU'VE REVIEWED THIS VIDEO SEVERAL TIMES IN PREPARING FOR

24   YOUR TESTIMONY, CORRECT?

25   A    YES.

**GER 0174**

1    Q    ALL RIGHT.  NOW, IN THIS -- MAYBE NOT THIS SEGMENT, BUT IN

2    THIS FEBRUARY 26TH, OPERATION, PATTY MAKES REFERENCE TO OTHER

3    INDIVIDUALS WHO ARE IN THE APARTMENT, RIGHT?

4    A    THAT WOULD BE FEBRUARY 22ND --

5              THE COURT:  FEBRUARY 22ND --

6              THE WITNESS: -- I BELIEVE.

7              THE COURT:  FEBRUARY 22ND.

8    BY MR. KALOYANIDES:

9    Q    I'M SORRY.  FEBRUARY 22ND.

10   A    YES.

11   Q    SHE REFERS TO A "JIMMY," RIGHT?

12   A    YES.

13   Q    SHE REFERS TO A "KEN"?

14   A    YES.

15   Q    SHE REFERS TO A "MARCIA"?

16   A    YES.

17   Q    AND SHE REFERS TO A "WILLIE"?

18   A    YES.

19   Q    TO YOUR KNOWLEDGE WERE ANY OF THOSE INDIVIDUALS ARRESTED?

20   A    NOT THAT I'M AWARE OF, NO.

21   Q    DID YOU INVESTIGATE ANY OF THESE INDIVIDUALS AS PART OF

22   THIS INVESTIGATION?

23   A    I DON'T BELIEVE SO.

24   Q    TO YOUR KNOWLEDGE BASED ON THIS INVESTIGATION, WERE ANY OF

25   THOSE INDIVIDUALS MEMBERS OF THE PUEBLO BISHOP BLOODS GANG?

1    A    NOT TO MY KNOWLEDGE.

2    Q    AND IT'S THROUGH PATTY AT THIS LOCATION WHERE ALL THESE

3    OTHER INDIVIDUALS ARE THAT C.S. 2 MEETS UP WITH MR. HARDIMAN --

4    A    YES.

5    Q    -- CORRECT?

6         (PAUSE IN PROCEEDINGS.)

7    BY MR. KALOYANIDES:

8    Q    NOW, ON FEBRUARY 22ND, 2008, C.S. 2 MEETS UP WITH PATTY

9    OUTSIDE THE PROJECTS, RIGHT?

10    A    THAT IS CORRECT.

11    Q    AND SHE TAKES THEM INTO -- TAKES HIM INTO THE PROJECTS?

12    A    YES.

13    Q    AND THAT'S WHERE ALL THESE OTHER INDIVIDUALS WERE LOCATED

14    ON THAT DAY?

15    A    YES.  UPON ENTERING THE LOCATION, THAT'S WHERE THEY

16    ENCOUNTERED THE NAMES WHICH SHE PREVIOUSLY -- AS FAR AS THEIR

17    AFFILIATION WITH THE PUEBLO BISHOPS, I CAN'T CONFIRM THEY WERE

18    ACTIVE MEMBERS.

19    Q    YOU DON'T KNOW?

20    A    YEAH.  NO, I DON'T.

21    Q    NOW, THE MARCH 18TH, 2008 OPERATION, C.S. 2 MEETS UP WITH

22    MR. HARDIMAN.

23    A    YES.

24    Q    AND AT WHAT LOCATION DID THAT MEET-UP OCCUR?

25    A    MARCH 18TH?  THAT OCCURRED -- I THINK THEY INITIALLY MET

**GER 0176**

1    AT THE PROJECTS.  AND I BELIEVE THEN THEY WENT OVER TO A

2    RESIDENCE ON THE 18TH.

3    Q    OUTSIDE THE PROJECTS?

4    A    OUTSIDE THE PROJECTS.

5    Q    THE TRANSACTION OCCURS OUTSIDE THE PROJECTS?

6    A    YES.

7              (PAUSE IN PROCEEDINGS.)

8    BY MR. KALOYANIDES:

9    Q    AGENT, DIRECTING YOUR ATTENTION TO GOVERNMENT'S EXHIBIT

10   129, WHICH IS IN EVIDENCE, THIS IS A SEGMENT OF ONE OF THE

11   OPERATIONS WITH C.S. 2 INVOLVING MR. HARDIMAN ON APRIL 18TH,

12   2008, CORRECT?

13   A    YES.

14   Q    THIS LOCATION IS IN THE PROJECTS, RIGHT?

15   A    YES.

16   Q    AND I UNDERSTAND AND APPRECIATE THAT THE VIDEO IS A LITTLE

17   UNCLEAR, BUT DO YOU RECOGNIZE THE INDIVIDUAL, THE FEMALE WHO IS

18   AT THE LOCATION WHEN C.S. 2 ARRIVED?

19   A    THAT'S VERY UNCLEAR.  AND I CAN'T SAY FOR SURE RIGHT NOW

20   THAT IT IS.  NO.

21   Q    IS THIS THE WOMAN WHO REFERRED TO HERSELF AS PATTY?  IF

22   YOU DON'T KNOW, JUST LET ME KNOW THAT.  I UNDERSTAND IT'S

23   BLURRY.

24   A    YEAH.  IT'S VERY -- IT'S BLURRY.

25   Q    OKAY.  DO YOU HAVE ANY RECOLLECTION INVESTIGATING WHO WAS

1    RESIDING AT THIS PARTICULAR RESIDENCE IN THE PROJECT WHERE C.S.

2    2 MET UP WITH MR. HARDIMAN?

3    A    YES, BUT I DON'T RECALL THE NAME OF THE -- WHO WAS THERE.

4    Q    DO YOU RECALL IF THE INDIVIDUAL WHO RESIDED AT THIS

5    LOCATION WAS A MEMBER OF THE PUEBLO BISHOP BLOODS GANG?

6    A    I DON'T RECALL THAT.

7    Q    DO YOU RECALL IF ANY INDIVIDUAL RESIDING AT THAT LOCATION

8    WAS ARRESTED IN THIS CASE?

9    A    I DON'T RECALL IF ANYONE AT THAT LOCATION WAS ARRESTED IN

10   RELATION TO THIS INVESTIGATION.

11              (PAUSE IN PROCEEDINGS.)

12   BY MR. KALOYANIDES:

13   Q    DIRECTING YOUR ATTENTION TO GOVERNMENT'S EXHIBIT 130,

14   WHICH IS ANOTHER SEGMENT FROM THE SAME DAY, A BETTER SHOT OF

15   THE WOMAN, DOES THAT PICTURE HELP YOU IDENTIFY HER ANY BETTER?

16   A    IT'S MORE CLEAR.  I MEAN, IT DOESN'T APPEAR TO BE PATTY.

17   Q    IT'S ANOTHER WOMAN IN YOUR ESTIMATION?

18   A    IT APPEARS TO BE.

19   Q    AND, AGAIN, YOUR ANSWERS WOULD STILL -- NOW THAT YOU HAVE

20   A BETTER PICTURE OF HER, DO YOU RECALL WHETHER OR NOT YOU

21   INVESTIGATED WHO THIS WOMAN IS?

22   A    I DON'T RECALL.  AGAIN, DURING THE INVESTIGATION, JUST TO

23   CLARIFY, WE CAME ACROSS MANY, MANY INDIVIDUALS THAT -- THAT ARE

24   BROUGHT TO OUR ATTENTION.  AND I THINK THERE ARE WELL OVER 60,

25   70, 80 TARGETS OF THE INVESTIGATION.  SO, AS FAR AS, YOU KNOW,

 1   SINGLING OUT THAT INDIVIDUAL, IT'S DIFFICULT FOR ME TO

 2   RECOGNIZE THAT.

 3   Q    I APPRECIATE THAT.  AND, AGAIN, IT WAS FOUR YEARS AGO,

 4   RIGHT?

 5   A    YES.

 6             (PAUSE IN PROCEEDINGS.)

 7   BY MR. KALOYANIDES:

 8   Q    NOW, DIRECTING YOUR ATTENTION TO GOVERNMENT'S EXHIBIT 133,

 9   WHICH IS A SEGMENT OF THE RECORDING OF THE OPERATION ON APRIL

10   22ND, 2008 --

11             THE COURT:  I'M SORRY.  WHICH NUMBER AGAIN?

12             MR. KALOYANIDES:  IT'S EXHIBIT 133, YOUR HONOR.

13   BY MR. KALOYANIDES:

14   Q    DO YOU RECOGNIZE THAT FEMALE?

15   A    YEAH, THAT APPEARS TO BE PATTY.

16   Q    AND TO YOUR RECOLLECTION, THE APRIL 22ND, 2008 OPERATION,

17   C.S. 2 MET UP WITH MR. HARDIMAN AT A LOCATION INSIDE THE

18   PROJECTS, RIGHT?

19   A    I BELIEVE SO, YES.

20             (PAUSE IN PROCEEDINGS.)

21   BY MR. KALOYANIDES:

22   Q    NOW, DIRECTING YOUR ATTENTION TO GOVERNMENT'S EXHIBIT 142

23   RELATING TO THE MAY 15TH, 2008 OPERATION, THIS IS AGAIN A

24   SEGMENT OF THE VIDEO -- WELL, THIS IS A STILL OF THE SEGMENT OF

25   THE --

**GER 0179**

1    A    SURE.

2    Q    -- VIDEO OF THAT OPERATION FROM C.S. 2, CORRECT?

3    A    UH-HUM.

4    Q    AND ALTHOUGH IT DOESN'T APPEAR CLEARLY ON THE STILL THAT I

5    HAVE, THERE -- YOU WERE ABLE TO RECOGNIZE WHICH UNIT IN THE

6    PROJECTS THIS WAS, RIGHT?

7    A    IT APPEARS TO BE 5246.

8    Q    OKAY.  AND THAT IS IN THE PROJECTS, RIGHT?

9    A    YES.

10   Q    DO YOU KNOW OR DID YOU LEARN WHO RESIDED AT THAT UNIT?

11   A    I'M SURE -- DURING THE INVESTIGATION I'M SURE WE DID.

12   Q    DO YOU RECALL AS YOU SIT HERE TODAY?

13   A    YEAH, AS FAR AS THE NAME OF WHO ACTUALLY WAS IN THERE, I

14   BELIEVE MARCIA WAS IN THERE.  BUT AS FAR AS, YOU KNOW, I DON'T

15   HAVE THE -- YOU KNOW, THAT NAME -- TO MEMORY.  BUT I DO KNOW

16   THAT WAS THE LOCATION WHICH WE WOULD MEET DEFENDANT HARDIMAN.

17   AND I KNOW DURING -- IN THE PROJECTS THERE WERE LOCATIONS IN

18   WHICH PUEBLO BISHOPS WOULD MEET AT TO --

19   Q    NO.  THIS -- WELL, LET ME STOP YOU.

20   A    SURE.

21   Q    SO, THIS LOCATION, C.S. 2 MEETS UP WITH MR. HARDIMAN.

22   A    YES.

23   Q    BUT TO YOUR KNOWLEDGE THIS WAS NOT MR. HARDIMAN'S

24   RESIDENCE, RIGHT?

25   A    I DON'T BELIEVE SO, NO.

1  Q    THIS -- SOMEBODY BY THE NAME OF MARCIA WAS THERE, RIGHT?

2  A    I BELIEVE THAT'S WHEN MARCIA WAS AT THE LOCATIONS ON

3  OCCASIONS.

4  Q    AND JUST TO BE CLEAR, FROM YOUR INVESTIGATION TO THE BEST

5  OF YOUR RECOLLECTION, MARCIA WAS NOT A MEMBER OF THE PUEBLO

6  BISHOP BLOODS GANG, RIGHT?

7          MR. PELHAM:  OBJECTION.  CALLS FOR SPECULATION.

8  BY MR. KALOYANIDES:

9  Q    TO YOUR KNOWLEDGE.

10         THE COURT:  OVERRULED.

11         IF HE KNOWS, HE CAN ANSWER.

12         THE WITNESS:  AGAIN, TO MY KNOWLEDGE, MARCIA -- I'M

13 NOT SURE IF SHE WAS A --

14 BY MR. KALOYANIDES:

15 Q    THAT'S --

16 A    -- MEMBER.

17 Q    THAT'S FINE.  THANK YOU.

18         (PAUSE IN PROCEEDINGS.)

19 BY MR. KALOYANIDES:

20 Q    NOW, AGENT STRICKLAND, ON DIRECT YOU TALKED ABOUT YOUR

21 EXPERIENCE IN DRUG INVESTIGATIONS, LEARNING DIFFERENT KINDS OF

22 TERMS AND PHRASES THAT YOU'VE COME ACROSS WHILE INVESTIGATING

23 DRUG TRAFFICKING, RIGHT?

24 A    THAT'S CORRECT.

25 Q    YOU TESTIFIED THAT YOUR UNDERSTANDING TO THE TERM "FRONT"

1   --

2   A    YES.

3   Q    -- IN THE CONTEXT OF A DRUG TRANSACTION, RIGHT?

4   A    YES.

5   Q    IT'S BASICALLY WHEN SOMEBODY WILL ALLOW ANOTHER INDIVIDUAL

6   TO BUY THE DRUGS SORT OF ON CREDIT WHERE THEY DON'T HAVE TO PAY

7   RIGHT UP FRONT, RIGHT?

8   A    HENCE THE NAME FRONT.

9   Q    NOW, YOU ALSO TESTIFIED THAT THE TERM "BLOW" REFERRED TO

10  COCAINE IN YOUR EXPERIENCE, RIGHT?

11  A    YEAH.  I'VE HEARD THAT TERM, YES, AS BLOW.

12  Q    IT REFERS TO POWDER COCAINE --

13  A    COCAINE --

14  Q    -- RIGHT?

15  A    GENERALLY.  MY UNDERSTANDING.

16  Q    OKAY.  AND THAT'S ALL I'M ASKING IS YOUR UNDERSTANDING

17  FROM YOUR TRAINING AND EXPERIENCE WITH THE FBI AS A DRUG

18  INVESTIGATOR.

19  A    YES.

20  Q    OKAY.

21       NOW, YOU ALSO TESTIFIED THAT THE TERM "4 AND A HALF"

22  -- YOU REMEMBER TESTIFYING ABOUT THAT TERM --

23  A    YES.

24  Q    -- 4 AND A HALF.  AND YOU TESTIFIED THAT REFERRED TO 4 AND

25  A HALF OUNCES, RIGHT?

**GER 0182**

1  A    YEAH.  TO MY KNOWLEDGE IT'S 4 AND A HALF -- FROM WHAT I'VE

2  LEARNED DURING INVESTIGATIONS, 4 AND A HALF -- IT WOULD BE 4

3  AND A HALF OUNCES.

4  Q    IT CAN ALSO BE 4 AND A HALF GRAMS, RIGHT?

5  A    IT COULD BE 4 AND A HALF GRAMS.  IT COULD BE --

6  Q    IT'S A NUMBER --

7  A    -- 4 AND A HALF KILOS.

8  Q    RIGHT.  IT'S GENERALLY A WEIGHT NUMBER, RIGHT?

9  A    YES.

10  Q    IN DRUG TRAFFICKING, RIGHT?

11  A    YES.

12  Q    BUT THE WEIGHT DENOMINATION MAY BE AT ISSUE DEPENDING ON

13  THE CONTEXT OF THE CONVERSATION, RIGHT?

14  A    IT COULD BE.  BUT GENERALLY MY UNDERSTANDING, AND WHAT

15  I'VE LEARNED DURING THE INVESTIGATION, 4 AND A HALF I

16  UNDERSTAND IS 4 AND A HALF OUNCES.

17  Q    SO, THAT'S YOUR INTERPRETATION, RIGHT?

18  A    THAT WOULD BE MY INTERPRETATION.

19  Q    IN YOUR INVESTIGATION IN THIS CASE HAVE YOU EVER COME

20  ACROSS THE TERM "CRAB"?

21  A    YES.

22  Q    AND WHAT DOES THAT REFER TO?

23  A    "CRABS" TERM -- IT WOULD BE A DEROGATORY TERM THAT IS USED

24  BY THE PUEBLO -- MEMBERS OF THE PUEBLO BISHOP TO IDENTIFY A

25  CRIP.  AND --

**GER 0183**

1   Q    WHAT --

2   A    AND A "CRIP" IS A -- ANOTHER AFRICAN-AMERICAN GANG.

3   Q    AND --

4   A    AND GIVEN THAT THE PUEBLO BISHOPS ARE BLOODS, THEY WOULD

5   TEND TO SAY DEROGATORY THINGS ABOUT CRIPS, I.E., CALL THEM

6   CRABS.  THAT WOULD BE A DEROGATORY TERM.

7   Q    IN YOUR EXPERIENCE AND INVESTIGATION AND TRAINING IN THE

8   AREA OF GANG ACTIVITY, DO YOU HAVE ANY KNOWLEDGE ABOUT ANY

9   CONFLICTS BETWEEN BLOOD GANGS AND CRIP GANGS?

10  A    SURE.  BLOODS AND CRIPS, YES.

11  Q    THEY DON'T GET ALONG, DO THEY?

12  A    GENERALLY NOT.

13  Q    AND SOMETIMES THEY'VE ACTED VIOLENTLY TOWARDS EACH OTHER,

14  RIGHT?

15  A    YES.

16  Q    NOW, IN YOUR EXPERIENCE AND TRAINING IN AND IN

17  INVESTIGATING GANG ACTIVITY IN THE GREATER LOS ANGELES AREA,

18  YOU'VE LEARNED, HAVE YOU NOT, THAT IF A MEMBER OF A BLOOD GANG

19  WERE TO ASSOCIATE WITH A MEMBER OF A CRIP GANG, THAT WAS

20  SEVERELY FROWNED UPON BY THE MEMBER OF -- THE OTHER BLOOD

21  MEMBERS, RIGHT?

22  A    I MEAN, IT'S -- I THINK IT'S -- I DON'T THINK YOU CAN SAY

23  THAT FOR ALL CASES.  MAYBE -- THAT MAY BE AN

24  OVERGENERALIZATION.  JUST SAY THAT, YOU KNOW, SOME BLOOD

25  COULDN'T HAVE A CRIP FRIEND.  I MEAN, THAT MIGHT BE AN

1  OVERGENERALIZATION.

2  Q    BUT GENERALLY SPEAKING, IN YOUR EXPERIENCE, CRIPS AND

3  BLOODS DO NOT COMMINGLE, RIGHT?

4        MR. PELHAM:  OBJECTION.  MISSTATES THE PRIOR

5  TESTIMONY.

6        THE COURT:  HE'S ASKING A QUESTION.

7        OVERRULED.

8        THE WITNESS:  GENERALLY?

9  BY MR. KALOYANIDES:

10 Q    GENERALLY.

11 A    AS FAR AS BLOODS AND CRIPS, I MEAN, FROM MY EXPERIENCE,

12 BLOODS TEND TO HANG OUT -- HANG WITH BLOODS.  AND CRIPS TEND TO

13 HANG -- TEND TO HANG OUT WITH CRIPS.  HOWEVER, TO SAY THAT

14 BLOODS AND CRIPS CAN'T HANG OUT TOGETHER, THAT WOULD BE AN

15 OVERGENERALIZATION.

16 Q    THERE ARE A LOT OF CRIP MEMBERS, RIGHT, IN LOS ANGELES?

17 A    I'M SURE.  YES, THERE ARE.

18 Q    AND THERE ARE A LOT OF BLOOD MEMBERS IN LOS ANGELES?

19 A    YES.

20 Q    OKAY.  SO, WE DON'T KNOW ABOUT EVERY SINGLE INDIVIDUAL.

21 BUT I'M JUST ASKING FOR IN YOUR EXPERIENCE, GENERALLY SPEAKING,

22 THE GANGS KEEP TO THEMSELVES.

23 A    YEAH, GENERALLY.  IN GENERAL TERMS, YES.

24 Q    AND SOMETIMES THEY'RE HOSTILE TOWARDS EACH OTHER, RIGHT?

25 A    YES.

**GER 0185**

1  Q    AND IN YOUR EXPERIENCE YOU HAVE ENCOUNTERED TIMES WHERE A

2  MEMBER OF ONE GANG WOULD BE PUNISHED BY THE GANG FOR

3  ASSOCIATING WITH A MEMBER OF THE OTHER GANG.  YOU HAVE

4  EXPERIENCED THAT, RIGHT?

5  A    I HAVE EXPERIENCED THAT, HAVE SEEN IT ACTUALLY IN PLACE OR

6  HAVE HEARD ABOUT --

7  Q    HAVE YOU LEARNED THAT?

8  A    I'VE LEARNED THAT, YEAH, THERE COULD BE REPERCUSSIONS IF

9  -- THAT WOULD TAKE PLACE.

10  Q    NOW, ON DIRECT YOU ALSO TESTIFIED ABOUT AN OPERATION ON

11  DECEMBER 19TH, 2008.  THERE WERE SEVERAL DAYS INVOLVED IN THIS

12  OPERATION.  BUT SPECIFICALLY ON DECEMBER 19TH, 2008, C.S. 2 WAS

13  SUPPOSED TO CONTACT MR. HARDIMAN TO MAKE A PURCHASE, RIGHT?

14  A    YES.

15  Q    AND I BELIEVE YOU TESTIFIED THAT C.S. 2 WAS SUPPOSED TO

16  TRY TO GET SOME DRUGS AND A FIREARM FROM MR. HARDIMAN; IS THAT

17  RIGHT?

18  A    THAT IS CORRECT.

19  Q    NOW, THE LOCATION WHERE C.S. 2 WOUND UP MEETING MR.

20  HARDIMAN WAS WHERE?

21  A    I BELIEVE IT WAS AT 1537 EAST 53RD STREET IN LOS ANGELES.

22  AND THAT IS A LOCATION KNOWN THAT WE LEARNED DURING THE

23  INVESTIGATION THAT MR. HARDIMAN EITHER RESIDED -- LAID HIS HEAD

24  SOMETIMES.  I BELIEVE HIS RELATIVE -- HIS FAMILY LIVED THERE.

25  AND THAT WAS A FAMILY HOUSE OF MR. HARDIMAN.

1    Q    OUTSIDE THE PROJECTS?

2    A    IT WAS WITHIN -- IT WAS ON THE OTHER SIDE -- IT WAS --

3    Q    LET ME BE CLEAR, AGENT --

4    A    ON THE EAST SIDE -- IT WAS ON --

5    Q    WAS IT IN THE PROJECTS --

6    A    IT WAS ON THE WEST SIDE OF THE PROJECTS --

7    Q    -- OR WAS IT OUTSIDE THE --

8    A    NO.  IT WAS A SINGLE-FAMILY RESIDENCE OUTSIDE THE

9    PROJECTS.

10   Q    THANK YOU.

11   A    IT WAS IN THE VICINITY OF THE PROJECTS.

12   Q    BUT IT WAS OUTSIDE THE PROJECTS, RIGHT?

13   A    YES.

14   Q    THANK YOU.

15        NOW, DIRECTING YOUR ATTENTION TO SEPTEMBER 14TH,

16   2010, THAT'S THE DAY YOU TESTIFIED THAT MR. HARDIMAN WAS

17   ARRESTED, RIGHT?

18   A    YES.

19   Q    YOU WERE PRESENT, RIGHT?

20   A    YES.

21   Q    TASK FORCE OFFICER, LAPD OFFICER MARK BROOKS WAS ALSO

22   PRESENT, RIGHT?

23   A    YES.

24   Q    NOW, YOU TESTIFIED THAT YOU FOUND MR. HARDIMAN WITH VERY

25   LITTLE, IF ANY CLOTHES, ON THAT DAY, RIGHT?

1   A    YEAH.  I REMEMBER HIM BEING SCANTILY CLAD IF CLAD AT ALL.

2   Q    I WANT TO BE CLEAR.  DO YOU REMEMBER WHAT TIME YOU

3   ACTUALLY CAME TO THE LOCATION?

4   A    I DON'T REMEMBER AN EXACT TIME.  NO.

5   Q    IS THERE ANYTHING THAT MIGHT REFRESH YOUR RECOLLECTION AS

6   TO THE TIME THAT YOU ARRIVED AT THE LOCATION TO ARREST MR.

7   HARDIMAN?

8   A    POTENTIALLY AN ARREST REPORT.

9   Q    WELL, I HAVE A DOCUMENT.  WOULD YOU BE WILLING TO LOOK AT

10  IT AND SEE IF IT REFRESHES YOUR RECOLLECTION.

11  A    SURE.

12          (PAUSE IN PROCEEDINGS.)

13  BY MR. KALOYANIDES:

14  Q    SO, AGENT STRICKLAND, THE COURTROOM DEPUTY IS GOING TO

15  HAND YOU A DOCUMENT.  LOOK AT IT TO YOURSELF, PLEASE.  DO NOT

16  READ IT OUTLOUD.

17          AND PARTICULARLY I WANT YOU TO LOOK AT PARAGRAPH 8,

18  BUT FEEL FREE TO LOOK AT THE WHOLE THING.  AND I'LL ASK YOU A

19  QUESTION WHEN YOU'VE REVIEWED THAT.

20          (PAUSE IN PROCEEDINGS.)

21          THE WITNESS:  YES.

22  BY MR. KALOYANIDES:

23  Q    AGENT STRICKLAND, HAVING REVIEWED THAT DOCUMENT,

24  PARTICULARLY PARAGRAPH 8, IS YOUR MEMORY REFRESHED AS TO WHAT

25  TIME YOU ARRIVED AT THE LOCATION TO ARREST MR. HARDIMAN?

GER 0188

1    A    REFERS TO ABOUT APPROXIMATELY 8:00 -- OR, I'M SORRY, 9:00

2    A.M.

3    Q    9:00 A.M.  THANK YOU.

4         AND IF YOU COULD REFRESH MY RECOLLECTION, WHERE WAS

5    THE LOCATION THAT YOU FOUND MR. HARDIMAN?

6    A    IT WAS ON VERNON.

7    Q    AND THAT IS NOT IN THE PROJECTS, RIGHT?

8    A    THAT IS NOT.

9    Q    NOW, YOU ARRESTED MR. HARDIMAN.  AND YOU TOOK HIM WHERE?

10   A    HE WAS TAKEN TO HIS INITIAL APPEARANCE, I BELIEVE.  I

11   MEAN, HE WENT TO HIS INITIAL APPEARANCE.

12   Q    HE WAS IN SOME KIND OF HOLDING CELL AT SOME TIME PRIOR TO

13   THAT, THOUGH, RIGHT?  RIGHT?

14        (PAUSE IN PROCEEDINGS.)

15   BY MR. KALOYANIDES:

16   Q    WELL, LET ME STRIKE THAT.  LET ME ASK A DIFFERENT

17   QUESTION.

18        YOU AND OFFICER -- YOU AND LAPD OFFICER -- TASK FORCE

19   OFFICER BROOKS BOTH TOOK MR. HARDIMAN TO A LOCATION WHERE

20   EVENTUALLY HE WOULD GO BEFORE A JUDGE, RIGHT?

21   A    YES, EVENTUALLY, YES.

22   Q    AND YOU AND OFFICER BROOKS ENGAGED IN A CONVERSATION WITH

23   MR. HARDIMAN, RIGHT?

24   A    I'M SURE WE SPOKE TO HIM AT SOME POINT DURING THE RIDE TO

25   THE -- HIS INITIAL APPEARANCE.

1  Q    AND AT SOME TIME YOU TOLD HIM THAT YOU WERE AWARE THAT HIS

2  LIFE WAS IN DANGER FROM THE PUEBLO BISHOP BLOODS GANG, DIDN'T

3  YOU?

4         MR. PELHAM:  OBJECTION.  CALLS FOR HEARSAY.

5         MR. KALOYANIDES:  I'M ASKING WHAT OFFICER OR AGENT

6  STRICKLAND SAID HIMSELF.

7         THE WITNESS:  WHAT I -- YOU'RE SAYING THAT THAT'S

8  WHAT I SAID?

9  BY MR. KALOYANIDES:

10  Q    I'M ASKING.  DID YOU NOT TELL HIM THAT?

11  A    DID I TELL HIM THAT?  I DON'T BELIEVE SO, NO.

12  Q    DID YOU TELL HIM THAT YOU WERE AWARE THAT HE WAS IN

13  SERIOUS TROUBLE WITH THE PUEBLO BISHOP BLOODS GANG?

14  A    I DON'T RECALL THAT.

15  Q    DID YOU TELL HIM THAT YOU KNEW HE WAS ON THE OUTS WITH THE

16  GANG BECAUSE HE WAS NOT PARTICIPATING IN GANG ACTIVITY?

17  A    I -- I DON'T RECALL THAT.

18         MR. KALOYANIDES:  NOTHING FURTHER, YOUR HONOR.

19         THE COURT:  AGAIN, THE JURY IS NOT TO ACCEPT ANY

20  INSINUATIONS SUGGESTED IN ANY OF THOSE QUESTIONS.

21         MR. KALOYANIDES:  THANK YOU, YOUR HONOR.

22         THE COURT:  THANK YOU.

23         MR. CREARY.

24         MR. CREARY:  NO QUESTIONS, YOUR HONOR.

25         THE COURT:  OKAY.

1          WELL, THEN, MR. PELHAM, HOW MUCH REDIRECT DO YOU

2     HAVE?

3          MR. PELHAM:  I HAVE ABOUT 15 TO 20 MINUTES, YOUR

4     HONOR.

5          THE COURT:  WE'LL STOP AT 4:15.

6          MR. PELHAM:  THANK YOU, YOUR HONOR.

7                    REDIRECT EXAMINATION

8     BY MR. PELHAM:

9     Q    NOW, AGENT STRICKLAND, YOU TALKED A BIT ABOUT THE NUMBER

10    OF INDIVIDUALS WHO WERE INVOLVED IN EACH OF THE CONTROLLED DRUG

11    PURCHASE OPERATIONS.

12          FOR THE AVERAGE OPERATION THAT YOU DIRECTED OR

13    OVERSAW, ABOUT HOW MANY OTHER TASK FORCE OFFICERS OR AGENTS

14    WOULD BE INVOLVED?

15    A    ON GENERAL TERMS APPROXIMATELY EIGHT.

16    Q    AND AS THE -- AS THE SUPERVISOR OF THOSE INDIVIDUALS,

17    WOULD YOU ASSIGN EACH OF THOSE OTHER INVESTIGATORS TO SEPARATE

18    TASKS?

19    A    YES.

20    Q    AND WHAT WAS THE PURPOSE FOR ASSIGNING EACH OF THOSE

21    INDIVIDUALS A SEPARATE TASK DURING THE COURSE OF A CONTROLLED

22    BUY OPERATION?

23    A    WELL, THE PURPOSE FOR ASSIGNING INDIVIDUALS TO A SEPARATE

24    TASK WOULD BE TO, YOU KNOW, SPREAD OUT THE JOBS SO I CAN HANDLE

25    -- SO EACH ONE WOULD HAVE A SPECIALIZED JOB SO THEY FOCUS IN

**GER 0191**

1  ON WHAT THEY WERE DOING IN ORDER TO ACCOMPLISH THE TASK.

2  Q    SO, IS THERE A REASON WHY YOU WOULD NOT BE INVOLVED IN THE

3  SEARCH OF A CONFIDENTIAL SOURCE -- OF EVERY CONFIDENTIAL SOURCE

4  BEFORE AND AFTER EACH OF THE CONTROLLED DRUG-BUY OPERATIONS

5  UTILIZED IN THIS CASE?

6  A    IN NO SPECIFIC REASON.  THERE WAS NO -- NO -- NO ONE HAD A

7  SET ROLE.  HOWEVER, GIVEN THAT I WAS MANAGING OR AT LEAST

8  OVERSEEING MOST OF THE OPERATIONS, I WAS IN A POSITION TO

9  OVERSEE OR AT LEAST ORGANIZE THE PIECES TO INCLUDE THE -- YOU

10  KNOW, THE BUY MONEY, THE RECORDER, AND THE KIND OF -- THE NUTS

11  AND BOLTS OF THE ACTUAL OPERATION AND WHAT YOU NEEDED TO

12  PROVIDE TO THE SOURCE.

13  Q    NOW, YOU ALSO TALKED A BIT ABOUT SOURCES BEING PAID FOR

14  THEIR WORK.

15  A    SURE.

16  Q    WHAT ARE THE REASONS GENERALLY THAT THE FBI WOULD PAY

17  CIVILIAN CONFIDENTIAL SOURCES FOR THEIR WORK FOR THE FBI?

18  A    OF COURSE -- CAN YOU -- I'M SORRY.

19  Q    WHAT ARE THE REASONS -- WHAT ARE THE REASONS FOR THE FBI

20  MAKING PAYMENTS TO CIVILIAN CONFIDENTIAL SOURCES FOR THEIR WORK

21  ON BEHALF OF THE BUREAU?

22  A    SOURCES ARE PAID FOR, YOU KNOW, SERVICES WHICH THEY

23  PROVIDED.  AND YOU HAVE TO REALIZE, WE'RE SENDING IN SOURCES --

24  INDIVIDUALS WHO HAVE AGREED TO COOPERATE, AGREED TO GO INTO A

25  VERY DANGEROUS SITUATION, SEND THEM INTO A PROJECT, A HOUSING

1    PROJECT THAT IS KNOWN TO BE VIOLENT.  MURDERS HAVE TAKEN PLACE

2    THERE.

3              SO, WE'RE ASKING PEOPLE TO BASICALLY RISK THEIR LIFE

4    TO GO IN TO MAKE A BUY FROM PUEBLO BISHOP GANG MEMBERS IN THIS

5    CASE.  THEREFORE, IT IS A HIGH-RISK OPERATION.  THEREFORE, THEY

6    WERE COMPENSATED FOR ANY OF THE ACTIVITIES WHICH THEY -- THEY

7    UNDERTOOK.

8    Q    AND ARE THERE SITUATIONS IN WHICH SOURCES ARE REQUIRED TO

9    DEVOTE MOST OF THE -- MOST OF THE WORKING DAY -- MOST OF THE

10   DAYLIGHT HOURS TO THE -- TO THEIR OPERATIONAL WORK ON BEHALF OF

11   THE BUREAU?

12   A    I MEAN, THERE WAS -- YOU KNOW, THE MORE INTEL- -- I MEAN,

13   SOURCES, IF THEY'RE IN A POSITION TO GET INFORMATION, THEN,

14   THEY NEED TO BE AVAILABLE TO US TO GO OUT AND SOLICIT THAT

15   INFORMATION.  AND THAT MEANS HANGING OUT, BEING IN THE

16   NEIGHBORHOOD.  AND, THEREFORE, THEIR TIME IS, YOU KNOW, A LOT

17   OF TIMES WOULD BE USED TO DO THAT.

18   Q    AND CAN THERE BE OCCASIONS IN WHICH A SOURCE HAS WORKED

19   FOR THE FBI, ENCOMPASSES TOO MUCH TIME TO GIVE THE SOURCE THE

20   OPPORTUNITY TO HOLD DOWN A FULL-TIME JOB OR REGULAR EMPLOYMENT

21   DURING THE SAME PERIOD IN WHICH THEY ARE WORKING FOR THE FBI?

22              MR. CREARY:  LEADING, YOUR HONOR --

23              MR. MC CURRY:  OBJECTION.  SPECULATIVE.  FOUNDATION.

24   RELEVANCY.

25              THE COURT:  AND LEADING.  SUSTAINED.

BY MR. PELHAM:

Q    WERE THERE SOURCES IN THIS INVESTIGATION, AGENT

STRICKLAND, THAT YOU TERMINATED THE BUREAU'S RELATIONSHIP WITH?

A    YES.

Q    ABOUT HOW MANY SUCH SOURCES WERE THERE?

          MR. KALOYANIDES:  OBJECTION.  RELEVANCE.

          THE COURT:  OVERRULED.

          THE WITNESS:  WELL, THE NUMBER OF SOURCES THAT WERE

TERMINATED, I DON'T HAVE A NUMBER OFF THE HEAD -- OFF THE TOP

OF MY HEAD, BUT I DO KNOW WE TERMINATED SOURCES DURING THE

INVESTIGATION.

BY MR. PELHAM:

Q    AND WHAT WERE THE REASONS FOR THOSE TERMINATIONS?

A    ONE TERMINATION DURING A POST-OPERATION SEARCH, NARCOTICS

WERE IDENTIFIED OR WERE RECOVERED DURING THAT SEARCH.

THEREFORE, THAT SOURCE WAS SUBSEQUENTLY TERMINATED.

          AND, AGAIN, AS FAR AS SOURCES USING DRUGS, SELLING

DRUGS, AGAIN, YOU KNOW, WE LOOKED AT THAT.  AND IN THIS CASE

THAT INDIVIDUAL WAS TERMINATED.

Q    WERE -- WOULD A SOURCE'S USE OF NARCOTICS IN THE COURSE OF

A CONTROLLED DRUG BUY OR CONTROLLED DRUG PURCHASE OPERATION

ALWAYS REQUIRE THE FBI TO TERMINATE?

A    NO.

Q    AND WHAT -- IN WHAT INSTANCES WOULD A CONFIDENTIAL

SOURCE'S USE OF NARCOTICS DURING THE COURSE OF A CONTROLLED

1    DRUG-BUY OPERATION NOT THEN REQUIRE TERMINATION OF THE SOURCE?

2    A    FOR AN EXAMPLE, IF A SOURCE UTILIZED MARIJUANA, IF A

3    SOURCE WAS WITH AN INDIVIDUAL ATTEMPTING TO MAKE A BUY, IF THE

4    PERSON WHICH THEY WERE BUYING NARCOTICS FROM, IF THEY OFFERED

5    THE SOURCE A HIT OFF OF THE MARIJUANA JOINT, THEN, THE SOURCE

6    IF THEY TOOK A HIT OFF, YOU KNOW, TO MAINTAIN THE CREDIBILITY,

7    IT MAY LOOK DIFFERENT -- IT MAY LOOK FUNNY IF THEY DIDN'T.

8    Q    WOULD THE SOURCE BE REQUIRED TO --

9         MR. KALOYANIDES:  OBJECTION.  LACKS FOUNDATION.

10   SPECULATION.  MOVE TO STRIKE.

11        THE COURT:  THE OBJECTION WOULD BE OVERRULED.

12        THE RESPONSE STANDS.

13   BY MR. PELHAM:

14   Q    WOULD THE -- WOULD THE SOURCE BE REQUIRED TO REPORT SUCH

15   CONDUCT TO THE HANDLING AGENT IF THAT WERE TO OCCUR.

16   A    YEAH.  THAT'S -- YES.

17   Q    NOW, YOU ALSO TALKED A BIT ABOUT SOME OF THE OTHER

18   INDIVIDUALS WHO -- SOME OF THE INDIVIDUALS WHO APPEAR IN THE

19   CONTROLLED DRUG-BUY OPERATIONAL VIDEOS.

20        HOW DID -- AS THE CASE AGENT, AGENT STRICKLAND, DID

21   YOU MAKE EFFORTS TO INVESTIGATE THE VARIOUS INDIVIDUALS WHO

22   APPEARED IN THE COURSE OF RECORDINGS MADE BY YOUR CONFIDENTIAL

23   SOURCES?

24   A    SURE.  IF DURING THE RECORDINGS OR IN THE REVIEW OF THE

25   RECORDINGS, WE MAKE EVERY EFFORT TO IDENTIFY WHO IS ON THE

1  VIDEO TO DETERMINE IF THEY ARE OR SHOULD BE INCLUDED AS A

2  TARGET IN THE INVESTIGATION.

3  Q    AND GENERALLY, HOW DID YOU AS THE CASE AGENT DETERMINE THE

4  FOCUS OF THE INVESTIGATION ONCE YOU IDENTIFIED SPECIFIC

5  INDIVIDUALS WHO APPEARED IN THOSE VIDEOS?

6  A    IDENTIFICATION.  AFTER WE IDENTIFIED SOMEONE WHO MIGHT BE

7  OR WHO IS IN THE VIDEO, THEN, WE WOULD DISCUSS -- WE WOULD TALK

8  WITH OUR LAW ENFORCEMENT PARTNERS.

9        WE WOULD TALK WITH THE SOURCE IF WE WERE TRYING TO

10  IDENTIFY AS MUCH INFORMATION ABOUT THAT INDIVIDUAL TO DETERMINE

11  THEIR CULPABILITY WITHIN THE GANG, THEIR ASSOCIATION WITH THE

12  GANG, WHERE THEY STOOD IN THE GANG.  AND, IN FACT, YOU KNOW,

13  WHAT STANDING THEY HAVE IN THE GANG.  SO, YES, WE WOULD.

14  Q    NOW, IN CERTAIN SITUATIONS -- EXCUSE ME.  LET ME WITHDRAW

15  THAT.

16        AS TO CONFIDENTIAL SOURCES, WERE THERE CERTAIN

17  EXPENSES THAT THE FBI WOULD PAY IN ORDER FOR -- IN ORDER TO

18  ALLOW THE SOURCES TO MAINTAIN CERTAIN -- CERTAIN EQUIPMENT SUCH

19  AS PHONES OR VEHICLES?

20  A    SURE.

21        MR. KALOYANIDES:  OBJECTION.  LEADING.

22        THE COURT:  OVERRULE.  FOUNDATIONAL.

23        THE WITNESS:  YES.  IN ORDER TO MAINTAIN CONTACT WITH

24  THE SOURCE, IT WAS -- I WOULD PROVIDE -- THE GOVERNMENT WOULD

25  PROVIDE A PHONE AND MINUTES IN ORDER FOR ME TO MYSELF OR OTHER

1    AGENTS WHO MIGHT BE CO-HANDLING THE AGENTS TO MAINTAIN CONTACT.

2    BY MR. PELHAM:

3    Q    AND WOULD THE FBI MAINTAIN ACCOUNTING OF THOSE EXPENSES

4    PAID FOR THE SOURCE AS PART OF THE TOTAL AMOUNT PAID ON THE

5    SOURCE'S BEHALF?

6    A    YES.

7              MR. PELHAM:  YOUR HONOR, AT THIS TIME THE GOVERNMENT

8    WOULD LIKE THE OPPORTUNITY TO RENEW ITS OFFER OF EVIDENCE IN

9    THIS CASE.  SO, IF WE COULD OPEN UP THE SCOPE OF REDIRECT FOR

10   THAT PURPOSE, PLEASE.

11             THE COURT:  ANY OBJECTION?

12             MR. KALOYANIDES:  MAY I HAVE A MOMENT TO CONFER WITH

13   GOVERNMENT COUNSEL, YOUR HONOR.

14             THE COURT:  YES.

15             (COUNSEL CONFERRING.)

16             THE COURT:  ARE YOU REFERRING TO EXHIBIT 350 --

17             MR. PELHAM:  YES.

18             THE COURT:  -- AD SEC?

19             MR. PELHAM:  YES.

20             THE COURT:  GO AHEAD.  PLEASE CONFER.

21             (COUNSEL CONFERRING.)

22   BY MR. PELHAM:

23   Q    AGENT STRICKLAND, GOING BACK TO EXHIBITS 350 THROUGH 401,

24   HAVE YOU REVIEWED THE ITEMS THAT THE GOVERNMENT HAS IDENTIFIED

25   AS EXHIBITS 350 TO 401,

1   A    YES.

2   Q    AND WHAT ARE THOSE ITEMS WITHOUT PROVIDING A SPECIFIC

3   DESCRIPTION.

4   A    350 TO 401 ARE THE TITLE 3 RECORDINGS FROM THE WIRETAP.

5   Q    AND HAVE YOU LISTENED TO EACH OF THOSE EXHIBITS?

6   A    YES, I HAVE.

7   Q    AND HAVE YOU COMPARED THOSE RECORDINGS OR DO YOU RECOGNIZE

8   THOSE RECORDINGS AS COMING FROM THE COPIES OF RECORDINGS THAT

9   WERE GENERATED DURING THE TITLE 3 INTERCEPTION PHASE OF THIS

10  CASE?

11  A    YES.

12  Q    NOW, DURING THE COURSE OF YOUR REVIEW OF THOSE RECORDINGS,

13  350 TO 401, DID YOU RECOGNIZE THE VOICE OF DEFENDANT JERMAINE

14  HARDIMAN?

15  A    YES.

16  Q    AND WHAT WAS THAT RECOGNITION BASED ON?

17  A    BASED ON MY EXPERIENCE DURING THE INVESTIGATION.

18  Q    AND HAVE YOU LISTENED TO JERMAINE HARDIMAN SPEAK IN

19  PERSON?

20  A    YES, I HAVE.

21  Q    HAVE YOU HEARD DEFENDANT GARY WHITE SPEAK IN PERSON

22  OUTSIDE OF THE CONTEXT OF ANY RECORDING?

23  A    YES, I HAVE.

24  Q    AND DID YOU RECOGNIZE HIS VOICE IN NUMEROUS OF THE

25  RECORDINGS THAT THE -- THAT THE GOVERNMENT HAS MARKED AS 350 TO

1    401?

2    A    YEAH.  I RECOGNIZE HIS VOICE.

3    Q    AND, AGAIN, DID YOU RECOGNIZE THE VOICE OF JOSE LEON

4    DURING THE COURSE OF THOSE RECORDINGS?

5    A    YES.

6    Q    WERE THERE OTHER INDIVIDUALS WHOSE VOICES YOU RECOGNIZED

7    BASED ON A FAMILIARITY THAT CAME FROM OUTSIDE THE CONTEXT OF

8    THE RECORDINGS THEMSELVES?

9    A    YES.  LEE HENDERSON WOULD BE ANOTHER INDIVIDUAL, YOU KNOW,

10   LOOKING OFF THE LIST HERE.  KEVIN ELEBY.

11   Q    AND DO YOU RECALL THOSE INDIVIDUALS AS HAVING TAKEN PART

12   IN CONVERSATIONS THAT ARE RECORDED?

13   A    YES.

14   Q    AND DURING THE COURSE OF THOSE RECORDINGS, DO SEVERAL OF

15   THOSE INDIVIDUALS IDENTIFY THEMSELVES AS MEMBERS OF THE PUEBLO

16   BISHOPS BLOOD GANG?

17   A    YES.

18          MR. PELHAM:  YOUR HONOR, THE GOVERNMENT RENEWS ITS

19   OFFER OF THESE EXHIBITS.

20          THE COURT:   OKAY.  I THINK THIS IS PROBABLY A GOOD

21   TIME TO EXCUSE THE JURY.  AND THEN THE COURT CAN TAKE THIS UP

22   -- THIS ISSUE UP WITH COUNSEL.

23          PLEASE RETURN TOMORROW.  WE'LL START AT 8:30.

24          DURING YOUR ABSENCE DO NOT DISCUSS THE CASE AMONGST

25   YOURSELF OR WITH ANY OTHER PERSON.  8:30 TOMORROW.

1           THE CLERK:  WILL YOU ALL RISE FOR THE JURY, PLEASE.

2           (JURY EXITING 4:12 P.M.)

3           THE COURT:  PLEASE HAVE A SEAT.

4           MR. PELHAM:  YOUR HONOR, DID YOU WANT AGENT

5     STRICKLAND TO RETURN?

6           THE COURT:  WHATEVER -- IF YOU FEEL MORE COMFORTABLE

7     THERE, FEEL FREE.  IF YOU WANT TO GO BACK TO COUNSEL TABLE,

8     FEEL FREE.

9           THE WITNESS:  THANK YOU.

10          THE COURT:  EXHIBITS 350 THROUGH 401 ARE IN -- ARE

11    IDENTIFIED AS INTERCEPTED TELEPHONE CALLS COVERING THE PERIOD

12    FROM AUGUST 6TH, 2009 TO OCTOBER 12TH, 2009.

13          THE EXHIBITS IDENTIFY VARIOUS SPEAKERS.  SEVERAL OF

14    THE SPEAKERS HAVE NOT YET BEEN IDENTIFIED BY SPECIAL AGENT

15    STRICKLAND.

16          THERE HAS BEEN AN OBJECTION BASED ON LACK OF

17    FOUNDATION AND RELEVANCE.  AND, SO, THE PRIMARY CONCERN THAT

18    THE COURT HAS IS THAT THERE'S SO MUCH INFORMATION HERE AND SO

19    MANY RECORDINGS THE GOVERNMENT IS GOING TO HAVE TO MAKE AN

20    OFFER OF PROOF AS TO THE RELEVANCE AND MATERIALITY OF THE

21    EXHIBITS.

22          MR. PELHAM:  AND WE CAN'T DO A -- WE CAN'T DO A

23    FILING, YOUR HONOR.

24          IF WE COULD JUST UNDERSCORE, WHAT AGENT STRICKLAND

25    HAS TESTIFIED TO IS THAT AS THE CASE AGENT HE SUPERVISED AN

1    ASPECT OF THE TITLE 3 COMPONENT OF THE INVESTIGATION THAT --

2              THE COURT:  MAYBE YOU CAN SPEAK AT THE LECTERN --

3              MR. PELHAM:  OH, YES.

4              THE COURT: -- BECAUSE I CAN HEAR YOU BETTER.

5              WHY IS IT -- WHY ARE ALL THE -- I UNDERSTAND THAT

6    CERTAIN RECORDINGS MAY BE RELEVANT, BUT, YOU KNOW, YOU HAVE 350

7    TO 401.  AND WHY IS -- WHY ARE ALL THE RECORDINGS RELEVANT AND

8    MATERIAL AND IMPORTANT TO THE GOVERNMENT'S CASE?

9              MR. PELHAM:  SO, SEPARATE FROM THE AUTHENTICITY

10   QUESTION --

11             THE COURT:  YES.  SEPARATE FROM THE AUTHENTICITY.

12             THE SPECIAL AGENT SAID HE IDENTIFIED ALL THE

13   SPEAKERS.  YOU ASKED HIM SPECIFICALLY ABOUT CERTAIN PERSONS

14   IDENTIFIED.  HE INDICATED THAT HE WAS ABLE TO IDENTIFY THOSE

15   PERSONS.  THERE'S SEVERAL OTHER INDIVIDUALS WHO ARE IDENTIFIED

16   IN THE EXHIBITS THAT HE HAS NOT YET MENTIONED.  SO, SEPARATE

17   FROM FOUNDATION, WHY IS IT IMPORTANT TO YOUR CASE?

18             MR. PELHAM:  YOUR HONOR, THESE CONVERSATIONS TURN ON

19   SEVERAL IMPORTANT TRANSACTIONS THAT OCCUR WITHIN THE TIME FRAME

20   OF INTERCEPTION.  SO, JUST AS AN EXAMPLE, THE AUGUST 22ND, 2009

21   GANG MEETING TAKES PLACE.  SEVERAL WEEKS LATER, AS THE

22   GOVERNMENT ALLEGES, THERE'S A SHOOTING AT A RESIDENCE THAT THE

23   MEMBERS OF THE GANG BELIEVE IS OCCUPIED BY A RIVAL MEMBER.

24   THAT SHOOTING OCCURS ON SEPTEMBER 11, 2009.

25             THERE ARE A NUMBER OF CALLS THAT SURROUND BOTH OF

1    THOSE EVENTS IN WHICH THE DEFENDANTS AND THEIR CO-CONSPIRATORS

2    ARE DISCUSSING WHY IT IS THAT THAT SHOOTING NEEDS TO TAKE

3    PLACE, WHAT WEAPONS ARE USED IN THE SHOOTING, AND WHAT HAPPENED

4    THEREAFTER.

5         AS ANOTHER EXAMPLE, DEFENDANT ANTHONY GABOUREL WAS

6    THE SUBJECT OF AN LAPD SEARCH BY THE METRO DIVISION ON AUGUST

7    2ND, 2009.  THAT SEARCH -- EXCUSE ME, AUGUST 9, 2009.  THAT

8    SEARCH TOOK PLACE ONLY SEVERAL DAYS AFTER THE MURDER OF

9    FRANCISCO CORNELIO.  THERE ARE NUMEROUS CALLS THAT SURROUND

10   THAT SEARCH AS PUEBLO BISHOPS TALK TO EACH OTHER ABOUT WHAT'S

11   BEING PULLED OUT OF THE HOUSE AND WHAT THE RELEVANCE OF THAT IS

12   FOR THE GANG.

13        SO, ALL OF THESE CALLS BASICALLY LAY OUT

14   CONVERSATIONS THAT TAKE PLACE ALONG KEY EVENTS THAT OCCUR

15   WITHIN THE TIME FRAME OF INTERCEPTION.

16        THE COURT:  WELL, AGAIN, I GUESS THE CONCERN THAT THE

17   COURT HAS IS YOU REFERENCE TWO IMPORTANT DATES, THE SEPTEMBER

18   11TH AND THE AUGUST 9TH DATE.  BUT, FOR EXAMPLE, 350 IS AN

19   AUGUST 6TH, 2009 TELEPHONE CALL FROM HENDERSON TO JOSE LEON.

20   AND HENDERSON AND LEON ARE NOT DEFENDANTS IN THIS TRIAL.

21        MR. PELHAM:  YES.  AND FOR MANY --

22        THE COURT:  AND THAT'S JUST ONE EXAMPLE.  WE CAN GO

23   THROUGH -- THERE ARE SEVERAL OTHER EXAMPLES THAT I CAN POINT

24   TO.

25        WE HAVE -- 352 IS ELERY TO LEON.

1         MR. PELHAM:  YES.

2         THE COURT:  AND ELEBY IS NO LONGER A PARTY TO THIS

3    LITIGATION HERE.

4         353, LEON TO ELEBY.  AND IT GOES BACK AND FORTH.

5         AND WE HAVE RASHAAD TO -- RASHAAD LAWS TO JOSE LEON,

6    354.

7         MR. PELHAM:  YES.

8         THE COURT:  SO, THERE HAS TO BE I THINK MORE -- MORE

9    DETAIL IN TERMS OF YOUR OFFER OF PROOF.

10        MR. PELHAM:  AND I CAN EITHER PROVIDE THAT --

11   ACTUALLY, MY CO-COUNSEL MR. JENKINS IS MORE KNOWLEDGEABLE ABOUT

12   MANY OF THESE CALLS.  AND WE CAN PROVIDE IT HERE TODAY, YOUR

13   HONOR.  OR WE CAN MAKE IT THE SUBJECT OF A FILING IF THAT'S

14   YOUR PREFERENCE.

15        THE COURT:  WELL, IF IT CAN BE DONE ORALLY AS AN

16   OFFER OF PROOF, LET'S DO THAT.

17        BUT WHY DON'T WE DO THIS.  LET ME GIVE COUNSEL THE

18   OPPORTUNITY TO FOCUS ON THE -- THERE'S JUST NUMEROUS EXHIBITS

19   HERE.  SO, IF YOU COULD JUST THINK ABOUT IT THIS EVENING.  AND

20   THEN WE CAN -- WE CAN RESUME TOMORROW HOPEFULLY BEFORE THE JURY

21   STARTS.  AND YOU CAN PROVIDE AN OFFER OF PROOF ON THE RECORD.

22        MR. PELHAM:  WHAT TIME SHOULD WE BE HERE?

23        THE COURT:  WELL, WE -- YOU SHOULD -- YOU SHOULD BE

24   HERE AT EIGHT O'CLOCK.  THE JURY IS GOING TO ARRIVE AT 8:30.

25   AND I'LL GIVE YOU SOME TIME BEFORE THE ARRIVAL OF THE JURY TO

**GER 0203**

204

1    MAKE THE OFFER OF PROOF.

2              MR. PELHAM:  VERY GOOD.  THANK YOU, YOUR HONOR.

3              THE COURT:  AND THEN THE OTHER ISSUE IS THE ISSUE OF

4    FOUNDATION.  SO, YOU'RE VERY SPECIFIC AS TO THE OFFICER BEING

5    ABLE TO IDENTIFY ALL OF THE SPEAKERS THAT ARE REFERENCED.

6              MR. PELHAM:  YES.

7              THE COURT:  OKAY.

8              MR. PELHAM:  THANK YOU.

9              THE CLERK:  COURT IS IN RECESS.

10             (PROCEEDINGS ADJOURNED AT 4:19 P.M.)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

205

1

2                    C E R T I F I C A T E

3

4          I CERTIFY THAT THE FOREGOING IS A CORRECT TRANSCRIPT

5     FROM THE ELECTRONIC SOUND RECORDING OF THE PROCEEDINGS IN THE

6     ABOVE-ENTITLED MATTER.

7

8

9

10    /S/ DOROTHY BABYKIN                    7/28/12

11    _____       _____

12    FEDERALLY CERTIFIED TRANSCRIBER        DATED

13    DOROTHY BABYKIN

14

15

16

17

18

19

20

21

22

23

24

25

| 9th Circuit Case Number(s) | 12-50589 |
|---|---|

**NOTE:** To secure your input, you should print the filled-in form to PDF (File > Print > *PDF Printer/Creator*).

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

## CERTIFICATE OF SERVICE
### When All Case Participants are Registered for the Appellate CM/ECF System

I hereby certify that I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system on (date) Nov 20, 2013 .

I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

Signature (use "s/" format) | s/ Christopher K. Pelham

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

## CERTIFICATE OF SERVICE
### When <u>Not</u> All Case Participants are Registered for the Appellate CM/ECF System

I hereby certify that I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system on (date) .

Participants in the case who are registered CM/ECF users will be served by the appellate CM/ECF system.

I further certify that some of the participants in the case are not registered CM/ECF users.  I have mailed the foregoing document by First-Class Mail, postage prepaid, or have dispatched it to a third party commercial carrier for delivery within 3 calendar days to the following non-CM/ECF participants:

Signature (use "s/" format)